UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
CAPITOL HILL GROUP,                           )
                                              )
                          Plaintiff,          )
                                              )        Civil No. 07-1936 (RCL)
        v.                                    )
                                              )
PILLSBURY WINTHROP SHAW PITTMAN, LLP,         )
SHAW PITTMAN, LLP,                            )
PAUL A. TUMMONDS, JR., AND                    )
PATRICK J. POTTER,                            )
                          Defendants.         )
_____)


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Jack McKay (159335)**
**Pillsbury Winthrop Shaw Pittman LLP**
**2300 N Street , N.W.**
**Washington, D.C. 20037**
**Tel: 202-663-8000**
**Fax: 202-663-8007**
**Email: jack.mckay@pillsburylaw.com**
**For Defendants**

October  29, 2007

# TABLE OF CONTENTS

**Page**

I.   THE COMPLAINT AND PROCEDURAL POSTURE OF THE CASE ................................ 1

II.  STATEMENT OF THE CASE.................................................................................. 2

III. STATEMENT OF UNDISPUTED MATERIAL FACTS ....................................... 4

IV.  STATEMENT OF HISTORICAL BACKGROUND................................................. 4

  A.  Prior Fee Litigation and Appeals to This Court................................................. 4

  B.  Court Approval of Shaw Pittman's Withdraw; CHG's New
       Counsel; Further Matters Regarding Zoning ...................................................... 9

  C.  CHG Was Warned of the Consequences of Making This Claim...................... 12

V.   ARGUMENT ................................................................................................. 13

  A.  All Three Counts of the Complaint are Barred by *Res Judicata* ...................... 13

    1.  Defendants are Entitled to Summary Judgment on Grounds of *Res Judicata* ............ 13

    2.  The Policies Underlying the Doctrine of *Res Judicata* Support Entry of a Judgment
         Against CHG on the Complaint..................................................................... 16

  B.  Claims Based on the Argument Ommission Must Be Dismissed
       Based on the Statute of Limitation and Claims Based on the
       Subsequent Delivery Omission Must be Dismissed Based Upon
       Lack of Duty ................................................................................................ 17

    1.  The Statute of Limitations Bars the Argument Omission........................................... 18

    2.  There was Neither a Duty nor a Breach of Duty With Respect to the Delivery
         Omission ...................................................................................................... 19

    a.  At the Time of Withdrawal, Shaw Pittman Fulfilled all Preexisting Duties it Might
         Have had to CHG.......................................................................................... 19

    b.  Shaw Pittman Owed no Duty to CHG at the Time of the Reconsideration Decision  19

  VI. CONCLUSION ................................................................................................ 21

# TABLE OF AUTHORITIES

## CASES                                                                                    PAGE

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)....................................................13

Banks v. District of Columbia, 498 F. Supp. 2d 228 (D.D.C. 2007)..............................13

Battle v. Peters, Civ. No. 06-5424 2007 U.S. App. LEXIS 19079 (D.C. Cir. Aug. 9, 2007)..........................................................................................................................14

Byers v. Burleson, 713 F.2d 856 (D.C. Cir. 1983) ........................................................18

\* Capitol Hill Group v. Shaw Pittman, LLP, 313 B.R. 344 (D.D.C. 2004)........................4

\* Capitol Hill Group v. Shaw Pittman, LLP, Civil No. 05-97 (Unpublished Memorandum Opinion dated June 21, 2005)................................................................4

\* Capitol Hill Group v. Shaw Pittman, LLP, Civil No. 05-98 (Unpublished Memorandum Opinion dated June 21, 2005)................................................................4

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .............................................................13

Coastal Plains, Inc. v. Mims, 326 B.R. 102 (Bankr. N.D. Tex. 2005)...........................15

Coleman v. Potomac Elec. Power Co., 422 F. Supp. 2d 209 (D.D.C. 2006)..................13

Dolce v. Gamberdino, 376 N.E.2d 273 (Ill. App. Ct. 1978).........................................20

Dunn v. Washington Metro. Area Transit Auth., Civ. No. 88-3298 (RCL)1991 U.S. Dist. LEXIS 14382 (D.D.C. Oct. 10, 1991) ..............................................................14

Fuchs v. Aronoff, 46 A.2d 701 (D.C. 1946)..................................................................20

\* Geruschat v. Ernst & Young, LLP, 331 B.R. 208 (Bankr. W.D. Pa. 2005) aff'd 346 B.R. 123 (W.D. Pa. 2006) .......................................................................................14

\* Grausz v. Englander, 321 F.3d 467 (4th Cir. 2003) ..................................................2,14

\* Havens v. Patton Boggs LLP, et al., Case No. 05-014549 (HHK) (D.D.C. June 26, 2006)..........18

\* Iannochino v. Rodolakis, 242 F.3d 36 (1st Cir. 2001) ..............................................2,14

\* Intelogic Trace, Inc., v. Ernst & Young, LLP, 200 F.3d 382 (5th Cir. 2000)................14

Jack Baker, Inc. v. Office Space Development Corp., 664 A.2d 1236 (D.C. 1995) ....................20

Jacobsen v. Oliver, 201 F. Supp. 2d (D.D.C. 2002) ........................................................18

Klein v. Toupin, Civ. No. 05-647 2006 U.S. Dist. LEXIS 32478 (D.D.C. May 24, 2006)...........14

Kuwait Airways Corp. v. Am. Security Bank, N.A., 890 F.2d 456 (D.C. Cir. 1989) ..................18

Law Offices of Jerris Leonard, P.C. v. Mideast Sys., Ltd., 111 F.R.D. 359 (D.D.C. 1986) .........15

Lee v. Wolfson, 265 F. Supp. 2d 14 (D.D.C. 2003) ........................................................18

Lundberg v. Backman, 358 P.2d 987 (Utah 1961) ........................................................20

Mitchell v. Dougherty, 644 N.W.2d 391 (Mich. Ct. App. 2002) ...................................20

Park v. Arnott, Civ. No. 89-3257 (RCL)1992 WL 184521 (D.D.C. July 14,1992) .....................20

Prior v. Dolan, No. 1042 1983 Ohio App. LEXIS 12448 (Ohio Ct App. June 24, 1983) .............20

Qualls v. Rumsfeld, 357 F. Supp. 2d 274 (D.D.C. 2005) ..............................................20

Simmons v. Cox, 495 F. Supp. 2d 57 (D.D.C. 2007) ...................................................13

Southmark Corporation v. Coopers & Lybrand, 163 F.3d 925 (5th Cir. 1999)..............................2

Taylor v. Akin, Gump, Strauss, Hauer & Feld, 859 A.2d 142 (D.C. 2004) .................................20

In re U.S. Office Prod. Co. Sec. Litig., 251 F. Supp. 2d 77 (D.D.C. 2003) ...................................20

Williams v. Mordkofsky, 901 F.2d 158 (D.C. Cir. 1990)............................................................18

## STATUTES

28 U.S.C. § 1334 (2007) ...............................................................................................2

D.C. Code § 12-301(7)-(8) (2007)..................................................................................18

Fed. R. Civ. P. 13(a) ....................................................................................................15

Fed. R. Civ. P. 56(c) ....................................................................................................13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**CAPITOL HILL GROUP,**                             )
                                                    )
                                **Plaintiff,**       )
                                                    )        **Civil No. 07-1936 (RCL)**
        **v.**                                      )
                                                    )
**PILLSBURY WINTHROP SHAW PITTMAN, LLP,**            )
**SHAW PITTMAN, LLP,**                              )
**PAUL A. TUMMONDS, JR., AND**                      )
**PATRICK J. POTTER,**                              )
                                **Defendants.**      )
_____)


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

        Pursuant to LCvR 7(h), Defendants Pillsbury Winthrop Shaw Pittman, LLP ("PWSP"),

Shaw Pittman, LLP ("Shaw Pittman"), Paul A. Tummonds, Jr. ("Tummonds"), and Patrick J. Potter

("Potter") (collectively, "Defendants"), through undersigned counsel, respectfully submit this

Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment

(the "Motion").

    I.        **The Complaint and Procedural Posture of the Case**

        The Complaint was filed by Capitol Hill Group ("CHG") on September 7, 2007, and served

on Defendants on September 27, 2007.  The Complaint asserts that Defendants are liable to CHG

for more than $50 million in damages allegedly arising from (a) Zoning Services (defined below)

rendered by Shaw Pittman to CHG during the course of CHG's chapter 11 bankruptcy and (b) Shaw

Pittman's alleged failure to give notice of its withdrawal to, and later to send to CHG a September

9, 2004 written decision of, the District of Columbia Board of Zoning Adjustment ("BZA").

Pursuant to an engagement approved by the bankruptcy court, Shaw Pittman provided the subject legal services to CHG during its chapter 11 proceeding.[1]

Defendants filed their Notice of Removal with the Court on October 26, 2007. The Court has jurisdiction over CHG's claims. See 28 U.S.C. § 1334 (2007); see also e.g., Grausz v. Englander, 321 F.3d 467, 471 (4th Cir. 2003) (federal jurisdiction exists and removal of lawsuit appropriate where the alleged legal malpractice arose out of the defendants' bankruptcy-approved retention by chapter 11 debtor); Iannochino v. Rodolakis, 242 F.3d 36 (1st Cir. 2001) (same); Southmark Corporation v. Coopers & Lybrand, 163 F.3d 925, 931 (5th Cir. 1999) ("It is somewhat disingenuous for Southmark to attempt to pry these claims out of their bankruptcy setting. Southmark's petition alleged *inter alia* claims for breaches of fiduciary duty and of the contract whose terms were approved by the bankruptcy court").

## II.    Statement of the Case

In a phrase, this case is like "déjà vu all over again" . . . again. The relevant facts are not in dispute. Previously, the parties engaged in a wide range of litigation regarding the work performed by Defendants for CHG. The bankruptcy court entered multiple final judgments, all of which were appealed to and affirmed by this Court in three separate opinions.

CHG's current Complaint focuses on two very discrete alleged omissions relating to the Zoning Services provided by Shaw Pittman in connection with CHG's reorganization:

1.    Prior to the bankruptcy court's January 7, 2004 order granting Shaw Pittman's request to cease representing CHG, Shaw Pittman allegedly failed to argue to the BZA that CHG's real property is not subject to any parking restrictions (hereinafter the alleged "Argument Omission");

2.    Shaw Pittman did not notify the BZA of the bankruptcy court's order authorizing its withdrawal and eight months later, Shaw Pittman allegedly failed to forward the BZA's September 9, 2004 written Reconsideration Decision (defined below) to CHG

---

[1]    Effective April 4, 2005, Shaw Pittman merged with Pillsbury Winthrop LLP to become PWSP. For ease of discussion, Defendants will continue to refer to the law firm as Shaw Pittman.

(hereinafter the alleged "Delivery Omission"), which Decision reflected a BZA February 24, 2004 oral ruling.

The time for raising these concerns has long since passed, and CHG is barred from raising them now.

These alleged omissions arose in connection with the Zoning Services rendered by Shaw Pittman to CHG solely to further CHG's bankruptcy reorganization efforts. Prior to the bankruptcy, CHG relied upon a different law firm for zoning services. Shaw Pittman became involved in the zoning problems confronting CHG solely as a result of CHG's need to satisfy the Bankruptcy Code's requirement that CHG remain in compliance with applicable non-bankruptcy law.

All of Shaw Pittman's fees and expenses relating to the Zoning Services were described in detail in its fee applications submitted to the bankruptcy court on November 14, 2003 and January 12, 2004, filed in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. On January 30, 2004, CHG filed objections to "the totality of fees billed by Shaw Pittman" for the entire bankruptcy proceeding and vigorously pressed its objections at several hearings conducted by the bankruptcy court in February, March and April of 2004. CHG took extensive discovery from Shaw Pittman and eventually alleged that Shaw Pittman had committed breaches of fiduciary duties and professional responsibilities. The bankruptcy court overruled CHG's objections and approved all of Shaw Pittman's fees in an order and judgment entered April 20, 2004. In August 2004, this Court affirmed. The relevant facts underlying any and all injuries allegedly caused by Shaw Pittman to CHG were known or reasonably should have been known to CHG in advance of the bankruptcy court's April 20, 2004 order and judgment approving Shaw Pittman's fees and expenses, and this Court's affirmance of the same.

However, two *additional* separate and complete trials on Shaw Pittman's fees incurred defending its First Fee Application (defined below) were held thereafter, the first on November 22, 2004 and the second on August 1, 2005. CHG still did not raise its concerns with the bankruptcy

3

court, even though all facts alleged in the Complaint were fully known to CHG. Worse, CHG was not candid with the bankruptcy court when asked whether CHG had specific concerns about services rendered by Shaw Pittman in connection with CHG's reorganization efforts. CHG's claims are barred by the doctrine of *res judicata* as uniformly applied by federal courts in this and other contexts.

In addition, judgment against CHG is warranted based on the statute of limitations and the absence of any legal duty owed by Shaw Pittman to CHG at the relevant times.

### III.  Statement of Undisputed Material Facts

Defendants incorporate by reference their Statement of Undisputed Material Facts ("Statement"), including the affidavits, transcripts and exhibits referenced therein.

### IV.    Statement of Historical Background

### A.    Prior Fee Litigation and Appeals to This Court

The relevant prior history and core nucleus of facts are described in the decisions of this Court. See Capitol Hill Group v. Shaw Pittman, LLP, 313 B.R. 344 (D.D.C. 2004) ("CHG I"); Capitol Hill Group v. Shaw Pittman, LLP, Civil No. 05-97 (Unpublished Memorandum Opinion dated June 21, 2005) ("CHG II"); and Capitol Hill Group v. Shaw Pittman, LLP, Civil No. 05-98 (Unpublished Memorandum Opinion dated June 21, 2005) ("CHG III").[2] The facts set forth in this section are all supported by record citations in the Statement and the attachments thereto.

CHG filed for bankruptcy on February 21, 2002. CHG's sole principal is Peter Shin, and its in-house general counsel is Donald Hartman. At the time of its chapter 11 filing, CHG was engaged solely in the business of owning and leasing certain improved real estate located on Capitol Hill in Washington, D.C. (the "Facility"). CHG leased a portion of the Facility to affiliates as a 60-bed

---

[2]      The Court's decisions are attached to the Statement. See Potter Affidavit at Exhibits 20, 25-A and 25-B, respectively.

hospital (the "Hospital") and a 117-bed nursing center (the "Nursing Center"). These affiliates of CHG were also operating in chapter 11 (though not represented by Shaw Pittman). According to its Disclosure Statement, CHG's post-reorganization plan was to continue to lease all or a portion of the Facility to the Hospital and Nursing Center.

Shaw Pittman served as CHG's legal counsel during the chapter 11 case. While Shaw Pittman and CHG had signed a retention agreement dated March 25, 1999, that agreement did not govern Shaw Pittman's employment during CHG's bankruptcy proceeding. Instead, Shaw Pittman's employment in the chapter 11 was governed by (i) the terms of its formal employment application, (ii) the bankruptcy court's order approving the employment application, and (ii) 11 U.S.C. § 327.

Shaw Pittman provided a range of legal services to CHG, including zoning litigation services and advice ("Zoning Services"). CHG's need for Zoning Services arose from a citation unexpectedly issued by the D.C. Department of Consumer and Regulatory Affairs ("DCRA") during the chapter 11. The citation required CHG to provide the Hospital and Nursing Center with a minimum of 225 parking spaces. As a result, CHG's largest unsecured creditor argued that CHG could not successfully emerge from chapter 11 because, in fact, CHG had only 177 parking spaces, and therefore could not comply with applicable local law. Therefore, it became necessary to seek relief from the citation so that CHG could continue leasing the Facility with the available 177 parking spaces.

After attempts to negotiate a consensual resolution to the citation failed, CHG, represented by Shaw Pittman, sued the District of Columbia in the bankruptcy court and moved for summary judgment. At the conclusion of the summary judgment hearing, the bankruptcy court stated it would rule in CHG's favor; however, the court granted the District's request to briefly postpone entry of judgment. During the adjournment, on March 26, 2003, the Zoning Administrator issued

Certificates of Occupancy providing that CHG was in compliance with applicable zoning regulations with respect to the amount of parking it was providing to the Hospital and Nursing Center. On the same date, the Zoning Administrator dismissed the citation. The Certificates of Occupancy required 60 parking spaces for the Hospital and 25 parking spaces for the Nursing Center; numbers well within the 177 parking spaces already available to CHG's tenants.

Subsequently, on May 23, 2003, neighbors of CHG appealed to the BZA the Zoning Administrator's decision to issue the Certificates of Occupancy. Through his own lawyers, the Zoning Administrator defended the appeal. Shaw Pittman, on CHG's behalf, supported the Zoning Administrator by written submissions dated July 23, 2003 and October 30, 2003, and through argument and examination before the BZA on November 25, 2003. On January 6, 2004, the BZA ruled in favor of the Zoning Administrator, affirming his Certificates of Occupancy and denying the appeal (the "January 6, 2004 BZA Decision"). (As described below, the bankruptcy court authorized Shaw Pittman's termination of CHG as a client the next day, January 7, 2004.)

The Zoning Services were detailed in Shaw Pittman's first fee applications filed on November 14, 2003 and January 12, 2004 (together, the "First Fee Application"). CHG filed its first set of objections to the First Fee Application on January 30, 2004. CHG's initial pleading, which included specific objections to certain of the Zoning Services, sought total disallowance of all of fees relating to all services rendered by Shaw Pittman to CHG.

By the time of the final rulings on the First Fee Application in April 2004, CHG had filed at least 3 supplemental objections. Furthermore, both Mr. Hartman and CHG's outside lawyers engaged in extensive document discovery, spending three days at Shaw Pittman's offices reviewing thousands of pages of documents and correspondence produced by Shaw Pittman. Many of these documents viewed by CHG's lawyers were previously provided to CHG on January 15, 2004 and

related to the Zoning Services.  CHG's outside lawyers and Mr. Hartman also conducted a 6-hour deposition of defendant Potter on March 24, 2004.

CHG's lawyers were searching for documents and facts to support their accusations of fiduciary-duty and professional-responsibility breaches on the part of Shaw Pittman.  As part of its objections to the First Fee Application, CHG alleged such breaches in connection with certain advice and services Shaw Pittman provided to CHG on a copyright infringement dispute (the so-called "Cassidy & Pinkard Matter").  Despite its receipt of the BZA files and despite CHG's knowledge, legally imputed or otherwise, of the results of the February 24, 2004 BZA reconsideration hearing (described below), CHG never asserted any malpractice in connection with the Zoning Services prior to or at the April 2004 hearings on the First Fee Application.

After several extensive hearings, the bankruptcy court overruled CHG's objections to the First Fee Application.  In the process, the court rejected CHG's malpractice contentions concerning the Cassidy & Pinkard Matter.  On April 20, 2004, the bankruptcy court entered its first fee judgment in favor of Shaw Pittman approving all services provided by Shaw Pittman to CHG (the "First Fee Judgment").

CHG appealed the First Fee Judgment, and this Court affirmed.  See 313 B.R. 344.[3]   CHG raised additional claims of breach of fiduciary duty and breach of professional conduct on appeal. 313 B.R. at 349-50.  While the Court refused to consider those claims to the extent not presented to the bankruptcy court, the Court did consider, and rejected, CHG's argument that somehow Shaw Pittman breached its fiduciary duties or professional obligations to CHG by negotiating with CHG over Shaw Pittman's fees and expenses.  Id. at 350-51.  The Court rejected other arguments made by CHG; one being described by the Court as amounting to "fraud" and another as "frivolous."  Id

---

[3]       The record on appeal to this Court included, among other things, the detailed time entries of Shaw Pittman related to the Zoning Services provided to CHG.

at 351-58.  The decision of this Court affirming the First Fee Judgment was never appealed by CHG.

In CHG I the Court also ruled that CHG was legally obligated to further compensate Shaw Pittman for its attorneys' fees and expenses incurred in defending the First Fee Application.  313 B.R. at 357-58.  Subsequently: (i) Shaw Pittman filed a supplemental fee application covering fees incurred through August 31, 2004 defending the First Fee Application ("Second Fee Application"); (ii) CHG objected on twenty-nine (29) grounds to the Second Fee Application; (iii) a trial was conducted on October 21, 2004, where CHG, represented by Mr. Hartman and outside counsel, Mr. Burns, appeared and extensively cross-examined Mr. Potter, the only witness; (iv) on October 22, 2004, the bankruptcy court delivered an extensive bench ruling overruling all of CHG's objections; (v) on December 2, 2004, the bankruptcy court entered a supplemental memorandum decision and a judgment in Shaw Pittman's favor (the "Second Fee Judgment"); (vi) CHG appealed the Second Fee Judgment; and (vii) this Court, in its CHG II decision, affirmed on June 21, 2005.  CHG further appealed CHG II, but then voluntarily dismissed.

In June 2005, Shaw Pittman filed statements in support of another supplemental fee application covering the period through May 31, 2005, relating to fees incurred defending the First and Second Fee Applications (the "Third Fee Application").  Once again, CHG raised numerous objections to Shaw Pittman's fees and expenses, at a time when CHG demonstrated in writing that it knew every fact alleged in the Complaint; though such facts were excluded from such objections.  On August 1, 2005, the bankruptcy court conducted a full-day trial on the matter where the only witness to testify was defendant Potter.  CHG was represented at this trial by Mr. Hartman and CHG's outside counsel, Mr. Burns.  Defendant Potter was extensively cross-examined by Mr. Burns.  For the third consecutive time, the bankruptcy court approved Shaw Pittman's fees in full

and entered a judgment against CHG (the "Third Fee Judgment"). While CHG initially appealed the this judgment, it voluntarily dismissed the appeal.

Subsequently, CHG, apparently desiring to avoid another trial, stipulated to entry of fourth and fifth fee judgments to bring Shaw Pittman current on the fees and expenses incurred in connection with the aforementioned litigation.

B.    **Court Approval of Shaw Pittman's Withdrawal; CHG's New Counsel; Further Matters Regarding Zoning**

On January 1, 2004, prior to commencement of the fee litigation described above, Shaw Pittman sought bankruptcy court approval to terminate its representation of CHG on "all matters," including zoning matters. The grounds included CHG's failure to fulfill financial obligations to Shaw Pittman and its failure to make full disclosure to Shaw Pittman that CHG, as subsequently discovered, diverted bankruptcy estate funds without obtaining the necessary bankruptcy court approvals. A hearing was conducted on the motion on January 7, 2004, where Mr. Hartman filed an appearance as counsel for CHG, substituting for Shaw Pittman. While Mr. Hartman indicated CHG's desire for Shaw Pittman to continue providing Zoning Services to CHG, the bankruptcy court held that CHG had sufficient time to engage substitute zoning counsel and entered an order granting Shaw Pittman's motion to cease representing CHG on zoning and all other matters. That order was never appealed.

A week later, on January 13, 2004, Mr. Hartman sent an e-mail to Mr. Potter stating, in relevant part, "please arrange to have Shaw Pittman's . . . BZA files sent to CHG immediately to permit CHG to retain substitute counsel in these pending matters." On January 15, 2004, defendant Tummonds sent the complete BZA record to Mr. Hartman and CHG.

On February 10, 2004, attorneys from Shaw Pittman appeared before the BZA for clients on matters *wholly unrelated* to CHG. While present at the BZA, the attorneys observed that members of the BZA decided, without prior notice to anyone, to reconsider the January 6, 2004 BZA

9

Decision[4] and set February 24, 2004 as the date for the reconsideration hearing.  These events were reported to defendant Tummonds, who, on February 11, 2004, sent a letter to CHG's counsel, Mr. Hartman, advising him that the BZA "will take this matter up at a special public meeting on February 24, 2004 at 9:00 AM."  In addition, Mr. Tummonds provided Mr. Hartman with the name and number of specific personnel at the BZA whom he could contact.  Mr. Tummonds also pointed out to Mr. Hartman that Shaw Pittman had not notified the BZA of Shaw Pittman's withdrawal, and that there was no practical way to do so.

The next day, February 12, 2007, CHG's principal, Peter Shin, sent an e-mail message to defendant Tummonds (with a copy to Mr. Hartman) stating, "Donald Hartman gave me a copy of your letter dated February 11, 2004 regarding BZA's special public meeting on February 24.  Thank you very much for your alert.  We appreciate it very much.  Regards.  Dr. Peter Shin."

On February 24, 2004, the BZA conducted its special public meeting to reconsider the January 6, 2004 decision (the "Reconsideration Hearing").  Despite receiving Mr. Tummonds' February 11, 2004 letter, it appears from the transcript of the proceeding that neither Mr. Hartman nor any other representative of CHG attended the Reconsideration Hearing.  If they had, they would have observed that the BZA decided, by a vote of 5-0, to require that CHG provide one parking space for each bed in the Hospital and Nursing Center.  However, instead of reverting to the 225 parking spaces required by the original citation, the BZA required a total of only 177 parking spaces for the Hospital and Nursing Center, which CHG could provide.

On September 9, 2004 - - eight months *after* the bankruptcy court granted Shaw Pittman's request to terminate its representation of CHG - - the BZA issued a written decision (the "Reconsideration Decision") reflecting its oral ruling on February 24, 2004.   The Reconsideration

---

[4]    As explained above, this was the decision in which the BZA upheld the Certificates of Occupancy issued by the Zoning Administrator and denied the appeal of CHG's neighbors.

Decision indicates that it was sent to defendant Tummonds and does not reflect that it was sent to

either Mr. Hartman or the other "substitute counsel" referenced in Mr. Hartman's January 13th

Email.  Mr. Tummonds does not recall whether he received the Reconsideration Decision.

On April 19, 2005 - - (i) more than 15 months *after* the bankruptcy court granted Shaw

Pittman's request to terminate its representation of CHG and (ii) more than 3 months *before* the

August 1, 2005 trial on the Third Fee Application - - Mr. Hartman engaged defendant Potter in a

series of email exchanges regarding the BZA's Reconsideration Decision, and in particular the

alleged Delivery Omission by Shaw Pittman that underlies the current Complaint.  Mr. Hartman

initiated the correspondence, stating:

> Patrick - I was reviewing the BZA file that your firm delivered to CHG last
> year.  Unfortunately, I can't locate a copy of any correspondence that Shaw
> Pittman might have sent to the BZA withdrawing as counsel to CHG in that
> matter.  Please fax a copy of the correspondence to BZA wherein
> Shaw Pittman withdrew as CHG's counsel in this matter at your
> earliest convenience. Thank you. Donald

Mr. Potter immediately responded by email stating:

> Donald:  I don't know which matter you are referring to.  Was there a pending,
> ongoing matter at the BZA when Judge Teel signed his order (in early January
> 2004) authorizing Shaw Pittman to withdrew as counsel to CHG?  If so,
> perhaps you can tell me what it was (with some specificity), and then I can try
> to follow up in further response to your question.  Furthermore, before I spend
> my time (or the time of others) tracking down old documents, I would
> appreciate an explanation of your need/desire for such correspondence.

In turn, Mr. Hartman immediately responded by email as follows:

> Patrick - Thank you for your prompt response.  As you may recall, Paul
> Tummonds was representing CHG before the BZA regarding appeal number
> 17043.  Apparently, BZA sent some correspondence to Shaw Pittman in
> September 2004 regarding this matter that CHG never received and CHG
> would like to be able to demonstrate to BZA that this missive should have
> been sent directly to CHG rather than Shaw Pittman.

These emails demonstrate that by April 19, 2005, CHG and its counsel, Mr. Hartman:  (i) consistent

with Mr. Tummonds' February 11, 2004 letter, knew that Shaw Pittman had not filed a notice of a

withdrawal with the BZA; and (ii) believed that Shaw Pittman had received, but not forwarded, the

Reconsideration Decision to CHG.  However, CHG and Mr. Hartman failed to raise such concerns

with the bankruptcy court in CHG's July 26, 2005 written objection to Shaw Pittman's Third Fee

Application, at the August 1, 2005 trial on the Third Fee Application, or at any other time prior to

entry of the order closing the bankruptcy case on June 19, 2007.

     **C.**       **CHG Was Warned of the Consequences of Making This Claim**

In litigation before the bankruptcy court, CHG was warned that a claim of malpractice

brought after that court had acted on CHG's objections to Shaw Pittman's applications for fees

would be sanctionable.  CHG then misled the bankruptcy court regarding its intentions.

At a hearing on April 12, 2006, the issue of whether CHG believed it possessed unasserted

claims against Shaw Pittman was specifically addressed, as was the issue of whether such claims

would be barred because they had not been raised by CHG.  Judge Teel stated:

> The fact is [CHG] could have raised the issue.  They didn't.  They're barred,
> as you say, by res judicata, from pursuing it.  If I understand the law correctly.
> There's no need to bring a declaratory judgment proceeding to get a
> declaration to that effect[.]

> If they want to pursue claims against you after this adversary proceeding is
> dismissed, you've got the defense of res judicata, you can file your Rule 11
> motion, file a motion to extend the time to answer, and if they don't dismiss in
> the face of a valid defense of res judicata, then you're back in the sanctions
> business.

In order to effect a closing of the bankruptcy case so that it might pursue its malpractice

claims in a more hospitable forum, CHG repeatedly disavowed any intent to sue Shaw Pittman.  In a

pleading filed with the bankruptcy court as recently  May 14, 2007, CHG scoffed at the notion that

it planned to sue Shaw Pittman, stating "Shaw Pittman bases its argument on an unsupported notion

that CHG, like the proverbial Phoenix, might one day arise from the ashes and somehow wreak

havoc upon Shaw Pittman."  With this and other similar representations of CHG on the record, the

bankruptcy court finally closed CHG's chapter 11 proceeding on June 19, 2007.  This suit, filed in the Superior Court of the District of Columbia, followed within three months.

## V.    Argument

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Defendants have the burden of demonstrating that there is an "absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences are to be drawn in CHG's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  "[T]he mere existence of *some* alleged factual dispute" alone, however, does not defeat a motion for summary judgment.  Id. at 247.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  The foregoing standard and summary judgment authorities are applied by the courts in this District.  See e.g. Simmons v. Cox,  495 F. Supp. 2d 57 (D.D.C. 2007); Banks v. District of Columbia, 498 F. Supp. 2d 228 (D.D.C.  2007).

For the reasons set forth below, summary judgment in favor of Defendants is warranted on all counts of the Complaint.

### A.    All Three Counts of the Complaint are Barred by Res Judicata

### 1.    Defendants are Entitled to Summary Judgment on Grounds of *Res Judicata*

The defense of *res judicata* is properly raised on summary judgment.  See e.g., Coleman v. Potomac Elec. Power Co., 422 F. Supp. 2d 209 (D.D.C. 2006) (granting PEPCO's summary judgment based upon the doctrine of *res judicata*).

"Under the doctrine of *res judicata*, 'the parties to a suit and their privies are bound by a final judgment and may not relitigate any ground for relief which *they already have had an*

*opportunity to litigate even if they chose not to exploit that opportunity whether the initial judgment was erroneous or not.*'  A final judgment on the merits in one action 'bars any further claim based on the same nucleus of facts, for it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies.'"  Coleman, supra, at 215 (emphasis in original) (citations omitted).  See also e.g., Battle v. Peters, Civ. No. 06-5424 2007 U.S. App. LEXIS 19079 at *1-2 (D.C. Cir. Aug. 9, 2007) ("The district court did not err in dismissing appellant's claims on the basis of res judicata, because such claims are based on the same nucleus of facts . . . and either were or could have been raised in the prior action.") (citations omitted); Klein v. Toupin, Civ. No. 05-647 2006 U.S. Dist LEXIS 32478 at *7 (D.D.C. May 24, 2006) ("Res judicata bars a party from litigating not only those issues that were previously litigated, but also those that could have been raised, but were not.");  Dunn v. Washington Metro. Area Transit Auth., Civ. No. 88-3298 (RCL) 1991 U.S. Dist. LEXIS 14382 at *1 (D.D.C. Oct. 10, 1991) ("As the United States Court of Appeals for the District of Columbia stated, 'principles of *res judicata* prevent relitigation not only on the grounds or theories actually advanced, but also on the grounds or theories which could have been advanced in the prior litigation.'") (citations omitted).

In the bankruptcy context, Courts of Appeals in three circuits have held that *res judicata* prevents a debtor (or similarly situated party) from suing its attorneys (or other court-approved professionals) on matters relating to the bankruptcy proceeding where the fees of such professional were previously approved by final judgment of the bankruptcy court.  See Grausz v. Englander, 321 F.3d 467 (4th Cir. 2003); Iannochino v. Rodolakis, 242 F.3d 36 (1st Cir. 2001); Intelogic Trace, Inc., v. Ernst & Young, LLP, 200 F.3d 382 (5th Cir. 2000).  See also Geruschat v. Ernst & Young, LLP, 331 B.R. 208, 226 (Bankr. W.D. Pa. 2005) ("Similarly, this Court's approval of E&Y's fees is res judicata as to any subsequent claims for malpractice or misconduct as to work performed under

the supervision of the Court.") aff'd, 346 B.R. 123 (W.D. Pa. 2006); Coastal Plains, Inc. v. Mims, 326 B.R. 102 (Bankr. N.D. Tex. 2005).  For the same basic proposition, though not in a bankruptcy proceeding and based upon Fed. R. Civ. P. 13(a) rather than *res judicata*, see Law Offices of Jerris Leonard, P.C.  v. Mideast Sys., Ltd., 111 F.R.D. 359 (D.D.C. 1986).

In Grausz, the debtor and his law firm terminated their relationship, the law firm obtained a final order approving its legal fees without any objections from the debtor, and thereafter the former client filed an action alleging legal malpractice.  The district court granted the firm's summary judgment motion, ruling that the doctrine of *res judicata* barred the malpractice claim.  321 F.3d at 471.  The Fourth Circuit affirmed, reasoning that (i) the bankruptcy court's fee order was final; (ii) the debtor was a party-in-interest in the fee application process; (iii) the firm's fee application and the debtor's malpractice claim arose from the same "core of operative facts;" (iv) the bankruptcy court found the firm's services acceptable by approving the same; (v) the debtor was aware of the facts giving rise to the claim before the final order was entered; and (vi) procedures were available to the debtor to raise his malpractice claim.  Id. at 472-73.  The Fourth Circuit concluded its opinion by stating that if the debtor could pursue a malpractice claim and obtain a judgment after the final fee order was entered, such judgment would undermine certain of the fundamental purposes of *res judicata*, including the prevention of inconsistent decisions and encouraging reliance on final adjudications.  Id. at 475.

Similarly, application of *res judicata*, as the doctrine is articulated by courts of and in this Circuit, bars litigation of the Argument Omission and the Delivery Omission because CHG was aware of and could have raised the alleged facts in connection with the prior fee litigation with Shaw Pittman, but failed to do so.  First, the parties in the prior bankruptcy litigation are the same as (or in privity with) the parties to the present litigation:  CHG and Shaw Pittman (and its partners, Messrs. Potter and Tummonds).  Second, the bankruptcy fee litigation and the Complaint share the

15

same core nucleus of operative facts – i.e., actions and alleged omissions relating to the Zoning

Services rendered by Shaw Pittman under the supervision of the bankruptcy court.  Third, several

final and appealable judgments were entered by the bankruptcy court, over the objections of CHG,

on April 20, 2004, December 2, 2004, and August 2, 2005; CHG either failed to appeal these

judgments or appealed them unsuccessfully.  Fourth, CHG had multiple opportunities to assert the

facts supporting its current legal theories in connection with the prior Shaw Pittman fee litigation.

Every fact alleged in the Complaint was known to CHG at least by the time of its objections

to the Third Fee Petition.  The alleged Argument Omission would have occurred well before Shaw

Pittman's withdrawal on January 7, 2004.  The fact that Shaw Pittman had not notified the BZA of

its withdrawal was specifically described in Mr. Tummonds' letter of February 11, 2004.  CHG had

actual or legally imputed knowledge of the BZA's February 24, 2004 one-bed-one-parking space

decision.  These core facts were all known to CHG  before the bankruptcy court entered the First

Fee Judgment.  Also, CHG's general counsel corresponded regarding the Delivery Omission on

April 19, 2005, well in advance of the bankruptcy court's Third Fee Judgment, entered on August 2,

2005.

Because each of the three counts of the Complaint is based on alleged omissions that could

and should have been argued by CHG in connection with the bankruptcy litigation between CHG

and Shaw Pittman, all three counts are barred by the doctrine of *res judicata*.

### 2.    The Policies Underlying the Doctrine of *Res Judicata* Support Entry of a Judgment Against CHG on the Complaint

The policies underlying the doctrine of *res judicata* are particularly implicated in this case.

> [R]es judicata . . .is not based solely on the defendant's interest in avoiding
> the burdens of twice defending a suit, but is also based on the avoidance of
> unnecessary judicial waste.

Coleman, supra, at 214 n.5 (citations and internal quotations omitted).

16

> As the Supreme Court has explained, the doctrine works "to preclude parties from contesting matters that they have had a full and fair opportunity to litigate," which in turn "protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action my minimizing the possibility of inconsistent decisions."

Klein, supra, at *7 (citing Montana v. United States, 440 U.S. 147 (1979)).

During the course of the fee litigation CHG had a full and fair opportunity to litigate the merits of the Complaint. If CHG is now permitted to proceed, Defendants will suffer the expense and vexation associated with re-litigating these matters with CHG; the Court, having already ruled in its CHG I, CHG II and CHG III decisions, will be required to expend additional resources; and the underlying decisions of the bankruptcy court and this Court, which determined that Shaw Pittman provided competent counsel and that its fees were fair and reasonable, will be subject to CHG's collateral attack. The policy considerations underlying the doctrine of *res judicata*, fully justify entry of judgment against CHG on the Complaint.

**B.     Claims Based on the Argument Omission Must Be Dismissed Based on the Statute of Limitations and Claims Based on the Subsequent Delivery Omission Must be Dismissed Based Upon Lack of Duty**

As noted, there are only two bases for CHG's claims that Shaw Pittman breached either its alleged contract with CHG or duties that are cognizable in tort: (a) that Shaw Pittman, prior to judicial termination of its relationships with CHG, failed to raise an argument that would purportedly have convinced the BZA that CHG had no obligation to provide parking spaces to its tenants (the Argument Omission) and (b) that Shaw Pittman, after judicial termination of its relationship with CHG, purportedly failed to fulfill an alleged duty to protect CHG by *not* filing a notice of withdrawal with the BZA and, subsequently, by failing to forward the September 9, 2004 Reconsideration Decision. The Complaint does not state a viable claim with respect to either.

1.      **The Statute of Limitations Bars the Argument Omission**

The statute of limitations applicable to each of the counts of the Complaint is three years. See D.C. Code § 12-301(7)-(8)(2007).  Malpractice actions, sounding in tort, accrue when the plaintiff suffers injury, whereas malpractice actions sounding in contract accrue at the time of the wrongful act.  See e.g. Havens v. Patton Boggs LLP, et al., Case No. 05-014549 (HHK), Memorandum Decision at 5 (D.D.C. June 26, 2006)("as opposed to actions in contract, which accrue at the time of the wrongful act, actions in tort do not accrue until the plaintiff suffers injury") (citations omitted), copy attached hereto as Attachment A.  See also Williams v. Mordkofsky, 901 F.2d 158 (D.C. Cir. 1990); Kuwait Airways Corp. v. Am. Security Bank, N.A., 890 F.2d 456 (D.C. Cir. 1989); Byers v. Burleson, 713 F.2d 856 (D.C. Cir. 1983); Lee v. Wolfson, 265 F. Supp. 2d 14 (D.D.C. 2003); Jacobsen v. Oliver, 201 F. Supp. 2d 93 (D.D.C. 2002).

With respect to all claims based on the Argument Omission and whatever CHG's legal theory, the statute of limitations has run.  The bankruptcy court terminated Shaw Pittman's representation of CHG on January 7, 2004.  Whatever errors that allegedly occurred during the prior representation must have occurred before that date.  Also, because CHG claims (Complaint ¶21) that Shaw Pittman's negligence was its failure to argue successfully for a finding that CHG was subject to no parking restrictions, CHG's alleged injuries were publicly manifested when the BZA, on January 6, 2004, affirmed the Certificates of Occupancy requiring CHG to provide 85 parking spaces.  CHG expressly acknowledges that it knew of the BZA's holding in this regard. Complaint ¶¶13 and 15.

All claims with respect to the Argument Omission are time-barred.

**2.      There was Neither a Duty nor a Breach of Duty With Respect to the Delivery Omission**

**a.      At the Time of Withdrawal, Shaw Pittman Fulfilled all Preexisting Duties it Might Have had to CHG**

Following its court-approved withdrawal as counsel to CHG (including as counsel in zoning matters), Shaw Pittman on January 15, 2004, forwarded all BZA files to CHG at CHG's request, which request was made for the stated purpose of hiring substitute zoning counsel.  On February 11, 2004, Shaw Pittman notified CHG's in-house counsel of the upcoming February 24, 2005 hearing of which Shaw Pittman had learned by happenstance.  In his letter of February 11, 2004, defendant Tummonds expressly told Mr. Hartman, CHG's in-house counsel, the names and phone numbers of specific BZA personnel that he could contact about the hearing and also specifically told him that Shaw Pittman had not filed a notice of withdrawal because it was not practicable as matters stood before the BZA.  The next day, CHG's principal, Mr. Shin, sent an e-mail thanking defendant Tummonds for his letter and the notice.  Statement at ¶20.  No more could be required of a withdrawn or withdrawing counsel - - CHG was alerted to every fact necessary to protect itself in connection with the BZA hearing.

As a matter of law, Shaw Pittman met duties, if any, that it owed CHG at the time of withdrawal and the Court should dismiss the Complaint as far as it relates to that portion of the Delivery Omission that is based on the failure to give a notice of withdrawal to the BZA.

**b.      Shaw Pittman Owed no Duty to CHG at the Time of the Reconsideration Decision**

Shaw Pittman owed no attorney-client or fiduciary duties to CHG as of September 9, 2004 that could give rise to a claim in tort or contract.  CHG concedes in the Complaint that any such duties would have arisen from the pre-bankruptcy retention agreement or the court-approved retention of Shaw Pittman, which agreements terminated no later than on December 15, 2003 and January 7, 2004 respectively.  As a matter of law, an attorney owes no fiduciary/attorney-client

19

duties to a client effective as of the date the attorney-client relationship is terminated.  See e.g.,

Taylor v. Akin, Gump, Strauss, Hauer &  Feld, 859 A.2d 142 (D.C. 2004); Fuchs v. Aronoff,  46

A.2d 701 (D.C. 1946); Lundberg v. Backman,  358 P.2d 987 (Utah 1961); Mitchell v. Dougherty,

644 N.W.2d 391 (Mich. Ct. App. 2002); Prior v. Dolan, No. 10421983 Ohio App. LEXIS 12448

(Ohio Ct. App. 11th June 24, 1983); Dolce v. Gamberdino, 376 N.E.2d 273 (Ill. App. Ct. 1978).

Likewise, on September 9, 2004, there was no existing contractual arrangement between

CHG and Shaw Pittman.  The pre-bankruptcy retention agreement had been rejected under the

terms of CHG's Plan (on December 15, 2003, the "Effective Date" of the Plan), and the bankruptcy

court retention was terminated effective January 7, 2004.  Statement ¶17.  In the absence of any

contractual arrangement between CHG and Shaw Pittman as of September 9, 2004, no claim for

breach of contract, based upon the Delivery Omission or otherwise, can lie against Shaw Pittman.

See e.g., Qualls v. Rumsfeld, 357 F. Supp. 2d 274, 282 (D.D.C. 2005) (noting that existence of

contract is generally required to establish breach of contract); In re U.S. Office Prod. Co. Sec. Litig.,

251 F. Supp. 2d 77, 94-95 (D.D.C. 2003) (dismissing breach of contract claim because no contract

existed); Park v. Arnott, Civ. No. 89-3257 (RCL) 1992 WL 184521, *4 (D.D.C. July 14,1992)

(denying a venue transfer motion because to transfer claim in the absence of a contract would be a

waste of judicial resources - - plaintiff must establish existence of a contract); Jack Baker, Inc. v.

Office Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1995) (observing that the party alleging a

contract has burden of proof on the issue, finding that no contract existed, and affirming summary

judgment).

Therefore, the Court should enter judgment with respect to the Delivery Omission as it

relates to the alleged failure to forward the Reconsideration Decision on September 9, 2004,

because Shaw Pittman owed no duties to CHG on that date.

## VI.    <u>Conclusion</u>

For the foregoing reasons, and for such other reasons as the Court deems appropriate,

Defendants request that the Court enter judgment, in the form submitted herewith dismissing with

prejudice all three counts of the Complaint.

Dated:  October 29, 2007                 Respectfully submitted,

                                          PILLSBURY WINTHROP SHAW PITTMAN, LLP

                                          By:    /s/ Jack McKay_____
                                                 Jack McKay (No. 159335)
                                                 2300 N Street, N.W.
                                                 Washington, D.C. 20037-1128
                                                 Tel:  (202) 663-8000
                                                 Fax:   (202) 663-8000

ATTACHMENT A
(To Defendants' Summary Judgment Memorandum)


HAVENS V. PATTON BOGGS LLP, et al., 05-01454 (HHK)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| |
|---|
| WARREN C. HAVENS,<br><br>        Plaintiff,<br><br>     v.<br><br>PATTON BOGGS LLP, et al.,<br><br>        Defendants. |

Civil Action 05-01454 (HHK)

## MEMORANDUM OPINION

Warren C. Havens brings this action against Patton Boggs LLP and some of its named and unnamed employees, alleging that their representation of Havens in a civil action in this court, *Lukas, Nace, Gutierrez & Sachs, Chartered v. Havens*, Civ. No. 99-395 (D.D.C.) (Green, J.) ("the Lukas Nace litigation"), constituted breach of contract and legal malpractice. Contending that Havens's complaint is barred by the applicable statutes of limitations, defendants move for judgment on the pleadings [#8]. Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion must be granted.

### I. BACKGROUND

On February 17, 1999, Havens and Patton Boggs entered into a written retainer agreement, pursuant to which the firm agreed to represent Havens in his defense and countersuit in the Lukas Nace litigation. Havens alleges that, during the course of this litigation, defendants "made various mistakes, errors of judgment and/or failures to competently perform the services for which Plaintiff hired them" and "failed to keep Plaintiff reasonably informed about the

progress of the litigation and/or concealed important developments and other matters in connection with their legal representation of Plaintiff." Compl. ¶ 11. As a "direct result," Havens replaced defendants with new counsel on May 8, 2000, in the midst of the litigation. *Id.* ¶ 12. Almost a year later, on March 28, 2001, Judge Green granted Lukas Nace's motion for partial summary judgment, dismissing two of Havens's three counterclaims. Thereafter, Havens entered into settlement discussions with Lukas Nace, eventually concluding—after a dispute about the settlement agreement's terms and a motion to enforce a handwritten draft of the agreement—with a court order on July 23, 2002, enforcing the settlement agreement. Havens asserts that, because of defendants' actions, he was forced to settled his claims for "vastly less than their actual value." *Id.* On July 22, 2005, he filed this case.

## II. DISCUSSION

Defendants move for judgment on the pleadings, pursuant to Rule 12©) of the Federal Rules of Civil Procedure,[1] arguing that Havens failed to bring his claims within the applicable three-year limitations period as required under D.C. Code § 12-301. The statute of limitations in

---

[1] The standard to be applied to defendants' motion for judgment on the pleadings is the same as that under Rule 12(b)(6). *Does I Through III v. Dist. of Columbia*, 238 F. Supp. 2d 212, 216 (D.D.C. 2002); *Dale v. Executive Office of the President*, 164 F. Supp. 2d 22, 24 (D.D.C. 2001). The motion "should not be granted 'unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief.'" *Beverly Enters., Inc. v. Herman*, 50 F. Supp. 2d 7, 11 (D.D.C. 1999) (citing *Kowal v. MCI Commc'ns, Corp.*, 16 F.3d 1271 1276 (D.C. Cir. 1994). To that end, the complaint must be construed liberally in the plaintiff's favor and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Where the pleadings present disputed questions of material fact, the movant's motion for judgment on the pleadings must be denied. *Does I Through III*, 238 F. Supp. 2d at 216; *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir. 1977).

In resolving a Rule 12(c) motion, courts "are allowed to take judicial notice of matters in the general public record, including records and reports of administrative bodies and records of prior litigation." *Does I Through III*, 238 F. Supp. 2d at 216.

the District of Columbia is three years both for breach of contract claims, D.C. Code § 12-301(7), and for professional negligence claims, *id.* § 12-301(8).[2] Because Havens filed his complaint on July 22, 2005, his claims are time-barred, absent tolling, if they accrued before July 22, 2002.

Defendants argue that Havens's complaint makes clear that his breach of contract claim accrued "on or before the date Plaintiff replaced Defendants with new counsel—May 8, 2000," Defs.' Mot. for Judgment on the Pleadings ("Defs.' Mot.") at 4, and that his legal malpractice claim accrued "not later than March 28, 2001," when "the District Court [in the Lukas Nace litigation] grant[ed] summary judgment against two of Plaintiff's three counterclaims." *Id.* at 6. Havens, by contrast, posits that his claims "did not accrue until—at the very earliest—July 23, 2002, when [the court in the Lukas Nace litigation] concluded that a handwritten agreement [settling that litigation] was not the product of mutual mistake and represented all material terms necessary for an enforceable agreement." Pl.'s Opp'n to Defs.' Mot. for Judgment on the Pleadings ("Pl.'s Opp'n") at 2. Alternatively, Havens argues that, even if his claims accrued before July 22, 2002, defendants "actively concealed their breach from him," thereby tolling the statute of limitations "until late in 2003," when "Havens discovered that defendants had 'covered-up' their breach of duty of care." *Id.* at 7–8. The court agrees with defendants.

## A. Breach of Contract

For a breach of contract claim, the statute of limitations traditionally starts to run when the contract is breached. *See Allison v. Howard Univ.*, 209 F. Supp. 2d 55, 59 (D.D.C. 2002);

---

[2] D.C. Code § 12-301(8) prescribes a three-year statute of limitations for all actions "for which a limitation is not otherwise specially prescribed." Legal malpractice claims fall into this category. *See Wagner v. Sellinger*, 847 A.2d 1151, 1154 (D.C. 2004); *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 994 (D.C. 1978).

*Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1198 (D.C. 1984) ("The contract is breached when the defective work is done and the statute of limitations begins to run from that time.") (alterations and internal quotations omitted). Here, Havens's complaint indicates that the "actions and inactions" constituting the alleged breach took place before he replaced defendants with substitute counsel in May 2000. *See* Compl. ¶ 21 ("Defendants breached the Agreement by failing [to] represent Plaintiff's interests in the Litigation competently"); *id.* ¶ 14 ("Defendants, *while acting as Plaintiff's attorneys* in connection with the Litigation, breached the standard of care applicable to attorneys in the relevant community") (emphasis added). Furthermore, by replacing defendants with new counsel, Havens terminated his contractual relationship with Patton Boggs, thereby making it impossible for defendants' alleged breach to have occurred any later than May 2000.

Havens asserts that the statute of limitations did not begin to run until more than two years later. According to Havens, "[a] breach of contract claim cannot be maintained without damages" and that he did not suffer damages until the court enforced the written settlement agreement on July 23, 2002. Pl.'s Opp'n at 8–9. This argument mistakenly conflates the existence of damages with the ease with which they can be quantified. Even though the extent of Havens's damages may not have been clear until the settlement was enforced in 2002, his claim nonetheless accrued when defendants allegedly breached their contract. *See* 31 RICHARD A. LORD, WILLISTON ON CONTRACTS § 79:14 (4th ed. 1990) ("[A] cause of action in contract accrues at the time of the breach . . . irrespective of any knowledge on the part of the plaintiff or of any actual injury occasioned to him or her."); *cf. Knight v. Furlow*, 553 A.2d 1232, 1236 (D.C.

1989) (stating, in a legal malpractice case, that "[t]he fact that not all of a client's damages are finally ascertainable . . . does not indicate that the client has not been injured earlier.").

Moreover, Havens's argument is belied by the allegations in his complaint, which state that defendants' asserted breach "effectively required [him] to obtain substitute counsel," Compl. ¶ 21, causing him "great expense and risk." *Id.* ¶ 12. Therefore, even assuming *arguendo* that Havens is correct in contending that his contract claim accrued not when the contract was breached, but rather when quantifiable damages could first be shown, the allegations in his complaint, which the court must assume to be true, demonstrate that he had sustained quantifiable damages by the time he obtained substitute counsel on May 8, 2000. Accordingly, Havens's claim for breach of contract accrued more than three years prior to his filing suit and is therefore barred by the applicable statute of limitations unless tolled by the doctrine of concealment, discussed below.[3]

## B. Legal Malpractice

As opposed to actions in contract, which accrue at the time of the wrongful act, actions in tort do not accrue until the plaintiff suffers injury. *Ehrenhaft*, 483 A.2d at 1199; *see also Fort Meyers Seafood Packers, Inc. v. Steptoe & Johnson*, 381 F.2d 261, 262 (D.C. Cir. 1967)

---

[3] While plaintiff never suggests that the "discovery rule," discussed *infra*, applies to his contract claim, D.C. Court of Appeals case law indicates that it might. *Woodruff v. McConkey*, 524 A.2d 722, 727 (D.C. 1987) ("The discovery rule thus far has been applied by this court . . . in cases involving professional negligence or malpractice, *regardless of whether the action is expressed in terms of contract or tort*.") (emphasis added) (citations omitted). Ultimately, however, the applicability of the discovery rule is irrelevant because, even if applied, the court would nonetheless hold that Havens's contract claim is time barred. Havens's complaint makes clear that he knew, or should have know, that his contract with Patton Boggs was breached, and that he suffered some injury as a result, by May 8, 2000, when he was forced to obtain substitute counsel "at great expense." Compl. ¶ 12.

(adopting the rule that a legal malpractice claim accrues when the injury occurs, not when the act

that causes the injury takes place).  Moreover, the injury suffered must be an "actual injury" as

opposed to "merely a speculative wrong." *Wagner v. Sellinger*, 847 A.2d 1151, 1155 (D.C.

2004) ("If there is no injury, even the strongest belief that the defendant has caused the plaintiff

real harm will not transmute that belief into a reality for limitations purposes.").  That said, "the

plaintiff need not be fully informed about the injury for the statute of limitations to begin

running; she need only have *some* knowledge of *some* injury." *Id.* at 1154 (emphasis in original).

In cases "where the relationship between the fact of injury and the alleged tortious

conduct is obscure" at the time the injury occurs, a three-pronged "discovery rule" is applied to

determine when the action accrues. *Diamond v. Davis*, 680 A.2d 364, 379 (D.C. 1996); *Williams

v. Mordkofsky*, 901 F.2d 158, 162 (D.C. Cir. 1990).  Under the discovery rule, a plaintiff's claim

does not accrue, and the statute of limitations does not begin to run, until the plaintiff knows (or

by the exercise of reasonable diligence should know) (1) of the injury, (2) its cause in fact and (3)

of some evidence of wrongdoing. *Bussineau v. President & Directors of Georgetown Coll.*, 518

A.2d 423, 425 (D.C. 1986).

Here, Havens's complaint makes clear that he was wronged by defendants, and that he

knew of such wrongdoing, by May 8, 2000.  Compl. ¶¶ 11–12 (stating that Havens "was forced

to engage new counsel" "[a]s a *direct result*" of defendants' alleged malpractice) (emphasis

added); *see also id.* ¶ 21 (stating that defendants "effectively required Plaintiff to obtain

substitute counsel *by their wrongful actions and inactions complained of herein*") (emphasis

added).  While it is unclear whether Havens had suffered an "actual injury" by this date sufficient

6

to begin the statute of limitations,[4] such actual injury definitely occurred by March 28, 2001,

when Judge Green dismissed two of Havens's three counterclaims. There is no dispute that this

ruling was adverse and reduced the value of Havens's claims. The fact that the extent of the

injury may not have been precisely calculable at that point is immaterial, for "[a]ny appreciable

and actual harm flowing from the attorney's negligent conduct establishes a cause of action upon

which the client may sue." *Knight*, 553 A.2d at 1235 (internal quotation omitted); *see also* 3

RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE, § 22.16, at 439–40 (2006 ed.)

("Damage exists, though the sum is neither precise nor substantial. Confusion arises where the

plaintiff undertakes to avoid or mitigate damages . . . . Neither activity, however, otherwise

alters the present discovery of the apparent wrong.").

Havens insists that "[a]ctual cognizable injury . . . did not come into existence until at the

earliest July 23, 2002." Pl.'s Opp'n at 6. He claims that, prior to this date, he was not injured

because he was "not sure whether a settlement existed or what the terms might be." *Id.* This

argument is meritless, for relevant case law makes clear that a plaintiff suffers injury in a legal

malpractice case well before she settles her claims for less than she would have absent her

attorney's alleged negligence. *See Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992,

995 (D.C. 1978) ("[T]he date on which appellants finally settled the case against the government

---

[4] It may be that actual injury occurred at this time because Havens was forced to obtain substitute counsel "at great expense." Compl. ¶ 12. Because the court concludes that Havens sustained actual injury when Judge Green granted partial summary judgment, it is unnecessary for the court to address this issue.

for less than they would have absent appellees' alleged negligence in handling their case . . . was

well beyond the point at which appellants suffered injury.").[5]

Having established the existence of actual injury on March 28, 2001, when Judge Green

dismissed two of Havens's counterclaims, it is clear that Havens knew, or through the exercise of

reasonable diligence should have known, of that injury, its cause, and some evidence of

wrongdoing before July 22, 2002.[6] Therefore, the face of Havens's complaint, combined with

facts in the public record, demonstrate that his legal-malpractice claim is time barred unless the

statute of limitations was tolled due to defendants' alleged concealment.

## C. Concealment

When a defendant fraudulently conceals the "existence of a cause of action," the statute

of limitations is tolled. *Diamond*, 680 A.2d at 371–72; *Weisberg*, 390 A.2d at 995–96 (in a legal

malpractice case, "[c]oncealment will exist if the attorney had knowingly made false

representations; it is only then that his conduct, by way of estoppel or otherwise, will toll the

---

[5] A more recent case suggests that no actual injury occurs in a legal malpractice claim
until the underlying litigation is concluded. *Wagner*, 847 A.2d at 1156 ("Typically, therefore, a
potential—not actual—injury has occurred when a client claims that an attorney has mishandled
a lawsuit still in progress . . . . [U]ntil the lawsuit is resolved (either by verdict or ruling in court
or by settlement), the injury remains uncertain or inchoate."). Despite the broad language
employed in *Wagner*, this court does not read it to suggest that partial resolution of a lawsuit,
such as by way of partial summary judgment, does not give rise to actual injury.

[6] Although Havens's complaint does not state the date on which he learned of the adverse
partial summary judgment ruling, he is charged with inquiry notice to discover it shortly after its
occurrence. The court need not decide precisely how shortly thereafter; it was certainly before
July 22, 2002, the last date of accrual that would fall within the statutory period absent tolling
and nearly 16 months after the adverse partial summary judgment ruling.

running of the statute.").[7] Havens asserts that defendants' motion to dismiss must be denied

because his complaint "specifically alleges" that defendants "actively concealed their breach

from him by feeding him bad advice and making false representations," and that "[i]t was not

until late in 2003 that Warren Havens discovered that defendants had 'covered-up' their breach

of care." Pl.'s Opp'n at 7–8. According to Havens, this presents an issue of triable fact

sufficient to overcome a Rule 12©) motion for judgment on the pleadings. This argument is

unavailing for, as defendants note, it contradicts Havens's "own allegations in the Complaint."

Defs.' Reply at 4 n.4.

    As Havens's complaint explicitly states, he replaced defendants with substitute counsel

on May 8, 2000, *because* he believed that they had represented him poorly. *See* Compl. ¶ 21

("Defendants made various mistakes, errors of judgment and/or failures to competently perform

the services for which Plaintiff hired them. They effectively required Plaintiff to obtain

substitute counsel by their wrongful actions and inactions complained of herein"). Consequently,

any alleged concealment on the part of Patton Boggs could not have extended beyond May 8,

2000. Because the alleged concealment ceased *before* the statute of limitations began to run, it

---

[7] The court notes that this doctrine has questionable applicability in jurisdictions, like
D.C., that apply the discovery rule. *See* MALLEN & SMITH, § 22.15, at 407 ("Where the
discovery rule applies, the fraudulent concealment doctrine, unless attributable to mere
nondisclosure, is unnecessary"). The D.C. Court of Appeals has explained that, "[i]n cases
involving alleged misrepresentation or concealment, there is an obvious overlap between the
discovery rule and the tolling doctrine. Courts differ in their formulation of the relevant
principles, but the key issue is whether under all the circumstances . . . the plaintiff was on
'inquiry notice' at the relevant time." *Ray v. Queen*, 74 A.2d 1137, 1142 n.6 (D.C. 2000). That
is, a defendant's concealment may justify a plaintiff's otherwise-inexcusable delay in discovering
evidence of wrongdoing; but once a plaintiff knows, or should know, of the defendant's
wrongdoing, the concealment doctrine ceases to be relevant.
    Despite its questionable relevance, the court will indulge Havens's argument, for doing so
does not affect the court's conclusion.

9

has no effect on the statutory deadline applicable to Havens's complaint. *Cf. Weisberg*, 390 A.2d at 996 ("[A] fraudulent concealment tolls a statute of limitations only for so long as the concealment endures.").[8]

### III. CONCLUSION

For the aforementioned reasons, the court concludes that defendants' motion for judgment on the pleadings must be granted. An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge

Date: June 26, 2006.

---

[8] Havens argues for the first time in his opposition that he discharged defendants, not because they were negligent, but rather "because their services were not worth the inflated rates they were charging." Pl.'s Opp'n at 1. The suggestion is that Havens replaced defendants for purely financial reasons and that, as a result of defendants' concealment, he did not discover their alleged wrongdoing until much later. Because this post hoc rationalization is at odds with the facts alleged in the complaint, the court must disregard it when ruling on defendants' motion for judgment on the pleadings. *See* 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34[2] at 12–69 (3d ed. 2000) (stating that in deciding a Rule 12 motion, "[t]he court may not . . . take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).").