**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                )
**CAPITOL HILL GROUP,**                         )
                                                )
                            **Plaintiff,**       )
                                                )        **Civil No.  07-1936 (RCL)**
            **v.**                              )
                                                )
**PILLSBURY WINTHROP SHAW PITTMAN, LLP,**       )
**SHAW PITTMAN, LLP,**                          )
**PAUL A. TUMMONDS, JR., AND**                  )
**PATRICK J. POTTER,**                          )
                            **Defendants.**      )
_____)


**AFFIDAVIT OF PAUL A. TUMMONDS, JR. IN SUPPORT**
**OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Paul A. Tummonds, Jr., Esquire, being of full age and duly sworn according to law,

hereby affirm as follows:

1.      I am a partner in the Real Estate Practice Group of Pillsbury Winthrop Shaw

Pittman, LLP ("PWSP").  Effective on or about April 4, 2005, the law firms of Pillsbury Winthrop,

LLP and Shaw Pittman, LLP ("Shaw Pittman") merged, and created PWSP.  I have practiced law at

Shaw Pittman, continuously and uninterrupted, since August, 2000.

2.      I acted as counsel to Capitol Hill Group ("CHG") in connection with zoning matters

related to solving problems for CHG as they related to its tenants, Capitol Hill Hospital d/b/a

MEDLINK Hospital, a 60-bed hospital (the "Hospital"), and Capitol Hill Healthcare Group d/b/a

Capitol Hill Nursing Center, a 117-bed nursing center (the "Nursing Center"), (the "Zoning

Services") beginning in November 2002.  Prior to that time I was never asked to, and did not ever,

provide any legal services to CHG.

1

3.      On November 18, 2002, I met with the Zoning Administrator of the District of Columbia, Robert W. Kelly, to address zoning issues related to a letter that the Acting Administrator of the Building and Land Regulation Administration of the District of Columbia, Mr. Denzil Noble, submitted to CHG on November, 5, 2002.  Attached as **Exhibit 1** is a true and accurate copy of Mr. Noble's letter.

4.      In the November 18, 2002 meeting with Mr. Kelly, I presented arguments regarding CHG's ability to operate its Nursing Center as a matter-of-right, and the number of parking spaces that CHG should be required to provide on its property with respect to the Nursing Center.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of a letter, dated December 12, 2002, that I received from Robert Kelly.  Mr. Kelly disagreed with my interpretation of the District of Columbia Zoning Regulations and determined that CHG could not operate the Nursing Center as a matter-of-right.  He asserted that CHG was required to seek relief from the District of Columbia Board of Zoning Adjustment ("BZA").

6.      Attached hereto as **Exhibit 3** is a true and correct copy of a letter, dated December 16, 2002, in which I responded to Mr. Kelly's December 12, 2002 letter.  In this letter I noted that Mr. Kelly's December 12, 2002, decision appeared to be in violation of the Federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*  ("FHA") and that if Mr. Kelly did not provide additional information regarding his December 12, 2002 determination, it may be necessary to file an action in CHG's bankruptcy proceeding seeking a determination that the FHA was violated.  As of January 15, 2003, Mr. Kelly had not responded to my December 16, 2002, letter.

7.      On January 16, 2003, CHG filed a complaint in the bankruptcy court for declaratory relief against the District of Columbia and the Director of the District of Columbia Department of Consumer and Regulatory Affairs alleging violations of the FHA based on the actions of Mr. Kelly.  A true and correct copy of the FHA Complaint is attached as **Exhibit 4**.

8.      On February 24, 2003, CHG filed a motion for Summary Judgment on the FHA Complaint.

9.      On March 18, 2003, the bankruptcy court heard arguments related to the motion for Summary Judgment.  During those arguments counsel for the District of Columbia stated that it was preparing a response to my December 16, 2002 letter.  At the conclusion of the March 18, 2003 hearing, Bankruptcy Judge Teel stated that he was prepared to grant the motion for Summary Judgment, but would allow the District to file its response to my December 16, 2002 letter.  See **Exhibit 5** transcript of the March 18, 2003 hearing.

10.      On March 26, 2003, the District of Columbia Department of Consumer and Regulatory Affairs, Building and Land Regulation Administration issued a Certificate of Occupancy to Capitol Hill Community Hospital (CO 51290) authorizing the use of 60 hospital beds with 60 parking spaces on the CHG Property and a Certificate of Occupancy to the Nursing Center (CO 51289) authorizing a community based residential facility – health care facility that provides housing for the handicapped with 25 parking spaces and 117 beds (the "Certificates of Occupancy").  True and correct copies of the Certificates of Occupancy are attached as **Exhibit 6**.

11.      A certificate of occupancy is legally binding on the District of Columbia government, and is evidence of the District of Columbia's determination that the use of the property enumerated in the certificate of occupancy is in compliance with the Zoning Regulations.

12.      On March 26, 2003, the Department of Consumer and Regulatory Affairs issued a Notice of Infraction Dismissal Request, which dismissed the Notice of Infraction Number 049089 and noted that the Nursing Center "provides housing for the handicapped under 1999 amendment to the Zoning Regulations it is matter-of-right and not subject to conditions in earlier BZA Order."  A true and correct copy of the Notice of Infraction and the Notice of Infraction Dismissal Request is attached as **Exhibit 7**.

Doc. #400652808

13.     On May 23, 2003, the Stanton Park Neighborhood Association ("SPNA") filed an appeal with the BZA alleging the Zoning Administrator's decision in issuing the Certificates of Occupancy was in violation of the District of Columbia Zoning Regulations ("**BZA Appeal No. 17043**").

14.     The BZA held public hearings on BZA Appeal No. 17043 on November 18, 2003 and November 25, 2003.  SPNA was the appellant.  The Office of the Zoning Administrator was the appellee.  While CHG was neither an appellant nor an appellee, it was permitted by the BZA to appear in the appeal.    I represented CHG by written submissions, dated July 23, 2003, and October 30, 2003.  I also argued and examined witnesses at the BZA public hearing on November 25, 2003. Mr. Donald Hartman, one of CHG's lawyers, was present at one or both of the November 18, 2003 and November 25, 2003 proceedings.

15.     On January 6, 2004, the BZA by a vote of 3-2 denied the appeal of the SPNA.  A true and correct copy of pertinent portions of the transcript of the BZA's January 6, 2004, public meeting is attached as **Exhibit 8**.  Mr. Hartman was present at the January 6, 2004 proceeding.

16.     On or about January 13, 2004, I was provided a copy of an e-mail from Mr. Hartman, which requested all of Shaw Pittman's BZA files, to "permit CHG to retain substitute counsel in these pending matters."  A true and correct copy of Mr. Hartman's email is attached as **Exhibit 9**.

17.     On January 15, 2004, I caused all of Shaw Pittman's pleading files related to BZA Appeal No. 17043 to be hand-delivered to Mr. Hartman.  A true and correct copy of my cover letter is attached as **Exhibit 10**.

18.     It is my understanding that on February 10, 2004, the Vice-Chair of the BZA made a motion to reconsider the BZA's previous denial of BZA Appeal No. 17043 with regard to the calculation of the required amount of parking spaces.  As shown in the attached transcript of the

4

BZA's February 10, 2004 public meeting (**Exhibit 11**) the motion for reconsideration was not on the BZA's agenda for this meeting and was raised as a preliminary matter.  The BZA approved the motion for reconsideration and scheduled the reconsideration decision for February 24, 2004.  The BZA noted that the reconsideration decision would be made at a deliberative session and that the record was not open to accept any further material. I was not present at the BZA's February 10, 2004 proceeding.

19.     I became aware of the BZA's decision to reconsider its January 6, 2004 decision because one of my colleagues was in attendance at the BZA's February 10, 2004 public meeting for another matter wholly unrelated to CHG.  On February 11, 2004, I wrote a letter to Mr. Hartman advising him of the BZA's decision to take this matter up at a special public meeting on February 24, 2004 at 9:00 AM.  In that letter I provided Mr. Hartman with the name and phone number of BZA personnel that he should contact with regard to the reconsideration decision hearing.  I also noted that there was no practical way to advise the BZA of Shaw Pittman's withdrawal and that Shaw Pittman had not notified either the BZA or the Office of Zoning of Shaw Pittman's withdrawal from this matter.  A true and correct copy of my February 11, 2004 letter to Mr. Hartman is attached as **Exhibit 12**.

20.     On February 12, 2004, I received an e-mail from Peter Shin which stated "Donald Hartman gave me a copy of your letter dated February 11, 2004 regarding BZA's special public meeting on February 24.  Thank you very much for your alert.  We appreciate it very much.  Regards."  A true and correct copy of Mr. Shin's February 12, 2004 e-mail is attached as **Exhibit 13**.

21.     On February 24, 2004, the BZA conducted the special public meeting to reconsider its previous decision in BZA Appeal No. 17043.  A true and correct copy of pertinent portions of the transcript of the BZA's February 24, 2004 Special Public Meeting is attached as **Exhibit 14**.

22.    As a result of the BZA's February 24, 2004 decision, CHG was required to provide 177 parking spaces on its property for its tenants, the Hospital and Nursing Center, which I understood CHG could provide.

23.    On September 9, 2004, the written order in BZA Appeal No. 17043 was issued by the BZA. The Certificate of Service attached to BZA Appeal No. 17043 lists me as the representative for the Capitol Hill Healthcare Group and does not reflect that it was sent to either Mr. Hartman or the other "substitute counsel" referenced in Mr. Hartman's January 13, 2004 e-mail. A true and correct copy of BZA Order No. 17043 is attached as **Exhibit 15**.

24.    I do not recall whether I received BZA Order No. 17043.

25.    I declare under penalty of perjury that the foregoing is true and correct.

/s/   Paul A. Tummonds, Jr.
PAUL A. TUMMONDS, JR.

October 29, 2007

6

## EXHIBIT LIST

1.  **Exhibit 1** – Letter from the Acting Administrator of the Building and Land Regulation Administration, dated November 5, 2002, to Dr. Peter Shin, President of the Capitol Hill Group.

2.  **Exhibit 2** – Letter from Robert Kelly to Paul Tummonds, dated December 12, 2002.

3.  **Exhibit 3**  - Letter from Paul Tummonds to Robert Kelly, Zoning Administrator of the District of Columbia, dated December 16, 2002.

4.  **Exhibit 4** –  CHG complaint for declaratory relief filed against the District of Columbia and the District of Columbia Department of Consumer and Regulatory Affairs, filed with the bankruptcy court on January 16, 2003.

5.  **Exhibit 5** – Transcript of the bankruptcy's court hearing on the motion for summary judgment, dated March 18, 2003.

6.  **Exhibit 6** – Certificates of Occupancy Nos. 51289 and 51290, dated March 26, 2003.

7.  **Exhibit 7** – Notice of Infraction No. 049089 and Notice of Infraction Dismissal Request Form dated March 26, 2003.

8.  **Exhibit 8** – Transcript of the BZA public meeting on January 6, 2004.

9.  **Exhibit 9** – E-mail from CHG General Counsel, Donald Hartman, dated January 13, 2004.

10.  **Exhibit 10** – Letter from Paul Tummonds to Donald Hartman, dated January 15, 2004.

11.  **Exhibit 11** - Transcript of the BZA public meeting on February 10, 2004.

12.  **Exhibit 12** – Letter from Paul Tummonds to Donald Hartman, dated February 11, 2004.

13.  **Exhibit 13** – E-mail from Dr. Peter Shin to Paul Tummonds, dated February 12, 2004.

14.  **Exhibit 14** – Transcript of BZA special public meeting on February 24, 2004.

15.  **Exhibit 15** – Order of the BZA in BZA Appeal No. 17043, dated September 9, 2004.

Doc. #400652808

Exhibit 1

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS



Building and Land Regulation Administration
Office of the Administrator

November 5, 2002


Capitol Hill Group
700 Constitution Avenue, NE
Washington, DC 20002
Attn: Dr. Peter Shin, President

Re:    700 Constitution Avenue, NE/Washington, DC
       (the "Property")

Dear Dr. Shin:

Our records in the Building and Land Regulation Administration reveal that there are several issued certificates of occupancy associated with the above referenced premises. These certificates of occupancy were issued to facilitate partial occupancy at your request.

However, to insure that the facility is operating in accordance with Board of Zoning Adjustment Orders # 16407 and 15542, you are required to consolidate the several certificates of occupancy issued into one certificate of occupancy for the entire building.

The proposed new certificate of occupancy application should reflect the total numbers of beds (162) and required parking spaces (200) consistent with BZA Order # 16407.

Respectfully,

Denzil L. Noble
Acting Administrator


Cc: David A. Clark, Director
    Theresa Lewis, D/Director for Operations
    Robert W. Kelly, Zoning Administrator

Exhibit 2

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS**

Building and Land Regulation Administration
   Office of the Zoning Administrator



December 12, 2002

Paul Tummonds
Shaw/Pittman LLP
2300 N Street NW
Washington DC 20037-1128

Subject: 700 Constitution Avenue. N.E. Washington DC (MedLINK)

Mr. Tummonds:

I have reviewed your proposal dated November 19, 2002 regarding the MedLINK facility at the above address. In your proposal you indicated that since the Zoning Commission established conditions and text relating to Community Based Residential Facilities after the Board of Zoning Adjustment conducted the hearing and finalized the conditions of approval for MedLINK, it is your opinion that the parking requirements and maximum number of beds ordered by the BZA should be dismissed.

The location is zoned R-5-D, and if the facility is classified as a community residence facility or a health care facility in either case BZA approval is required.

The BZA is authorized to establish conditions it deems necessary to protect the neighborhood in approving special exceptions or variances. In approving the MedLINK facility parking requirement and the maximum number of beds were established in the order. Therefore it is the Zoning Administrator's opinion to remove conditions in the BZA order requires an action by the BZA. Consequently your request for a matter-of-right is here by denied and you must seek relief from the BZA.

On November 5th, 2002, Denzil Noble, Acting Administrator, informed Dr. Shin that he must consolidate the several Certificates of Occupancy into one Certificate reflecting the total numbers of beds (162) and required parking spaces (200) to be consistent with the BZA Orders 16407 and 15542. This action must be completed before December 31, 2002.

---

941 North Capitol Street, N.E., Suite 2000   Washington, DC 20002 Phone: (202) 442-4576 Fax: (202) 442-4871

If you have any questions contact me at  442-4576.

Sincerely,

Robert W Kelly
Zoning Administrator

Cc: David Clark, Director
    Theresa Lewis, DD/ CofS
    Denzil L. Noble, AA/BLRA

Exhibit 3

# ShawPittman LLP

*A Limited Liability Partnership Including Professional Corporations*

PAUL TUMMONDS
202–663–8873
paul.tummonds@shawpittman.com

December 16, 2002

By Hand Delivery

Robert Kelly
Zoning Administrator, District of Columbia
941 N. Capitol Street, N.E.
Washington, DC 20002

Re:    **700 Constitution Ave, N.E., Lot 76, Square 896 (also known as 708
       Massachusetts Ave., N.E.) (the "Property")**

Dear Mr. Kelly:

This is in response to your letter dated December 12, 2002, copy attached, where it appears you conclude that the MedLink Nursing Center ("**Nursing Center**") is not, with respect to the Property, permitted as a matter-of-right use.

As an initial matter, Capitol Hill Group ("**CHG**"), the owner of the above-referenced property, appreciates the substantial time, effort and consideration that you and your colleagues, including the Office of General Counsel, have devoted to this matter over the past several weeks.

By this letter we seek, in part, to (i) memorialize the context of your December 12th letter, and (ii) reconfirm the apparent conclusion in your December 12th letter that the Nursing Center is not a community based residential facility providing housing for the handicapped.

1.    As you know, pursuant to the Zoning Regulations, the Zoning Administrator is authorized to determine whether a community based residential facility:

> "is intended to be operated as housing for the handicapped as that term is
> defined under Section 3602(h) of the Fair Housing Act, as amended, 42
> U.S.C. Section 3601 et seq. (1955)." 11 DCMR §330.5(i), copy attached.

The significance of making such a determination is that if a subject facility is operated as housing for the handicapped, as that term is defined under Section 3602(h) of the Fair Housing Act ("**FHAA**"), then such facility constitutes a permitted matter-of-right use in the R-4 and less restrictive zones.

Washington, DC
Northern Virginia
New York
Los Angeles
London

# ShawPittman LLP

Robert Kelly
December 16, 2002
Page 2


2.      Consistent with the preceding paragraph, CHG, though this firm, requested that the Zoning Administrator's Office affirmatively determine whether the Nursing Center is operated as a facility that provides housing for the handicapped, as that term is defined under Section 3602(h) of the FHAA. Specifically, and to assist in such determination, I sent you a letter dated November 19, 2002, explaining that Zoning Commission Order No. 869, which became effective on April 30, 1999, made community based residential facilities that are intended to be operated as housing for persons with handicaps a permitted matter-of-right use in the R-4 and less restrictive districts. *See* 11 DCMR §330.5(i).

3.      While not described in the text of my November 19th letter to you, I note here that in the case of <u>Hovsons, Inc. v. Township of Brick</u>, 89 F. 3d 1096, 1103 n.3[1] (U.S. Ct. of App. 1996), the court determined that a nursing home is deemed to be a facility that provides housing for the handicapped, as defined in the FHAA. As you know, the <u>Hovsons</u> case was expressly followed by the BZA in Case No. 16716A (copy attached to my November 19th letter), when it determined that an assisted living facility was a facility that provided housing for the handicapped.

4.      On December 12th you responded to the above-described request of CHG - <u>i.e.</u>, CHG's request that the Zoning Administrator determine whether the Nursing Center is operated as a facility that provides housing for the handicapped, as that term is defined under Section 3602(h) of the FHAA. In this regard, your December 12th letter states, in part:

> The location is zoned R-5-D, and if the facility is classified as a community residence facility or a health care facility in either case BZA approval is required.

---

[1]      Footnote 3 of <u>Hovsons</u>, states: "The parties do not dispute that the nursing home patients at Holiday Village would be 'handicapped' within the meaning of the FHAA. *See* 42 U.S. C. § 3602(h) (defining the term 'Handicap' under the FHAA); *See also Wagner v. Fair Acres Geriatric Ctr.*, 49 F. 3d 1002, 1010 (3d Cir. 1995) ('Obviously, everyone that applies for admission to a nursing home does so because of his or her disabilities. Indeed no one would be able to meet a nursing home's admission requirements in the absence of some handicapping condition necessitating nursing home care')."

# ShawPittman LLP

Robert Kelly
December 16, 2002
Page 3

However, your December 12th letter, and the quoted paragraph in particular, does not specifically address the fact that under 11 DCMR §330.5(i) **all** community based residential facilities[2] providing housing for the handicapped are permitted matter-of-right uses. While you do not expressly state that the Nursing Center is **not** a facility that provides housing for the handicapped, that is the only logical conclusion that can be drawn from your determination. <u>In other words, CHG's interpretation of your December 12th letter is that the Zoning Administrator's Office (in response to CHG's request for a determination) has affirmatively determined that the Nursing Center is **not** operated as a facility that provides housing for the handicapped, as that term is defined under Section 3602(h) of the FHAA.</u>

     5.     In order for CHG to determine whether your December 12th letter is consistent with prior determinations of the Zoning Administrator's Office, the Office of Corporation Counsel, the Board of Zoning Adjustment and the Zoning Commission, as well as compliance with the FHAA, please inform us as to whether we have misconstrued your December 12th determination. In other words, please confirm, one way or the other:

     (a)     Whether the Zoning Administrator's Office has determined that the Nursing Center is **not** operated as a facility that provides housing for the handicapped, as that term is defined under Section 3602(h) of the FHAA (which appears to be the case based on our reading of your December 12th letter); *or*

     (b)     Whether the Zoning Administrator's Office has determined that the Nursing Center *is* operated as a facility that provides housing for the handicapped, as that term is defined under Section 3602(h) of the FHAA (a conclusion that appears entirely inconsistent with your December 12th letter).

     6.     If our interpretation of your position is correct, please let us know as soon as possible, preferably before the close of business on Wednesday, December 18, 2002. Your prompt response in this matter is necessary, as CHG is presently engaged in

---

[2]     As noted in the Zoning Regulations' definition of community based residential facility, copy attached, "All community-based residential facilities shall be included in one or more of the following subcategories: . . . (b) community residence facility . . . (d) health care facility." Health care facilities and community residence facilities are merely two types of community based residential facilities.

# ShawPittman LLP

Robert Kelly
December 16, 2002
Page 4


Chapter 11 bankruptcy proceedings and will need to take appropriate steps to protect its rights with respect to your determination (as CHG currently understands such determination). If CHG's current interpretation of your December 12th letter is correct – i.e., that the Zoning Administrator's Office has determined that the Nursing Center is not operated as a facility that provides housing for the handicapped, as that term is defined under Section 3602(h) of the FHAA - - such measures may include commencement by CHG of legal action in the Bankruptcy Court seeking a determination that the FHAA has been violated by such determination of the Zoning Administrator's Office. In addition, your prompt response to this request will help CHG secure one Certificate of Occupancy for the Property, as you requested, in a more timely manner.

If you have any questions or comments regarding this letter, please feel free to contact me at (202) 663-8873.

Sincerely,

Paul Tummonds

Enclosures


cc:    Dr. Peter Shin (by fax)
       Patrick Potter


Document #: 1293766 v.5

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
## DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS

**Building and Land Regulation Administration**
**Office of the Zoning Administrator**



December 12, 2002

Paul Tummonds
Shaw/Pittman LLP
2300 N Street NW
Washington DC 20037-1128

Subject: 700 Constitution Avenue. N.E. Washington DC (MedLINK)

Mr. Tummonds:

I have reviewed your proposal dated November 19, 2002 regarding the MedLINK facility at the above address. In your proposal you indicated that since the Zoning Commission established conditions and text relating to Community Based Residential Facilities after the Board of Zoning Adjustment conducted the hearing and finalized the conditions of approval for MedLINK, it is your opinion that the parking requirements and maximum number of beds ordered by the BZA should be dismissed.

The location is zoned R-5-D, and if the facility is classified as a community residence facility or a health care facility in either case BZA approval is required.

The BZA is authorized to establish conditions it deems necessary to protect the neighborhood in approving special exceptions or variances. In approving the MedLINK facility parking requirement and the maximum number of beds were established in the order. Therefore it is the Zoning Administrator's opinion to remove conditions in the BZA order requires an action by the BZA. Consequently your request for a matter-of-right is here by denied and you must seek relief from the BZA.

On November 5th, 2002, Denzil Noble, Acting Administrator, informed Dr. Shin that he must consolidate the several Certificates of Occupancy into one Certificate reflecting the total numbers of beds (162) and required parking spaces (200) to be consistent with the BZA Orders 16407 and 15542. This action must be completed before December 31, 2002.

If you have any questions contact me at  442-4576.

Sincerely,

Robert W Kelly
Zoning Administrator

Cc: David Clark, Director
    Theresa Lewis, DD/ CofS
    Denzil L. Noble, AA/BLRA

SOURCE: §3103.5 of Regulations effective May 12, 1958.

## 322     USES SUBJECT TO BZA APPROVAL: GENERAL (R-3)

322.1   Any use permitted in R-2 districts under §§302 through 306 shall be permitted in an R-3 District if approved by the Board of Zoning Adjustment in accordance with the conditions specified in §3108 of chapter 31 of this title.

SOURCE: §3103.4 of Regulations effective May 12, 1958.

## 323 - 329   [RESERVED]

## 330     R-4 DISTRICTS: GENERAL PROVISIONS

330.1   The R-4 district is designed to include those areas now developed primarily with row dwellings, but within which there have been a substantial number of conversions of the dwellings into dwellings for two (2) or more families.

330.2   Very little vacant land shall be included within the R-4 district, since its primary purpose shall be the stabilization of remaining one-family dwellings.

330.3   The R-4 District shall not be an apartment house district as contemplated under the General Residence (R-5) districts, since the conversion of existing structures shall be controlled by a minimum lot area per family requirement.

330.4   Except as provided in chapters 20 through 25 of this title, in an R-4 district, no building or premises shall be used and no building shall be erected or altered that is arranged, intended, or designed to be used except for one (1) or more of the uses listed in §§330 through 349.

330.5   The following uses shall be permitted as a matter of right in an R-4 district:

(a)   Any use permitted in R-3 districts under §320.3 of this chapter:

(b)   Flat;

(c)   The conversion of a building or other structure existing before May 12, 1958, to an apartment house as limited by §§350.4(c) and 401.3;

(d)   Child development center and/or elderly day care center; provided that the center shall be limited to no more than sixteen individuals;

(e)   Child/elderly development center located in a building that was built as a church and that has been used continuously as a church since it was built; Provided, that all of the play space required for the center by the licensing regulations shall be located on the same lot on which the center is located;

(f)   Hospital, sanitarium, or clinic for humans;

(g)   Private Club, lodge, fraternity house, sorority house, or dormitory, except where the use is a service customarily carried on as a business;

(h)   Museum; and

(i)   Community based residential facility; Provided, that notwithstanding any provision in this title to the contrary, the Zoning Administrator has determined that such community based facility, which otherwise complies with the zoning requirements of this title that are of general and uniform applicability to all matter of right uses in an R-4 District, is intended to be operated as housing for the handicapped as that term is defined under Section 3602 (h) of the Fair Housing Act, as amended, 42 U.S.C. Section 3601 et seq. (1955). Section 802 of the FHAA defines handicap as follows:

(h)   "Handicap" means, with respect to a person-

(1)   A physical mental impairment which substantially limits one or more of such person's major life activities.

(2)   A record of having such an impairment, or being regarded as having such an impairment, but such terms does not include current, illegal use of or addiction to a controlled substance (as defined in section 102 of the Controlled Substance Act (21 U.S.C. 802)).

330.6   A rooming or boarding house shall be permitted as a matter-of-right in an R-4 District; Provided that the following requirements are met:

(a)   Accommodations are not provided to transient guests who stay ninety (90) days or less at the premises, or guests whose occupancies would be subject to the tax imposed by the District of Columbia Hotel Occupancy and Surtax on Corporations and Unincorporated Business Tax Act of 1977;

(b)   No sign is displayed on the premises;

(c)   No advertisement is displayed or published on or off the premises holding out the establishment to be a hotel, motel, inn, hostel, bed and breakfast, private club, tourist home, guest house, or other transient accommodation;

**Community-based residential facility** - a residential facility for persons who have a common need for treatment, rehabilitation, assistance, or supervision in their daily living. This definition includes, but is not limited to, facilities covered by D.C. Law 2-35, The Community Residence Facilities Licensure Act of 1977, and facilities formerly known as convalescent or nursing home, residential halfway house or social service center, philanthropic or eleemosynary institution, and personal care home.

If an establishment is a community-based residential facility as defined in this section, it shall not be deemed to constitute any other use permitted under the authority of these regulations. A community-based residential facility may include separate living quarters for resident supervisors and their families. All community-based residential facilities shall be included in one (1) or more of the following subcategories:

(a)     **Adult rehabilitation home** - a facility providing residential care for one (1) or more individuals sixteen (16) years of age or older who are charged by the United States Attorney with a felony offense, or any individual twenty-one (21) years of age or older, under pre-trial detention or sentenced court orders;

(b)     **Community residence facility** - a facility that meets the definition for and is licensed as a community residence facility under the Health Care Facilities and Community Residence Facilities Regulations, 22 DCMR §3099.1, as that definition may be amended from time to time;

(c)     **Emergency shelter** - a facility providing temporary housing for one (1) or more individuals who are otherwise homeless and who are not in need of a long-term sheltered living arrangement, as that arrangement is defined in the Health Care Facilities and Community Residence Regulations, 22 DCMR 3099.1;

(d)     **Health care facility** - a facility that meets the definition for and is licensed as a skilled care facility or intermediate nursing care facility under the Health Care Facilities and Community Residence Regulations, 22 DCMR 3099.1, as those definitions may be amended from time to time;

(e)     **Substance abusers home** - a community residence facility that offers a sheltered living arrangement, as that arrangement is defined in the Health Care Facilities and Community Residence Facilities Regulations of the District of Columbia, 22 DCMR §3099.1, for one (1) or more individuals diagnosed by a medical doctor as abusers of alcohol, drugs, or other controlled substances;

(f)     **Youth rehabilitation home** - a facility providing residential care for one (1) or more individuals less than twenty-one (21) years of age who have been detained or committed by a court pursuant to their involvement in the commission of an act designated as an offense under the law of the District of Columbia, or of a state if the act occurred in a state, or under federal law. The facility shall not house persons sixteen (16) years of age or older who are charged by the United States Attorney with a felony offense; or

(g)     **Youth residential care home** - a facility providing safe, hygienic, sheltered living arrangements for one (1) or more individuals less than eighteen (18) years of age, not related by blood, adoption, or marriage to the operator of the facility, who are

Exhibit 4

PAT
COPY

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLUMBIA

IN RE:

CAPITOL HILL GROUP,

        Debtor.

Case Number 02-0359
Chapter 11

CAPITOL HILL GROUP,

    700 Constitution Avenue, N.E.
    Washington, D.C. 20002

        Plaintiff,

        v.

THE DISTRICT OF COLUMBIA,
    a Municipal Corporation,
    One Judiciary Square
    441 4th Street, N.W.
    Washington, D.C. 20001

DAVID A. CLARK,

    as Director
    District of Columbia Department of
    Consumer and Regulatory Affairs
    441 4th Street, N.W.
    Washington, D.C.    20001

        Defendants.

Adv. Pro. No. _____

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

### Introductory Statement

This action seeks certain redress, including but not limited to redress for unlawful

discrimination on the basis of handicap in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et*

*seq.* and the District of Columbia Human Rights Act, D.C. Code § 2-1401 *et seq.* (2001).

Plaintiff, Capitol Hill Group, asserts that its Tenant, the Nursing Center (defined below), is

considered a permitted matter-of-right use under the Zoning Regulations of the District of Columbia because it provides housing for the handicapped.  Defendants disagree that the Nursing Center provides housing for the handicapped, and, as a result of that determination, are imposing more stringent zoning conditions and requirements on the Capitol Hill Group, Facility (defined below), than are placed on similar facilities that do not provide housing for the handicapped.  One of the more egregious conditions is that Capitol Hill Group provide an inordinate number of parking spaces for the Nursing Center.  Accordingly, Capitol Hill Group brings this action seeking, inter alia, a declaration that the Nursing Center provides housing for the handicapped, and that consequently, Capitol Hill Group's parking space availability at the Facility is in full compliance with applicable zoning laws.

## Parties, Jurisdiction and Venue

1.     Plaintiff Capitol Hill Group ("**CHG**" or the "**Debtor**") is a debtor and debtor in possession in case number 02-0359 pending in the United States Bankruptcy Court for the District of Columbia.

2.     Defendant the District of Columbia (the "**District**") is a municipal corporation and is considered a person capable of being sued with respect to the matters raised in this complaint.

3.     Defendant David Clark, the Director of the Department of Consumer and Regulatory Affairs ("**DCRA**"), is an individual domiciled in the District who is sued herein solely in his capacity as the Director of DCRA, and not in his individual capacity.

4.     The Office of the Zoning Administrator is a department included in the DCRA, under the authority of Defendant Clark, which interprets the District of Columbia Zoning Regulations, 11 DCMR *et seq.* ("**Zoning Regulations**").

5.     The Office of the Administrator of the Building and Land Regulation Administration is a department included in the DCRA under the authority of Defendant Clark.

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 151, 157, and 1334, 11 U.S.C. §§ 547, 550, Fed. R. Bank. Pro. 7001, and Local Rule 5011-1 of the United States District Court for the District of Columbia.

7.    This action arises in and relates to the Debtor's bankruptcy case, and some or all of the issues raised in the Complaint arise under Title 11 of the United States Bankruptcy Code.

8.    This action constitutes an actual controversy within the jurisdiction of the Court, including under 28 U.S.C. §2201 (e.g., the dispute between the parties as to whether the Nursing Center is a facility that provides housing for the handicapped).

9.    This Court also has federal question jurisdiction with respect to this action under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 3613.

10.    This action arises in part under the laws of the United States.

11.    This action also arises in part under the laws of the District of Columbia. As to claims thereunder, this Court has supplemental jurisdiction under 28 U.S.C. § 1367.

12.    This action concerns the administration of CHG's bankruptcy estate.

13.    This action is a core proceeding.

14.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

15.    The statutory predicates for this action include 11 U.S.C. §§ 101 et seq., 42 U.S.C. § 3601 *et seq.*, and D.C. Code § 2-1401 *et seq.* (2001). They also include 28 U.S.C. §2201.

### Facts

#### Bankruptcy Filings

16.    On February 21, 2002 (the "**Petition Date**"), CHG filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

17.    Certain entities with affiliations to the Debtor also filed voluntary chapter 11 petitions with the Court on February 21, 2002. These included Capitol Hill Community

Hospital, d/b/a MedLink Hospital at Capitol Hill (the "**Hospital**") and Capitol Hill Healthcare Group, d/b/a Capitol Hill Nursing Center (the "**Nursing Center**").

18.    CHG, the Hospital and the Nursing Center each continues to operate and manage its respective business as debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of those cases.

**The Facility and its Uses**

19.    CHG owns the real estate and improvements thereon located at 700 Constitution Avenue, N.E., Washington, D.C. 20002 ("**Facility**"). The Facility is currently located in the R-5-D Zoning District (although, as explained below, at one time the Facility was located in the R-5-C Zoning District.)

20.    In the aggregate, the Facility has a total of 177 parking spaces to be used by both the Hospital and the Nursing Center.

21.    As a practical matter, the Hospital and Nursing Center, and their staffs, patients and guests, have never, in recent history (if ever), used all 177 parking spaces (at virtually all times there are at least 100 unused parking spaces at the Facility.)

22.    The portion of the Facility used by the Nursing Center is operated as a nursing facility for elderly and other persons who are unable to perform major life activities and need continuous medical care and attention.

23.    The Nursing Center currently has 117 residents, with an average daily census of 113, and is licensed as a skilled care facility or intermediate nursing care facility under the Health Care Facilities and Community Residence Regulations, 22 DCMR 3099.1.

24.    The portion of the Facility used by the Hospital is operated as a long-term acute care hospital. The Hospital currently is licensed to provide care for 50 patients.

25.    The Zoning Regulations allow hospitals to be located in the R-4 District and less restrictive districts, such as the R-5-D Zoning District in which the Facility is currently located,

as a matter-of-right. Therefore, no discretionary zoning approval is required for the Hospital to operate as part of the Facility, and there are no site specific conditions related to the Hospital's operation on this property.

26.    Pursuant to 11 DCMR §2101.1, the Zoning Regulations require hospitals to provide one parking space for each hospital bed - - 50 spaces in the case of the Hospital.

27.    The Zoning Regulations include skilled care facilities and intermediate nursing care facilities in the definition of a health care facility, a type of community based residential facility ("**CBRF**").

### Zoning History of the Nursing Center

28.    In 1991, the Facility was located in an R-5-C Zone District.

29.    In 1991, the Zoning Regulations permitted a CBRF in an R-5-C district only by special exception granted by the District of Columbia Board of Zoning Adjustment ("**BZA**").

30.    At that time, the Zoning Regulations provided that the number of parking spaces required for a CBRF in the R-5-C district would be determined by the BZA.

31.    In 1991, an application was submitted to the BZA for a special exception to establish that the Nursing Center was a type of CBRF, specifically, a facility for elderly patients with 130 beds and 250 full-time staff (the "**1991 Application**").

32.    The BZA approved the 1991 Application on July 24, 1991 and issued BZA Order No. 15542 on August 16, 1991 ("**Order No. 15542**").

33.    Order No. 15542 was subject to certain conditions, including the following: the Nursing Center was required to comply with all final conditions specified by the District of Columbia State Health Planning and Development Agency Certificate of Need; 176 on-site screened parking spaces were to be provided for employees, residents, and visitors with preference for employees to occupy free parking in the underground garage in the same square; the applicant was to cease using the 7th Street entrance for loading/unloading ambulances and

reopen the 8th Street entrance prior to operating as a long term care facility; the applicant was not to have retail operations other than what is required by the Public Health Regulations for the convenience of the occupants; and the applicant was not permitted to rent office space to physicians not associated with the operation of the facility.

34.    By 1998, the zone district in which the Facility is located had changed from R-5-C to R-5-D.

35.    In 1998, the Zoning Regulations still required special exception approval from the BZA in order for a CBRF, such as the Nursing Center, to be located in the R-5-D District, and the BZA still determined the number of parking spaces to be provided relative to the Nursing Center.

36.    On September 23, 1998, an application was filed with the BZA for special exception approval to add 32 new beds to the Nursing Center (the "**1998 Application**"[*]).

37.    The 1998 Application was approved by BZA Order No. 16407, dated October 21, 1999 ("**Order No. 16407**").

38.    Order No. 16407 required that the Nursing Facility satisfy numerous conditions in order to operate on the property, these conditions included the following: the approval was limited to a period of 10 years; the facility was limited to 162 beds; the maximum number of employees was 340; 276 off-street parking spaces must be provided; the applicant was required to meet four times per year with ANC 6A and other concerned neighbors; and the applicant was required to keep the property and surrounding area clear of trash.

---

[*] CHG advises the Court that said application was prepared and filed on behalf of CHG by the law firm of Robins, Kaplan, Miller & Ciresi ("**Robins Kaplan**"). As the Court knows, Robins Kaplan represents the Holladay Corporation ("**Holladay**") in connection with certain litigation pending in the above-captioned chapter 11 case. As the Court also knows, and as the Court confirmed during a July 31, 2002 hearing, CHG does not waive any conflicts or other rights that exist with respect to services provided by Robins Kaplan to CHG, all rights of any kind having been (and continuing to be) specifically reserved. Indeed, CHG advises the Court that it will seek, among other things, the disqualification of Robins Kaplan from representing any party in connection with litigation involving the zoning applicable to the Facility.

39.    Thereafter, CHG filed a request to modify Order No. 16407 to reduce the required number of parking spaces to 200, while retaining the additional 32 beds in the Nursing Facility (the "**Modification Request**"[*]).

40.    The Modification Request was initially approved by the BZA.

41.    However, in response to community opposition to such approval, CHG withdrew the Modification Request.

42.    Thus, the conditions of Order No. 16407 continued to authorize the Nursing Center to have 130 beds conditioned on the provision of 176 parking spaces at the Facility, or up to 162 beds conditioned on the provision of 276 parking spaces at the Facility.

## Subsequent Amendment to the Zoning Regulations Regarding CBRFs

43.    Effective April 30, 1999, the District of Columbia Zoning Commission ("**Zoning Commission**") adopted an amendment to the Zoning Regulations, 11 DCMR § 330.5(i), which made all CBRFs that are intended to be operated as housing for the handicapped, as that term is defined under Section 3602(h) of the Fair Housing Act, as amended, 42 U.S.C. Section 3601 *et seq.*, a permitted matter-of-right use in the R-4 and less restrictive zone districts, such as R-5-D (the Facility being located in an R-5-D District).

44.    Whether a CBRF, such as the Nursing Center, is intended to provide housing for the handicapped is determined pursuant to 11 DCMR § 330.5(i).

---

[*]  CHG advises the Court that said application was prepared and filed on behalf of CHG by Robins Kaplan.  As the Court knows, Robins Kaplan represents the Holladay in connection with certain litigation pending in the above-captioned chapter 11 case. As the Court also knows, and as the Court confirmed during a July 31, 2002 hearing, CHG does not waive any conflicts or other rights that exist with respect to services provided by Robins Kaplan to CHG, all rights of any kind having been (and continuing to be) specifically reserved. Indeed, CHG advises the Court that it will seek, among other things, the disqualification of Robins Kaplan from representing any party in connection with litigation involving the zoning applicable to the Facility.

45.     In furtherance of this determination, 11 DCMR § 330.5(i) contains language identical to the Fair Housing Act's definition of handicap: "a physical mental impairment which substantially limits one or more of such person's major life activities". 32 U.S.C. § 3602.

46.     However, when the Zoning Commission adopted the above-described 1999 amendment to the Zoning Regulations regarding the permitted uses in the R-4 and less restrictive districts (such as the R-5-D Zoning District), it failed to also amend the pertinent section of the Zoning Regulations regarding the number of parking spaces that are required to be provided by a CBRF, like the Nursing Center, that provides housing for the handicapped in the R-4 and less restrictive zones.

47.     In such instances where the Zoning Regulations do not state with specificity the number of required parking spaces for a particular use, the long standing practice of the Zoning Administrator's Office is to determine an appropriate similar use and apply those parking requirements.

48.     Pursuant to the amended Zoning Regulations, a CBRF that provides housing for the handicapped in the R-5-D District is permitted as a matter-of-right use and is therefore not required to obtain BZA approval for such use, or be subject to conditions that govern such use.

## Previous Determinations of the Zoning Administrator Regarding CBRFs that Provide Housing for the Handicapped

49.     The Office of the Zoning Administrator has previously determined that an assisted living facility for elderly residents qualified as a facility operated as housing for the handicapped, and, thus, was a matter-of-right use in an R-5-D Zone District under 11 DCMR § 330.5(i).

50.     In that same case, the Office of the Zoning Administrator determined that appropriate similar uses to calculate the number of parking spaces required for the assisted living facility would be based on the same ratio as that used for publicly assisted housing reserved for

8

the elderly and/or handicapped, (i.e., one parking space for every six dwelling units);

alternatively, the Chief of the Zoning Review Branch determined that an appropriate similar use

was a rooming or boarding house, which requires "one parking space plus one parking space for

every 5 rooming units", 11 DCMR 2101.1.

51.    In BZA Order No. 16716A, dated October 12, 2001, the BZA upheld the above-

mentioned decision of the Zoning Administrator when it determined that an assisted living

facility satisfied 11 DCMR § 330.5(i) and is permitted as a matter-of-right in the R-5-D Zone

District. A copy of this Order of the BZA is included in an appendix to this complaint.

### Nursing Center's Satisfaction of the Requirements of 11 DCMR 330.5(i)

52.    As previously mentioned, the Nursing Center is deemed to be a CBRF under the

Zoning Regulations.

53.    Furthermore, the Nursing Center provides housing for residents who are even

more handicapped than individuals residing in an assisted living facility.

54.    Pursuant to 11 DCMR § 330.5(i), CHG submits that the Nursing Center provides

housing for the handicapped, as its residents certainly have a physical or mental impairment that

substantially limits one or more of their major life activities and it is therefore permitted to

operate as a matter-of-right use at the Facility, without any conditions of BZA approval, just as

any other matter-of-right use is permitted in the R-5-D Zone District, such as an apartment

building or a hospital.

55.    During a meeting on November 18, 2002 and in a follow-up letter dated

November 19, 2002, CHG identified for the Office of the Zoning Administrator two similar uses

to determine the appropriate amount of parking spaces for the Nursing Center – (1) publicly

assisted housing for the elderly and/or handicapped, which would require CHG to provide a total

of 22 parking spaces for the Nursing Center, and (2) a rooming or boarding house, which would

require CHG to provide a total of 27 parking spaces for the Nursing Center.

### Actions of the Representatives of the Department of Consumer and Regulatory Affairs

56. Notwithstanding the foregoing important amendment to the Zoning Regulations, on November 5, 2002, the Acting Administrator of the Building and Land Regulation Administration of DCRA informed CHG that, among other things, the Nursing Facility remains subject to BZA Orders 15542 and 16407 described above.

57. On November 18, 2002, CHG met with the Zoning Administrator and explained that BZA Order Nos. 15542 and 16407 are no longer applicable to the Nursing Center due to the Zoning Commission's adoption of 11 DCMR § 330.5(i) on April 30, 1999.

58. CHG also informed the Zoning Administrator that, because the Nursing Center is a CBRF that provides housing for the handicapped, 11 DCMR § 330.5(i) is fully satisfied and the Nursing Center is a matter-of-right use.

59. CHG submits that, by a letter dated December 12, 2002, the Zoning Administrator in effect informed CHG that the Zoning Administrator does not consider the Nursing Center to be a matter-of-right use in an R-5-D Zone District; with the effect that the Zoning Administrator asserts that the Nursing Center does not provide housing for the handicapped.

60. By letter dated December 16, 2002, CHG reiterated its previous arguments and requested that the Zoning Administrator reconfirm CHG's interpretation of the Zoning Administrator's position – that the Nursing Center is not a permitted matter-of-right use because the Office of the Zoning Administrator asserts that the Nursing Facility is not intended to provide housing for the handicapped. As of the date of this Complaint, the Office of the Zoning Administrator has not responded to the December 16, 2002 letter from CHG.

### Facts Regarding Damages

61. The actions of Defendants have caused significant harm to CHG in that it has received an improper citation for its alleged non-compliance with the conditions of Order Nos.

15542 and 16407, and remains subject to the further potential enforcement of these now inapplicable Orders and ineffectual conditions.

62.     If allowed to continue, the actions of Defendants will require CHG to expend significant resources to comply with these now inapplicable Orders and ineffectual conditions, which may threaten the continued viability of the Nursing Center and cause harm to the Nursing Center patients.

63.     The actions of Defendants have caused attorneys' fees, costs, and other expenses for professional assistance beyond what would have been incurred had Defendants not engaged in the wrongful and discriminatory conduct.

## COUNT I
### (DECLARATORY RELIEF UNDER 28 U.S.C. §2201)

64.     Paragraphs 1-63 are hereby realleged and incorporated as if fully set forth herein.

65.     28 U.S.C.§ 2201(a) provides: "In a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. §2201(a).

66.     CHG submits that the Nursing Center is being operated as a facility that provides housing for the handicapped, that consequently it is a matter-of-right-use in the R-5-D Zone District and consequently CHG is required to provide no more than a total of 27 (and as few as 22) parking spaces with respect to the Nursing Center.

67.     The Zoning Administrator asserts that the Nursing Center is not being operated as a facility that provides housing for the handicapped, and consequently that the conditions of approval included in BZA Order Nos. 15542 and 16407 are to be applied against CHG.

68.    The foregoing dispute represents an actual controversy between the parties under

28 U.S.C. §2201.

## COUNT II
## INTENTIONAL HANDICAP DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT

69.    Paragraphs 1-68 are hereby realleged and incorporated as if fully set forth herein.

70.    Pursuant to 42 U.S.C. § 3604, it is unlawful "to discriminate in the sale or rental,

or otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap

of ... a person residing in or intending to reside in that dwelling after it is sold, rented, or made

available; or any person associated with that buyer or renter." 42 U.S.C. § 3604(f)(1).

71.    Pursuant to 42 U.S.C. § 3604 discrimination includes "a refusal to make

reasonable accommodations in rules, policies, practices, or services, when such accommodations

may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42

U.S.C. § 3604 (f)(3)(B).

72.    The actions of Defendants as set forth above constitute a policy or decision that is

evidence of intentional discrimination against the handicapped because such actions have made,

and threaten to continue to make, housing unavailable to the handicapped.

73.    The actions of Defendants as set forth above constitute a policy or decision that is

evidence of intentional discrimination against the handicapped because such actions constitute a

refusal by Defendants to make reasonable accommodations in rules, policies, practices, or

services when such accommodations may be necessary to afford such a person equal opportunity

to use and enjoy a dwelling.

74.    Accordingly, the actions of Defendants as set forth above constitute intentional

discrimination on the basis of handicap, in violation of the provisions of the Fair Housing Act, 42

U.S.C. § 3601 *et seq.*

## COUNT III
## DISCRIMINATORY IMPACT ON BASIS OF HANDICAP IN VIOLATION OF THE FAIR HOUSING ACT

75.     Paragraphs 1-74 are hereby realleged and incorporated as if fully set forth herein.

76.     Claims for discriminatory impact also are cognizable under the Fair Housing Act.

77.     The actions of Defendants as set forth above constitute a policy or decision that has an inordinate adverse impact on the handicapped, and have made, and threaten to continue to make, housing unavailable to the handicapped.

78.     The actions of Defendants as set forth above constitute a policy or decision that has an inordinate adverse impact on the handicapped, and constitute a refusal by Defendants to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such a person equal opportunity to use and enjoy a dwelling.

79.     Accordingly, the actions of Defendants as set forth above have had and are having the effect and impact of discrimination on the basis of handicap, in violation of the provisions of the Fair Housing Act, 42 U.S.C. § 3604.

## COUNT IV
## UNLAWFUL INTERFERENCE WITH CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 3617

80.     Paragraphs 1-79 are hereby realleged and incorporated as if fully set forth herein.

81.     Pursuant to 42 U.S.C. 3617, "It shall be unlawful to … interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" the Fair Housing Act.

13

82.    The continued application of the conditions to the Nursing Center by Defendants, enforcement thereof, and other actions set forth above, have interfered with the ability of the Nursing Center to provide housing to its handicapped residents.

83.    Such actions constitute unlawful interference in the exercise and enjoyment of rights protected under the Fair Housing Act, 42 U.S.C. § 3617.

## COUNT V
## VIOLATION OF RIGHTS UNDER THE LAWS OF THE DISTRICT OF COLUMBIA

84.    Paragraphs 1-68 are hereby realleged and incorporated as if fully set forth herein.

85.    Under the District of Columbia Human Rights Act it is "an unlawful discriminatory practice in the sale or rental of real estate to deny a dwelling to a buyer or renter or to otherwise make a dwelling unavailable to a buyer or renter because of a disability of... [a]ny person residing in or intending to reside in that dwelling after it is sold, rented or made available; or any person associated with that buyer or renter." D.C. Code § 2402.21(d)(1) (2001).

86.    Under the District of Columbia Human Rights act it is "unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with the dwelling because of a disability of ... [a]ny person residing in or intending to reside in that dwelling after it is sold, rented or made available; or any person associated with that buyer or renter." D.C. Code § 2402.21(d)(2) (2001).

87.    Under the District of Columbia Human Rights Act, unlawful discrimination includes "[a] refusal to make reasonable accommodations in rules, policies, practices, or services, when these accommodations may be necessary to afford any person equal opportunity to use and enjoy a dwelling." D.C. Code § 2-1402.21(d)(3) (2001).

88.    The actions of Defendants as set forth above have made, and threaten to make, housing unavailable to the disabled.

89.    The actions of Defendants as set forth above constitute an unlawful discriminatory practice in the sale or rental of a dwelling because of disability.

90.    The actions of Defendants as set forth above constitute unlawful discrimination in the terms, conditions, or privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with the dwelling because of a disability.

100.    Accordingly, the actions of Defendants constitute misapplication and misinterpretation of the laws, rules, and regulations of the District of Columbia in violation of the rights of CHG and those of the Nursing Center residents under the District of Columbia Human Rights Act, D.C. Code (2001) §§ 2-1401.01 *et seq.* and its laws, rules, and regulations relating to permitted uses.

## PRAYER FOR RELIEF

WHEREFORE, CHG requests that the Court award the following relief against Defendants jointly and severally:

A.    A declaration that Defendants have discriminated on the basis of handicap in violation of the Fair Housing Act;

B.    A permanent injunction against Defendants and all persons acting on their behalf or at their directions, enjoining any and all further violations of the Fair Housing Act;

C.    A declaration that Defendants have misapplied and misinterpreted District laws, rules, and regulations related to permitted uses, and have violated the District of Columbia Human Rights Act in violation of the rights of CHG thereunder;

D.      An order decreeing that the Nursing Center provides housing for the handicapped and that CHG is entitled to operate and use the Facility as a community based residential facility (health care facility) as a matter-of-right, that the Facility satisfies the matter-of-right parking requirements for such use, as well as an order declaring, with respect to CHG and the Facility, BZA Order Nos. 15542 and 16407 to be of no further force and effect as of April 30, 1999, and mandating that DCRA vacate all notices of infraction regarding any alleged violations by CHG of those Orders.

E.      A money judgment for compensatory and punitive damages;

F.      A money judgment for reasonable attorneys' fees;

G.      A money judgment for all costs and expert fees;

H.      Interest on the above amounts; and

I.      All other appropriate relief as the Court deems just and proper in law and equity.

SHAW PITTMAN LLP

Dated:  January 16, 2003

Patrick J. Potter (426514)
Paul A. Tummonds, Jr. (452020)
2300 N Street, N.W.
Washington, D.C.  20037
Tel: (202) 663-8000
Fax: (202) 663-8007
Counsel for Capitol Hill Group

Document #: 1295075 v.6

16

# **APPENDIX**

## **BZA ORDER NO. 16716A**

Document #: 1299936 v.1

GOVERNMENT OF THE DISTRICT OF COLUMBIA
Board of Zoning Adjustment



Office of Zoning

Appeal No. 16716A of Nebraska Avenue Neighborhood Association, pursuant to 11 DCMR §§ 3100 and 3101, from the administrative decision of the Zoning Administrator, Department of Consumer and Regulatory Affairs, in the issuance of a building permit (No. B435464) on March 3, 2001, to Sunny and Louis Reyes *et al.* to permit the construction of a 102-unit handicapped assisted-living-apartment residence in an R-2 and R-5-D District at premises 5111, 5113, 5117, 5119, 5121, 5123, and 5125 Connecticut Avenue, N.W., and 5201, 5203, and 5205 Chevy Chase Parkway, N.W. (Square 1989, Lots 49-57 and 161).

HEARING DATES:      July 17, 2001; August 3, 2001

DECISION DATES:     September 4, 2001; October 2, 2001

## DECISION AND ORDER

This appeal was filed on March 16, 2001, by the Nebraska Avenue Neighborhood Association (NANA) challenging on various grounds the Zoning Administrator's decision to approve the issue of Building Permit No. B435464, to Sunrise Assisted Living LLC to construct the 7-story Sunrise Assisted Living facility at 5111 Connecticut Avenue, N.W. After a public hearing, the Board denied the appeal, affirming the Zoning Administrator's approval of the permit.

## PRELIMINARY AND PROCEDURAL MATTERS

<u>Parties</u>. The co-appellants in this case are the Nebraska Avenue Neighborhood Association, represented at the hearing by its President, Dr. Anne Page Chiapella, and Advisory Neighborhood Commission ("ANC") 3G, represented at the hearing by Marilyn Holmes, Esq., Commissioner of ANC Single Member District (SMD) 3G-07. The subject property is located within the area served by ANC 3G. As indicated by its letters dated April 9, 2001 (Ex. 16) and June 25, 2001 (Ex. 29), ANC 3G joined in this appeal with NANA in challenging the Zoning Administrator's decision.

Toye Bello, from the Department of Consumer and Regulatory Affairs, Zoning Review Branch, appeared on behalf of the Zoning Administrator. The Office of the Corporation Counsel represented the Zoning Administrator.

When the building permit application was filed on July 10, 2000, the subject property was owned by a number of individual property owners and Sunrise Connecticut Avenue Assisted

Living LLC (hereinafter "Sunrise" or "owner"). Subsequent to the issuance of the building permit on March 8, 2001, Sunrise completed its purchase of all of the subject property. As the owner of the property that is the subject of this appeal, Sunrise is automatically a party in this appeal pursuant to 11 DCMR § 3199.1. Sunrise is represented by ShawPittman LLP.

Notice of Appeal and Notice of Public Hearing. By memoranda dated March 26, 2001, the Office of Zoning advised Sunny and Louis Reyes, ANC 3G, the Zoning Administrator, the ANC Commissioner for the single-member district within which the property is located, the Ward 3 council member, the D.C. Office of Planning, and the Office of the Corporation Counsel of the filing of the appeal.

The Board scheduled a public hearing on the appeal for July 17, 2001. Pursuant to 11 DCMR § 3112.14, the Office of Zoning, on May 31, 2001, mailed ANC 3G, NANA, and the Zoning Administrator notice of hearing. Notice of hearing was also published in the *D.C. Register* on June 1, 2001, at 48 DCR 4898-99.

On May 7, 2001, Sunrise filed a motion to recuse Board Member Anne Renshaw. On July 10, 2001, after reviewing the motion and the responses thereto and debating the matter in a public meeting, four members of the Board requested that Member Renshaw voluntarily recuse herself. When Ms. Renshaw refused to recuse herself, the Board voted 4-1-0 to recuse her. An Order evidencing this decision was mailed to all parties to this appeal on July 26, 2001. No challenge of that order has been filed.

On July 16, 2001, NANA filed a request for clarification of the status of Sunrise as the property owner, a request to strike from the record a portion of the Property Owner's Statement and a motion for the participation of four Board Members requesting that the Board not proceed with the hearing with fewer than four Board members participating. After confirming the Board's right to consider any application or appeal with a quorum of three members, the Board noted that the request was moot since four members were in attendance. Further, the Board confirmed that Sunrise is the owner of all the property that is the subject of the appeal and that there was no basis for striking a portion of the Property Owner's Statement.

Appellants' Case. The Appellants raised eight issues on appeal that they assert constitute error on the part of the Zoning Administrator, and which form the basis for their argument that the building permit should be revoked. The issues are:

    (a) the building permit application was not complete before the Zoning Commission setdown date for the rezoning of the property;

    (b) incomplete and inaccurate information on the Building Permit Application materials invalidates these forms;

    (c) the approved building violates the FAR requirements;

    (d) the building has an inadequate rear yard setback;

    (e) the height of the building exceeds the permitted height in the R-5-D zone;

    (f) the housing for the mechanical equipment and the elevator penthouse is improper;

    (g) the parking spaces and loading areas are inappropriate;

    (h) the plans were not referred to the Office of Planning (OP) for review and report before final approval of the roof structures plan; and

BZA Appeal No. 16716A
Page No. 3

(i) the proposed facility does not meet all applicable code and licensing requirements of 22 DCMR 3242 and 3257.

Zoning Administrator's Case. Mr. Bello, Chief of the Zoning Review Branch, testified about the components of a complete building permit application and discussed the plan review process. He described the use of architectural embellishments and their application to the roof structures here, the FAR calculations for the cited areas of the building, and the judgments required due to the uniquely shaped lot. Mr. Bello described the Zoning Administrator's practices regarding application intake, application amendments, plan referral to OP, building height measurements, and uniform treatment of community-based residential facilities under the Regulations.

Property Owner's Case. Sunrise presented testimony from Sean Ambrose, its Vice President for Development. Sunrise also called two expert witnesses, one in architecture, Steve Ruiz the project architect, and one in building and zoning regulatory matters, Armando Laurenco. Messrs. Ambrose and Ruiz testified about consultations with the Zoning Administrator pre-application and plan changes requested by the Zoning Administrator during the application review process. Sunrise, through counsel, objected to the appellants' testimony and argument regarding the Building Code and Department of Health as outside the jurisdiction of the Board.

Public Agency Reports. There are no public agency reports in this case.

ANC Report. There is no ANC report in this case. ANC 3G presented testimony and argument at the hearing.

Closing of the Record. The record closed at the conclusion of the August 3, 2001 hearing, with the exception of an e-mail from OP related to the referral regarding 11 DCMR §411.10 and Mr. Bello's additional response to elevator machine room setback and documentation establishing when the application was actually accepted for intake.

When submitting its proposed findings of facts and conclusions of law, Sunrise attached a drawing illustrating the penthouse. NANA filed a memorandum requesting a public hearing to permit additional cross-examination on the exhibit. Sunrise then moved to strike the memorandum or to withdraw the exhibit. The Board declined to accept the drawing and ordered it stricken from the record. See 11 DCMR §§3121.5, 3121.9.

Decision Meeting. At its decision meeting on September 4, 2001, the Board, voting 4-0-1, with Member Renshaw not voting, denied the appeal in all aspects, except for the structure plan not reviewed by the Office of Planning and the stair and elevator/penthouse setback requirements. The Board, voting 3-1-1, with Member Renshaw not voting, denied the appeal based on roof structure not being reviewed by the Office of Planning. The Board, voting 3-1-1, with Member Renshaw not voting, moved to deny the appeal regarding the stair and elevator penthouse setbacks and locations adjacent to exterior walls.

Motion for Reconsideration. At the Board's October 2, 2001 public meeting, Zoning Commission member Carol J. Mitten requested that the Board reconsider its September 4, 2001 votes on the roof structure review by the Office of Planning and the stair and elevator penthouse setbacks. Ms. Mitten, who heard the Appeal but submitted her vote by proxy at the September meeting, wished to present her reasons for her vote and her request for reconsideration to the Board in person. After discussion, the Board voted 2-2-1, with Member Renshaw not voting, and the motion for reconsideration of the Board's previous votes failed for want of a majority.

## FINDINGS OF FACT

### The Subject Property

1.    The property that is the subject of the appeal is located at 5111, 5113, 5117, 5119, 5121, 5123, and 5125 Connecticut Avenue, N.W., and 5201, 5203, and 5205 Chevy Chase Parkway, N.W., Square 1989, Lots 49-57 and 161, in an R-5-D District.

2.    The property is an irregularly shaped lot that includes frontage on Connecticut Avenue, N.W. and Chevy Chase Parkway, N.W.

### Pre-Application Rulings and Building Permit Application Intake and Review

3.    On October 15, 1998, Sunrise met with then Deputy Zoning Administrator, Gladys Hicks, to discuss the proposed use of the property as an assisted living facility. On December 17, 1998, Sunrise received written confirmation from Ms. Hicks that the proposed assisted living use would be permitted as a matter of right, once the proposed amendments to the Zoning Regulations were adopted regarding housing for the handicapped.[1] Sunrise received additional confirmation from Ms. Hicks on March 8, 1999, regarding the number of required parking spaces and loading berths for the assisted living facility. (Record Exhibit ("Exh.") 34, p. 5.)

4.    The Appellants became aware of Sunrise's development plans early in the process. The ANC and the community opposed the alley closing application filed by Sunrise on August 2, 1999, to close the alley stub in Square 1989 adjacent to the subject property.

5.    As a result of this opposition, Sunrise abandoned the alley closing application and pursued a building design that did not require closure of the alley. (Exh. 34, p. 6.)

6.    On May 2, 2000, Sunrise met with the current Zoning Administrator, Michael Johnson, to review the matter-of-right zoning requirements for the proposed building, including height, rear yard setback, side yard setback and court determinations. On July 8, 2000, Michael Johnson provided written confirmation of the appropriate development parameters for the proposed assisted living facility on the site. (Exh. 34, pp. 6-7.)

---

[1] The D.C. Zoning Commission adopted these amendments to the Zoning Regulations in Zoning Commission Order No. 869, which became effective on April 30, 1999.

7.    On July 10, 2000, Sunrise filed a building permit application with the Building and Land Regulation Administration ("BLRA") of the Department of Consumer and Regulatory Affairs ("DCRA").  The detailed working drawings that were filed with the application included 178 pages and showed the construction of an assisted living facility for seniors. (Exh. 34, p. 7.)

8.    Among other information the submission contained scaled drawings that showed the lot's exact shape, topography and dimensions; the plan, elevation, location and dimensions of existing and proposed structures and the proposed use; parking and loading plans; and building plats required by 11 DCMR §3202.  The building permit application filed on July 10, 2000 was complete.

9.    DCRA accepted a filing fee and issued a receipt on July 10, 2000.  DCRA will only accept a filing fee for a building permit application that the intake officials at the Permit Review Branch deem complete.[2]

10.    The building permit application correctly referred to the proposed use as an assisted living facility.

11.    Internal notes made on the building permit application by the permit intake personnel did not invalidate the initial filing date or in any way affect the owner's representation of the proposed use.

12.    During its October 16, 2000 public meeting, the Zoning Commission set down for hearing a proposed map amendment that would downzone the subject property from R-5-D to R-3.

13.    By virtue of 11 DCMR §3202.5, the property owner had to file a complete building permit application by October 16, 2000, in order to allow the processing of the building under the R-5-D zoning.

14.    Once plans are filed, it is common for the permit reviewers to comment or make notations on the plans, require plan clarification, additional drawings or plan modifications to address specific issues.

15.    DCRA reviewed the application and the detailed working drawings for eight months. During the review process, DCRA required Sunrise to amend or supplement portions of its plans. The adjustments associated with this building permit application were typical of the building permit review process.

16.    During the review process, the Zoning Administrator did not specifically refer the roof structure plans to the Director of the Office of Planning for review and report as required by 11 DCMR §411.10.

---

[2]  Except where otherwise noted, the findings of facts stated herein are based upon the testimony of Toye Bello, Sean Ambrose, Steve Ruiz and Armando Laurenco and the evidence admitted in the record in the course of that testimony.

BZA Appeal No. 16716A
Page No. 6

17.    The Office of the Zoning Administrator has not made a specific referral of roof plans to the Office of Planning for several years.

18.    Sunrise submitted a revised building permit application in February 2001.

19.    Building Permit No. B43564 was issued on March 8, 2001, authorizing the construction of a "seven story cast in place concrete structure containing assisted living residences (CRF, housing for the handicapped as the term is defined by the Fair Housing Act) with undergrd parking." (Exh. 6.)

## Matter-of-Right Use

20.    A community residence facility intended to be operated as housing for persons with handicaps is permitted as a matter-of-right in the R-5-D zone pursuant to 11 DCMR §330.5(i) which permits a community based residential facility as a matter-of-right in the R-4 and higher zone districts provided that the Zoning Administrator determines that the community based facility, otherwise complies with the zoning requirements of Title 11 that are of general and uniform applicability to all matter of right uses in an R-4 district, and is intended to be operated as housing for persons with handicaps.

21.    The Sunrise facility, as described, is a community residence facility.

22.    The Appellants did not challenge the determination that the facility would provide housing for the handicapped.

23.    The proposed facility, as a community residence facility that provides housing for the handicapped, is permitted as a matter-of-right use on the property given its R-5-D zoning.

## Floor Area Ratio ("FAR") Calculations

24.    FAR for the building was calculated correctly in that the gross floor area calculations included all the portions of the building that are to be counted pursuant to the definition of gross floor area and correctly excluded the areas for which the Zoning Regulations specifically provide exemptions. For example, ventilation and utility shafts and rooftop terraces are excluded, but interior balconies are included.

25.    The third floor roof terrace is excluded from FAR because it does not constitute habitable space; it is not fully enclosed. The terrace's columns are not exterior walls, there is no permanent roof, and the space is open to the elements.

26.    The building has only seven stories. The eighth level consists only of roof structures, housing for mechanical equipment, stairway and elevator penthouses, described 11 DCMR §411.1 and therefore is not a story within the meaning of 11 DCMR §199.1. The penthouses qualify for the excess FAR that is allowed penthouses under 11 DCMR §411.7.

27.    Floors or levels in roof structures that are less than six feet and six inches in height are excluded from FAR.  The mechanical room on the roof was correctly excluded from the building's FAR calculation.

28.    The architectural embellishments above the roof's parapet line do not constitute usable space and therefore are excluded from FAR.

29.    The Zoning Administrator uses a perimeter calculation to determine the ratio of gross floor area that would constitute a basement by applying the definition of basement or cellar and prorating the amount of square footage that is devoted to each function. Testimony of Bello.

30.    The portion of the building's lower level that qualifies as basement was correctly counted and included in the building's FAR.  The FAR computations correctly excluded a portion of the garage level of the building because only 11.9% of that level constitutes basement space as defined in 11 DCMR §199.1.

31.    FAR calculations were based only on the lot area of the R-5-D portion of the split-zoned site.

32.    The building's FAR of 3.47 fully complies with the 3.5 limit applicable in the R-5-D zone.

33.    Appellants' FAR computations were erroneous in many respects.  The computations improperly included rooftop penthouses.  The rooftop terrace over the low roof of the second floor was improperly counted toward FAR as if it were an exterior balcony.  The appellants did not apply the perimeter wall computation correctly in determining the gross floor area of the lower level of the building in that they incorrectly measured from adjacent finished grade to the underside of the slab rather than the finished ceiling.  This error resulted in an overstatement of the basement area and, accordingly, an overstatement of gross floor area.

**Rear Yard and Side Yard**

34.    The property is on a corner lot with a highly unusual configuration.

35.    Corner lots, by definition, have more than one front.  Once the property owner chooses the front, for purposes of determining yards, the rear yard is designated as the yard opposite the chosen front.

36.    For a corner lot, "the depth of rear yard may be measured from the center line of the street abutting the lot at the rear of the structure." 11 DCMR §404.2.

37.    A side yard is not required in an R-5-D district, but if one is provided, it must be at least three inches wide per foot of height of the building, but no less than eight feet wide. 11 DCMR §405.6.

BZA Appeal No. 16716A
Page No. 8

38.     In the case of unusually shaped lots, the Zoning Administrator must make a judgment call. The side and rear yard computations were determined appropriately given the highly unusual configuration of the lot.

39.     The Zoning Administrator correctly determined that Connecticut Avenue and Chevy Chase Parkway were the fronts and the portion of the lot east of the building, abutting the north-south rear alley that runs roughly parallel to Connecticut Avenue and Chevy Chase Parkway, was the rear.

40.     Given the Zoning Administrator's interpretation, the rear yard depth of 34 feet was correctly measured as the depth of the yard located between the rear building line and the north-south alley.

41.     The manner in which the rear yard was computed for this irregularly configured lot was reasonable and consistent with the longstanding interpretation of the Zoning Regulations by the Office of the Zoning Administrator and does not yield an unnatural result.

42.     The Zoning Administrator correctly determined that the south side yard was the portion of the lot that abutted the building on the south at 5109 Connecticut Avenue.

43.     The building's north wall continues to the building restriction line on the north that coincides with the boundary line separating the R-5-D and R-2 zones. The Zoning Administrator determined that no side yard is required on the north side.

44.     There is an extremely generous open space between the proposed building and the residential properties to the north because the entire R-2 zoned portion of the site will contain no building area.

45.     The Zoning Administrator's ruling yielded an appropriate and natural result because it will ensure ample open space surrounding the building, consistent with the intent of the Zoning Regulations.

## Building Height

46.     The building height is the vertical distance between the level of the curb opposite the middle of the front of the building to the highest point of the roof or parapet. 11 DCMR §199.1.

47.     The building height was 83 feet, which is seven feet less than the maximum permitted height of 90 feet in the R-5-D zone.

48.     Accurate measurement of height under the Zoning Regulations requires the correct classification of the architectural and structural features that are permitted on rooftops. In determining the height of the subject building, the height was measured to the top of the three-foot parapet. 11 DCMR §199.1.

BZA Appeal No. 16716A
Page No. 9

49.    The roof contains several structures that do not count toward the determination of the height of the building under 11 DCMR §400.8. These structures include a mechanical penthouse that houses mechanical equipment, a stairway and an elevator machine room.

50.    Architectural embellishments above the parapet line do not constitute habitable space and are not counted toward the building's height.  11 DCMR §199.1; Testimony of Bello.  These embellishments include towers such as the one that houses the elevator equipment which is capped with a purely decorative peaked roof element as well as the other architectural embellishments that simulate the look of a mansard roof around the building's perimeter.

51.    The Zoning Administrator correctly determined that the height of the building was in compliance with the Zoning Regulations and followed standard review procedures that had been used in cases since 1958.

52.    The Appellants were unable to refute the accuracy of the datum points that formed the basis of the measurement of the building height.

**Elevator Penthouse and Rooftop Mechanical Equipment**

53.    The architectural embellishments and penthouse elements were correctly excluded from both the height and FAR computations.

54.    The Chief of the Zoning Review Branch correctly determined that the mansard roof-like structure that wraps around the perimeter of the building serves as an enclosure of the entire penthouse under 11 DCMR §411.3.  |

55.    The roof plan meets the requirement that penthouses and mechanical equipment be placed within a single enclosure.

56.    The Chief of the Zoning Review Branch correctly determined that the elevator tower located at the rear edge of the roof of the building was located within an architectural embellishment and accordingly was not subject to the penthouse setback requirement.

57.    There is no prohibition against including mechanical equipment within an architectural embellishment.

58.    The Zoning Review Branch regularly approves tower elements and architectural embellishments that are not set back from the exterior face of the building when they are incorporated with any other architectural element for dual functions and are not designed to gain additional habitable space.

59.    The same doctrine was applied by the Zoning Administrator in approving similar designs in which architectural embellishments that are not set back from the edge of the roof include mechanical equipment at 2590 L Street, N.W., 1725 I Street, N.W., and 1818 H Street, N.W.

60.    The enclosing façade of the elevator penthouse was deemed to be an architectural embellishment designed for the predominant purpose of architectural uniformity of the roof plan and therefore, not subject to the setback requirements of 11 DCMR § 400.7(b).

61.    The determination that the façade was an architectural embellishment is consistent with a previous design in which the architectural embellishment was proposed as an extension of a façade or curtain wall above the main roofline to conceal mechanical equipment behind the wall.

62.    The Zoning Regulations are silent on the issue of the amount of functionality that is permitted for an architectural embellishment. Architectural embellishments cannot be used to provide habitable space; but there is no prohibition of the functional duality afforded by locating mechanical equipment in an architectural embellishment.

63.    The decision to include the elevator enclosure in the excess FAR allowed penthouses is logical given the roof plan proposal, which was designed to create uniformity with the mansard and turret roofs on other portions of the building, and the function of the penthouse enclosure.

64.    The Office of Planning made no comments as to any negative impact of the roof structure on neighboring properties although it received notice of the appeal and had access to the plans.

## Parking and Loading

65.    The plans meet the parking requirement the Zoning Administrator applied to the proposed use.

66.    The Zoning Regulations do not explicitly establish a ratio of required parking spaces for community residence facilities in the R-5-D zone. The Zoning Administrator applied the ratio applicable to publicly assisted housing for the elderly because the Regulations do not provide a parking ratio for the proposed use.

67.    In reviewing the permit application, the Chief of the Zoning Review Branch applied an even more restrictive standard, that for a rooming house or a boarding house. The project also satisfied the more restrictive requirements for a rooming or boarding house. The plans provide for 31 parking spaces.

68.    The proposed loading dock and berth fully satisfy the requirements of the Zoning Regulations.

69.    The convenience of use or the exact manner in which the loading facilities will function is beyond the purview of the review of the Zoning Administrator.

70.    The approved plans adequately depict the location of the loading berth, loading platform and service delivery space. The plans show that the loading platform is contiguous to the loading berth and that there is unobstructed access from the berth to the platform.

71.   The Zoning Regulations do not provide a ratio for loading spaces.   The Zoning Administrator correctly applied the ratio required for any other use in all districts.

## Licensing Requirements of 22 DCMR 3242 and 3257

72.   Such licensing issues are issues that are beyond the scope of this appeal because they fall within the jurisdiction and expertise of the Department of Health.

## Referral of Roof Plans to the Office of Planning

73.   See Findings of Fact 16 and 17.

## CONCLUSIONS OF LAW AND OPINION

The Board is authorized under §8 of the Zoning Act of 1938, approved June 20, 1938 (52 Stat. 797, as amended; D.C. Code, 2001 Ed. §6-641.07(g)(1) (2001)) ("Zoning Act"), to hear and decide appeals where it is alleged by an appellant that an administrative officer erred in any administrative decision based in whole or in part upon any Zoning Regulation or Zoning Map. This appeal is properly before the Board pursuant to 11 DCMR §§ 3100.2, 3101.5, and 3200.2. The notice requirements of 11 DCMR §3112 for the public hearing on the appeal have been met.

The appellants, NANA and ANC 3G, appeal the decision of the Zoning Administrator to approve the issuance of a building permit for a seven-story building to permit the construction of a 102-unit handicapped assisted-living-apartment residence on a variety of procedural and substantive grounds.

## Complete Building Permit Application

In order to vest its rights under the R-5-D zoning, pursuant to 11 DCMR §3202.5, Sunrise had to file a complete Building Permit Application prior to October 16, 2000, the date upon which the Zoning Commission set down the application to down zone the site for public hearing. Based on the evidence submitted by the property owner, the testimony of the Chief of the Zoning Review Branch, and evidence in the record including a receipt for the payment of a filing fee on July 10, 2000, the Board concludes that the property owner filed a complete Building Permit Application on July 10, 2000, well in advance of the October setdown date for the rezoning of the property.

## Matter-of-Right Use

Historically, the Zoning Regulations have treated assisted living facilities as a type of community based residence facility.  11 DCMR §199.1.  The owner's property is located in an R-5-D zone.  The Board notes that housing for the handicapped is clearly permitted as a matter of right use in an R-4 District under 11 DCMR §330.5(i), which states:

Community based residential facility; Provided that notwithstanding any provision in this title to the contrary, the Zoning Administrator has determined that such community based facility, which otherwise complies with the zoning requirements of this title that are of general and uniform applicability to all matter of right uses in an R-4 District, is intended to be operated as housing for persons with handicaps. For purposes of this subsection, a "handicap" means, with respect to a person, a physical or mental impairment which substantially limits one or more of such person's major life activities, or a record of having, or being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance.

The Board concludes that the Zoning Administrator applied general and uniform zoning requirements applicable to multi-family residences in an R-4 District, such as parking requirements, in his review of the application for a building permit. There is no evidence in this case that the proposed building does not otherwise satisfy the zoning requirements for a multi-family residence in an R-4 or R-5 District. Community residential facilities for handicapped persons in the multi-family districts are not subject to a greater level of regulation than that applicable to housing for non-handicapped persons.

Appellants presented no evidence that the proposed building is not intended to provide housing for "handicapped" residents within the meaning of Section 330.5(i). Finding of Fact ("FF") 22. Based upon its testimony, Sunrise plans to serve residents who meet the definition of handicapped under the Federal Fair Housing Amendments Act and qualify as members of a protected class under the act by virtue of having "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h); see, e.g., Hovson's, Inc. v. Township of Brick, 89 F.3d 1096, 1103 and n. 3 (U.S. Ct. App. 1996); Assisted Living Associates of Morristown, LLC v. Morristown Township, 996 F.Supp. 409, 435 (D.N.J. 1998). The proposed facility will assist residents in major life activities such as eating, bathing, toileting and grooming. This particular facility will also serve individuals with cognitive impairment caused by Alzheimer's Disease. The Board concludes that the uses of the building, described by Sunrise, are consistent with a community residence facility providing housing for the handicapped. Therefore, Sunrise' proposed use is permitted as a matter-of-right in an R-5-D zone.

## Floor Area Ratio ("FAR") Calculations

The Board concludes that FAR has been properly calculated and fully complies with the 3.5 FAR limit applicable in the R-5-D zone. The testimony of record from the architect and the owner's zoning expert demonstrates that the FAR was based on a careful evaluation of gross floor area contained in the regulations. In determining the amount of the garage level that should count towards the building's FAR, Sunrise applied the well-established and long recognized "perimeter wall test." The owner's zoning expert demonstrated to the Board's satisfaction that several areas of the building that are not countable toward FAR were incorrectly included by the Appellants.

## Rear Yard and Side Yard

The Board concludes that the proposed building fully complies with the rear yard setback requirement of 11 DCMR §404.1. The Board notes that the subject lot has more than the usual four sides and hence its shape is highly irregular. Further, an alley stub protrudes into the lot at an angle. The Board concludes that in considering the lot's unusual configuration, the Zoning Administrator correctly determined that Connecticut Avenue was designated the front, and that the portion of the lot abutting the north-south alley to the rear, running roughly parallel to Connecticut Avenue was the rear. The Board concludes that the ruling of the Zoning Administrator yields a logical and natural result that is consistent with the intent and meaning of the Zoning Regulations.

The Board is also constrained to conclude that the Appellants' interpretation of the rear yard requirement is not supported by the regulations and would produce illogical results. The portion of the building that abuts the alley stub cannot be considered the "rear line of the building" and such a determination would render a disproportionately large portion of the lot not buildable. The Board concludes that the building, as proposed, provides significant open space and ample light and air to adjacent properties consistent with the intent of the yard requirements.

**Building Height**

The Board concludes that the Chief of the Zoning Review Branch and the owner's zoning expert have demonstrated that the building height was measured properly and that, at 83 feet, the height is well below the allowable 90-foot height limit in the R-5-D zone. The Chief of the Zoning Review Branch and the owner's zoning expert also demonstrated that architectural embellishments and penthouses do not count toward the building height, therefore they were correctly excluded from the building's height computation. The Board further notes that the 83-foot building height was conservatively measured to the parapet line of the tower element which contains the elevator machine equipment, while the Zoning Regulations would permit the measurement to be taken at a lower point, the roof itself, thus resulting in an even lower height for the building. The Board also notes that, while a portion of the building consists of seven stories, the southern portion of the building steps down to only six stories. The Appellants produced no evidence to demonstrate that the height of the building was measured incorrectly.

**Elevator Penthouse and Rooftop Mechanical Equipment**

The Board concurs with, and longstanding administrative precedent supports, the Zoning Administrator's interpretation of the portions of the Zoning Regulations addressing rooftop structures and architectural embellishments. Accordingly, the Board concludes that the penthouse and architectural embellishments associated with the proposed building fully comply with the Zoning Regulations. The testimony of the Chief of the Zoning Review Branch and post-hearing submission on this issue provide compelling evidence that architectural embellishments do not count toward building height and are not subject to the penthouse setback requirements. The Board agrees with the testimony of the Chief of the Zoning Review Branch and his conclusion that the elevator tower located at the rear edge of the roof of the building was correctly designated as an architectural embellishment, and accordingly is not subject to the penthouse setback requirements.

BZA Appeal No. 16716A
Page No. 14

The Board agrees with the Zoning Administrator and therefore concludes that there is no prohibition against including mechanical equipment within an architectural embellishment and that there is ample precedent for this issue in other recently approved buildings in the District of Columbia. The Board concludes that the Office of the Zoning Administrator regularly approves tower elements as architectural embellishments that are not set back from the exterior face of the building. The practice represents a reasonable interpretation of the Zoning Regulations. The Board also concludes that the mansard roof-like structure that wraps around the perimeter of the building acts as an enclosure of the entire penthouse as required by the regulations. Accordingly, the roof plan meets the requirement for having a single penthouse enclosure. Further, the Board notes that the building height was measured to the parapet at the top of the stair tower, while the regulations do not require measurement to that point.

The Board concludes that the Appellants have not successfully refuted the Zoning Administrator's interpretation of the penthouse requirements and the longstanding interpretation of the treatment of architectural embellishments. While the Appellants argued that the elevator tower embellishment constitutes an eighth story, the Board concludes that the Chief of the Zoning Review Branch demonstrated that such an element does not meet the definition of a story.

**Failure to Refer Roof Plans to the Office of Planning**

Section 411.10 of the Zoning Regulations provides that:

Before taking final action on a roof structure plan, the Zoning Administrator shall have submitted the plan to the Director of the Office of Planning for review and report. The report shall be returned within fifteen (15) days of the date of submission unless a different period has been provided by mutual agreement of all parties involved.

There is no dispute that the Zoning Administrator failed to make this referral. Instead, it was pointed out to the Board that Office of the Zoning Administrator does not routinely make such referrals. The customary violation of a zoning regulation does not repeal the provision. Thus, the Zoning Administrator's failure to refer the subject plans violated the specific roof referral requirement set forth in the Zoning Regulations.

However, in this instance, the Board does not believe that this single violation justifies revocation of the permit issued here. Based upon its review of the record, the Board has found no substantive grounds for revoking the permit. During the course of this hearing, the Board could have requested the input from the Office of Planning with respect to the roof structure plans (see, D.C. Official Code §6-626.04 (2001), but did not do so. OP's only statement on the issue was an email stating that it does not customarily review such plans. Even if the Board remanded the permit for the purpose of a referral, OP's views would not be binding on the Zoning Administrator. Thus, a referral could very well accomplish nothing but delay. Given the fact that the Board has concluded that issuance of the building permit was consistent with the substantive requirements of the Zoning Regulations, the administration of those regulations is

BZA Appeal No. 16716A
Page No. 15

not furthered by having the Office of Planning make non-binding recommendations with respect to matters already decided in this Order.

## Parking and Loading

The Board concludes that the building permit drawings correctly show fully compliant loading facilities. In addition the plans include 31 parking spaces, which exceed the number required for comparable uses under the regulations. The Board concludes that the Zoning Administrator correctly determined the applicable parking and loading requirements, and that a ruling from the Zoning Administrator was necessary because the regulations do not set forth specific parking and loading ratios for a community residence facility in the R-5-D zone. The Board concludes that the loading facilities provide unobstructed access as required under the Zoning Regulations.

The Board concludes that the Appellants offered no persuasive evidence to merit a reversal of the Zoning Administrator's ruling on this issue.

## Non-Zoning Issues

With regard to the non-zoning issues raised by the appellants, the Board finds that these issues are outside the scope of the Board's review authority. Section 8 of the Zoning Act provides for appeals to the BZA that are "based in whole or in part upon any zoning regulation or map." In implementing §8 of that act, 11 DCMR §3100.2 provides that the BZA may "hear and decide appeals where it is alleged by the Appellants that there is error in any order, requirement, decision, determination, or refusal made by any administrative officer or body, including the Mayor, in the administration or enforcement of this Title." The BZA has consistently confirmed that interpretation on many occasions. Accordingly, the allegations brought by NANA that DCRA officials failed to address external agency concerns and did not provide full access to DCRA records are not zoning matters and are not properly before the Board. Similarly, any and all issues related to the licensing of assisted living facilities by the Department of Health and other District agencies are similarly outside of the scope of the Board's authority.

The Board is required under D.C. Official Code §1-309.10(d)(3)(A) (2001) to give "great weight" to the affected ANC's recommendations. Under D.C. Official Code §1-309.10 (d)(3)(B) (2001), the Board must articulate with particularity and precision the reasons why the ANC does or does not offer persuasive advice under the circumstances and make specific findings and conclusions with respect to each of the ANC's issues and concerns. The ANC presented no report in this matter, but joined with the appellant in presenting its legal arguments. The Board has addressed each of the issues raised by the appellants and the ANC, and explained, in each instance, why it agreed or disagreed with the specific positions taken by these parties. The Board thus gave great weight to the issues and concerns raised by the ANC in this appeal.

BZA Appeal No. 16716A
Page No. 16

## Motion for Reconsideration – The Effect of a Tie Vote

Under §8 of the Zoning Act of 1938, approved June 20, 1938 (52 Stat. 799, as amended; D.C. Code, 2001 Ed. §6-641.07(h)), "The concurring vote of not less than a full majority of the members of the Board shall be necessary for any decision or order." The Board's Rules of Practice and Procedure likewise provide in 11 DCMR §315.2 that "The concurring vote of at least a full majority of the Board shall be necessary for any decision." Because the Board is composed of five members, a decision to grant Ms. Mitten's Motion for Reconsideration requires at least three affirmative votes.

A tie vote occurs when 50 percent of a body votes in favor of a motion and 50 percent votes against the motion. If there is no way to break a tie vote, the motion is lost. A tie vote that is not broken by a subsequent vote thus operates to deny the relief that was the subject of the motion. *See Morrison v. District of Columbia Bd. of Zoning Adjustment*, 422 A.2d 347, 349 n.5 (D.C. 1980) (tie votes); *see also Hubbard v. District of Columbia Bd. of Zoning Adjustment*, 366 A.2d 427, 428 (D.C. 1976) (failure to achieve super-majority vote tantamount to denial of motion for rehearing). In this case, there is no way to break the tie because the Board's fifth member is recused from this Appeal. Accordingly, the motion for reconsideration is deemed denied.

## CONCLUSION

For the reasons stated above, the Board concludes that the appellants have not met their burden of proving by a preponderance of the evidence that the Zoning Administrator erred in approving the issuance of the building permit because the building plans do not conform in all respects to the applicable Zoning Regulations. It is hereby ORDERED that the appeal of the issuance of Building Permit Number B435464 filed by the Nebraska Avenue Neighborhood Association and joined by Advisory Neighborhood Commission 3G is **DENIED**.

VOTE: 4 – 0 - 1    (Sheila Cross Reid, Carol J. Mitten, Geoffrey H. Griffis, and David W. Levy to deny appeal in all aspects, except for the structure plan not reviewed by the Office of Planning and the stair and elevator/penthouse setback requirements; Anne M. Renshaw, not voting, recused).

VOTE: 3 – 1 - 1    (Sheila Cross Reid, Geoffrey H. Griffis, and David W. Levy to deny the appeal based on roof structure not being reviewed by the Office of Planning; Carol J. Mitten, opposed; Anne M. Renshaw, not voting, recused).

VOTE: 3 – 1 - 1    (Sheila Cross Reid, Geoffrey H, Griffis, and David W. Levy to deny the appeal regarding the stair and elevator penthouse setbacks and locations adjacent to exterior walls; Carol J. Mitten, opposed; Anne M. Renshaw, not voting, recused).

BZA Appeal No. 16716A
Page No. 17

VOTE: 2 – 2 - 1    (Carol J. Mitten and David W. Levy to grant the motion for reconsideration of the Board's decisions (i) to deny the appeal based on roof structure not being reviewed by the Office of Planning and (ii) the stair and elevator penthouse setbacks and locations adjacent to exterior walls; Sheila Cross Reid and Geoffrey H. Griffis, opposed; Anne M. Renshaw, not voting, recused).

BY ORDER OF THE D.C. BOARD OF ZONING ADJUSTMENT

Each concurring member approved the issuance of this Order.

ATTESTED BY: _____

JERRILY R. KRESS, FAIA
Director, Office of Zoning

DATE OF ORDER:  OCT 1 2 2001

AB/PY

GOVERNMENT OF THE DISTRICT OF COLUMBIA
Board of Zoning Adjustment



Office of Zoning

**BZA APPEAL NO. 16716A**

OCT As 2Di2r0e0c1tor of the Office of Zoning, I hereby certify and attest that on
_____ a copy of the order entered on that date in this matter was mailed first
class, postage prepaid or delivered via inter-agency mail, to each party and public agency who
appeared and participated in the public hearing concerning the matter, and who is listed below:

Page Chiapella, President
Nebraska Avenue Neighborhood
Association.
5126 Nebraska Avenue, N.W.
Washington, DC  20008

Anne Mohnkern Renshaw, Chairperson
Advisory Neighborhood Commission 3G
Chevy Chase Community Center
P.O. Box 6252
Washington, DC  20015

Marilyn Holmes
Single Member District Commissioner 3G07
3700 Military Road, N.W.
Washington, DC  20015

Maureen E. Dwyer
ShawPittman
2300 N Street, N.W.
Washington, DC  20037-1128

Michael Johnson, Zoning Administrator
Dept. of Consumer and Regulatory Affairs
Building and Land Regulation Administration
941 North Capitol Street, N.E., Suite 2000
Washington, DC  20009

Attestation Sheet – Appeal No. 16716A
Page No. 2

Councilmember Kathleen Patterson
Ward 3
1350 Pennsylvania Avenue, N.W.
Suite 107
Washington, DC 20004

Alan Bergstein
Office of the Corporation Counsel
441 4th Street, N.W., 7th Floor
Washington, DC 20001

ATTESTED BY: _____

JERRILY R. KRESS, FAIA
Director, Office of Zoning

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>**CAPITOL HILL GROUP,**<br><br>Debtor. | Case Number 02-0359<br>Chapter 11 |
| **CAPITOL HILL GROUP,**<br><br>700 Constitution Avenue, N.E.<br>Washington, D.C. 20002<br><br>Plaintiff,<br><br>v.<br><br>**THE DISTRICT OF COLUMBIA,**<br>a Municipal Corporation,<br>One Judiciary Square<br>441 4th Street, N.W.<br>Washington, D.C. 20001<br><br>**DAVID A. CLARK,**<br><br>as Director<br>District of Columbia Department of<br>Consumer and Regulatory Affairs<br>441 4th Street, N.W.<br>Washington, D.C. 20001<br><br>Defendants. | Adv. Pro. No. _____ |

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2003, copies of the Complaint for Declaratory and Other Relief were sent via postage prepaid regular mail and via facsimile to the parties on the attached service list.

Paul A. Tummonds, Jr.

## SERVICE LIST

## CAPITOL HILL GROUP

Amon James
United States Trustee
115 South Union Street
Plaza Level, Suite 210
Alexandria, VA  22314
B.Amon.James@usdoj.gov


The District of Columbia
c/o Charles L. Reischel, Esq.
Deputy Corporation Counsel
Appellate Division
441 4th Street, NW
6th Floor South
Washington, D.C. 20001


David A. Clark
District of Columbia Department of Consumer
and Regulatory Affairs
c/o Karen Edwards, Esq.
Office of the General Counsel
Department of Consumer and Regulatory Affairs
901 North Capitol Street, N.E.
Suite 9400
Washington, D.C. 20001


Document #: 1299921 v.1

Exhibit 5

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - x
                        :
CAPITOL HILL GROUP      :
                        :
        Plaintiff       :
                        :
    vs.                 :  Adversary Proceeding: 03-10003
                        :
THE DISTRICT OF COLUMBIA :
                        :
        Defendant       :
                        :  Washington, D.C.
- - - - - - - - - - - - x  March 18, 2003


TRANSCRIPT OF HEARING ON MOTION FOR SUMMARY JUDGMENT
        BEFORE THE HONORABLE S. MARTIN TEEL, JR.
            UNITED STATES BANKRUPTCY JUDGE



APPEARANCES:

  For the Plaintiff:        PATRICK J. POTTER, ESQ.
                            PAUL TUMMONDS, ESQ.

  For the Defendant:        NANCY SMITH, ESQ.




Proceedings recorded by the Court, transcript produced
By Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307,
Washington, D.C. 20005, 202-347-5395
B6930/bf

1                **P R O C E E D I N G S**

2            THE CLERK:  The next case will be Case Number 03-

3    1003, Capital Hill Group versus the District of Columbia,

4    et al.  The matter before the Court is a motion by the

5    Plaintiff for summary judgment on Counts 1, 2 and 3 of the

6    complaint for declaratory and other relief.  The parties

7    will please state their name for appearance.

8            MR. POTTER:  Good morning, Your Honor.  Patrick

9    Potter and Paul Tummonds on behalf of the Debtor, Capitol

10   Hill Group, and the Plaintiff in this adversary proceeding.

11           MS. SMITH:  Nancy Smith, Assistant Corporation

12   Counsel for Defendants.

13           THE COURT:  This is on for a hearing on a motion

14   for summary judgment.  There's been a motion to dismiss in

15   the interim, on the grounds of primary jurisdiction.

16   I don't know what the Plaintiffs, as the Movants on the

17   motion for summary judgment, want to do in light of that.

18           MR. POTTER:  We've obviously got a chicken and

19   egg problem, for lack of a better analogy.

20           I'm hopeful, I guess -- Plaintiff's position

21   would be that we're hopeful that the Court's had an

22   opportunity to review the motion to dismiss and while I

23   think we would otherwise be entitled to ask the Court for

24   time to respond, we don't think that there is any need for

25   that, and I'm happy to address the arguments right now.

1            THE COURT:  All right.  Why don't I hear you on

2    that.

3            MR. POTTER:  Thank you, Your Honor.  Basically

4    the Defendants have made two arguments as to why the Court

5    should dismiss this adversary proceeding, and it's

6    obviously worth noting for the Court that the crux of the

7    adversary proceeding is an allegation of violations of

8    federal law, of violation of the Fair Housing Act,

9    42 U.S.C., 3601, et seq.

10            The first argument that the Defendants make is

11    that this notion of primary and exclusive jurisdiction,

12    that someone other than Your Honor -- and the only parties

13    identified by Defendants are the zoning administrator and,

14    I guess, the, for lack of a better phraseology, appellate

15    body above the zoning administrator is the Board of Zoning

16    Appeals, the BZA, are the bodies that possess this primary

17    jurisdiction which is exclusive to Your Honor on

18    allegations of violations of the Fair Housing Act.  That

19    position, Your Honor, is completely without any merit

20    whatsoever.

21            And I would first draw Your Honor's attention to

22    the statute, 42 U.S.C., Section 3613, small a, 1, capital

23    A.  Says that these types of actions, alleged violations of

24    the Fair Housing Act, may be commenced by the aggrieved

25    parties in either the Federal Courts or the State Courts.

4

1   We obviously commenced our action in the Federal Courts --

2   in the Federal Court.

3           And there is not a suggestion or a hint in the

4   papers filed by Defendants that there is some other Court

5   that we should be prosecuting these claims before, but some

6   non-Court that we should be presumably prosecuting these

7   claims before, and there's simply no statutory authority

8   for such an argument.

9           There are no -- still focusing on the first

10  argument, the primary and exclusive jurisdiction -- there

11  are no cases cited in their papers to support a proposition

12  that FHA, Fair Housing Act cases, should be prosecuted

13  before a non-judicial body; that is, before the Zoning

14  Administrator or the Board of Zoning Appeals and, indeed,

15  the cases are all to the contrary inasmuch as every

16  published and unpublished FHA case that we've been able to

17  locate was commenced in a Federal Court.

18          And this includes cases published here in the

19  Federal Courts of the District of Columbia.  I'd cite, for

20  an example, the Court to the Samaritan Inns case, 1995 U.S.

21  Dist. Lexus, 9294, in which there was an appeal on not

22  jurisdictional issues, but the award of, I believe -- the

23  magnitude of the award of legal fees awarded by the

24  District Court in favor of the Plaintiffs, published at 114

25  F.3d, 1227.

```
 1              And as Defendants know, there are a number of
 2   other pending Fair Housing Act violation cases pending, I
 3   guess the District of Columbia, in the United States
 4   District Court and the Federal Courts for the District of
 5   Columbia.  They include a case commonly referred to as
 6   Zeke's House, it has a District Case Number 01-2120.  I
 7   think the caption is actually entitled "Community Housing
 8   Trust, et al., versus the Department of Consumer and
 9   Regulatory Affairs, et al."
10              There is a case commonly referred to -- I don't
11   have the case number -- commonly referred to as Boys Town,
12   a Fair Housing Act violation case brought against the
13   District of Columbia, by aggrieved parties, in the United
14   States District Court for the District of Columbia.  And
15   there are likely other cases that have been brought against
16   the District of Columbia in the United States District
17   Court.  That's where FHA violations are prosecuted, and it
18   only begs --
19              THE COURT:  And what's the civil action -- what's
20   the civil action number on Boys Town?
21              MR. POTTER:  I can get that for Your Honor, but I
22   don't have it immediately available.
23              THE COURT:  All right.
24              MR. POTTER:  I would suggest, Your Honor, that it
25   only begs the question to say that there are zoning issues
```

1   involved, and that zoning issues are local in nature and

2   therefore Federal Courts should keep their nose out of

3   zoning affairs.  I would submit to Your Honor, it's really

4   the other way around in this instance.  You've got an

5   alleged violation, we believe a violation of the Fair

6   Housing Act by the District of Columbia, and it would be,

7   frankly, the local zoning authorities butting their nose

8   into a properly commenced federal action to suggest that

9   they should somehow be passing or ruling upon, you know,

10  the elements necessary, and conclusions that would be drawn

11  in that sort of cause of action.

12          I think there's really no legal support for the

13  primary and exclusive jurisdiction argument that's been

14  made by the Defendants.

15          The second argument made by Defendants is really

16  nothing more than a request that this Court voluntarily

17  abstain from hearing and deciding a Fair Housing Act

18  violation cause of action.  They, the Defendants, in their

19  papers, cite no decisions where a Federal Court was faced

20  with a FHA action and the Court agreed to abstain.  They

21  cite, in fact, to no cases whatsoever where there was an

22  alleged violation of any federal statute and -- as we've

23  alleged -- and a Court granted a motion to abstain.

24          Since we only received the papers yesterday,

25  we've located, not through any great legal research

7

1   efforts, by looking in the annotations to the statute,

2   three decisions where Federal Courts on the specific issue

3   of a Fair Housing Act cause of action were asked to abstain

4   and the Courts, in all three instances, appear to have

5   refused the request.

6        One of those decisions is out of the U.S.

7   District Court in Maryland; Judge Blake decided the case

8   of Skipper, which is 996 F.Supp., 478, it's a 1998

9   decision, and the other two decisions are the case of

10  Oxford, a case out of the District of New Jersey.  The cite

11  is 769 F.Supp., 1329.  And the third decision is called

12  Moorestown, M-o-o-r-e-s-t-o-w-n, another case out of

13  New Jersey, and the cite there is 996 F.Supp., 409.  We

14  have not located any decisions where a FHA case was

15  commenced and the Court granted a party's motion to

16  abstain.

17       And for these reasons, Your Honor, we would ask

18  the Court to deny the motion filed by the Defendants, on

19  both grounds.

20       THE COURT:  All right.  Ms. Smith, are you

21  prepared to argue this?

22       MS. SMITH:  Yes, Your Honor.  I'm prepared to

23  argue my motion.

24       Your Honor, the District recognizes that Your

25  Honor would have jurisdiction over this matter by way of

1   the Fair Housing Act, but we'd argue that the Fair Housing

2   Act claims are based just fundamentally on local zoning

3   issues, which is a very local government function.   The

4   District has a huge, comprehensive scheme for zoning

5   matters.   There are regs, there's a system administrative

6   review.   Very importantly, there is citizen input and

7   there's, finally, judicial review.

8           We recognize that there are other cases pending,

9   and actually, Your Honor, we believe that these other cases

10  supports the District's position on primary jurisdiction.

11  The Agency is working with all these cases, to come out

12  with a uniform policy on housing for the handicapped and

13  how it fits into the zoning.   I know specifically,

14  regarding Boys Town, that the District has been meeting

15  with the Department of Justice specifically on the fair

16  housing issues.

17          And so for that reason, Your Honor, this is

18  ongoing, and we'd ask that Your Honor defer or abstain

19  jurisdiction, to allow that process to go forward, and

20  allow the District to come up with a uniform policy.

21          Now, the nursing facility is operating at this

22  time.   It's not that it's been denied a certificate of

23  occupancy.   It's operating under a special exception.   The

24  crux of the problem seems to come down to the number of

25  parking spaces.   There has been no final denial of Capitol

1   Hill Group's letters to the Zoning Administrator and, as a

2   matter of fact, I've been authorized to represent that they

3   are treating Capitol Hill Group's last letter as a request

4   for reconsideration and they do intend to send a response

5   out this week.

6        Your Honor, based on the cases that we have

7   cited, which I agree were not specific to the Fair Housing

8   Act, do demonstrate that it would be the better course in

9   this case to allow the local government to proceed forward,

10  to come to a decision regarding the zoning and how it's

11  going to fit in with the Fair Housing Act, and allow it to

12  come up with a uniform approach on all these cases, rather

13  than have to deal with this case piecemeal in addition to

14  the other cases pending.

15       So for those reasons, we'd ask that Your Honor

16  dismiss the complaint and allow the administrative process

17  to go forward.  The Courts have said is when there is --

18  there's expertise in the administrative agency and there's

19  adequate judicial review, it should go forward that way,

20  and we'd say this fits squarely into that.

21       THE COURT:  But their motion for summary

22  judgment, as I understand it, says that the current

23  regulation violates the Fair Housing Act.

24       MS. SMITH:  The regulations --

25       THE COURT:  Or their conduct violates --

1    MS. SMITH:  The conduct.

2    THE COURT:  The current conduct violates the Fair

3 Housing Act.

4    MS. SMITH:  So far, there has been no final

5 action to complain of.  They've been going back and forth

6 with the Zoning Administrator, not having a final review,

7 not going to the BZA -- matter of fact, they had gone to

8 the BZA after the regulations were changed to permit their

9 matter of right use, and they withdrew that.  The District

10 is very concerned that they have an opportunity and a full

11 administrative scheme ahead of them to go forward and make

12 their case, and instead they're choosing to bring it before

13 Your Honor -- no disrespect meant -- but the system is set

14 up otherwise.

15    And as I say, the issue really comes down, I

16 think, to parking.

17    THE COURT:  So what are they trying to do by

18 their motion for summary judgment?  If there's no final

19 decision.

20    MS. SMITH:  They want Your Honor to rule that

21 they have the zoning as of right -- I don't want to speak

22 for them, but that seems to be what they're asking for --

23 and they want to make their own presentation on the number

24 of parking spaces that they have to provide.

25    THE COURT:  If the District doesn't have in place

1   a current zoning system that is compliant with the Fair

2   Housing Act, what they're saying is declare whatever's in

3   existence now as non-compliant with the Fair Housing Act so

4   that we can move forward without being bound by what is a

5   discriminatory policy.  If the District later adopts a

6   different zoning -- different set of zoning rules for the

7   District of Columbia, I suppose you could come in then and

8   say you're now subject to a different set of zoning

9   restrictions and they are uniform and they're not being

10  applied in a discriminatory fashion, and you would then try

11  to enforce them against the Debtor at that juncture.

12          MS. SMITH:  Your Honor, at this point --

13          THE COURT:  So I guess what I'm saying, what I'm

14  trying to get at is they're saying whatever the conduct

15  that currently exists is, is violative of the statute, just

16  declare that so that we can move forward.  They're not

17  saying, if the District changes the zoning laws that

18  somehow they're grandfathered.  They may have that argument

19  at a later date, but they're not trying to get a

20  declaration that forever they're entitled to be treated as

21  permitted to use the property for the purpose they want to

22  use it for.

23          MS. SMITH:  They are using it for the purpose

24  they want to use it for.  And they are simply arguing that

25  it should be instead of a special exception as of right,

1  and then the extension of that argument is that therefore

2  they don't have to supply as many parking spaces as they do

3  now.

4         THE COURT:  Well, they want a declaration -- But

5  I didn't see an opposition to the motion for the summary

6  judgment, I confess I've read the motion for summary

7  judgment very quickly, without word for word.

8         MS. SMITH:  Your Honor, I have to admit I'm

9  placed in a position where I'm directed to make the primary

10  jurisdiction an abstention argument.  If Your Honor rules

11  that you will go to the substance, I have to ask for an

12  enlargement of time to respond to it substantively.

13         THE COURT:  Well, we already gave you an

14  enlargement of time.

15         MS. SMITH:  I understand that, Your Honor, but

16  I believe that the position that the District's taking

17  regarding the primary jurisdiction and the extension would

18  invalidate any motion for summary judgment.

19         If the Plaintiffs had actually started down an

20  administrative course and been denied, and then -- there

21  would be some position.  But that's not the case.  The fact

22  is that they've been sending letters to the Zoning

23  Administrator, one after another.  This is not exactly

24  going through the administrative process, and as I've

25  indicated perhaps there's been some frustration that it's

1    taking such a period of time, but I understand that there

2    will be a response going out this Friday, Your Honor, if

3    not before.

4         THE COURT:  But at this juncture, they're just

5    seeking a declaration that if the District continues in

6    place its current treatment of the hospital, if its zoning

7    provisions remain in place, that those violate the Fair

8    Housing Act.  That's all they're seeking at this juncture.

9         MS. SMITH:  And I think that would be an error,

10   Your Honor, because the zoning regs, as they are in place,

11   provide for as of right zoning for housing for the

12   handicapped.  The District is in the process of developing

13   more specific regs, or more specific policy on what

14   constitutes housing for the handicapped.  The hospital is

15   operating under a special exception.  They are arguing that

16   this special exception should be essentially voided by the

17   new regulations.  They've provided absolutely no authority

18   for that position.

19        So in the absence of that, they are operating

20   under the special exception, and it has to do with the

21   parking.

22        THE COURT:  So you're saying there's no

23   controversy, is that what you're trying to say?

24        MS. SMITH:  Well, it seems -- well, it's not that

25   we've forbidden them from operating.  It's not that we've

1    denied them a certificate of occupancy.  We've invited them

2    to apply for a certificate of occupancy under the new as of

3    right provision that was enacted in '99.  They have not

4    done so.

5         The problem is they have declined to start an

6    administrative procedure, so the District is sort of in a

7    bad position to say we're violating anything, haven't

8    actually put the issue at issue yet.

9         THE COURT:  But as the law is currently written,

10   it violates the FHA, there's no reason to start an

11   administrative proceeding and subject themselves to what

12   is a statute that violates -- a zoning regulation that

13   violates the FHA.

14        MS. SMITH:  I don't think it's been argued that

15   the regulation itself violates the Fair Housing Act.  They

16   could speak up if they'd like on that issue.

17        THE COURT:  All right, let me hear from the

18   Plaintiff.

19        MR. POTTER:  Your Honor, I may defer to

20   Mr. Tummonds on some of the more particulars of the zoning,

21   because, as Your Honor knows, I'm not a zoning lawyer.

22        But I think it is more accurate to say that, if

23   you look at our complaint and our motion for summary, it's

24   the actions of the zoning authorities that we assert have

25   violated the Fair Housing Act.  It is true that -- and it's

1    important to make the distinction, particularly for

2    discrimination purposes, between the hospital and nursing

3    center, that the entity that we're talking about here is

4    the nursing center.  Because the hospital is a matter of

5    right entity, and they get treatment A for parking and

6    other zoning-type issues, then you have the nursing center

7    on a, you know, a floor above or a floor below in the same

8    facility, which gets a completely different treatment for

9    parking and zoning issues.  And you have Sunrise Nursing

10   Center a couple of blocks away or nearby, wherever it is,

11   which receives yet another treatment, and we believe

12   discriminatory type of treatment relative to the number of

13   parking, so it's the actions of the zoning administrators.

14   So they have not closed down --

15              THE COURT:  All right, Mr. Potter --

16              MR. POTTER:  They have not closed down the

17   nursing home.

18              THE COURT:  I'm going to take a five-minute

19   recess.

20              MR. POTTER:  Thank you, Your Honor.

21              THE CLERK:  All rise.  This Court stands in a

22   brief recess for five minutes.

23              (Whereupon, a brief recess was taken.)

24              THE CLERK:  All rise.  This Court is again in

25   session.  Please be seated and come to order.

1        THE COURT:  I'm having trouble understanding what

2    the difficult is.  The BZA has issued two orders, 15542 and

3    16407.  What do those orders say that you're complaining

4    about, Mr. Potter?

5        MR. POTTER:  I am going to ultimately defer to

6    Mr. Tummonds.

7        THE COURT:  All right.

8        MR. POTTER:  If I may on this, but ultimately,

9    Your Honor, what they've done is that they've issued us a

10   citation in October or November of this year, the Debtor

11   was issued -- Capitol Hill Group was issued a citation for

12   alleged non-compliance with one or more of these orders.

13   And it is these actions, including the issuance of a

14   citation to us, that we assert are in violation of the Fair

15   Housing Act, and Mr. Tummonds is going to address it in

16   more detail.

17       THE COURT:  All right.  Mr. Tummonds.

18       MR. TUMMONDS:  Your Honor, the two BZA orders add

19   a number of conditions to the use of this property.  Those

20   conditions include a ten-year approval period, such that at

21   the conclusion of that ten-year approval the nursing center

22   would have to go back again before the Board of Zoning

23   Adjustment.  In addition, they put a limit on the number of

24   beds, on the number of employees, a requirement for a

25   specified number of parking spaces, a requirement that

1   Capitol Hill Group meets with the local Advisory
2   Neighborhood Commission and neighborhood community members
3   four times per year, as well as a condition on the ways in
4   which ambulances are loaded and unloaded at the nursing
5   center.  So these BZA orders include conditions that go to
6   the use of the nursing center.
7           Now, as Mr. Potter said, the hospital on that
8   same site, because it is a matter of right use, has no such
9   conditions.  There is no such authority for the Board of
10  Zoning Adjustment to place conditions on its use.
11          And with the adoption of the Amended Zoning
12  Regulations on April 30th, 1999, and the requirements of
13  the Zoning Regulations 330.5(i), which says that a facility
14  that provides housing for the handicapped is deemed a
15  matter of right use in this zone, those previous conditions
16  are no longer applicable because the zoning regulations
17  were in fact changed.
18          So at the time that --
19          THE COURT:  You're going way too fast for me.
20          MR. TUMMONDS:  I'm sorry.
21          THE COURT:  What came first?
22          MR. TUMMONDS:  What came first, BZA Order Number
23  15542, which allowed the nursing center to use the facility
24  based on certain conditions.  Subsequently, BZA Order
25  Number 16407 was brought by the nursing center, in that

1   case to be allowed to add more beds, because the previous

2   condition said you can have X number of beds, you can have

3   that number of beds, it requires you to have X number of

4   parking spaces.

5          THE COURT:  Now, these orders, were they issued

6   with respect to only this entity?

7          MR. TUMMONDS:  Yes.

8          THE COURT:  Or to various entities?

9          MR. TUMMONDS:  No, very specific entities.  The

10  way that the Board of Zoning Adjustment works is that if

11  you are located in a specific zoning district, and you are

12  proposing a use that the zoning regulations dictate to be a

13  special exception use, you then present an application to

14  the Board of Zoning Adjustment, where you show how you

15  satisfy the requirements of the zoning regulations for your

16  specific use.  Included as one of those conditions is the

17  fact that your use will not create an adverse impact on

18  neighboring properties due to noise, traffic, number of

19  cars, it's a general adverse impact standard.

20         So in those two applications, 15542 and 16407,

21  the Debtor, Capitol Hill Group, through its previous

22  counsel, presented a case to the Board of Zoning Adjustment

23  showing how its specific facility and its operation

24  satisfied those requirements.

25         THE COURT:  Satisfied which requirements?  Where

1  are those requirements written?

2            MR. TUMMONDS:  Those were the previous section of

3  the zoning regulations, which were subsequently amended on

4  April 30th, 1999.  The previous zoning regulations which

5  said a --

6            THE COURT:  No hardship on the community --

7            MR. TUMMONDS:  Exactly.

8            THE COURT:  That sort of thing.

9            MR. TUMMONDS:  Exactly.

10            THE COURT:  But those no longer exist.

11            MR. TUMMONDS:  For this type of use.  And that is

12  11 D.C.M.R., 330.5(i) --

13            THE COURT:  Well, let's take it by baby steps.

14            MR. TUMMONDS:  Sure.

15            THE COURT:  Because when I read your paper I

16  couldn't figure out what the problem is.  So then what

17  happened was there was a new regulation, is that right?

18            MR. TUMMONDS:  Correct.

19            THE COURT:  And what is that?

20            MR. TUMMONDS:  The new regulation, which is now

21  codified at 11 D.C.M.R., 330.5(i), which applies to

22  community-based residential facilities in the R-5 District,

23  which is the zoning district in which this property is

24  located.  And I might add, that amendment to the zoning,

25  which created the current zoning regulation, 330.5(i), was

1    the result of a consent decree between the Department of

2    Justice and the District of Columbia regarding the Fair

3    Housing Act, in that the Department of Justice told the

4    District, "The way your current regulations read, they are

5    potentially violative of the Fair Housing Act; thus, you

6    need to adopt this amendment."  This amendment, which

7    became the current zoning regulations which apply now, the

8    330.5(i), which I described.

9            THE COURT:  All right, and you  maintain,  one,

10   that those are the regulations that -- that is the

11   regulation that applies to --

12           MR. TUMMONDS:  This Debtor.

13           THE COURT:  -- the nursing center.

14           MR. TUMMONDS:  Yes.

15           THE COURT:  And you next contend that under

16   Section 330.5(i) that you're not required to what?

17           MR. TUMMONDS:  330.5(i) states that the zoning

18   administrator has the ability to determine whether a

19   facility is in fact a facility that provides housing for

20   the handicapped.  So I would respectfully disagree with the

21   _____  said that the administrative decision process

22   has not begun, and in fact, it has begun because we went to

23   the duly authorized zoning official and asked for his

24   determination that yes, this nursing facility is a facility

25   that provides housing for the handicapped.

1          THE COURT:  So you got a favorable ruling
2     already?
3          MR. TUMMONDS:  We have not received a ruling on
4     that.  I mean, that's -- I should say, that's -- we met
5     with the zoning administrator on November 18th, we filed
6     our initial -- our letter which was part of our original
7     complaints on November 19th.  Subsequently, on December
8     12th, we received a letter from the Zoning Administrator
9     that said -- that basically did not agree with our view
10    that this facility -- we have to take a step back, Your
11    Honor.
12         After the Zoning Administrator's decision, if the
13    Zoning Administrator decides that yes, you are a facility
14    that provides housing for the handicapped, you are a matter
15    of right use.  Which means you do not go to the BZA.  So on
16    November 19th, that's what we asked the Zoning
17    Administrator to determine.
18         On November 2nd, the staff of the District's
19    Zoning Inspection Division went out to the site.
20    Subsequently, on November 20th, they issued the Debtor a
21    citation for failure to comply with the conditions of BZA
22    Orders Number 16407 and 15542, and thus required to get a
23    certificate of occupancy that shows that we complied with
24    those.
25         As we stated in our November 19th letter, we felt

1      that those orders were no longer necessary.

2            On December 12th --

3            THE COURT:  All right, just a second.

4            MR. TUMMONDS:  Yes.

5            THE COURT:  Is your November 19th letter in this

6      packet of materials?

7            MR. TUMMONDS:  It is attached to our original

8      complaint, and actually it is attached to the motion to

9      dismiss filed yesterday by the District.

10            THE COURT:  All right, just a moment.  I don't

11      see it attached to the complaint.

12            MR. TUMMONDS:  Okay.  I think it would be --

13      there were attached to our complaint, or it is attached to

14      the motion to dismiss which you received yesterday, as

15      well.

16            THE COURT:  All right.  I've got it.

17            MR. TUMMONDS:  Okay.

18            THE COURT:  Go ahead.

19            MR. TUMMONDS:  In fact, the December 12th letter

20      from the Zoning Administrator was in fact, we believe, a

21      denial of our November 19th letter, and in fact a

22      determination that we believe was violative of the Federal

23      Fair Housing Act.

24            THE COURT:  All it says is he wants you to

25      consolidate.

1          MR. TUMMONDS:  Right.  But coupled with --

2   he wants us to consolidate, coupled with the notice of

3   infraction that we received.  In that notice of

4   infraction -

5          THE COURT:  That notice of infraction was dated

6   November the 20th?

7          MR. TUMMONDS:  It is -- it appears that the

8   inspection occurred on November 1st.  It was served on the

9   parties on November 25th.  And in fact, the consolidation -

10  - the process in which to consolidate our certificates of

11  occupancy into one certificate of occupancy also required

12  that we state on the certificate of occupancy that this use

13  is permitted pursuant to the two BZA orders.  Which we

14  believe is not true.

15         We believe that we are able to use this property

16  as a matter of right, and that yes, after this decision is

17  made by the Zoning Administrator that we are in fact a

18  matter of right, we would go and obtain a single

19  certificate of occupancy.  We do not believe that it is

20  correct that we obtain a certificate of occupancy that

21  notes that the conditions of BZA Orders Number 15542 and

22  16407 are applicable to --

23         THE COURT:  All right.  You got a letter December

24  the 12th that says that "The Zoning Administrator's opinion

25  is that to remove conditions in the BZA order --" and I

1  take it that refers to the two numbered orders you recited

2  earlier.

3          MR. TUMMONDS:  That is correct.

4          THE COURT:  "That to remove those conditions in

5  those BZA orders requires an action by the BZA.

6  Consequently, your request for a matter of right is hereby

7  denied and you must seek relief from the BZA."

8          Is the administrator simply saying, you know, I'm

9  like a trial court, I've got to follow my appellate court

10 until they tell me to act differently.  I guess that's what

11 I'm going to ask you first.

12         MR. TUMMONDS:  Our first instance is that we've

13 had a follow-up letter to this December 12th letter,

14 saying, "Mr. Kelly, are you telling us that --" I mean,

15 because we didn't -- we had asked for a determination, as

16 required by the zoning regulations, that this is a facility

17 that provides housing for the handicapped.  This December

18 12th letter never says, "This nursing center is not a

19 facility that provides housing for the handicapped."

20         THE COURT:  Where does it say that?

21         MR. TUMMONDS:  It doesn't say that.  We can only

22 assume that, based on the continued notice of infraction

23 proceedings that are occurring, as well as the fact that we

24 asked him to do that and requiring us to go back to the BZA

25 would only be applicable if this use was not deemed to be a

1    matter of right use.

2              So we disagree with the Zoning Administrator

3    saying -- he's saying, "You have to go to the BZA to remove

4    these conditions." With those amendments to the zoning

5    regulations in 1999, the BZA no longer has jurisdiction.

6    So it is -- an analogy would be if a property was

7    previously located in a residential zone, there was a

8    change to that zoning district, such that it became a

9    commercial zone, that property is then able to have all the

10   rights of that commercial zone. It's not subject to

11   previous requirements.

12             So that when the zoning regulations were amended

13   to allow facilities that provide housing for the

14   handicapped in this zone as a matter of right, any previous

15   conditions which were imposed by the Board of Zoning

16   Adjustment are no longer applicable. And we think that is

17   at the heart of this Fair Housing Act violation. So, in

18   fact, the Zoning Administrator's decision on December 12th,

19   telling us that we need to go to the BZA, we believe is

20   violative of the Fair Housing Act.

21             In addition, there is no requirement under the

22   Fair Housing Act that we exhaust our administrative

23   remedies. In that we are not appealing -- we are in effect

24   appealing a alleged violation -- or, we are proposing an

25   alleged violation of the Fair Housing Act.

1           MR. POTTER:  Your Honor, may I answer the

2    question that you asked?  Thank you.

3           I think an analogy would be if the Court of

4    Appeals, a Court which Your Honor felt you had to honor a

5    decision from the U.S. Court of Appeals for the D.C.

6    Circuit, issued an order that said X.  And then the

7    Congress changed the Bankruptcy Code after they issued that

8    decision that said X, that said "Not X."  Your Honor would

9    no longer have to obviously follow the U.S. Court of

10   Appeals decision that said X.  It would be, I think,

11   appropriate for Your Honor to -- if it was a plain language

12   issue in the Code or something like that, then Your Honor

13   would follow the "Not X" statement by Congress in an

14   amendment to the Bankruptcy Code.

15          I think that's the appropriate analogy in answer

16   to Your Honor's question.  When you said is it like a trial

17   court that has to go back and follow what the appellate

18   court had said.  There's been an intervening event which is

19   a legislative change.

20          THE COURT:  Let me ask you this.  The December

21   19th letter spells it out pretty clearly -- December 16th

22   letter, I beg your pardon.

23          But I'm wondering whether the November 19th

24   letter laid it out so clearly.  Let me see.

25          It does.  In the paragraph entitled "Amendment,"

1  it's the section entitled "Amendment to the Zoning

2  Regulations."  It says that the prior zoning order, BZA

3  orders no longer apply because of the change in the

4  regulations and the fact that the nursing center satisfies

5  the definition of a residential facility that provides

6  housing for the handicapped.

7         And you say therefore we should be permitted to

8  operate as a matter of right.

9         So I guess you made it pretty clear to him that

10 that's what you were contending, and I'm befuddled by his -

11 - he doesn't respond to it.  He's just totally

12 unresponsive.  It's like the section dealing with Amendment

13 to the Zoning Regulations is disregarded.

14        Let me read the parking reg in the requirements

15 section of the November 19th letter.

16        MR. TUMMONDS:  And Your Honor, that was why we

17 followed up with the December 16th letter, is that we did

18 not feel his December 12th letter was responsive, and as

19 Ms. Smith has mentioned, the District is still coming up

20 with their response to our December 16th letter.

21        But again, we had to file this action because we

22 were not getting a response to the December 16th letter.

23        THE COURT:  Well, do you concede that you're

24 entitled to operate with either 22 or 27 parking spaces?

25 Is that what you're trying to contend for?

```
1              MR. TUMMONDS:  Yes -- I mean, it's --

2              THE COURT:  How many spaces do you have?

3              MR. TUMMONDS:  Right now, there are -- right on

4    any given day, right around 176 parking spaces.

5              THE COURT:  So if it's only 22 or 27, you're way

6    over it.

7              MR. TUMMONDS:  Absolutely.

8              THE COURT:  All right, I didn't understand that

9    from the papers.

10             MR. TUMMONDS:  I'm sorry.

11             THE COURT:  It got lost on me.  So you want them

12   to concede, one, that you are a matter of right use under

13   the amended regulation, and two, you have sufficient

14   parking spaces.

15             MR. TUMMONDS:  Correct.  And the parking space

16   requirement only really comes into play here because when

17   the zoning regulations were amended in 1999 -- I think it

18   was probably just a drafting error -- they did not carry

19   through to the other portion of the zoning regulations,

20   which says a matter of right, community-based residential

21   facility shall provide parking of X.  The way the zoning

22   regulations work is that the chapter regarding parking

23   requirements says an apartment building in this zone is

24   required to provide one parking space for every four units,

25   and hospitals are required to provide one parking space for
```

1   every bed, a -- various things of that nature.

2          Because the previous zoning regulations only

3   allowed community-based residential facilities in this

4   zone, pursuant to the BZA, that section of the zoning

5   regulations says, "The BZA will determine the appropriate

6   amount of parking spaces."  It has always been the past

7   practice of the Zoning Administrator, in these instances

8   where the zoning regulations are not clear, for the Zoning

9   Administrator, a duly authorized representative of the

10  government to interpret the zoning regulations, to make a

11  appropriate determination as to what would be an applicable

12  substitute.

13         In the Sunrise Assisted Living case, which we've

14  cited, where really the same fact pattern was presented,

15  other than the fact that you there had an assisted living

16  facility, which obviously provides a degree of care less

17  acute than a nursing facility, we asked the Zoning

18  Administrator to make a determination, what would be an

19  appropriate -- basically, category of uses to determine

20  what the parking space requirements would be in that

21  instance.

22         In the Sunrise case they said, "We believe an

23  assisted living facility would be similar to the portion of

24  the zoning regulations which say a facility that provides

25  housing for the elderly shall provide --" I believe it's

1 | one parking space for every four apartment units.  We said
2 | -- that's how we came up with 22 parking spaces for this
3 | nursing facility, using that same analogy.
4 | That's what is the two issues we asked the Zoning
5 | Administrator to address.  Which is it's a matter of right
6 | use so therefore all the conditions of approval in two BZA
7 | orders are no longer applicable, and that the Zoning
8 | Administrator make an interpretation of the zoning
9 | regulations regarding what is the appropriate number of
10 | parking spaces that need to be provided by the nursing
11 | center.
12 | THE COURT:  So what's the controversy in front of
13 | me?  Because you've written to them --
14 | MR. TUMMONDS:  The controversy is that, a, we
15 | still have a pending notice of infraction against us, and
16 | where they have cited us and said that, "You are operating
17 | this facility in violation of your certificate of
18 | occupancy."  So while that is still pending, you know, that
19 | is an action that we believe is a violation of the Fair
20 | Housing Act, against Capitol Hill Group.
21 | THE COURT:  And what were the two violation --
22 | what were the infractions they recited in that notice?
23 | MR. TUMMONDS:  Well, the notice just refers to
24 | the ultimate BZA order itself.  We believe that the problem
25 | was the number of parking spaces, in that the zoning

1    inspector came out and counted, one, two, three, and then

2    came up with a number that was less than 176.

3            THE COURT:  It's Exhibit 5, right?

4            MR. TUMMONDS:  Correct.

5            THE COURT:  "Not in compliance with _____

6    BZA ordinance," I guess it's one of the two that you

7    recited previously.

8            MR. TUMMONDS:  Yes.  And I believe it says

9    something, "parking spaces."

10           THE COURT:  "Parking spaces."  So you want to

11   declare that infraction notice to be improper.

12           MR. TUMMONDS:  Correct.  And alternatively, as

13   well, as long as the District still believes that those BZA

14   orders are in effect and are applicable to the Debtor in

15   this case, a zoning inspector could go out tomorrow and

16   find that, "Oh, you have not had your four quarterly

17   meetings with ANC6A in the neighboring communities."

18           THE COURT:  So you want a declaration that the

19   BZAs no longer operate because you're a matter of right

20   use.

21           MR. TUMMONDS:  Absolutely.

22           THE COURT:  That still leaves the issue of what

23   is the appropriate number of parking places.

24           MR. TUMMONDS:  Correct.  And that is an issue

25   that we believe -- we have asked the Zoning Administrator

1   to make that determination.  He has not.  And so, you know,

2   that is an issue that, you know, this Court could make that

3   determination.  Hobsons v. Brick is a case that we've cited

4   in the 3rd Circuit, and New Jersey stated that the Federal

5   Fair Housing Act requires the jurisdiction to provide

6   reasonable accommodations for these types of facilities.

7   And in that case the Court crafted what they believed to be

8   a reasonable accommodation.

9           This Court, we believe, has the authority to say,

10  based on past actions of the Office of the Zoning

11  Administrator and the Board of Zoning Adjustment, "We

12  should apply those same analogy determinations with regards

13  to the number of parking spaces and determine that Capitol

14  Hill Group should provide 22 parking spaces or 27 parking

15  spaces."

16          THE COURT:  This letter of December the 12th says

17  that you've got to treat the whole facility as a single

18  certificate of occupancy.  It says, "On November the 5th,

19  Denzel Noble, Acting Administrator, informed Dr. Shin that

20  he must consolidate the several certificates of occupancy

21  into one certificate reflecting the total number of beds,

22  162, and required parking spaces, 200, to be consistent

23  with the BZA orders, 16407 and 15542."

24          I guess that raises an issue in my mind of when

25  you've got a nursing center and a hospital in the same

1  building, are you required to file a combined certificate
2  of occupancy.
3          MR. TUMMONDS:   In effect -- in that case, you
4  would not.  Because when an applicant goes to file a
5  certificate of occupancy, they fill out a form that says,
6  "Proposed use," the zoning district in which they're
7  located.  Here, if then the staff of the District of
8  Columbia Zoning Division would then make to see if that use
9  was either, a, a matter of right use, or b, a use that
10  required special exception approval.
11          What would happen in a case like this, the
12  Capitol Hill Group would go and apply for a certificate of
13  occupancy allowing hospital uses on floors 3, 4 and 6.  And
14  then you could also receive a certificate of occupancy for
15  a community-based residential facility on floors 1, 2 and
16  7.  The hospital certificate of occupancy for those
17  specified floors would be a matter of right approved use.
18          When the certificate of occupancy application is
19  reviewed by the Zoning Division with regards to the
20  community-based residential facility, they would say,
21  previously, "This use requires special exception approval
22  from the Board of Zoning Adjustment, I need to see a copy
23  of that order."  You would then show them BZA Number 16407
24  and on the certificate of occupancy it would say,
25  "Community-based residential facility approved pursuant to

1   BZA Order Number 16407, 15542."

2           If this Court were to make a determination that,

3   yes, the nursing facility is a matter of right use, the

4   nursing facility would obtain a new certificate of

5   occupancy that states, "Approved use, community-based

6   residential facility."  And it would not reference as per

7   the conditions in BZA Order Numbers blank.

8           So in our November 19th letter to Mr. Kelly, in

9   response to this issue of -- that they requested us to go

10  get one certificate of occupancy, we said that we will

11  absolutely do that as soon as you will, on our view, on our

12  argument, on our request for a determination, that this is

13  a matter of right use.  So we felt that until this issue

14  was decided, it was not appropriate to get that new

15  certificate of occupancy because we felt that their request

16  was not accurate.  Not appropriate.

17          THE COURT:  Does the FHA -- the Fair Housing Act

18  require some animus in this discriminatory treatment?

19          MR. TUMMONDS:  No.  It does not.

20          THE COURT:  Because what it appears to me is you

21  just got somebody who's not responsive to your letter,

22  which is why you wrote back, trying to say, "Get with it,

23  face up to the issues as we framed them, and give us a

24  response," and Ms. Smith says they're going to respond

25  tomorrow.

```
 1              MS. SMITH:  Friday.

 2              THE COURT:  This Friday.  Do you know what their

 3    response is going to be, Ms. Smith?

 4              MS. SMITH:  I'm really not at liberty to say.  If

 5    I -- no.

 6              If I might say something in that regard, Your

 7    Honor.  Since that last letter in December, the District is

 8    treating the last letter from the Plaintiff, as I said

 9    before, as a request for reconsideration.  Since that time,

10    there have also been developments in the other Fair Housing

11    Act cases, and they've sort of crystallized some policy.

12    And I would also like to add that the magic words in the

13    new regulations are intended to be provided as housing for

14    the handicapped.

15              And I believe that position of the Zoning

16    Administrator, who Plaintiffs said, rightly, has the

17    authority to decide, is that there has to be a showing on

18    that housing for the handicapped.  I mean, everyone here is

19    bandying about as if a nursing facility is, just because

20    it's called a nursing facility, provides housing for the

21    handicapped.

22              THE COURT:  As I understand it from prior

23    hearings, these are pretty ancient people who really are in

24    dire need of hand-on-hand care.

25              MS. SMITH:  That may very well be, but I don't
```

1 | think that presentation has been made to the Zoning
2 | Commission -- Zoning Administrator.  And until that is,
3 | there is no next step of matter of right use, and therefore
4 | there is no automatic voiding of prior BZA orders.
5 | What I'm say is that a process is just in the
6 | beginning, and that it should be permitted to go forward.
7 | I don't think there's been a showing of discrimination.  I
8 | don't think there's necessarily been a showing of housing
9 | for the handicapped and automatic matter of right use.
10 | MR. TUMMONDS:  I would point to our November 19th
11 | letter, where we reference the fact that the Office of the
12 | Zoning Administrator, as well as the Board of Zoning
13 | Adjustment, had previously determined that an assisted
14 | living facility is a facility that provides housing for the
15 | handicapped.
16 | And as I note on page 3, the first full
17 | paragraph, "Since the Office of the Zoning Administrator
18 | and the BZA have determined that an assisted living
19 | facility is a community-based residential facility that
20 | provides housing for the handicapped, it is readily
21 | apparent that a nursing facility, which provides care for
22 | individuals with a greater degree of impairment, and
23 | satisfying one's major life activities, should also be
24 | deemed to be a community-based residential facility that
25 | provides housing for the handicapped."

1          The definition of handicapped in the Fair Housing

2     Act is just that, a failure of one to provide for life's

3     major daily activities, which include bathing oneself,

4     feeding oneself, being able to take medications.  We

5     believe that we have appropriately provided to the Zoning

6     Administrator evidence that a nursing facility is in fact a

7     facility that provides housing for the handicapped.

8          In our December 16th letter, we also cited the

9     Hobsons case, which noted that even in that case it was --

10         THE COURT:  Let me cut you short.  Is the

11    District prepared to say it's not going to contend their

12    infractions while this issue is being resolved?

13         MS. SMITH:  I don't think there is anyone going

14    out there writing any more tickets while this is pending.

15         THE COURT:  No, you know, if I'm going to say I

16    don't want to decide this because I think it can be worked

17    out administratively, I've got to have a clear commitment

18    from the District that they're not going to maintain, in

19    the midst of this being worked out at the administrative

20    level, that there is an infraction.  In the face of their

21    trying to get a judicial determination so that they  know

22    where they stand.

23         If you say you want to go forward and do it

24    administratively, that's fine, but you know, they're

25    entitled to summary judgment today that they're a right --

1    what's the term?

2            MR. POTTER:  "Matter of right."

3            THE COURT:  Matter of right use, that doesn't

4    impose any potential infractions upon them.

5            MS. SMITH:  If that one civil infraction is the

6    bone of contention, I believe I can waive that on behalf of

7    my client.

8            THE COURT:  But how about infractions from this

9    day until the administrator finally gets around to deciding

10   this mess?

11           MS. SMITH:  If I can make a phone call, Your

12   Honor, I can --

13           THE COURT:  I'll take a recess.

14           MS. SMITH:  Thank you.

15           THE CLERK:  All rise.  This Court will stand in

16   brief recess.

17           (Whereupon, a brief recess was taken.)

18           THE CLERK:  All rise.  This Court is again in

19   session.  Please be seated and come to order.

20           THE COURT:  All right, Ms. Smith?

21           MS. SMITH:  Your Honor, I've been advised that

22   I can represent that during the pendency of the

23   administrative application we won't be writing any more

24   civil infractions.  Aside -- I mean, if there's some

25   serious thing, but we're talking parking here, so no, there

1  won't be any.

2          THE COURT:  Well, I guess I need to ask, is it

3  the parking that's the immediate problem for the Plaintiff?

4  I know that the two BZA orders have other conditions.  I

5  don't know when those come due.  Like meeting annual --

6  quarterly, is it, with the neighborhood commission and so

7  forth?

8          MR. TUMMONDS:  Yes.  That's correct.  But I

9  believe -- the answer to your question is yes.

10          THE COURT:  The parking is --

11          MR. POTTER:  Our understanding, Your Honor -- the

12  only thing we've been cited for and the only thing that's

13  been brought to our attention with respect to these

14  conditions is the parking.

15          THE COURT:  Well --

16          MR. POTTER:  So the answer is, we don't expect

17  any other -- I don't think we believe that we're in --

18  assuming those orders are applicable to us -- we don't

19  concede that -- that would be the only one that we believe

20  is at issue, yes.

21          THE COURT:  At the immediate moment.

22          MR. POTTER:  Yes.

23          THE COURT:  Eventually you want to get rid of

24  them in toto, because it's got some other burdens that you

25  would rather not have imposed upon you.

1          MR. POTTER:   Your Honor understands that

2    overlaying all this process and how this issue first came

3    up was related to the litigation with Holladay and Your

4    Honor heard the hearing in January on our application for a

5    2004 examination regarding whether Holladay went out and

6    sort of stirred up this trouble or not, and I don't want to

7    review that round but what I do want to say, Your Honor,

8    from a timing standpoint here is that the Debtor will be

9    filing a plan -- a Chapter 11 reorganization plan on

10   Thursday.  That's when exclusivity is scheduled to run out.

11   We don't intend to file additional applications for

12   extending exclusivity, and we're going to file a plan on

13   Thursday, which means that, you know, if things go

14   according to Hoyle that we should be at a confirmation

15   hearing some time in the next 60 to -- 60 to 75 days, I

16   would imagine.

17          Either before this Court, if it's uncontested by

18   Heller, or before Judge Mannes if it is contested by

19   Heller.  I don't expect it to be contested by Heller

20   because we're going to propose -- our plan proposes to pay

21   them in full.

22          But the point being that it's been put on the

23   record by Holladay at prior hearings that we can't confirm

24   a plan until this issue is resolved.  And my only concern

25   with where I think this may be going, if we don't get the

1   relief --

2           THE COURT:  Well, I want to see the letter Friday

3   and I'm going to ask Ms. Smith what needs to be done to

4   satisfy the Zoning Administrator that this is a handicap

5   facility.

6           MS. SMITH:  I think it will be set out in the

7   letter, Your Honor.  That's what I've been told.

8           I think the issue is not so much the handicap

9   portion of that phrase, but the housing.

10          MR. POTTER:  If I may, Your Honor?

11          MS. SMITH:  In terms of short-term, long-term.

12  I don't know all the ins and outs of the issues before the

13  Zoning Administrator, but that's what he's represented.

14          THE COURT:  It seems to me that on this record

15  I'd have to say they are a handicap facility, and that they

16  are excepted -- they're a matter of right use.  And those

17  two BZA orders no longer apply.

18          I'm not prepared to say what the parking out to

19  be because I think that ought to be given back to the

20  Administrator and let him come up with an appropriate

21  number, and it sounds like the Debtor is going to readily

22  exceed whatever number he could possibly come up with,

23  based upon prior precedent of how that issue's been handled

24  as to somewhat analogous facilities.

1       So I'm inclined to say let the letter come
2   forward on Friday.  Hopefully it'll simply say, yes, if you
3   are a handicap facility you're entitled to the exemption,
4   and hopefully it'll have a ready way of satisfying the
5   Administrator so this issue can be wrapped up before a plan
6   confirmation hearing comes up.
7       So I -- he's going to lay out what they're
8   supposed to do.  Do you know how fast the Administrator can
9   react once the Debtor makes a submission?
10      MS. SMITH:  Well, it will be either the
11  Administrator or Mr. Noble, who's the director.
12      I impressed on them the fact that they have to
13  move quickly.  I have not gotten a representation back from
14  them, and I have heard that the Zoning Administrator has
15  resigned, but they do understand that they have to move
16  quickly, Your Honor.
17      THE COURT:  Why don't we take a look at the
18  letter that comes out on Friday, and see where we stand in
19  terms of what impact that has upon the Debtor's
20  reorganization efforts.
21      MS. SMITH:  Shall I submit it to the Court, Your
22  Honor?
23      THE COURT:  Submit it to Mr. Potter, and file it
24  with the Court, and we'll resume this hearing sometime
25  after that letter has been submitted.

```
 1              MR. TUMMONDS:  Can we set a time for next week,
 2   Your Honor?
 3              THE CLERK:  10:30 on the 27th?
 4              MR. POTTER:  Your Honor, can I make one closing
 5   remark?
 6              THE COURT:  Yes.
 7              MR. POTTER:  And that is that I understand -- I
 8   think I understand Your Honor's reasoning and position as
 9   to where we landed where we landed, but I do want to make
10   one point, and that is that under the Fair Housing Act and
11   the definitions of handicap and dwelling and the like, that
12   the federal law arms this Court -- and we're not asking,
13   we've never asked this Court, a Federal Court, to make a
14   decision as to what housing for the handicapped is under
15   D.C. Law, but this -- the request is to, under the Fair
16   Housing Act and the specific definitions provided within
17   the Definitions Section of the Fair Housing Act, whether
18   the nursing center satisfies the definition of a dwelling,
19   I think is the term used there, dwelling for the
20   handicapped.  In the case that, I think the principal
21   decision that we would refer Your Honor to is the Third
22   Circuit's decision in the Hobsons -- in the Hobsons case,
23   and I would submit, Your Honor, is if this doesn't go the
24   way that I think we all hope it goes, that Your Honor would
25   be -- it is our position -- I want to make it clear -- it's
```

44

1    our position that Your Honor has the legal authority under

2    federal law to determine, based upon a record before this

3    Court, either through affidavits or by putting someone on

4    the stand, to determine whether the nursing center

5    satisfies those definitions.

6              THE COURT:  All right.  I'll continue this matter

7    until March the 27th, 2003, at 10:30 a.m.  Thank you,

8    counsel.

9              MR. POTTER:  Thank you, Your Honor.

10             MS. SMITH:  Thank you, Your Honor.

11             (Whereupon, proceedings were concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES OF AMERICA )
                         )        Adversary Proceeding 03-10003
DISTRICT OF COLUMBIA     )

        I, PAUL R. CUTLER, do hereby certify that a

recording of the foregoing proceedings in the above matter

was duplicated from an original recording by the Office of

the Clerk, United States Bankruptcy Court for the District

of Columbia, and that said duplicate recording of the

proceedings was transcribed under my direction to

typewritten form.


                              _____
                                    PAUL R. CUTLER

        I do hereby certify that the foregoing transcript

was typed by me and that said transcript is a true record

of the recorded proceedings to the best of my ability.


                              _____
                                    BONNIE FURLONG

Exhibit 6

Department of Consumer and Regulatory Affairs
Building and Land Regulation Administration
941 North Capitol Street N.E. room 2100
Washington D.C. 20002
Tel. (202) 442-4470    Fax (202) 442-4862

Government
of the District
of Columbia
BLRA 94A



# C of O

# CERTIFICATE OF OCCUPANCY

**PERMIT NO.**

**CO 51290**

THIS PERMIT IS VALID ONLY FOR THE PREMISES
OF THE PROJECT ADDRESS

**DATE : 3/26/2003**

| ADDRESS : AKA 700 CONSTITUTION AVE NE | FLOOR(S) : | PRCLID : 0895 | -0000- | 0076 |
|---|---|---|---|---|
| 708 MASSACHUTTES AVE NE | BASEMENT 1ST, 2ND & 3RD FLOORS | (square) | | (lot) |
| | | WARD : 6 | ZONE : | R5D |

PERMISSION IS HEREBY GRANTED TO :                                    TRADING AS :

**CORPORATION : CAPITOL HILL COMMUNITY HOSPITAL**
**ID No.: 952308**

APPROVED USES :                                    PREVIOUS USES :

**HOSPITAL**                                    **HOSPITAL**

| TYPE : | BZA NO. : | OCCUPIED SQ. FOOTAGE : | OCCUP. LOAD : | EXPIRATION DATE : |
|---|---|---|---|---|
| **USE CHANGE** | | **85,000** | **60** | **NONE** |

DESCRIPTION OF USE :

**HOSPITAL 60 BEDS & 60 PARKING SPACES**

**FEE :**

**$414.00**

THIS CERTIFICATE SHALL BE POSTED CONSPICUOUSLY ON THE ABOVE PREMISES AT ALL TIMES. IT IS VALID INDEFINITELY, unless an expiration date is stated, VALID ONLY for the premise at the above address or part thereof, and for the purpose(s), indicated above, and IS NOT TRANSFERABLE to another person or premises under ANY conditions. ANY CHANGE in the type of business, ownership of business, or part of premises used therefor, will render this Certificate VOID and a NEW Certificate must be obtained.

| David A. Clark DIRECTOR | PERMIT CLERK : THINGOC MACXOAN |
|---|---|



Department of Consumer and Regulatory Affairs
Building and Land Regulation Adminstration
941 North Capitol Street N.E. room 2100
Washington D.C. 20002
Tel. (202) 442 - 4470    Fax (202) 442 - 4862

Government
of the District
of Columbia
BLRA 94A

# C of O

# CERTIFICATE OF OCCUPANCY

PERMIT NO.

## CO 51289

THIS PERMIT IS VALID ONLY FOR THE PREMISES
OF THE PROJECT ADDRESS

**DATE : 3/26/2003**

| ADDRESS : AKA 700 CONSTITUTION AVE NE | FLOOR(S) : | PRCLID : 0895 | -0000- | 0076 |
|---|---|---|---|---|
| | BASEMENT | (square) | | (lot) |
| 708 MASSACHUTTES AVE NE | 1ST. 4TH. 5TH. 6TH. FL. | WARD : 6 | ZONE : | R5D |

PERMISSION IS HEREBY GRANTED TO :                          TRADING AS :

**CORPORATION : CAPITOL HILL HEALTHCARE GROUP**
**ID No.: 921732**

| APPROVED USES : | PREVIOUS USES : |
|---|---|
| **COMMUNITY RESIDENCE FCL** | **COMMUNITY RESIDENCE FCL** |

| TYPE : | BZA NO.: | OCCUPIED SQ. FOOTAGE: | OCCUP. LOAD: | EXPIRATION DATE: |
|---|---|---|---|---|
| **USE CHANGE** | | **95,000** | **117** | **NONE** |

DESCRIPTION OF USE :

**COMMUNITY BASED RESIDENTIAL FACILITY-HEALTH CARE FACILITY THAT PROVIDES HOUSING FOR
THE HANDICAPPED. 25 PARKING SPACES & 117 BEDS**

FEE :

**$444.00**

THIS CERTIFICATE SHALL BE POSTED CONSPICUOUSLY ON THE ABOVE PREMISES AT ALL TIMES. IT IS VALID INDEFINITELY, unless an expiration date is stated, VALID ONLY for the premise at the above address or part thereof, and for the purpose(s), indicated above, and is NOT TRANSFERABLE to another person or premises under ANY conditions. ANY CHANGE in the type of business, ownership of business, or part of premises used therefor, will render this Certificate VOID and a NEW Certificate must be obtained.

| David A. Clark | PERMIT CLERK: |
|---|---|
| **DIRECTOR** | **THINGOC MACXOAN** |

ANTI-FRAUD PROTECTION - PATENTS 5,197,765 & 240,191

Exhibit 7

03/27/2003 12:05 FAX 2024429447        GENERAL COUNSEL                    ☑002



**GOVERNMENT**
**OF THE DISTRICT**
**OF COLUMBIA**

## DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
### OFFICE OF CIVIL INFRACTIONS
### VIOLATIONS PROCESSING DIVISION

## NOTICE OF INFRACTION DISMISSAL REQUEST

NOTICE OF INFRACTION NUMBER  *047089*

TO BE COMPLETED BY THE REQUESTOR:

*Robert Kelly  Zoning Administrator*                    *Zoning Division / DCRA*
_____Name/Title_____                              ____Office/Administration____

*Capitol Hill Group*
Respondent's Full Name (Last, First, Middle)

CHECK THE APPROPRIATE BOX:

Cancel Citation ☒        Adjust All Violations/Fines ☐              Partial Adjustment ☐
Other

Please indicate the violation(s) cited, proposed adjustments and reasons to justify your request to adjust or cancel said Notice of Infraction. Explanation must include the original fine(s) cited, the adjusted fine(s) and the amended total to be collected.

| Code *53209* | Regulation *11 DCMR § 3305.4* | Fine $ *1000.00* |

Nature of Infraction: *Not in compliance with conditions in Certificate of Occupancy from*
Explanation: *Because Respondent provides housing for the handicap BZA Order*
*under 1199 amendment to Zoning Regulations it is matter at right and*
*not subject to conditions in earlier BZA Order.*

| Code | Regulation | Fine $ |

Nature of Infraction:

Explanation:

| Code | Regulation | Fine $ |

Nature of Infraction:

Explanation:

| Code | Regulation | Fine $ |

Nature of Infraction:

Explanation:

Total (Cited): *$1000.00*                    Total (Amended): *-0-*

*Rob*
_____            *3-26-03*
Signature of Issuing Administration                    Date
Administrator/Chief

*Susanna Little*                               *3/26/03*
_____            _____
Signature of Administrator Law Judge                  Date

*N/A*                                         *N/A*
_____            _____
Signature of OCI Chief                                Date

OCI/VPD Copy          Issuing Administration Copy        OCI/Collection Division    97-P7989 W2252

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
### OFFICE OF ADJUDICATION



### NOTICE OF INFRACTION PART TWO

Notice of Infraction No :    **049089**

Date of Service :    11/25/2002     Date of Infraction :    11/1/2002     Time of Infraction :      1:50:00 PM

Place of Infraction :              700 CONSTITUTION AVENUE ,  NE Washington DC

Business/Company Name :     CAPITOL HILL GROUP

Respondent Name:            CAPITOL HILL GROUP
Respondent C/O:              CAPITOL HILL GROUP
Respondent Address :         700 CONSTITUTION AVENUE ,  NE
                             Washington DC 20002-

**I PERSONALLY OBSERVED OR INVESTIGATED THE COMMISSION OF THE INFRACTION(S) NOTED
BELOW INSPECTOR    ROCKETT, YVONNE     BADGE NUMBER    000780     (ORIGINAL ON FILE)**

**THE CITATION REFLECTS A DESCRIPTION OF THE CODE REGULATIONS.
PLEASE REFER TO THE DEFICIENCY NOTICE AS REFERENCED BY THE ITEM NUMBER FOR
DETAILED DESCRIPTION OF THE VIOLATION.**

| No. | Code / Regulation | Violation Narrative | |
|---|---|---|---|
| 1 | 052209 | 500 OWN/CONTROL/USE BLDG W/O | $500.00 |
| | 11 DCMR 3204.4 | COMPLYING WITH C/O | |

[  ] ADMI [  ] ADMIT WITH AN EXPLAN   [  ] DEN        BZA #16407 PARKING SPACE

| | | |
|---|---|---|
| | **Total Violations Amount** | **$500.00** |

Exhibit 8

GOVERNMENT

OF

THE DISTRICT OF COLUMBIA

+ + + + +

BOARD OF ZONING ADJUSTMENT

+ + + + +

PUBLIC MEETING

+ + + + +

TUESDAY

JANUARY 6, 2004

+ + + +

        The Public Meeting convened in Room 220 South, 441 4th Street, N.W., Washington, D.C. 20001, pursuant to notice at 9:30 a.m., Geoffrey H. Griffis, Chairperson, presiding.


BOARD OF ZONING ADJUSTMENT MEMBERS PRESENT:

    GEOFFREY H. GRIFFIS,      Chairperson
    CURTIS ETHERLY, JR.,     Vice Chairperson
    RUTHANNE MILLER,        Board Member
    DAVID ZAIDAIN,          Board Member

ZONING COMMISSION MEMBER PRESENT:

    ANTHONY J. HOOD,        Commissioner

OFFICE OF ZONING STAFF PRESENT:

    CLIFFORD MOY,           Deputy Secretary
    BEVERLEY BAILEY,        Zoning Specialist
    JOHN NYARKU,            Zoning Specialist

D.C. OFFICE OF CORPORATION COUNSEL:

    LORI MONROE, ESQ.
    SHERRY GLAZER, ESQ.

C-O-N-T-E-N-T-S

| AGENDA ITEM | PAGE |
|---|---|

PRELIMINARY ITEMS . . . . . . . . . . . . . . . 3

BOARD MOTIONS/ACTION:

      Application No. 16597 of Elaine Carrera
      Garage Addition - Motion for Dismissal,
      pursuant to Subsection 3113.11 . . . . . . 5

      Remand from the District of Columbia
      Court of Appeals:  BZA Appeal
      Application Nos. 15129 and 15136 -
      Woodland Normanstone Neighborhood
      Association and Advisory Neighborhood
      Commission 3C, respectively - Draft
      Order for Exceptions. . . . . . . . . . . 7

      Remand from the District of Columbia
      Court of Appeals:  BZA Appeal
      Application No. 15708 - NBC Draft Order
      For Exceptions. . . . . . . . . . . . . . 8

      Motion from Applicant to Amend Order
      No. 16852 of Washington Psychoanalytic
      Society/St. Patrick's Protestant
      Episcopal Church . . . . . . . . . . . . 11

      Application No. 17079 of Mark Lee
      Phillips . . . . . . . . . . . . . . . . 15

      Application No. 16823 of Humberto
      Gonzalez . . . . . . . . . . . . . . . 20

      Application No. 17087 of Jeffrey D.
      Kotersky . . . . . . . . . . . . . . . 21

      Application No. 16970 of the National
      Child Research Center . . . . . . . . 24

      Appeal Application No. 17043 of
      Stanton Park Neighborhood Association . 147

ADJOURN . . . . . . . . . . . . . . . . . . . 197

1    Let's take 15 minutes.

2            VICE CHAIR ETHERLY:  There was also just a

3    minor correction on the vote.  I believe I was the

4    seconder of the motion, Mr. Moy, if I recall

5    correctly.  Mr. Zaidain has already left.

6            CHAIRMAN GRIFFIS:  We'll take care of

7    that.  Thank you.

8            Let's take 15 minutes and clear this and

9    we'll get back to the last decision in the morning.

10           (Off the record.)

11           MR. MOY:  Mr. Chairman, the next case is

12   Appeal Application No. 17043 of Stanton Park

13   Neighborhood Association, pursuant to 11 DCMR 3100 and

14   3101, from the administrative decision of the Zoning

15   Administrator in the issuance of Certificate of

16   Occupancy Permit Nos. CO51289 and CO51290, to Capitol

17   Hill Healthcare Group dated March 26, 2003, for a

18   community residence facility and hospital (60 beds and

19   60 parking spaces) respectively.  The Appellant

20   alleges that the Zoning Administrator erred by issuing

21   the occupancy permits where the proposed use is in

22   violation of the parking requirements.  The R-5-D

23   zoned subjected premises are located at 700

24   Constitution Avenue, N.E. (Square 875, Lot 76).  On

25   November 25, 2003, the Board completed testimony on

1    the appeal application and scheduled its decision on

2    January 6, 2004.

3         Also, the Board requested the following

4    post-hearing documents, one, a copy of the consent

5    decree.   This was submitted by the -- this was

6    submitted in the file as Exhibit No. 105.   Also,

7    written statement of the oral testimony given by Cody

8    Rice of ANC SMD 6A3 and that was submitted and is

9    identified in your case folders as Exhibit 108.

10        That completes the staff briefing, sir.

11        CHAIRMAN GRIFFIS:   Thank you very much,

12   Mr. Moy.

13        Let's get right into the deliberation on

14   this then.   Who would like to open?

15        MEMBER MILLER:   I would like to open.   Mr.

16   Chair, the Appellant's arguing in this case that

17   Zoning Administrator erred in issuing the Certificates

18   of Occupancy because the authority to set parking

19   requirements for CBRFs with over 16 persons as

20   delegated to the BZA and not the ZA under 11 DCMR

21   2101.1.

22        I would note that the property is located

23   in ANC 60, so ANC 60 was automatically a party and the

24   Board granted intervenor status to ANC 6A, whose

25   borders across the street and both ANCs supported the

1    Appellant's position that the BZA has authority over

2    the parking for this facility and not the Zoning

3    Administrator.

4              DCRA and Capitol Hill Group argued that

5    the nursing facility is no longer subject to BZA

6    jurisdiction because it is a community-based

7    residential facility that is permitted to operate as a

8    matter of right.

9              Since the Board's last order, the Zoning

10   Commission enacted amendments in 1999 in order to

11   comply with the settlement agreement with the Justice

12   Department with respect to the Fair Housing Act.  They

13   argue that if the nursing home is permitted by

14   regulation to operate as a matter of right, then the

15   Zoning Administrator, not the BZA, determines the

16   parking requirements.

17             While the ZA characterized the facility as

18   a community residence facility, DCRA states that the

19   nursing home is a health care facility.  In its

20   prehearing statement at 3 and also in Exhibit C to

21   DCRA's prehearing statement, the certificate of

22   licensure as health care characterizes it as a health

23   care facility.

24             So for purposes of our analysis, we need

25   to treat the nursing home as a health care facility.

1    So the question in this case in the matter of law is

2    whether or not the nursing home is a matter of right

3    use in this R5 zone or whether it is entitled to

4    operate as a matter of right or whether or not it is

5    subject to 359.1 which states that health care

6    facilities for 16 to 300 persons, not including

7    residents, supervisors or staff and their families,

8    shall be permitted as a special exception in an R5

9    district if approved by the Board of Zoning Adjustment

10   under 3104 subject to the provisions of this section.

11            If we find that this facility is subject

12   to 359.1, we would also find that the parking

13   requirements of 2101 still apply.

14            So DCRA and Capitol Hill Groups make the

15   argument that it is a CBRF and under the text

16   amendments of the Zoning Commission enacted in 1999,

17   it is allowed to operate as a matter of right.

18            And I would suggest that -- let me read

19   that provision. That would be pursuant to 330.5(i).

20   330.5(i) says the following uses shall be permitted as

21   a matter of right in R4 district (i) community-based

22   residential facility, provided that notwithstanding

23   any provision in this title to the contrary, the

24   Zoning Administrator has determined that such

25   community-based residential facility that otherwise

1    complies with the zoning requirements of this title

2    that are of general and uniform applicability to all

3    matter of right uses in an R-4 district is intended to

4    be operated as housing for persons with handicaps.

5              Okay, so then the question is does this

6    nursing home fall within this provision because --

7    what other provision do we have?  350.4(a) says uses

8    that are permitted as a matter of right in R-4 are

9    permitted as a matter of right in R-5.

10             I would suggest that the nursing home does

11   not fall within this provision, 330.5(i) because it is

12   not, in my opinion, does not fall within requirement

13   that is of general and uniform applicability to all

14   matter of right uses in an R-4 district.

15             If you look at the Zoning Commission text

16   amendment order, I believe that they were primarily

17   dealing with group homes and when you're talking about

18   a facility, that can as large as up to 300 persons and

19   falls within an R-5 district.  It is not clear at all

20   that it was intended to encompass that facility.

21             I also wanted to bring your attention to

22   -- it's a question of statutory interpretation and in

23   the Zoning Commission order number 869 in which the

24   text amendments are presented, the Commission stated

25   that Commission stated it would interpret that which

1    is before the Commission on a very narrow basis, only

2    dealing with issues that would satisfy DOJ's mandate

3    to ensure that the regulations would conform to the

4    Fair Housing Amendments Act of 1988 and the Americans

5    With Disabilities Act at this time.

6         So it would be a way to interpret the

7    regulation narrowly, but also the Zoning Commission

8    has never repealed 359, nor the parking requirements

9    set forth in the parking schedule.  And another point

10   I want to make on this is that our regulations have to

11   comply with the Fair Housing Act and there are cases

12   that are particularly cited by DCRA in their pre-

13   hearing statement, Lapids-Laurel and Hovsons which are

14   federal cases which dealt with nursing homes that were

15   subject to variances which place a larger burden on

16   developers than special exceptions and the Court

17   upheld that regulatory framework.

18        In one case, I think it was Lapids-Laurel,

19   the Court said the town had denied the variance on the

20   grounds that the nursing home created traffic and

21   safety problems and that was upheld.

22        In Hovsons, the Court found that -- in

23   that case I think the nursing home wasn't allowed to

24   locate in any residential district and that did

25   violate the Fair Housing Act.  So I think in this

1    instance, the fact that a special exception is

2    required for the nursing home in this case, there's no

3    evidence of any disparate impact.  The rationale for

4    it goes to its size and its impact on traffic and

5    safety.

6                CHAIRMAN GRIFFIS:  Thank you.  Others?  If

7    I follow you correctly, you're indicating at a point

8    in R-4, it is a matter of right and it's a community-

9    based residential facility.  Do you dispute the fact

10   that this is a health care facility for a handicapped

11   population?

12               MEMBER MILLER:  No, I think it's well

13   settled that nursing homes are handicapped dwellings

14   under the Fair Housing Act.  My only point is that

15   they are -- towns are not, cities are not prohibited

16   from regulating them with special exceptions just

17   because of that definition.

18               CHAIRMAN GRIFFIS:  I understand.  And

19   following on your citing of 330.5(i) the basis of size

20   then you say puts us into the 359 section in the R-5,

21   is that correct?

22               MEMBER MILLER:  Well, 359, we're in an RD-

23   5 zone to begin with, so that's why we're in 359.

24   However, to decide whether or not it's permitted to

25   operate as a matter of right instead of special

1   exception, I go back to 330.4 and .5(i) because

2   there's one provision in there that says any facility

3   that -- all uses that are permitted as a matter of

4   right in R-4 are permitted as a matter of right in R-5

5   and so my point is this one is not necessarily

6   permitted as a matter of right in R-4 because (i) is

7   qualified and I don't believe that this falls within

8   that qualification.

9           CHAIRMAN GRIFFIS:    Okay, but not

10  necessarily, I would think you would have to be fairly

11  definitive that it did not qualify in R-4 and you're

12  resting that it may not qualify in R-4 because of the

13  general and uniform applicability to all matter of

14  right uses?

15          MEMBER MILLER:  Yes, and I think that does

16  go to size.

17          CHAIRMAN GRIFFIS:  Okay.

18          MEMBER ZAIDAIN:  So, yes, I was just going

19  to ask what does that mean?    There is this

20  qualification in 330.5(i) that says that the CBRF must

21  otherwise comply with the zoning requirements of this

22  title that are of general, uniform applicability to

23  all matter of right uses in the R-4 district.

24          CHAIRMAN GRIFFIS:    It's going to uses

25  also, not size.

1    MEMBER ZAIDAIN:  Right, so I'm trying to

2   get my mind around the argument here.  What aspects of

3   the R-4 district does this not comply with?

4    MEMBER MILLER:  I don't think it complies

5   with a health facility of this size because it's not

6   even -- it's a special exception in size.  It's not

7   even mentioned --

8    CHAIRMAN GRIFFIS:  But does it comply with

9   the R-4 uses?

10    MEMBER MILLER:  Well, what does it compare

11   to?  I think that the Fair Housing Act is based on

12   equal treatment of dwellings for the handicapped and

13   dwellings for the non-handicapped and I don't believe

14   that this has any direct comparison in that zone and

15   any zone.

16    If you take a small health facility where

17   there are six to eight people, then you may get some

18   comparisons with other types of group homes --

19    CHAIRMAN GRIFFIS:  Of comparable use.

20   That's comparable use.

21    MEMBER MILLER:  Well, I don't know that a

22   small health facility is a comparable use as a large

23   health facility because the large health facility, I

24   think brings a lot more staff --

25    CHAIRMAN GRIFFIS:  But you're talking

1    about intensity of use.  I mean doesn't 330.5(i) speak

2    to matter of right uses, so let's make an analogy,

3    let's talk grocery stores.  An R-4 -- not analogies.

4    If we have to just compare uses and not intensity of

5    uses, isn't it a matter of right in R-4 by 330.5(i)?

6              MEMBER ZAIDAIN:   I think the problem is

7    the use of 359.  I don't agree that 359 applies here.

8     I think that applies to health care facilities that

9    are not for a protective class.

10             If you read the definition for CBRF which

11   this use falls in, it says CBRF -- it's either CBRF or

12   it's not.  It can't be anything else and I think 359

13   is talking about something else.

14             Unfortunately, the zoning regs are written

15   with these hodge podge of terminologies.  You've got a

16   health care facility.   Then you've got a community

17   residence  facility.    But  then  under  the  CBRF

18   definition,  you  have  a  CBRF  community  residence

19   facility and then CBRF health care facility.

20             And I think they're different.  I think

21   330.5 is the one that applies here in terms of whether

22   or not the use is allowed as a special exception.  Now

23   and I also think that our purview here is to interpret

24   the regulations.  I have to assume, given all of the

25   interesting legal documentation we've seen from the

1    Department of Justice, the settlement agreement,

2    etcetera, etcetera or whatever the official title of

3    it is, that the Zoning Commission did its best to

4    implement that.

5              So and I'm just going to be Frank because

6    we're still in our morning session. Where I fall down

7    in this is this.  I do not agree that a special

8    exception is required for this type of use.  What I do

9    struggle with is why under the parking regulations,

10   under residential uses it says community-based

11   residential facility.  That's very, very clear to me,

12   whereas you've got health care facilities, you've got

13   all these other hodge podges of definitions, but under

14   the parking regulations, it's clear.  Community-based

15   residential facility for 16 or more persons, their

16   parking requirements are determined by the BZA.

17             Now I'm going to be clear.  I'm going to

18   be Frank.  I don't understand why that's in there.  I

19   think that's extremely odd.  I don't know how that

20   type of process would work.  I mean is that a special

21   exception process or do we become the parking

22   regulatory board to determine some sort of -- but I

23   can't get around the fact that it's there and it

24   clearly applies to a CBRF which -- in a residential

25   district which is what this is.

1        MEMBER MILLER:  I'd say it's there because

2  359 is still there as well.  I don't think that we can

3  assume that all these regulations are repealed.

4        MEMBER ZAIDAIN:   And see, it's not in

5  repealment.    359 -- I  just  don't  agree  that  359

6  applies here.  That's for a health care facility that

7  is not a CBRF.

8        MEMBER MILLER:  What is that?

9        MEMBER ZAIDAIN:  That would be a health

10 care facility that does not constitute -- I can sit

11 here and speculate on what that is.

12       MEMBER MILLER:  I don't think that exists.

13       MEMBER ZAIDAIN:    I  can't  help  that.

14 There's also tanning parlors that are a use there, and

15 I  don't  know  what  that  is  either.   But  under  the

16 zoning code, that is -- those are the type of uses

17 that  we  have  to  deal  with.   It  doesn't  say  a  CBRF

18 health care facility.

19       I mean I don't understand why 359 is there

20 if it contradicts what 330.1 says or whatever that is.

21       MEMBER MILLER:    I  believe  it's  there

22 because they can be read together and it doesn't have

23 to contradict it and that's the way you should apply

24 statutory  construction  when  you're  looking  at

25 different provisions.  You try to make them work and

1    in this case that would be the case.

2              Even if -- you may not understand.    I

3    don't know that I necessarily understand what they

4    meant when they qualified (i) to say that it has to be

5    of general and uniform applicability to all matter of

6    right uses.

7              MEMBER ZAIDAIN:  You're right.

8              MEMBER MILLER:    In our fourth district,

9    okay, but this -- it can be -- it's there and it is a

10   qualification and I believe that a good argument could

11   be made that this does not fall within general and

12   uniform applicability of all matter of right uses.

13             MEMBER ZAIDAIN:    And I agree with where

14   you're going there.  I am just curious as to what part

15   of the R-4 district it does not comply with.  I mean

16   that's a good point.  I just don't -- that's actually

17   a -- was there testimony in that?  I think that's a

18   good point.  I'm trying to figure out what part of the

19   R-4 district this does not comply with so that claim

20   can be substantiated.  It's a good point.

21             CHAIRMAN GRIFFIS:    It's the core of the

22   argument.

23             MEMBER ZAIDAIN:  Right, but I don't agree

24   with the 359 part of it.

25             MEMBER MILLER:  I think the other part of

1    the core of my argument is that our regulations have

2    to be in accordance with the Fair Housing Act and the

3    fact that a facility such as this, a health care

4    facility which is, in this case, a nursing home is

5    required to apply for special exception for parking,

6    that has been upheld in the Federal Courts as not

7    being in violation of the Fair Housing Act.  And that,

8    in addition with the Zoning Commission's order that

9    says we should interpret that which is before us on a

10   very narrow basis would mean that we don't include

11   that provision as being repealed by the text

12   amendment.

13           MEMBER    ZAIDAIN:        Maybe    I'm

14   misunderstanding.  Maybe we're arguing the same point

15   and I just don't understand.

16           Are you arguing that the parking special

17   exception is applicable or are you arguing just that -

18   - or are you arguing that the whole entire thing is

19   subject to special exception, the whole entire use?

20           MEMBER MILLER:  Yes, I'm arguing that the

21   health care facility is still subject to 359.1 which

22   it was subject to under our previous order and by

23   being a special exception under 359.1, the parking

24   requirements apply.

25           MEMBER ZAIDAIN:  Okay.  I think I agree

1    with you in part and I disagree in part.   I don't

2    agree that 359 applies, but I can't get around the

3    fact   that   under   the   parking   schedule,   under

4    residential uses it says CBRFs.   If it just said

5    health care facility,  it would be a different ball

6    game, but that clearly says CBRFs shall be run by the

7    BZA.

8              MEMBER MILLER:   I think what that means is

9    that not all CBRFs are matter of right use.

10             CHAIRMAN GRIFFIS:  Mr. Hood?

11             COMMISSIONER   HOOD:    I'm   sitting   here

12   listening to the conversation and it reminds me of

13   when the Zoning Commission took this up.   It was the

14   same exact conversation that went back and forth if

15   you read the transcript and I was sitting here trying

16   to   remember   exactly.    I   know   there   were   some

17   classifications   that   were   tossed   around,   but   my

18   question, Mr. Chair, and through you too, Ms. Miller,

19   is from your interpretation and all that extensive

20   research you've done, when does 359 come into play?  I

21   don't understand because if I remember correctly, it's

22   an R-4 zone and I would say with more restrictive --

23   R-4 zone and up, I always say up, R-4, R-5, everything

24   as far as the Fair Housing Act is supposed to be a

25   matter of right.

1    So I want to know from your research, when

2    does 359 come into play?

3    MEMBER MILLER:  Well, from my reading of

4    the regulations, 359 is in an R-5 district and in this

5    particular case, it deals with a nursing home in an

6    R-5 district.

7    COMMISSIONER HOOD:  Okay, I stand to be

8    corrected.

9    MEMBER MILLER:  My research, there isn't

10   case law on this per se in the District, so my

11   research goes to other jurisdictions that have looked

12   at nursing homes to see whether or not they were

13   governed by special exceptions or variances that

14   violated the Fair Housing Act and it didn't.

15   COMMISSIONER HOOD:  I just think that --

16   if I remember correctly, everything that was R-4, R-5

17   and everything that was less restrictive, everything

18   was supposed to be matter of right.  And I think that

19   this came into play.  That's why I want to know when

20   359 came into play.

21   MEMBER ZAIDAIN:  And if you look at the

22   parking provisions for all other -- I mean I'm not

23   criticizing the Zoning Commission.  I mean just in my

24   mind the way the scenario should have been played out

25   is when all these regulations were fixed to make those

1    matter of right uses, there should have been a

2    standard put in the parking requirements saying what a

3    CBRF -- what the parking level is required for a CBRF.

4    That means they can go and pull a permit as long as

5    they comply with that.  If you look at the uses, it's

6    like that, one for each 10 persons housed, 9 to 15

7    persons, you need 2 parking spaces.  But under the 16

8    or more persons housed, it says as determined by the

9    BZA.

10    COMMISSIONER HOOD:    I will say this

11   probably needs to be looked at, but when this issue

12   was in front of us when it was an issue about the city

13   being a lawsuit being placed on the city, so I don't

14   know if all that was put in.  We're just trying to get

15   into compliance.

16    MEMBER ZAIDAIN:  Right, no, I understand.

17    COMMISSIONER HOOD:  But I would suggest, I

18   don't know what we can do with this case now, but I

19   think the Zoning Commission needs to relook at that.

20    CHAIRMAN    GRIFFIS:    But    there's    a

21   differentiation between matter of right CBRF and non-

22   matter of right and I think that's why it was probably

23   left there.

24    Ms. Miller, how do you reconcile we asked

25   for the stipulated agreement to the United States and

1   District of Columbia, which is Exhibit 105 in the

2   record.   The second paragraph reads, and I'll start

3   somewhat in the middle that D.C. does not dispute.

4   The  District  of  Columbia  zoning  regulations  or

5   practices that are applicable to housing areas in zone

6   4, multi-family housing include classifications based

7   on  disability  which  on  their  face  and  as  applied,

8   violate   the   Fair   Housing   Act.   These   zoning

9   regulations  and  practices  place  restrictions  upon

10  housing for persons with disability when such housing

11  is considered a community-based residential facility,

12  even though -- critical part -- even though no such

13  restrictions are placed on housing for an equal number

14  of non-disabled persons.

15          Doesn't  that  seem  to  be  precluding  our

16  regulations from requiring a special exception or a

17  different  treatment  for  a  residential  facility  like

18  this?

19          MEMBER  MILLER:   Well,  I  don't  --  I'm

20  trying to look for the provision in our regs, but we

21  require  special  exceptions  for  all  sorts  of  large

22  developments  and  from  what  I  recall  there  was  a

23  residential development in an R-5 zone.  Here it is.

24  353.1, I think, all new residential developments have

25  to get special exceptions.  I don't think there's any

1    disparate impact that's going on between health care

2    facilities and some other comparable residential

3    dwelling which is the basis of the Fair Housing Act.

4            CHAIRMAN GRIFFIS:  But it wouldn't be

5    comparable in the specific zone this is located.

6            MEMBER MILLER:  What wouldn't be

7    comparable?

8            CHAIRMAN GRIFFIS:  Looking at the zone

9    that this is located in which is not the R-5-A which

10    is what I think you were referring to in terms of a

11    special exception, is that correct?

12            MEMBER MILLER:  I think it's R-5-D.

13            CHAIRMAN GRIFFIS:  Is where this is

14    located.  R-5-A is the provision of which special

15    exception would be required.  So is there a special

16    exception?

17            MEMBER MILLER:  In R-5-D is there a

18    special exception equivalent to this?

19            CHAIRMAN GRIFFIS:  For multi-family

20    residential.

21            MEMBER MILLER:  I can't say that there is,

22    okay?  I think the dilemma is that even with the

23    Zoning Commission text order is vague and it's

24    ambiguous and there's room for interpretation and

25    therefore that's why I look to the Court cases that

1  talk about nursing homes.  We know that this is a

2  nursing home and we know that by the case law that a

3  nursing home being subject to a special exception or

4  variance is not in violation of the Fair Housing Act.

5  And then I look to the intent of the Zoning

6  Commission which says to read the regulations

7  narrowly.  And that's where I come down.

8  I'm not saying that an argument couldn't

9  be made the other way, but I would urge the Board to

10  find that it is still a special exception because it

11  hasn't been repealed.  It is in the public interest.

12  What this special exception is all about is looking at

13  the impact on neighborhoods.  It has nothing to do

14  with discriminating.  There's been no case made that

15  there's any discrimination as a result of a special

16  exception being required for a nursing facility.

17  Nursing facilities are an animal of their own that

18  bring staff or ambulances or whatever, that the Courts

19  have recognized as having an impact on communities and

20  being allowable to be subjected to ordinances such as

21  special exceptions and variances.

22  CHAIRMAN GRIFFIS:  Okay.  Clearly, the

23  most difficult cases that we have to decide are ones

24  where the regulations are not clear.

25  In this case, that is certainly the rule.

1    In addition too, though we have other documents in

2    which to refer.  One is this agreement.  And I think,

3    Ms. Miller, you've addressed that substantially.

4              I don't think the Board disagrees with the

5    fact that parking would be required and is an

6    important aspect, one obviously for the community, but

7    also for the successful operation.

8              My concern is that we may be -- I'm not

9    100 percent convinced that upholding this appeal would

10   not give an indication that we were actually treating

11   in some different manner a facility of this type and

12   use and size.

13             Ms. Monroe?

14             MS. MONROE:  Can I interject for a minute?

15             CHAIRMAN GRIFFIS:  Sure.

16             MS. MONROE:  Just a few things.  I know

17   Mr. Zaidain and Ms. Miller were talking before about

18   the general and uniform applicability language and I

19   think what that refers to is Chapter 4.  Chapter 4 is

20   the FAR height, side yard, rear yard, etcetera

21   requirements in R-4.

22             I think the intention of this paragraph,

23   334.5(i) is if you're in R-4, you have to meet those

24   requirements for R-4.  If you're in R-5, you have to

25   meet those requirements for R-5.  Wherever you are,

1  you have to meet those requirements of general,

2  uniform applicability in that zone.

3           CHAIRMAN GRIFFIS:  Right.

4           VICE CHAIR ETHERLY:   And this one does,

5  correct?

6           MS. MONROE:  I don't know.  To be honest

7  with you, I don't know what all the requirements are

8  for this.  I don't even know if it's in the record to

9  be honest.

10          But I also wanted to address the other

11  thing which I think might be helpful.  I think the

12  Board has to remember that they have to look at the

13  regulations in toto and you can't separate out

14  different regulations and the problem with the parking

15  schedule and you're right, in 2101 it says "community-

16  based residential facilities 16 or more persons housed

17  as determined by the BZA."

18          But the BZA only has a certain amount of

19  jurisdiction.   It can only determine special

20  exceptions, variances and there's one other thing,

21  certain special questions.  So in order to be

22  determined by the BZA it would have to come to the BZA

23  as a special exception or a variance.

24          So the way I think this can be read and

25  reconciled is 16 or more persons housed as determined

1    by the BZA would have to come to the BZA as a special

2    exception under, for example, 359.  And that would

3    mean there were no handicapped persons in this

4    facility.  Otherwise, it would not come to the BZA at

5    all.  It would fall under 330.5(i) which would make it

6    a matter or right which would mean it wouldn't go to

7    the BZA for parking.  It would go to the parking

8    schedule which would go to the ZA.

9         I think you can read that, as I said, the

10   16 or more persons housed as determined by the BZA as

11   applying only to those CBRFs which are special

12   exceptions.  And then matter of right, CBRFs would not

13   fall under that --

14        MEMBER ZAIDAIN:    CBRFs or special

15   exceptions?

16        MEMBER MILLER:    Not under 330.5(i).

17   They're a matter of right if they have housing -- if

18   they house handicapped --

19        MEMBER ZAIDAIN:  There's no CBRFs that are

20   special exceptions in that zoned district, correct?

21        MEMBER MILLER:  In what zone?  R-5?

22        MEMBER ZAIDAIN:  Yes, you just said that

23   that would only apply to CBRFs that were special

24   exceptions.

25        MEMBER MILLER:  In any zone.

1      MEMBER ZAIDAIN:  And are there any?

2      MEMBER MILLER:  Well, 359 is the one that

3 -- 359 is health care facilities for 16 --

4      MEMBER ZAIDAIN:  But that's not a CBRF.

5      MEMBER MILLER:  Yes, it is.  A health care

6 facility is a type of CBRF.  It's in the definition.

7 If you look at the definition of CBRF, there's seven

8 different ones laid out and that's one of them that's

9 laid out.

10     In other words, it's a sub --

11      MEMBER ZAIDAIN:  Ms. Miller, instead of

12 wasting -- the sub-definition under CBRF, I'm sorry.

13 Let me reverse this statement.  The health care

14 facility that is discussed in 359 is also the same

15 health care facility that comes under sub (i), under

16 the CBRF definition?

17      MEMBER MILLER:  Yes, yes, yes.  If you

18 look at the definition of CBRF, you go back, there's

19 A, B, C, D, E, F, G, H and D is health care facility.

20  And that term and all the other terms like community

21 residence facility, adult rehabilitation of all the

22 various types of CBRFs are used throughout the regs to

23 mean a type of CBRF, but they don't specify every

24 single time this health care facility is also a CBRF.

25 It's assumed, I think, because it's the same and the

1    term is defined.

2         MEMBER ZAIDAIN:   What's  the  difference

3    between 359 and then 330.5(i).

4         MEMBER MILLER:  The only difference that I

5    see and my take on this is is 359 would continue to be

6    a special exception and let's assume you had a health

7    care  facility  where  you  didn't  have  handicapped

8    people.  Maybe  it  was  --  handicapped  people  as  the

9    definition  says,  they  have  difficulty  engaging  in  any

10   major life activities and maybe there's a health care

11   facility  where  it's  just  a  temporary  recovery

12   facility.

13        MEMBER  ZAIDAIN:   Right.   It's  for  a

14   nonprotected class of people.

15        MEMBER MILLER:  Right, nonprotected.

16        MEMBER ZAIDAIN:  So it wouldn't be a CBRF.

17    It would just be a health care facility.

18        MEMBER MILLER:  With is a type of CBRF.  I

19   mean it is.

20        MEMBER ZAIDAIN:  But a CBRF in my mind,

21   the  way  --  I  think  we're  saying  the  same  thing.   I

22   think what delineates in my mind a protected class or

23   what  delineates  a  CBRF  or  something  else  is  the

24   presence  of  a  protected  class.   If  there's  a  health

25   care  facility  that  does  not  deal  with  a  protected

1    class, then it's not a CBRF, correct, am I wrong?

2              MEMBER MILLER:    No, I don't think so.

3    It's a CBRF anything.  I just may not have handicapped

4    people in it.

5              And I'm not saying that exists or doesn't

6    exist, but it could be a possibility.  The thing is if

7    it does have handicapped people in it and it's a CBRF,

8    it goes under 350.5(i) and it's a matter of right and

9    that's it.

10             MEMBER ZAIDAIN:    And if it's a health care

11   facility that does not have a handicapped class, then

12   it falls under 359 as a special exception.  Okay.

13             MEMBER MILLER:    Right, yes.  Because it

14   specifically says that the Zoning Administrator has to

15   determine that this is operated as housing for persons

16   with handicaps.    If he does not make that

17   determination, they don't get the matter of right

18   status under --

19             MEMBER ZAIDAIN:    The term CBRF under the

20   zoning regulations is not exclusive to protected

21   classes.

22             MEMBER MILLER:    No, not according to the

23   definition of CBRF.

24             MEMBER ZAIDAIN:    That throws a monkey

25   wrench in my thinking a little bit, but I think I

1   understand.

2        MEMBER MILLER:  Let me just say that the

3   definition of CBRF says persons who have a common need

4   for    treatment,    rehabilitation,    assistance    of

5   supervision in their daily living.  Do you consider

6   that a protected class?  I doesn't specify.  It

7   doesn't say a protected class under any particular

8   federal act or anything else.  And I think that's open

9   to interpretation to be honest with you.

10        MEMBER ZAIDAIN:  Which definition did you

11   just read?

12        MEMBER MILLER:  The definition of CBRF,

13   the very first line.

14        MEMBER ZAIDAIN:  The definition includes,

15   but is not limited to --

16        MEMBER MILLER:  I'm probably being

17   repetitive, but the purpose of these regulations which

18   are not necessarily so well written was to comply with

19   the Fair Housing Act and this is a nursing home and

20   it's been found under Court cases that nursing homes

21   may be subjected to special exception laws and that's

22   what we're talking about.

23        Can it still be a special exception.

24        MEMBER ZAIDAIN:  We can put this on the

25   regs.  I know Court cases say you can do this and you

1    can do that, but where are the regs?

2              MEMBER MILLER:  The regs say --

3              MEMBER ZAIDAIN:  The way I read the regs

4    is that if it's a nursing home, then it's a CBRF that

5    falls under 330.(i).  That's the way I read the regs.

6              MEMBER MILLER:  So basically what you're

7    choosing to do is -- no, by implication, 359 is

8    repealed because of 330.5(i).

9              MEMBER ZAIDAIN:  No, to me that would deal

10   with -- the way I'm struggling through this, but the

11   way I understand 359 is for health care facilities

12   that do not meet the definition of -- that do not have

13   a protected class.

14              That's the way I understand that.  You

15   asked me what that would be and I'm not sure.  I think

16   our definition of protected classes is expanding daily

17   so -- I'm not to the point where I totally disagree

18   with you.  I'm just trying to give some clarity to

19   this.  Maybe some of the other Board Members are

20   completely clear and they're just not telling me.

21              COMMISSIONER HOOD:  I would say I'm not

22   clear, but I kind of somewhat agree with Ms. Miller.

23              MEMBER  ZAIDAIN:     You   wrote   these

24   regulations, Mr. Hood.

25              COMMISSIONER HOOD:  Well, you can see

1    where I was with those regulations too, if you look

2    and see which way I voted, but anyway, be it as it

3    may, I am not all that clear, but Ms. Miller, I really

4    buy into her point about the precautionary measures

5    and the impacts on the community. So I probably would

6    be in favor. That started me ticking. I'm not sure

7    if that's exactly what the Commission meant because

8    like I said we were tied up in -- I see I'm getting to

9    get off -- but I see we were tied up in trying to come

10   into compliance. So I would rather err on the side of

11   caution and maybe Ms. Miller does have a point.

12           But I still say it should go back to the

13   Zoning Commission --

14           MEMBER ZAIDAIN:  I have an odd question

15   and maybe this is for either the Zoning Commission rep

16   or OCC.  It's clear that we have an ambiguous

17   regulation that is dealing with a very sensitive

18   issue, obviously one that has caused great

19   consternation for the District in the past. And is

20   there any avenue for this Board to have the Zoning

21   Commission fix this problem as oppose to us ruling on

22   this regulation? I'll just throw it out there.

23           CHAIRMAN GRIFFIS: Not that I'm aware of.

24           MEMBER ZAIDAIN:  It would be clear to me

25   if the parking schedule were amended to deal with this

1    use and that it was clear, we wouldn't have this

2    problem.

3            COMMISSIONER HOOD:  I would agree, but the

4    only thing I would suggest, I don't know.  I guess --

5            MEMBER ZAIDAIN:  I know generally about

6    the Commission.  I know there's emergency rulemaking

7    proceedings and etcetera, etcetera and I'm just -- I

8    mean --

9            CHAIRMAN GRIFFIS:  I think it would be

10   hard to remedy or decide this case based on an action

11   by the Zoning Commission.

12           COMMISSIONER HOOD:  Well, actually, and

13   I'm not sure -- I know this is an appeal.  If the

14   Commission Member thinks, I believe, anything else

15   that is not done correctly, we can take it back and

16   I'm sure we can do the same thing here which I could -

17   - sua sponte.  And I hate to use that word because

18   it's like an authority.

19           MEMBER ZAIDAIN:  I don't know if you can

20   sua sponte an appeal.

21           COMMISSIONER HOOD:  That's what I'm

22   asking.

23           MEMBER ZAIDAIN:  It's just a thought

24   because this is a tricky issue that I know the Zoning

25   Commission was trying to resolve at one time and it

1    seems that there's a provision that is still causing

2    problems.

3                  COMMISSIONER HOOD:  But the issue is here

4    if that was not the intent of the Zoning Commission,

5    then the BZA does not write regulations.  So that's

6    kind of where I am.

7                  MEMBER ZAIDAIN:  But in essence, that's

8    kind of what we're doing here.  We're saying 359 --

9    there's arguments out there talking about this part of

10   the parking schedule is not going to apply, etcetera,

11   etcetera.

12                 CHAIRMAN GRIFFIS:  If you look at it in

13   this frame, if you look at 330 and 330.5(i) it

14   establishes a community-based residential facility for

15   the R-4, the matter of right uses that would be in

16   general and uniform applicability.  That carries into

17   R-5 and Ms. Monroe has stated the fact that you then

18   would take it in with the same language in R-5 and say

19   would the general applicability in the R-5 District.

20   It's not saying that you can move all of that -- well,

21   that being said, it's established that this is, in

22   fact, a health care facility for the handicapped.

23   That would remove it from the special exception and

24   therefore we wouldn't have the difficulty in the

25   parking table and it wouldn't be looked at.

1    We would then go to the fact of whether

2    the  Zoning  Administrator  erred  in  their  common

3    practice  of  establishing  a  similar  use  in  order  to

4    establish the --

5         MEMBER  ZAIDAIN:    And  I  think  the  DCRA

6    testimony was  good.    I  think with what  the  knowledge

7    the DCRA had, they made the right decision.   I'm just

8    trying to decide if they should have gone that route.

9    Do you know what I mean?

10        They  found  --  I  think  their  --  the

11   testimony we received about the logic on formulating

12   the  parking  requirements  in  light  of  their

13   determination that the parking schedule doesn't apply

14   I thought was appropriate.   I'm just struggling with

15   how  we  handle  the  parking  regulations  and  the

16   ambiguity therein.

17        CHAIRMAN  GRIFFIS:    Well,  we  don't  have

18   ambiguity in the parking regulations if we establish

19   that this is, in fact, a matter of right.

20        MEMBER MILLER:   We don't have ambiguity if

21   we just establish it's a special exception either.

22        CHAIRMAN  GRIFFIS:    But  we  have  some

23   difficult with the reading of the agreement between

24   the U.S. and the District of Columbia.

25        Yes.

1          MS. GLAZER:  There was some question as to

2    the status and I just thought I could be helpful

3    perhaps to bring you up to date on the status of the

4    CBR regulations.  As Board Member today, Commissioner

5    Hood said the Zoning Commission was not happy at the

6    time that it passed this legislation.  It felt it was

7    doing it in a compromised situation.  From that moment

8    on, it had been the goal of the Zoning Commission to

9    have the CBR regulations reevaluated.  In fact, it has

10   been formally sent to the Office of Planning and they

11   have been working on it, on and off, for several

12   years, actually.  They have had meetings with the

13   community.  The Mayor has had his own task force

14   relating to community-based residential facilities.

15          I think the problem is is that there are

16   so many complexities to what we would like to do from

17   a zoning point of view and what is allowed by the

18   Justice Department as well as varying interests

19   because of the community concerns about where these

20   are located that it hasn't been resolved.  But I think

21   this can be used as an opportunity to say to Office of

22   Planning, can you please put this up on your agenda to

23   evaluate this quickly so that we can change our

24   regulations appropriately.

25          The regulations when they were changed

1  were not completely changed.  When this happened, just

2  certain pieces were picked out and changed.  This was

3  again negotiated.  So it might not be consistent

4  throughout.

5          CHAIRMAN GRIFFIS:  Okay.

6          MS. GLAZER:  You can ask your staff to

7  write a letter to the Office of Planning or to the

8  Zoning Commission to request that the Office of

9  Planning look into this as soon as possible.

10         CHAIRMAN GRIFFIS:  I certainly think we

11  can do that.  Thank you.

12         MEMBER MILLER:  I just want to reiterate

13  the intent of these regulations are so that they be in

14  accordance with the letter and the spirit of the Fair

15  Housing Act and the Zoning Commission says that it

16  should be read narrowly and if we read it to exclude a

17  nursing home which has been upheld to be allowed to be

18  subject to a special exception or variance and not

19  violate the Fair Housing Act, we go beyond the spirit

20  and letter of the Fair Housing Act.

21         MS. MONROE:  Mr. Chairman, can I make a

22  point here?

23         CHAIRMAN GRIFFIS:  Yes.

24         MS. MONROE:  One last one, I think.  I

25  just want to point out that 350.4 permits in this

1    zoning, in an R-5 district, as a matter of right,

2    multiple dwellings.  So they're a matter of right.

3    They don't need to go to the BZA special exception,

4    parking or otherwise.  If you have a multiple dwelling

5    with 50 unrelated, not handicapped people in it,

6    they're okay.  They're a matter of right.

7            If you take that same multiple dwelling

8    and put 50 handicapped people in it, you can't then

9    impose on that dwelling a special requirement of

10   having to go back to the BZA for anything because I

11   think that could be considered disparate treatment

12   under the Fair Housing Act and I think that's what's

13   happening here.

14           These handicapped dwellings are dwellings

15   for handicapped people, are supposed to be treated the

16   same way as a residential use in that zone and if this

17   residential use of multiple dwelling, it doesn't have

18   to go to the BZA for parking, then a residential use

19   for handicapped people should not have to either.  It

20   should be a matter of right under 340.5(i).

21           And it's a disparate treatment question

22   and it's a statute to be reckoned with.  I think it

23   should be seriously considered.

24           CHAIRMAN GRIFFIS:  We appreciate that

25   advice.

1          Okay.   Is  the  Board  prepared  for  some

2     action?

3          COMMISSIONER HOOD:  Have we taken off the

4     table recommendations that I heard tossed back and

5     forth?

6          CHAIRMAN GRIFFIS:  No, the recommendations

7     are  going,  but  I  don't  see  how  that  remedies  our

8     situation.  We still have to deal with this appeal.

9          COMMISSIONER HOOD:   Ms. Monroe, is there

10    any  recourse  that  the  Zoning  Commissioner  has  on

11    appeal to deal with this at the Commission level?

12         MS. MONROE:  I honestly don't know whether

13    you can sua sponte an appeal, off the top of my head.

14     My concern is --

15         CHAIRMAN  GRIFFIS:    We  still  need  a

16    decision if you're going to sua sponte --

17         COMMISSIONER HOOD:  But here's the thing.

18     Is this term urgent that we can't take it back to the

19    Zoning  Commission  and  let  them  deal  with  it

20    accordingly?

21         MS. MONROE:  Let me address that.

22         COMMISSIONER  HOOD:    What's  going  to

23    happen, I think you said present in here.  This is a

24    piece and like I said, having sat on that case I don't

25    think that the Commission really thought this thing

1  through.   We didn't look down the lines to see some

2  things that may come up and I just would rather see us

3  be cautionary as opposed to just trying to say okay,

4  the Board made a decision, but that decision, come

5  back next time, then you make another decision which

6  will be the reverse of this one, so I just would

7  rather see us move cautiously.

8         MEMBER MILLER:  Mr. Hood, I think what our

9  role here is to take the facts that are presented to

10  us and make the best decision possible based on our

11  knowledge of the legislative history, our knowledge of

12  Court cases, our interpretation of the regs and then

13  if we're wrong, someone will appeal and a higher court

14  will --

15         COMMISSIONER HOOD:   It seems to me, Ms.

16  Miller, that we're writing regulations at -- it

17  appears to me that we're writing regulations.  My

18  question to you was how do we go to 359 and I didn't

19  see what pointed me to that, but I will tell you this

20  to save a lot of discussion and then I want to hear

21  from Ms. Monroe to save a lot of discussion is that I

22  would agree with what you're saying because I would

23  err on the side of caution and make sure that the

24  special exception process stays in place for the

25  protectionary  and  cautionary  measures  of  the

1    neighborhood as far as parking.

2            I would agree with that.  But from the

3    legislative history from what I've seen and I haven't

4    done as much research as you have from what -- being

5    on the Commission at that time, I don't think all that

6    stuff was filtrated and decided upon.  So there are a

7    lot of open ends and I just hate to see us moving in

8    the wrong direction.

9            MS. MONROE:  Let me just say this, how we

10    get to 359 is that this facility is a health care

11    facility.  It's licensed as a health care facility.

12    DCRA has represented that it's a health care facility

13    as has Capitol Hill groups.  So we know it's a health

14    care facility and we know it's in an R-5 district.  So

15    we go to the regs in an R-5 district where it says how

16    health care facilities are regulated and there it says

17    that it's subject to a special exception.  And there,

18    for health care facilities for 16 to 300 persons, and

19    once it's a special exception, then that gives the

20    Board the authority to go to the parking schedule for

21    CBRS for 16 to 300 or however it's read, persons.

22            Basically what we're doing is applying the

23    same regulations we applied under our previous order.

24    We're not reading that regulation out on the basis of

25    the text amendments that were issued by the Zoning

1  Commission in 1999.

2            COMMISSIONER HOOD:   Again, when the Fair

3  House Act came that was supposed to be a matter of

4  right which would make it a matter of right, you know.

5   You don't have to come for approval from the BZA.

6            MEMBER MILLER:   If you interpret that as

7  applying to all CBRF and that there are no exceptions,

8  I'm saying it doesn't have to be interpreted that

9  broadly.  It's not that clear.

10           It's   not   clear   they   repealed   this

11  provision to me.

12           COMMISSIONER HOOD:   And again, we're still

13  getting ready to rewrite some regulations.

14           MEMBER MILLER:   No, we're interpreting it

15  one way or the other.   It's not clear, but a lot of

16  things aren't clear that come to us, I think.

17           COMMISSIONER HOOD:   They're not?

18           (Laughter.)

19           COMMISSIONER HOOD:   Mr. Chairman, I think

20  Ms. Monroe was going to say something.

21           MS. MONROE:   This is not a lot of wisdom.

22   I was going to say is that if you hold this in

23  abeyance or wait or whatever and wait for the Zoning

24  Commission, first of all, they don't know how long

25  it's going to take.   Second of all, the Zoning

1    Commission like any legislative body, if they're going

2    to enact a regulation it generally will have

3    prospective applications.   It would be an argument

4    whether or not it would apply to this particular case

5    at all and I don't know whether the Zoning Commission

6    has authority to make its regulations reach into the

7    past and deal with certain cases and issues.  It would

8    only apply in the future.   So this case may not even

9    fall under a new reg.  Just to put that.

10            COMMISSIONER HOOD:   You bring up a good

11   point.   I'm not sure I would do that, but I do know

12   that we can do a temporary which would expedited, but

13   like I said, I don't know if it will reach back.

14            MS.  MONROE:     To  cover  an  emergency.

15   That's another unclear question.

16            (Pause.)

17            MEMBER  MILLER:    At  this  point,  Mr.

18   Chairman, I would like to move to grant the appeal of

19   Stanton  Park  Neighborhood  Association  of  the

20   Administrative Order of the Zoning Administrator in

21   the issuance of the Certificate of Occupancy to -- I'm

22   not sure which one it is, but to the nursing on the

23   grounds that the Zoning Administrator has authority.

24   The subject property is still governed by BZA Orders

25   16407 and 15542, as a special exception.

1      CHAIRMAN GRIFFIS:  Is there a second?

2      COMMISSIONER HOOD:  I will second that.

3      CHAIRMAN  GRIFFIS:    Thank  you.    Further

4  discussion on the motion?

5      In support -- no further discussion?  Then

6  I would speak in opposition to the motion.   I think

7  it's a compelling case that's set up.   I think the

8  difficulty is as I've said is the fact that there is

9  some great ambiguity.  My difficulty comes in tracing

10  through  starting  with  the  provisions  in  R-4,  then

11  going to the R-5 matter of right and the matter of

12  right as indicated today and in our own review, 350.4,

13  multiple dwellings are a matter of right.

14      Then  looking  to  the  stipulated  agreement

15  at which it talks directly to the multi-family housing

16  classifications  and  saying  that  we  cannot  set  up

17  something that would create a differing threshold for

18  the construction and use.

19      I  have  difficulty  seeing  why  this  isn't

20  matter  of  right  and  why  we  would  be  able  to  make  it

21  not  matter  of  right  in  further  processing  this

22  application.  I do not disagree with the fact of the

23  impact of parking, the community impact on it.   I do

24  not believe if this appeal was denied that no parking

25  would  be  required.   I do understand the specifics of

1    this that there may be diminished or a lesser burden

2    of parking and I'm not sure that I necessarily agree

3    with that.  But I believe on face, looking at how this

4    was looked at by the Zoning Administrator was actually

5    not in error.

6                    MEMBER MILLER:    I  just  would  like  to

7    reiterate that in the face of ambiguous regulations

8    that we should look to the purpose of the Fair Housing

9    Act  and  that  special  exceptions  being  applied  to

10   nursing homes which this is, is not in violation of

11   the  Fair  Housing  Act,  and  that  the  Commission

12   instructed in its order that the regulations be read

13   narrowly.  And this is being read broadly to repeal a

14   regulation that serves strong public purpose.

15                    The public purpose that I'm referring to

16   is to consider the impact of traffic, parking, safety

17   issues on a community that nursing homes have been

18   found to bring.

19                    CHAIRMAN GRIFFIS:  I understand that issue

20   and that's why I say it isn't exempt from providing

21   parking that would lesson that.

22                    Okay,  I  understand  your  point.    Further

23   comments?

24                    Okay,  we  have  before  us  the  motion  that

25   has been seconded to uphold the appeal that's before

1    us.

2            Let me ask for all those in favor of the

3    motion signify by saying aye.

4            (Ayes.)

5            Opposed?

6            (Opposed.)

7            Abstaining?

8            (No response.)

9            Why don't we record the vote, Mr. Moy?

10            MR. MOY:    The staff records the vote as

11    2:3:0.   This is on the motion of Ms. Miller to grant

12    the appeal, seconded by Mr. Hood.   To support the

13    motion is Ms. Miller, Mr. Hood.   Opposed to granting

14    the appeal is the Chairman, Mr. Etherly and Mr.

15    Zaidain so the motion fails.

16            CHAIRMAN GRIFFIS:   Thank you very much.

17    Anything else for us this morning, Mr. Moy?

18            MR. MOY:   Well, we have the --

19            CHAIRMAN GRIFFIS:    Do we have an

20    affirmative motion?

21            MEMBER ZAIDAIN:   We need one, don't we?

22            CHAIRMAN GRIFFIS:   That would be fine.

23    Mr. Zaidain?

24            MEMBER ZAIDAIN:   Okay, I'll make a motion

25    to deny the appeal of Stanton Park Neighborhood

1    Association which is Application No. 17043.

2                    CHAIRMAN GRIFFIS:  Is there a second?

3                    VICE CHAIR ETHERLY:  Seconded.

4                    CHAIRMAN GRIFFIS:  Thank you.

5                    MEMBER ZAIDAIN:  Very briefly, this is a

6    very difficult case to discern and I will admit that I

7    am, in essence, a strict constructionist, if I can say

8    that, when it comes to the zoning regulations.  And my

9    interpretation of how this all plays out is that as

10   you    followed    the    CBRF    regulations    through    the

11   residential districts, that they are a matter of right

12   and not special exception.  Now I struggle very much

13   with the parking requirements or the parking schedule

14   talking about them being determined by BZA and I do

15   not understand why that is there.  So I have to defer

16   to our legal information, our legal interpretation and

17   that is the Fair Housing Act which says you cannot

18   treat these facilities differently than you can other

19   facilities.

20                    And it's my opinion that making them go to

21   the BZA to have their parking -- make the parking

22   -- have the BZA determine the parking for a -- not

23   only a CBRF, but a CBRF facility that's just greater

24   than 16 people I find to be unique and treats this use

25   differently than other uses within that residential

1   district.

2          I will say with that caveat that -- I will

3   add a caveat to that this is disturbing somewhat and I

4   do highly recommend the Zoning Commission fix this so

5   that we don't have to have our morning session run

6   until 4 o'clock again.

7          COMMISSIONER HOOD:   Wait a minute, now

8   don't blame that part on me.

9          (Laughter.)

10          CHAIRMAN GRIFFIS:  Indeed.

11          VICE CHAIR ETHERLY:   If I may, just to

12   follow up on Mr. Zaidain's comments.  I agree with him

13   wholeheartedly.  My concern here squarely rests with

14   the issue of reconciling the role of the FHA in this

15   particular decision here.

16          Perhaps a workable compromise might have

17   been, but I would just as soon follow Mr. Zaidain's

18   reasoning and just encourage this area to get some

19   clarification quickly.  Perhaps a workable compromise

20   here might have been looking at while not saying the

21   BZA erred with regard to exercising authority to

22   determine parking for matter of right use, perhaps the

23   secondary step would have been to take a look at well

24   then if that is not an error, what should have been

25   the appropriate model for the most appropriate

1  analogous use to look at in making the determination

2  around parking.

3          But I think that's essentially a stop gap

4  measure that would be aimed at trying to clarify what

5  is a gaping hole that simply needs to be squared away

6  somehow and I tend to perhaps agree with Mr. Zaidain

7  and Mr. Hood in that that gets us close to just trying

8  to write a regulation that needs to be written and

9  isn't yet there in place.

10          But I am in support of the motion.  Thank

11  you, Mr. Chair.

12          MEMBER MILLER:  Mr. Chairman, I have to

13  look through my papers here, but either -- I believe

14  it was either argued before us or we can consider

15  whether, in fact, the Zoning Administrator erred by

16  looking at the wrong use in determining the

17  appropriate parking for this facility.  So we may not

18  be finished with this case yet.

19          CHAIRMAN GRIFFIS:  Is there discussion on

20  that?  Is there anyone in belief that there was an

21  error?

22          MEMBER ZAIDAIN:  Are you saying that is

23  before us or that's not before us.

24          MEMBER MILLER:  I believe it's before us.

25  I just want to check the paper.

1    MEMBER ZAIDAIN:   well, we did get

2   testimony from Mr. Hogan from DCRA and I agreed with

3   her testimony to be frank.  I thought that CBRF is

4   determined to be a residential use and she looked at

5   the most restrictive residential use in determining

6   the parking regulations and I thought that was

7   correct.

8    CHAIRMAN GRIFFIS:  Do others disagree with

9   that interpretation so we might amend the motions

10   before us?

11    MEMBER MILLER:  I would disagree that it

12   was an appropriate analogous use to look at.   I

13   believe that the parking was diminished by over three

14   times what it was under our orders and I think it

15   would have been more appropriate for the ZA to look at

16   hospital use because a nursing facility brings in

17   similar types of staff and traffic, ambulances, things

18   like that.  And that is a much greater number than the

19   number we found to be analogous.

20    MEMBER ZAIDAIN:  Now, how do are we doing

21   this procedurally?  It's my motion.  I don't agree

22   with taking on that issue.  Do you want to dispense

23   with my motion and then deal with her issue?

24    VICE CHAIR ETHERLY:  And I kind of raised

25   the specter of that.  The reason why I would suggest

```
1    just following through with Mr. Zaidain's motion is

2    it's the cleanest way and once again, while I am

3    tempted to pursue the route that my colleague, Ms.

4    Miller highlighted, I think, unfortunately, it's just

5    a stop gap approach to a much deeper issue that just

6    simply needs to get resolved in another venue.  So I

7    would be inclined to support Mr. Zaidain's motion and

8    move forward as a seconder of that motion.

9              MEMBER MILLER:    I would suggest that we

10   could certainly proceed with Mr. Zaidain's motion and

11   decide that vote on whether this is a matter of right

12   or not and whether or not the ZA had the authority to

13   set the parking and then I would suggest that there's

14   a second question then is whether the ZA made the

15   correct determination.

16             VICE  CHAIR  ETHERLY:    If  I  understood

17   correctly, Mr. Zaidain's motion would be dispositive.

18    It would be definitive.  He did not parse it out.

19             CHAIRMAN GRIFFIS:    That's true.    You'd

20   have to change the motion that's before us that the

21   Zoning Administrator didn't --

22             MEMBER ZAIDAIN:    The motion was to deny

23   the appeal.  And I'm not willing to amend the motion,

24   but my question would be is after we dispose of my

25   motion, can she make another motion after that to deal
```

1    with her issue?

2              CHAIRMAN GRIFFIS:    No, we've just moved

3    for the entire appeal.    You'd have to change your

4    motion in order to deny the appeal based on the ZA's

5    authority to determine the parking in this matter and

6    then the second motion would be did they determine, so

7    they had the proper authority to determine the parking

8    and the second motion would be did they make the right

9    interpretation to establish the parking.

10             MEMBER ZAIDAIN:    I thought they did, so I

11   mean I thought they had the right interpretation.    I'm

12   not supportive amending my motion.

13             VICE CHAIR ETHERLY:    I am the seconder of

14   the motion.    I'm inclined to support the motion as is.

15             CHAIRMAN GRIFFIS:    Mr. Hood, any comment?

16    None required.

17             COMMISSIONER HOOD:    Okay, good.    Let's

18   just move forward.    I don't have any comment not on

19   that issue.

20             CHAIRMAN GRIFFIS:    Right, indeed.    I

21   appreciate that and I think the Board did have time to

22   look at that and move it apart.

23             So we have a motion before us that's been

24   seconded and it's been deliberated.    Is there further

25   comments?

1    Not noting any, I'd ask them for all those

2    in favor of the motion signify by saying aye.

3    (Ayes.)

4    Opposed?

5    (Opposed.)

6    MR. MOY:  The staff would record the vote

7    which is on the motion of Mr. Zaidain to deny the

8    appeal.  Seconded by Mr. Etherly; supported in favor

9    to deny the appeal, the Chairman.  Opposed to the

10   motion, Mr. Hood and Ms. Miller.  2:3:0.

11   CHAIRMAN GRIFFIS:  Good.  Thank you very

12   much.

13   I'm going to dispense with all other

14   agenda items for our morning session as it is the hour

15   of 4 o'clock.

16   We're going to take a 20 minute break

17   before we call the afternoon agenda.

18   We will get through all the applications,

19   I'm anticipating by 6:30 and no later and we

20   appreciate everyone's patience with this.  We

21   obviously had quite a bit to accomplish today.  So

22   we're just going to take 20 minutes so that certain

23   Board Members can get something to eat as we haven't

24   broken for lunch yet and then we will come back.

25   Thank you.

1                    (Whereupon, at 4:04 p.m., the public

2       meeting was concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Exhibit 9

**Potter, Patrick J.**

**Subject:**                    Transfer of Files

-----Original Message-----

"Donald Hartman" <hartmand75@hotmail.com>
01/13/2004 11:19 AM

To:    patrick.potter@shawpittman.com
cc:
Subject:    Transfer of Files

Patrick - in accordance with yesterday's events, and in order best avoid further prejudice
to the interests of CHG, please arrange to have Shaw Pittman's Newmark and BZA files sent
to CHG immediately to permit CHG to retain substitute counsel in these pending matters.    I
would appreciate it if you would provide me with a date certain by which this will be
accomplished.    Thank you.

Donald

1

Exhibit 10

# ShawPittman LLP

*A Limited Liability Partnership Including Professional Corporations*

PAUL A. TUMMONDS, JR.
202.663.8873

January 15, 2004

<u>By Hand Delivery</u>

Donald Hartman, Esq.
General Counsel
Capitol Hill Group
700 Constitution Avenue, N.E.
Washington, DC 20002

Re:     **D.C. Board of Zoning Adjustment Appeal No. 17043 –
        Appeal of Stanton Park Neighborhood Association**

Dear Donald:

Enclosed please find Shaw Pittman's pleading files for the above-mentioned case. These pleading files are a complete record of the case before the Board of Zoning Adjustment. If you have any questions regarding these materials, please call me.

Sincerely,

*Paul*

Paul Tummonds

Enclosures

cc:     Patrick Potter, Esq. (w/o encl.)

Exhibit 11

GOVERNMENT
OF
THE DISTRICT OF COLUMBIA

+ + + + +

BOARD OF ZONING ADJUSTMENT

+ + + + +

PUBLIC HEARING

+ + + + +

TUESDAY
FEBRUARY 10, 2004

+ + + + +

The Public Hearing was convened in Room 220 South, 441 4th Street, N.W., Washington, D.C. 20001, pursuant to notice at 9:30 a.m., Geoffrey H. Griffis, Chairperson, presiding.

BOARD OF ZONING ADJUSTMENT MEMBERS PRESENT:

GEOFFREY H. GRIFFIS        Chairperson
RUTHANNE G. MILLER         Vice Chairperson
CURTIS ETHERLY, JR.        Board Member
DAVID ZAIDAIN              Board Member (NCPC)

ZONING COMMISSION MEMBERS PRESENT:

CAROL MITTEN               Chairperson

OFFICE OF ZONING STAFF PRESENT:

CLIFFORD MOY,              Deputy Secretary
BEVERLEY BAILEY,           Zoning Specialist
JOHN K. A. NYARKU,         Zoning Specialist

OFFICE OF PLANNING STAFF PRESENT:

JOHN MOORE,                Office of Planning
STEPHEN MORDFIN,           Office of Planning
TRAVIS PARKER,             Office of Planning

D.C. OFFICE OF CORPORATION COUNSEL:
SHERRY GLAZER, ESQ.
LORI MONROE, ESQ.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        www.nealrgross.com

C-O-N-T-E-N-T-S

| AGENDA ITEM | PAGE |
|---|---|
| OPENING REMARKS | 4 |
| PRELIMINARY MATTERS | 8 |
| APPLICATION OF EDWARD B. ROOTHS AND NANCY N. DAO 17071 ANC-2F | 8 |
| APPLICATION OF SUN SERVICE, INC. 17095 ANC-1C | 13 |
| APPLICATION OF NANCY MCKEON 17112 ANC-2E | 66 |
| AFTERNOON SESSION | |
| OPENING REMARKS | 80 |
| PRELIMINARY MATTERS | 84 |
| APPLICATION OF MILLENNIUM ARTS CENTER 17110 ANC-6D | 93 |
| APPLICATION OF STEPHEN P. MCCARRON 17113 ANC-3G | 99 |
| APPLICATION OF 2412 LIMITED PARTNERSHIP 17111 ANC-1C | 112 |

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

83

1    the record and also stress again the fact of what you

2    want us to deliberate on should be presented into the

3    record in some fashion, either in written or in

4    testimony today.

5              At this time, the Board will consider any

6    preliminary matters. Preliminary matters are those

7    which relate to whether a case will or should be heard

8    this afternoon such as request for a postponements,

9    continuances or withdrawal or whether proper and

10   adequate notice has been provided of the application.

11             If you are not prepared to go forward

12   today or if you believe that the Board should not

13   proceed with a case today, I would like you to come

14   forward and have a seat at the table as an indication

15   of having a preliminary matters.

16             Let me say a very good afternoon to our

17   staff, Ms. Bailey on my very far right and Mr. Moy and

18   we have represents of the Corporation Counsel with us

19   also this afternoon.

20             Ms. Bailey, are you aware of any

21   preliminary matters for us at this time?

22             MS. BAILEY: Mr. Chairman and to members

23   of the Board, good afternoon.

24             Mr. Chairman, just for clarification for

25   the staff, will the Stanton Park Neighborhood

84

1   Association discussion be taking place this afternoon?

2           CHAIRPERSON GRIFFIS:  Yes, we have a Board

3   preliminary matter which we will bring up after I

4   clear what else we have to entertain.

5           MS. BAILEY:  There is a request, sir, for

6   Application Number 17110, the Millennium Arts Center

7   for a postponement of that case this afternoon, Mr.

8   Chairman.

9           CHAIRPERSON GRIFFIS:  Okay.  Is there a

10  representative from Millennium Arts here?  Okay.  Let

11  me -- let me do this.  Have your -- make yourself

12  comfortable.  Turn off your microphone.

13          We're going to take up -- if there's

14  nothing else, we're going to take up the Board's

15  preliminary matter.  So, don't go anywhere.  We'll be

16  right with you and let's do entertain that.

17          I understand that the Board is interested

18  in a brief discussion on the previous case that we

19  have heard.

20          Ms. Miller.

21          VICE CHAIR MILLER:  Yes, Mr. Chairman.  I

22  would like to move that this Board reconsider our

23  denial of Appeal Number 17043, Stanton Park

24  Neighborhood Association.

25          That case really had two parts to it and

1   in my view, we fully deliberated on the first part,

2   but not on the second part.

3            The first part dealt with whether or not

4   the parking for the health care facility was still

5   within the authority of the BZA in light of Zoning

6   Commission text amendments that were enacted in

7   response to a consent decree with the Justice

8   Department related to the Fair Housing Act and in my

9   view, the Board fully deliberated that issue and

10  determined that the health care facility governed by

11  359 was as a result of the Zoning Commission text

12  amendment a matter of right use and, therefore, the

13  BZA did not have authority over it as a special

14  exception pursuant to that provision.

15           We spent an extensive amount of time

16  discussing that issue.

17           Then the second issue which had been by

18  the appellants and by the ANC was then whether the

19  Zoning Administrator had determine the correct

20  analogous use for that parking given that there was no

21  specific parking delineated for that health care

22  facility which was also considered a nursing home.

23           And I would like to bring the Board's

24  attention to -- we had another case, Appeal Number

25  16839 of Advisory Neighborhood Commission 4A in which

86

1    the Board analyzed analogous uses and the laws that

2    the ZA looks to the parking schedule for the use most

3    comparable to the --

4            CHAIRPERSON GRIFFIS:  Let me interrupt you

5    there because it seems like you're going to

6    substantively argue.

7            VICE CHAIR MILLER:  No.  No.  No, I was

8    just saying what we didn't do was what we were suppose

9    -- what I believe we should have done was the type of

10   analyses both look to the nature of the use and the

11   impacts of the use on the public.

12           CHAIRPERSON GRIFFIS:  Okay.

13           VICE CHAIR MILLER:  And I don't believe

14   that we did that.  So, that's -- that's the basis for

15   my motion.

16           CHAIRPERSON GRIFFIS:  Excellent.  So, we

17   have a motion before us.  Is there a second?

18           MEMBER ZAIDAIN:  Mr. Chair, I'll -- I'll

19   second the motion.

20           CHAIRPERSON GRIFFIS:  Thank you

21           MEMBER ZAIDAIN:  And I'd like to speak to

22   it since -- since I was the one that made the -- the

23   motion during the decision making to deny the full

24   appeal.

25           CHAIRPERSON GRIFFIS:  Right.

1          MEMBER ZAIDAIN:  At that time in reading

2     the transcript, I was not willing to amend that --

3     that motion because at that time, I felt that we had

4     -- well, I was comfortable with denying the whole

5     appeal, but after this issue -- well, this issue's

6     been raised by Ms. Miller and after looking further

7     into it, it seems that we should have had more

8     discussion on that issue specifically.

9          It was a critical part of the -- is a

10    critical aspect of the appeal brought by the

11    neighborhood association and there was enough -- there

12    was -- there was substantial amount of information in

13    the record both through testimony of the appellant and

14    DCRA particularly that would have allowed us a much

15    more broader discussion of that issue.

16          So, I -- I would be happy to support a

17    reconsideration of this.  However, you know,

18    obviously, we're not sure how it's going go.  You

19    know, the -- the -- the outcome may be the same.

20          I will say that there was a lot of things

21    discussed in the initial hearing that talked about

22    precedent and -- and, you know, how this will impact

23    other uses.  I -- I -- I'm -- I -- I don't necessarily

24    buy into that because this is an extremely unique

25    situation in my mind.  This use is intermingled in

1    with a -- with a more -- more intense use, that being

2    the hospital and -- and surrounding facility.

3            It's also unique in the sense that are

4    existing Board orders that albeit may or may not be

5    valid -- well, are not valid.    That's how we

6    determined our appeal, but still, there was

7    significant information contained in those orders that

8    this Board acted on that would have -- may or may not

9    have been important for the Zoning Administrator to

10   look at.

11           So, I don't really -- I don't really have

12   a huge precedential concern as -- as some people in

13   the community think.

14           So, I'd be happy to support the motion.  I

15   don't think we handled the -- the case sloppily as --

16   as some people may -- may think.  I do think that we

17   had exhausted that -- that case and maybe another case

18   that day to the point that we had to act on a motion

19   and -- and we did the best we could.

20           But, I think Ms. Miller's raised a good

21   point and I think it's worthy of reconsideration.

22           CHAIRPERSON GRIFFIS:    Thank you, Mr.

23   Zaidain.  Others?  Motion before us.  It's been

24   seconded.

25           I'd like to just reiterate the fact that,

1    of course, our -- the Board's work is not done nor is

2    its responsibility fulfilled until the order is

3    actually written and issued. I think it's a very

4    responsible move for the Board to look back at the

5    transcript and -- and our memory and the record that

6    indicated that perhaps we didn't deliberate fully on a

7    single issue.

8                I think Ms. Miller has adequately

9    addressed that fact that there were two distinct

10   issues that were to be deliberated on. The second was

11   a little lacking and so, I would support the motion

12   also and note the fact that we would not revisit any

13   of the substantive issues of the first and go to the

14   second and that is as it's laid out whether the -- the

15   correct and most analogous use was derived in order to

16   calculate the parking requirement.

17                That being said, Mr. Zaidain.

18                MEMBER ZAIDAIN: Yes, I just want to just

19   kind of reiterate something you said and I'm sure

20   you'll clarify this when you get into the kind of

21   administrative part of this -- of this action here.

22                One of the reasons why I supported the

23   reconsideration was I think there was enough

24   information in the record that we could -- we could --

25   you know, we could look into this. Obviously, we'd --

90

1    if not, we'd have to go into a rehearing which would

2    change the -- you know, change the aspect of what

3    we're doing here, but I think this was a critical part

4    of the appeal that was presented by the appellant and

5    I think we should have just disposed of it a little

6    bit better and -- and -- and we can spend some more

7    time on it.

8            CHAIRPERSON GRIFFIS:  I think it needs to

9    be said no further than that except that our -- our

10   deliberation is what forms the writing of the order

11   and without a sufficient and adequate substantive

12   deliberation, there would not be necessarily the basis

13   to write a full and binding order.

14           Any others?  Very well then.  We have a

15   motion before us.  It's been seconded.  I asked for

16   all those in favor signify by saying aye.

17           (Ayes.)

18           CHAIRPERSON GRIFFIS:  And opposed.  Mr.

19   Moy.

20           MR. MOY:  The staff would record the vote

21   as 4-0-0.  This is on the motion to -- by Ms. Miller

22   the Vice Chair to reconsider the -- to reconsider the

23   denial of Application Number 17043 that was just

24   decided on January the 6th, 2004.  This was seconded

25   by Mr. Zaidain.  Also in favor of the motion is Mr.

1    Griffis, Mr. Etherly and we have an absentee vote by

2    Mr. Hood which gives the final vote as 5-0-0.

3            CHAIRPERSON GRIFFIS:    Excellent.    Thank

4    you very much, Mr. Moy.

5            So, for clarity, we've done a motion that

6    we will reconsider.  Reconsideration will be set for

7    the 24th of February.

8            It should also be clearly noted by the

9    Board, I'm sure we're well aware of it, that this is a

10   deliberative session.    It will be a special public

11   meeting set for the 24th.

12           Therefore, the record is open for our

13   deliberation, but it's not open to accept any further

14   material.

15           As   Mr.   Zaidain   I   think   adequately

16   addressed, there is sufficient amount of information

17   addressing this issue for a full deliberation and

18   we'll conduct it that way.

19           Mr. Zaidain, question?

20           MEMBER ZAIDAIN:   Well, I just -- I just

21   want to make sure that I -- because I think this is

22   the first time this has happened since I've been on

23   the Board.  We -- we're not reopening the whole entire

24   appeal.  We're just looking at the issue that Ms.

25   Miller based her motion on and that was the analogous

parking is determined by DCRA. We're not --

CHAIRPERSON GRIFFIS: That's correct.

MEMBER ZAIDAIN: The -- the denial -- the aspects of the denial of the appeal that were outside of that frankly that we have special exception authority over parking, that -- that still stands.

CHAIRPERSON GRIFFIS: That's correct.

MEMBER ZAIDAIN: Okay. I just want to make sure.

CHAIRPERSON GRIFFIS: That's correct and we won't be accepting any additional information on this.

Okay. Everyone clear? Very well. Thank you.

In which case, the next preliminary matter.

MS. GIORDANO: For the record, Cynthia Giordano from Arnold & Porter Law Firm. With me representing the applicant, the Millennium Arts Center, is Bill Wooby is the founder and director of the Millennium Arts Center.

CHAIRPERSON GRIFFIS: Good tie choice for the Millennium Arts Center Director. Okay.

MS. GIORDANO: We're requesting a postponement today.

Exhibit 12

# ShawPittman LLP

*A Limited Liability Partnership Including Professional Corporations*

February 11, 2004

**_By Facsimile_**

Donald Hartman, Esq.
General Counsel
Capitol Hill Group
700 Constitution Avenue, N.E.
Washington, D.C.  20002

> **Re:**    **BZA Appeal No. 17043 - Stanton Park Neighborhood Association's**
> **Appeal of the Decision of the Zoning Administrator -**
> **BZA's Actions at February 10, 2004 Public Hearing and Meeting**

Dear Mr. Hartman:

During the course of the BZA's February 10, 2004 public hearing and public meeting, BZA Commissioner Miller sua sponte (and with no prior notice) moved to revisit the BZA's January 6, 2004 decision in the above-mentioned case.  The BZA granted Commissioner Miller's request with regard to the issue of whether the Zoning Administrator's decision to require one parking space for every five units/beds was appropriate.  No prior notice was provided to any of the parties (or to this firm) that this issue was going to be raised.  I was made aware of this decision only because one of my colleagues was in the audience for another case before the BZA.

The BZA stated that it will take this matter up at a special public meeting on February 24, 2004 at 9:00 AM.  It is my understanding that the BZA will **not** allow additional submissions from any of the parties in this case on this issue and that the BZA is only going to address this specific issue; it is **not** going to revisit the issue of whether the nursing center use is a matter-of-right use.

You should contact the Office of Zoning staff (the staff to the BZA) directly to confirm the status of this matter.  I recommend that you contact Rick Nero of the Office of Zoning at (202) 727-2806.  In addition, since the BZA Appeal is concluded (except for the issuance of a written order), there is no practical way (or reason) for Shaw Pittman to announce its withdrawal as CHG's counsel, and we have not notified anyone at the BZA or the Office of Zoning of such withdrawal.

2300 N Street, NW  Washington, DC 20037-1128        202.663.8000  Fax:202.663.8007        *www.shawpittman.com*

Washington, DC
Northern Virginia
New York
Los Angeles
London

# ShawPittman LLP

Donald Hartman, Esq.
February 11, 2004
Page 2


If you have any questions or comments regarding the issues addressed in this letter, please contact me at (202) 663-8873.

Very Truly Yours,

/s/

Paul A. Tummonds, Jr.

cc: Patrick Potter, Esq.

Document #: 1379794 v.1

Exhibit 13

**Subject:**                    BZA Hearing


-----Original Message-----

MLINK6750@aol.com
02/12/2004 03:12 PM

To:    Paul.Tummonds@shawpittman.com
cc:    hartmand75@hotmail.com, dhartman@medlink-dc.com
Subject:    BZA Hearing


Donald Hartman gave me copy of your letter dated February 11, 2004 regarding BZA's special
public meeting on February 24.  Thank you very much for your alert.  We appreciate it very
much.  Regards.

Dr. Peter Shin,
President, MedLINK Healthcare
700 Constitution Ave., NE
Washington, DC 20002
O) 202-675-0400
F) 202-675-0411


================================================================
The information in this email is confidential and may be legally privileged. It is
intended solely for the addressee. Access to this email by anyone else is unauthorized.
Please contact the sender if you are not the intended recipient. Any disclosure, copying,
distribution is prohibited.
================================================================

Exhibit 14

GOVERNMENT
OF
THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \*

BOARD OF ZONING ADJUSTMENT

\* \* \* \* \* \* \* \* \* \*

SPECIAL PUBLIC MEETING

\* \* \* \* \* \* \* \* \* \*

TUESDAY
FEBRUARY 24, 2004

\* \* \* \* \* \* \* \* \* \*

APPLICATION NUMBERS:

16553 (George Washington University)

17043 (Reconsideration of Appeal of Stanton Park
Neighborhood Association)

\* \* \* \* \* \* \* \* \* \*

The Special Public Meeting convened in
Room 220 South, 441 4th Street, N.W., Washington, D.C.
20001, pursuant to notice, at 9:00 a.m., Geoffrey H.
Griffis, Chairperson, presiding.

BOARD OF ZONING ADJUSTMENT MEMBERS PRESENT:

| | |
|---|---|
| GEOFFREY H. GRIFFIS | Chairperson |
| RUTHANNE MILLER | Vice Chairperson |
| CURTIS ETHERLY, JR. | Board Member |

ZONING COMMISSION MEMBERS PRESENT:

| | |
|---|---|
| CAROL MITTEN | Chairperson |
| ANTHONY HOOD | Vice Chairperson |

OFFICE OF ZONING STAFF PRESENT:

| | |
|---|---|
| Clifford Moy | Acting Secretary |
| Beverly Bailey | Office of Zoning |
| John Nyarku | Office of Zoning |

C O N T E N T S

| AGENDA ITEM | PAGE |
| --- | --- |

PRELIMINARY MATTERS  ..............................

APPLICATION OF GEORGE WASHINGTON UNIVERSITY
    16553D ...................................... 5


APPLICATION OF STANTON PARK NEIGHBORHOOD ASSOCIATION
    17043 ANC-1B .............................. 22

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

8

1           MR. MOY:  Staff would record the vote as

2   four, zero, one on the motion of Ms. Mitten, seconded

3   by Mr. Etherly.  Also in support of the motion, Mr.

4   Griffis, the Chairman, and Ms. Miller.  We have one

5   Board member, Mr. Zaidain, not participating, not

6   voting.

7           CHAIRPERSON GRIFFIS:  Thank you very much.

8           We have one other decision making at this

9   special public meeting agenda that's on the agenda for

10  us.  However, we have two cases in the morning at our

11  public hearing that are requesting postponement.  So I

12  think it would be more adventitious and equitable to

13  take those up.

14          So what I'd like to do is suspend the

15  public meeting for a brief moment and call to order

16  the morning session and public hearing of the 24th of

17  February 2004.

18          (Whereupon, the foregoing matter went off

19          the record at 10:25 a.m. and went back on

20          the record at 11:37 a.m.)

21          CHAIRPERSON GRIFFIS:  And we will resume

22  and reconvene our public meeting, and let's call the

23  second case in our public meeting this morning.

24          MR. MOY:  Yes, Mr. Chairman.  That second

25  case is reconsideration of motion of the Board of the

1    appeal    of    17043    of    Stanton    Park    Neighborhood

2    Association, pursuant to 11 DCMR 3100 and 3101, from

3    the    administrative    decision    of    the    Zoning

4    Administrator    in    the    issuance    of    Certificate    of

5    Occupancy Permit Nos. CO51289 and CO512090 to Capitol

6    Hill  Healthcare  Group,  dated  March  26,  2003,  for  a

7    community residence facility and hospital, 60 beds and

8    60 parking spaces, respectively.    Appellant alleges

9    that  the  Zoning  Administrator  erred  by  issuing  the

10   occupancy    permits    where    the    proposed    use    is    in

11   violation  of  the  parking  requirements.    The  R-5-C

12   zoned subject premises are located at 700 Constitution

13   Avenue, N.E., Square 875, Lot 76.

14            The    Board    completed    testimony    on    the

15   application and decided the case on January 6th, 2004.

16    On February 10th, 2004, the Board on its own motion

17   moved to reconsider its decision of January 6th, 2004,

18   and  scheduled  its  decision  for  reconsideration  for

19   February 24th, 2004.

20            And    that    completes    my    briefing,    Mr.

21   Chairman.

22            CHAIRPERSON GRIFFIS:    Good. Thank you very

23   much, Mr. Moy.

24            And it is true that the Board on its own

25   motion did decide to reconsider, and we are now under

10

1    the reconsideration, and of course, an important

2    aspect of this is we did not receive any additional

3    materials into the record and no other findings or

4    filings were requested. I think that this is an

5    important aspect of the Board that oftentimes upon

6    substantive reflection of an application, especially

7    one as complex as the appeal that we heard with the

8    Stanton Park Neighborhood, that the deliberation in

9    the record is not entirely full in order for us to

10   write a strong order.

11        And in looking at that, I think the Board

12   appropriately takes the opportunity to reflect on some

13   of the actions that it had taken.

14        With that, we are here present today in

15   order to proceed with this, and I will turn it over to

16   the Vice Chair, Ms. Miller, I believe, who has some

17   opening or beginning comments on this; is that

18   correct?

19        VICE CHAIRPERSON MILLER: I think at this

20   time I'd like to put a motion before the Board and

21   then we can have discussion on that.

22        CHAIRPERSON GRIFFIS: Excellent.

23        VICE CHAIRPERSON MILLER: The motion is to

24   grant Appeal No. 17043 of the Stanton Neighborhood

25   Park Association on the grounds that the Zoning

1    Administrator erred where there was no parking

2    schedule specifically applicable for a health care

3    facility in applying the parking requirements for a

4    rooming or boarding house where he should have

5    satisfied the parking requirements for a hospital.

6              In support of that, I would note that a

7    hospital's facility that is more similar in the nature

8    of its operations and the likely impacts on parking.

9    We had little evidence in the record from DCRA as to

10   why a rooming house was a more appropriate, analogous

11   facility, and in looking at all of the evidence in the

12   record, it appears to me that a hospital makes a lot

13   more sense; that it's a medical facility; that it has

14   similar staffing needs or more similar staffing needs

15   to a nursing home than does a rooming house, and there

16   was evidence in the record put in by the ANC and by

17   the neighborhood association on that.

18             The ZA is supposed to look at parking

19   schedule --

20             MR. ETHERLY:  Mr. Chairman, before we get

21   too far, it might be appropriate to have a second.

22             CHAIRPERSON GRIFFIS:  Would you like a

23   second on that motion?

24             VICE CHAIRPERSON MILLER:  I'm sorry.

25             MR. ETHERLY:  I'd like to defer to my

1  colleague, Mr. Hood.

2          COMMISSIONER HOOD:  I was going to second

3  it, but I just wanted to clarify when we're talking

4  about granting the appeal, we're just talking about

5  that portion that pertains just to parking.

6          VICE CHAIRPERSON MILLER:  That is correct.

7          COMMISSIONER HOOD:  Yes, I'll second.

8          CHAIRPERSON GRIFFIS:  So what we have is

9  the motion, which we can restate in succinct form,

10 which would be to deny in part and actually to grant

11 in part.

12         VICE CHAIRPERSON MILLER:  I only phrased

13 it that way because I thought we were just

14 reconsidering one part.  So I was just addressing that

15 part.

16         COMMISSIONER HOOD:  Okay.  I'll second.

17         VICE CHAIRPERSON MILLER:  I guess where I

18 was basically saying that the ZA is supposed to look

19 at the most analogous use, and in doing that, he

20 should be looking at the nature of the use, and the

21 impacts of the use on the public, and there was not

22 very much evidence in the record that he actually did

23 that.

24         I think he limited himself to looking at

25 residential uses only, and there's no requirement in

13

1    the law that he be limited to looking purely at

2    residential uses, particularly --

3                   CHAIRPERSON GRIFFIS:  So if I'm clear on

4    that, one of the foundations of what you see as the

5    error by the Zoning Administration is that they looked

6    at an analogous use as residential and didn't then go

7    beyond the residential requirements, and you find that

8    three's an error for several reasons.

9                   VICE CHAIRPERSON MILLER:  That's correct.

10   I think that the health facility aspect of this case

11   is very important when you're considering the parking

12   and not just the residential use.  I think that the ZA

13   looked to the Sunrise cases precedents, which was a

14   community  residence  facility,  but  that  community

15   residence  facility  does  not  have  the  same  kind  of

16   medical  needs  and  support  staff  as  does  a  nursing

17   home.

18                   CHAIRPERSON  GRIFFIS:    So  Sunrise  is

19   differentiated from the Stanton Park facility based on

20   the fact that a community residence is different than

21   a health care facility.

22                   VICE CHAIRPERSON MILLER:  I would strongly

23   agree with that, yes.

24                   CHAIRPERSON GRIFFIS:  Okay.  Good.  Other

25   members?

1    COMMISSIONER HOOD:  I don't know how much

2    more, Mr. Chairman, I would need to add, but I would

3    agree with Board Member Miller and her synopsis, and

4    I'm glad that this was brought to our attention

5    because I would hate to see something that moved in

6    that direction and we not address it.

7    So I would clearly agree with all of her

8    comments.  I don't know how much more I can add to

9    that.

10    CHAIRPERSON GRIFFIS:  Okay, good.  Anyone

11    else?

12    I think it was very strongly stated,

13    although succinctly, which is fine, and the point

14    being that as we look at this health care facility and

15    rooming house and the knowledge of how a rooming house

16    is utilized and how health care facilities or this

17    particular and based on the record how much support

18    staff and others go into this, even if you look at,

19    and I think the Board did do in its own deliberation,

20    look at higher intensity uses than rooming houses, and

21    going even to large multi-family or multi-dwelling, as

22    appropriate, for the parking table, you look at the

23    analogous use.

24    In an apartment building the parking is

25    calculated out of unit count.  Unit count obviously

15

1    goes to how many cars one unit might have, but there

2    is not the attendant staff that runs a multi-family or

3    apartment building as one is aware of in health

4    facilities.

5              Of course in the hospital, in the

6    analogous use that is being proposed here, hospitals

7    counts by bed, and one could say, "Well, you're

8    counting bed.  You're counting units.  What's the

9    difference?"  But the hospital, it seems to be

10   appropriately as one per one bed, meaning it seems

11   like they're only creating this table fully realized

12   that not everyone in a bed would necessarily be

13   driving, but encapsulated the idea of what it takes to

14   run and support a hospital in terms of staff and

15   facility people, and it seemed to ba n appropriate

16   ratio from bed to the total number of people that

17   would be coming in.

18             As we look at the health care facility and

19   the use, I think it is very appropriately and much

20   closer analogous to a hospital than it would, in fact,

21   be to a rooming house.

22             Procedurally it seems to me that with this

23   determination, if this motion does pass, that then

24   this would actually go back to the Zoning

25   Administrator for the exact calculation of the parking

16

1    count.  But I think the deliberation of the Board is

2    direct enough and substantive enough to have a full

3    understanding of how it should be done.

4              Yes?

5              MR. ETHERLY:  Just one final piece, Mr.

6    Chair, if I could.  I definitely would like to thank

7    our colleague, Ms. Miller, for kind of raising this

8    issue in the very detailed way that she did.    I

9    believe during our earlier deliberation, you know,

10   upon a review of the record, I had somewhat felt early

11   on that we did have some measure of deliberation on

12   the issue, but through Ms. Miller's work, I think it

13   became clear that there was a need to perhaps resolve

14   a little more clearly this issue.

15             One of the things that gave me some

16   initial pause was as we had talked about at our

17   earlier deliberation, the reconciliation of this

18   application in this overall topic area with the Fair

19   Housing Act, and I just wanted to piggyback on your

20   comment regarding the parking because I think we are

21   taking an action here on the parking aspect that is,

22   indeed, in step and consistent with the Fair Housing

23   Act and does not raise any concerns for me in that

24   regard in terms of are we establishing a disparate

25   treatment, so to speak.

1          I raise that issue just in case if there

2     is perhaps a remaining doubt out there, I think that

3     this action is, indeed, consistent with the FHA if we

4     look at parking and, in particular, as we look at the

5     most appropriate analogous use as being a hospital

6     because I think this helps if in no other way to

7     further the goals and objectives of the Fair Housing

8     Act by insuring that the level of services that are

9     being provided at this site are, indeed, sufficient to

10    serve the needs of the residents that are at issue

11    here.

12          But I think simply suffice it to say that

13    I don't have a concern about a continuing Fair Housing

14    Act issue here because I think if I'm also not

15    mistaken, clearly there is nevertheless parking

16    requirements that are required for matter-of-right

17    residential uses.   So there is no issue here of

18    disparate treatment, as I would see it, and I think

19    this is an appropriate resolution of a very critical

20    issue confronting this community.

21          CHAIRPERSON GRIFFIS:   That's an excellent

22    point, and you're absolutely correct.   Matter of right

23    does not mean that there are not requirements for

24    parking and other compliance with the zoning

25    regulations.

1    VICE CHAIRPERSON MILLER:  Just to fill out

2    the record, and I think I probably made reference to

3    this case when we had our motion to reconsider before,

4    but I just want to note that this Board had a previous

5    case, 16839, of Advisory Neighborhood Commission 4A,

6    in which it took a look at what was required , where

7    there is no parking schedule set for a specific use

8    and our case is consistent with that now, that we look

9    to the nature and impact of the use on the public, and

10   I think this is what we've done.

11        CHAIRPERSON GRIFFIS:  Thank you very much.

12        MR. WOOLSEY:  I think perhaps the last

13   word on this  and we've said it in the previous

14   deliberation, but there seems to need to be some

15   reconciliation within the rezoning regulations

16   specifically looking at 330.5(i), and I know this

17   Board will be sending our opinion of the direction

18   that the Zoning Commission should take on this in

19   terms of procedure of perhaps text amendments.

20        That being said, we have a motion before

21   us that has been seconded.  Further deliberation?

22        (No response.)

23        CHAIRPERSON GRIFFIS:  Not seeing any, I'd

24   ask for all of those in favor of the motion signify by

25   saying aye.

19

1          (Chorus of ayes.)

2          CHAIRPERSON GRIFFIS:  And opposed?

3          (No response.)

4          MR. MOY:   Staff would record the vote as

5     four, zero, zero, to grant the appeal in part and to

6     deny in part, seconded by Mr. Hood.   We have a proxy

7     or absentee vote from Mr. Zaidain, who supports the

8     motion.    That gives a final result of five, zero,

9     zero.

10          CHAIRPERSON GRIFFIS:  Good, excellent.

11          Ms. Bailey, is there any other business

12     for the Board this morning?

13          MS. BAILEY:  No, Mr. Chairman.

14          CHAIRPERSON GRIFFIS:  Excellent.   In that

15     case, we can conclude our morning session the 24th of

16     February 2004.

17          (Whereupon, at 11:52 a.m., the special

18     public meeting was concluded.)

19

20

21

22

23

24

25

Exhibit 15

GOVERNMENT OF THE DISTRICT OF COLUMBIA
BOARD OF ZONING ADJUSTMENT



**Appeal No. 17043 of the Stanton Park Neighborhood Association,** pursuant to 11 DCMR §§ 3100 and 3101, from the administrative decision of the Zoning Administrator in the issuance of Certificate of Occupancy Permit Nos. CO51298 and CO51290, to Capitol Hill Healthcare Group, dated March 26, 2003, for a community residence facility and hospital (60 beds and 60 parking spaces) respectively. The R-5-D zoned subject premise is located at 700 Constitution Avenue, N.E. (Square 875, Lot 76).

| | |
|---|---|
| **HEARING DATES:** | July 29, 2003, November 4, 2003, November 18, 2003, November 25, 2003 |
| **DECISION DATE:** | January 6, 2004 |

**DATE OF DECISION ON RECONSIDERATION:** February 24, 2004

### ORDER

**PRELIMINARY MATTERS**

On May 23, 2003, appellant Stanton Park Neighborhood Association ("Appellant") filed this appeal with the Board of Zoning Adjustment ("Board") alleging error in the Zoning Administrator's ("ZA") March 26, 2003 issuance of two Certificates of Occupancy, Nos. 51289 and 51290. Certificate of Occupancy No. 51289 was issued to Capitol Hill Healthcare Group for a "Community Based Residential Facility-Health Care Facility That Provides Housing For The Handicapped. 25 Parking Spaces & 117 Beds." Certificate of Occupancy No. 51289 described the use as a "Health Care Facility," which is a specific type of community-based residential facility ("CBRF") under the Zoning Regulations, but then, in the same C of O, also characterized the use as a "Community Residence Facility," which is a different type of CBRF. Certificate of Occupancy No. 51290 was issued to Capitol Hill Community Hospital for a "Hospital 60 Beds & 60 Parking Spaces."

There were two earlier Board Orders with respect to the property that is the subject of the two Certificates of Occupancy. In 1991, Board Order No. 15542 granted a special exception pursuant to § 359 of the Zoning Regulations to Capitol Hill Hospital to operate a health care facility with 130 beds, 250 employees, and 176 off-street parking spaces. This Order was modified by Order No. 16407, issued to the Capitol Hill Group, and dated February 3, 1999, which permitted an expansion of the CBRF use to 162 beds and 340 employees with 276 off-street parking spaces. Order No. 16407 was never implemented and so lapsed after two years from its effective date.

On April 30, 1999, the Zoning Regulations were amended to make CBRFs housing handicapped individuals a matter-of-right use in all residential zones. Based on this regulatory amendment,

BZA APPEAL NO. 17043

PAGE NO. 2

the ZA issued Certificates of Occupancy Nos. 51289 and 51290 as matter-of-right uses. The Zoning Regulations specify a parking ratio of one off-street parking space per bed for a hospital. Therefore the ZA required the hospital, with 60 beds, to provide 60 spaces. There was, however, no parking schedule in the Zoning Regulations for the health care facility, covered by the 1999 zoning amendments. Therefore, the ZA looked to the parking schedule in the Zoning Regulations and applied the ratio applicable to what he determined was the most comparable facility set forth therein - a rooming house. Accordingly, he reduced the required off-street parking to 25 spaces for the health care facility.

In this appeal, Appellant claims that the ZA disregarded the two previous Board Orders in issuing the matter-of-right certificates of occupancy and that he was without authority to do so. In the alternative, the Appellant claims that, even if the certificates of occupancy were properly issued, the ZA was without authority to determine parking requirements under them, as that authority is expressly given to the Board by the Zoning Regulations.

The Board did not hear this appeal on the originally scheduled hearing dates of July 29, 2003, and November 4, 2003. A public hearing was held on November 18, 2003, and continued and concluded on November 25, 2003. At the hearing, ANC 6C was automatically a party. The Board granted party status to ANC 6A, which is located across the street from the subject property, and to Father Richard Downing, pastor of St. James Parish, which is located in the same square as the subject property.

At its January 6, 2004 public decision meeting, the Board denied the appeal by a vote of 3-2-0. On February 10, 2004, however, the Board, on its own motion, voted 5-0-0 to reconsider part of the denial. On February 24, 2004, the Board voted 5-0-0 to partially deny and partially grant the appeal.

**FINDINGS OF FACT**

The Subject Property and its Use

1.    The subject property is located in an R-5-D zone district at 708 Massachusetts Avenue, N.E. (a.k.a. 708 Constitution Avenue, N.E.) and 700 Constitution Avenue, N.E., in Square 895, Lot 76.[1]

2.    The subject property is owned by the Capitol Hill Group ("CHG"), which leases portions of the property for use as a hospital and a health care facility.

3.    Certificate of Occupancy No. 51289 refers to the nursing center[2] as both a "health care facility that provides housing for the handicapped" and a "community residence facility."

---

[1]The advertisement for this appeal refers to Square 875, Lot 76, however, when the case was announced at the November 18, 2003 hearing, it was announced as Square 895, Lot 76. The first pair of certificates of occupancy (Nos. 51289 and 51290) issued on March 26, 2003 refer to Square 865, Lot 862, while the second pair, issued under the same numbers and on the same date, refer to Square 895, Lot 76. The Board need not resolve this discrepancy, since the material facts of this case are not altered and there is no prejudice as there is no question as to what facility or what issues are involved in this appeal.

4.     These two types of facilities are not interchangeable, but are two distinct types of CBRF uses. The Zoning Regulations definitions (11 DCMR § 199.1) for both these types of CBRFs refer to their respective (and now superseded) definitions in the public health regulations at 22 DCMR § 3099.1. Based upon the definitions at 22 DCMR § 3099.1, all the evidence in the record, and the two prior Orders that treat the same use at the same facility as a health care facility under § 359 of the Zoning Regulations, the Board finds that the nursing facility is a health care facility.

6.     The health care facility is operated by the Capitol Hill Healthcare Group and is located at address 708 Massachusetts Avenue, N.E. The hospital is operated by Capitol Hill Community Hospital and is located at address 700 Constitution Avenue, N.E. The hospital occupies the basement, part of the first floor, and the second and third floors of the building on the subject property. The health care facility occupies part of the first floor, and the fourth, fifth, and sixth floors of the building. The hospital is permitted as a matter-of-right in the R-5-D district. 11 DCMR §§ 350.4(a) and 330.5(f).

History

7.     Prior to April 30, 1999, the date of enactment of 11 DCMR § 330.5(i), all health care facilities for 16 or more residents in an R-5 zone, whether providing housing for the handicapped or not, required special exception approval under § 359 and required that the number of parking spaces be determined by the Board of Zoning Adjustment. 11 DCMR § 2101.1.

8.     Board Order No. 15542, dated August 16, 1991, granted a special exception under § 359 to Capitol Hill Hospital, for the establishment of a health care facility with 130 beds and 250 full-time staff at 708 Massachusetts Avenue, N.E. (Square 895, Lot 76). Exhibit No. 76, Attachment B.

9.     Order No. 15442 mandated that the health care facility provide 176 on-site screened parking spaces for employees, residents and visitors. *Id.*

10.    Board Order No. 16407, dated October 21, 1999, granted a special exception under § 359 to the Capitol Hill Group "for opening an additional 32 beds in an existing nursing facility at 700 Constitution Avenue, N.E." Order No. 16407 conditioned the special exception with a 10-year term and further required that the health care facility have a maximum of 340 staff, no more than 162 beds, and 276 off-street parking spaces. Exhibit No. 76, Attachment C.

11.    CHG never added the 32 beds or 100 more parking spaces authorized by Order No. 16407. Because the Order was not implemented within the necessary 2-year period from its effective date, it lapsed. *See,* November 25, 2003 hearing transcript at 145, lines 4-12 and at 154, lines 2-15.

---

[2] In the record, the hospital and health care facility are sometimes collectively referred to as "MedLink" and the latter is sometimes referred to as the "nursing center."

12.   In Order No. 869, the Zoning Commission amended the Zoning Regulations to add a new
      section 330.5(i), effective April 30, 1999, which states:

      The following uses shall be permitted as a matter of right in an R-4 District:

          (i)    Community-based residential facility; provided that, notwithstanding
                 any provision in this title to the contrary, the Zoning Administrator
                 has determined that such community-based residential facility, that
                 otherwise complies with the zoning requirements of this title that are
                 of general and uniform applicability to all matter-of-right uses in an
                 R-4 District, is intended to be operated as housing for persons with
                 handicaps. For purposes of this subsection, a "handicap" means, with
                 respect to a person, a physical or mental impairment which substantially
                 limits one or more of such person's major life activities, or a record of
                 having, or being regarded as having, such an impairment, but such item
                 does not include current, illegal use of, or addiction to, a controlled
                 substance.

13.   A health care facility is a type of CBRF. 11 DCMR § 199.1 (definition of Community-
      based residential facility).

14.   The definition of "handicap" in § 330.5(i) contains the same language as that found in the
      definition of "handicap" in the Fair Housing Act, as amended, 42 U.S.C. § 3602(h).

15.   Subsection 330.5(i) applies in R-5-D zone districts by virtue of § 350.4(a), which states:
      "[t]he following uses shall be permitted as a matter of right in an R-5 District: ... (a) Any
      use permitted in the R-4 District" subject to certain requirements not relevant here.

16.   On November 5, 2002, Denzil Noble, Acting Administrator of the Building and Land
      Regulation Administration ("BLRA") of DCRA, and therefore, the supervisor of the ZA,
      sent a letter to CHG pointing out that there were several certificates of occupancy for the
      subject property. Mr. Noble requested that CHG consolidate the multiple certificates of
      occupancy into one for the entire building to ensure compliance with the two previous
      Board Orders and to reflect the requirements of Board Order No. 16407.

17.   In response, CHG requested new matter-of-right certificates of occupancy for the health
      care facility and the hospital, pursuant to the change in the regulations brought about by §
      330.5(i). *See,* November 25, 2003 hearing transcript at 157, lines 19-24.

18.   On March 18, 2003, then-ZA Robert Kelly sent a letter to CHG's attorney indicating that
      CHG had not submitted any information to verify that it was providing housing for
      handicapped persons, and he requested this information. Exhibit No. 91, Attachment B.

19.   CHG submitted to DCRA the appropriate information verifying its provision of housing
      for the handicapped at the health care facility. *See,* Exhibit No. 91; *see also,* hearing

BZA APPEAL NO. 17043
PAGE NO. 5

transcript of November 18, 2003, at 310-311, lines 21-25 & 1-12.  Specifically, CHG submitted to DCRA a copy of its application for a license for a health care facility, its certificate of licensure, its long term facility application for Medicare and Medicaid, and an affidavit of its Chief Financial Officer.  *See*, Exhibit No. 91, Attachment C, and Exhibit No. 76, Attachment F.

20.     Based on its review of this information, DCRA found that the health care facility provides housing for the handicapped.

21.     DCRA also found that the health care facility complies with the zoning requirements of general and uniform applicability to all matter-of-right uses in an R-5-D zone district.

22.     Therefore, on March 26, 2003, DCRA issued Certificate of Occupancy No. 51289 for a matter-of-right "Community-Based Residential Facility-Health Care Facility That Provides Housing For The Handicapped.  25 Parking Spaces & 117 Beds."

23.     Also on March 26, 2003, DCRA issued Certificate of Occupancy No. 51290 for a "Hospital 60 Beds & 60 Parking Spaces," pursuant to § 2101.1 of the Zoning Regulations, which requires a hospital in an R-5-D district to provide one off-street parking space per hospital bed.

24.     The Zoning Regulations state that the number of parking spaces required by a CBRF with more than 16 residents in all zones other than C-3, C-4, and C-5, is to be determined by the Board. 11 DCMR § 2101.1.

25.     When the Zoning Commission amended the Zoning Regulations to permit a health care facility housing the handicapped as a matter of right, it did not amend the parking schedule set forth at 2101.1 that provides for the BZA to determine the number of parking spaces for CBRF's with 16 or more residents, nor did the Commission establish a separate parking ratio for a matter-of-right health care facility with 16 or more residents in zones other than C-3, C-4, and C-5.

26.     Because the Zoning Administrator determined that the health care facility was matter-of-right and there was no established parking ratio for that specific matter-of-right use, he chose the parking schedule for what he determined to be the most analogous matter-of-right use in the same (R-5) zone.

27.     The Zoning Administrator limited his review of comparable facilities to residential uses.

28.     The ZA deemed the use in § 2101.1 entitled "rooming or boarding house: All districts" to be the most analogous residential use.  He therefore applied its parking schedule of "1 plus 1 for each 5 rooming units" to the health care facility.  This resulted in the ZA requiring the health care facility to provide 25 off-street parking spaces.


**CONCLUSIONS OF LAW**

BZA APPEAL NO. 17043
PAGE NO. 6

An appeal may be taken by a person aggrieved by, or District agency affected by, any decision of a District official in the administration and enforcement of the Zoning Regulations, including the issuance of a certificate of occupancy. D.C. Official Code § 6-641.07(f) (2001). Appellant timely appealed DCRA's March 26, 2003 issuance of two certificates of occupancy, numbers 51289 and 51290. Appellant sets forth two issues on appeal: (1) the ZA was without authority to issue a matter-of-right certificate of occupancy for the health care facility use so long as the Board Order granting a special exception was in place,[3] and (2) alternatively, even if the certificates of occupancy were properly issued, the ZA was without authority to set the parking requirement for the health care facility as only the Board has the authority to do so.[4] Although the Board finds both arguments unpersuasive, the Board nevertheless grants the appeal because the Zoning Administrator erred by limiting himself to residential uses when determining the parking requirement. Rather than remand the appeal to the Zoning Administrator, the Board finds that the most analogous matter-of-right use would be that of a hospital, and therefore reforms the certificate of occupancy to reflect a parking requirement of one off-street parking space for each bed. 11 DCMR § 2101.1 (parking requirement for hospital).

Appellant's two issues actually subsume the following questions within them. First, after the enactment of § 330.5(i), was the health care facility still subject to the special exception order previously issued by the Board, and, in particular, the parking requirements set forth therein? Second, if the health care facility were no longer subject to the special exception order, would the Board still have jurisdiction to determine the parking requirement pursuant to § 2101.1? Lastly, if the Board was without jurisdiction to determine the parking requirements, then did the ZA properly determine them? Each of these questions will be answered in turn.

1. The Zoning Commission's enactment of 330.5(i) on April 30, 1999 changed the status of health care facilities housing the handicapped from special exception to matter-of-right use and thereby removed them from the jurisdiction of the Board.

Prior to April 30, 1999, the health care facility was subject to special exception approval pursuant to § 359 of the Zoning Regulations. A special exception for the health care facility was first approved in 1991 by Board Order No. 15542. Order No. 15442 imposed no temporal condition on the use, but required the provision of 176 off-street parking spaces.

Effective April 30, 1999, the Zoning Commission, in Order No. 869, made CBRFs located in R-4 and the less restrictive residential and commercial zones, that provided housing for the handicapped, matter-of-right uses, provided they comply with the "zoning requirements of … general and uniform applicability to matter-of-right uses" in the district in which the CBRF is

---

[3]Only Order No. 15542 is actually in question. *See,* Finding of Fact No. 11.
[4]Although the Appellant appealed the issuance of the certificates of occupancy for both the health care facility and the hospital, the certificate of occupancy for the hospital was never seriously challenged and was properly issued as a matter-of-right use with 60 beds and 60 off-street parking spaces. *See,* 11 DCMR §§ 350.4(a) and 330.5(f), and § 2101.1. During the hearing, the Appellant stated that it was not disputing "the hospital portion" of the parking required by the ZA. *See,* November 18, 2003 hearing transcript at 344, lines 2-3. Therefore, only the certificate of occupancy and the parking requirement for the health care facility are actually in question here.

located.[5] "Zoning requirements of general and uniform applicability" mean basic area requirements for matter-of-right development in that zone, such as maximum height or lot occupancy. Under § 330.5(i), therefore, a CBRF in an R-5 zone district which provides housing for the handicapped and meets the generally and uniformly applicable Zoning Regulations for that zone district is a matter-of-right use and not a special exception.

Section 330.5(i) defines "handicap" as "a physical or mental impairment which substantially limits one or more of such person's major life activities...." The Affidavit of the health care facility's Chief Financial Officer, which was submitted to the ZA, states that "[a]ll of the ... residents require assistance in performing one or more of their major life activities, including, but not limited to, eating, bathing, dressing, getting out of bed, taking medication, etc." Exhibit No. 76, Attachment F. These residents suffer mental and/or physical disabilities caused by strokes, respiratory problems, Alzheimer's disease, or the like. *Id.* The health care facility provides residential and 24-hour medical care to its residents. *Id.* Based on these facts, the ZA found, and the Board concurs, that the health care facility provides housing for the handicapped as "handicapped" is defined in § 330.5(i).

The Appellant does not contest the ZA's determination that the health care facility complies with the requirements of general and uniform applicability to matter-of-right uses in an R-5-D zone. Accordingly, the Board finds that the ZA correctly determined that the health care facility housed the handicapped and complied with the applicable general and uniform zoning requirements. It therefore falls squarely within § 330.5(i) and is no longer a special exception use. The enactment of § 330.5(i) removed this use from the category of special exceptions and placed it in the category of matter-of-right uses.

Because the health care facility is a matter-of-right use, it is no longer subject to the earlier Board Order. It is axiomatic that matter-of-right uses are not subject to Board approval. Pursuant to § 330.5(i), CBRFs housing handicapped persons are a matter-of-right use in an R-5-D zone. They are not subject to a greater level of regulation than that applicable to a row dwelling or a multiple dwelling and so, cannot be made to come before the Board for a special exception or be subject to Board conditions. This is borne out by Zoning Commission Order No. 869, which enacted § 330.5(i). Part of the impetus for the enactment of § 330.5(i) was the determination by the Department of Justice that the Zoning Regulations did not provide equal housing opportunity for handicapped persons in multifamily zones. One of the inequities cited was that CBRFs housing handicapped persons required Board approval, while multifamily housing not specifically designated to serve handicapped persons did not. *See,* Exhibit No. 96, Zoning Commission Order No. 869 (1999), at 1. Section 330.5(i) was enacted to remove the requirement of Board approval for multifamily handicapped housing, thus making it no more regulated than other matter-of-right multifamily housing.

Section 330.5(i) must be construed to cause the least restriction necessary on the use of the land. *See,* Rathkopf's *The Law of Zoning and Planning*, 4th ed., § 5:13 (2001). The enactment of § 330.5(i) changed the status of this health care facility from a special exception to a matter-of-

---

[5] Although § 330.5(i) only refers to the R-4 District, § 350.4 provides that the same uses permitted as a matter of right in the R-4 District shall be permitted as a matter of right in an R-5 District subject to conditions not relevant here.

BZA APPEAL NO. 17043
*PAGE NO. 8*

right use and terminated the special exception just as if the Order had had a termination date. Given the fact that the Commission understood that subjecting these uses to special exception review was discriminatory, it is unlikely that the Commission intended to maintain in place orders that would continue such disparate treatment. Therefore, the health care facility is no longer subject to Order No. 15542.

2.  Because the health care facility is no longer a special exception, the Board does not determine its parking requirement.

The Appellant argues that because the health care facility houses more than 16 persons, its parking requirement must be determined by the Board, whether or not it is still treated as a special exception, pursuant to the specified parking requirement set forth in § 2101.1. Although § 2101.1 provides that the number of parking spaces required for a CBRF housing 16 or more persons shall be determined by the BZA, the Board concludes that the Appellant's argument runs counter to the general scheme of the Zoning Regulations and the language of § 330.5(i).

Section 2101.1 sets forth the parking schedule for all uses and includes a provision setting forth parking requirements for CBRFs. This provision specifies a parking requirement for CBRFs in C-3, C-4, and C-5 districts, all of which are a matter-of-right. It also specifies a parking requirement for all CBRFs in all other zones which house between 1 and 8 residents. These, too, are all matter-of-right uses in their respective zones. It also specifies a parking ratio for all CBRFs with up to 15 residents, some of which are matter-of-right. *See, e.g.,* 11 DCMR § 350.4(f). Therefore, all matter-of-right CBRFs have parking requirements set out in the Zoning Regulations. No matter-of-right CBRFs have their parking requirement left to the determination of the Board.

The only CBRFs whose parking requirement is left to the Board are those in zones other than C-3, C-4, and C-5, which house 16 or more persons. These CBRF's are all special exceptions, not matter-of-right uses. A careful reading of § 2101.1 then shows that only CBRF's which are special exceptions have their parking determined by the Board.

Prior to § 330.5(i), all CBRFs in residential zones for 16 or more persons, whether handicapped or not, were special exceptions, so it made sense for the Board to determine their parking. That changed with the enactment of § 330.5(i), but no new parking ratio for an over-16-person matter-of-right CBRF housing handicapped persons was added to the Zoning Regulations. Until this lack of a parking ratio is rectified, there is a gap in the regulations, but the general scheme of the regulations is clear – special exception CBRFs go to the Board for parking, while matter-of-right CBRF's do not.

The wording of § 330.5(i) also undermines the Appellant's position. It states that a CBRF housing the handicapped is a matter-of-right use "notwithstanding any provision in this title to the contrary."(Emphasis added). To the extent that 2101.1's provision that CBRFs for more than 16 persons shall have their parking determined by the Board conflicts with the matter-of-right status conferred by § 330.5(i), § 2101.1 must fail. Section 2101.1's provision would apply to a CBRF in an R-5-D district with more than 16 residents, none of whom are handicapped, because

BZA APPEAL NO. 17043
PAGE NO. 9

this would not be a matter-of-right use. However, § 2101.1's provision does not apply to the same CBRF with handicapped residents, as here, because it is a matter-of-right use.

Finally, this Board concludes that the Zoning Commission intended to eliminate all discrimination between CBRFs housing the handicapped and in compliance with the applicable general and uniform zoning requirements and other multi-family dwellings. This would include a requirement for these CBRFs to come to the BZA to determine their parking, when there is no such requirement for all other matter-of-right uses.

3. Because the Zoning Regulations do not specify a parking ratio for this matter-of-right use and § 2101.1's requirement of parking determination by the Board applies only to special exceptions, the ZA had the authority to determine parking for the health care facility. The issue then before the Board is whether the ZA properly determined the parking requirement for health care facilities where no specific ratio is designated in the regulations.

Since the enactment of § 330.5(i), the ZA has properly interpreted § 2101.1's provision regarding parking for CBRFs housing 16 or more persons as applying only where Board approval is required for a special exception, not where the CBRF is established as a matter-of-right. When, as here, the ZA is presented with a matter-of-right use for which no parking ratio is set forth in the Zoning Regulations, he applies the parking ratio for the most analogous use for which such a ratio is specified. The ZA's action falls within his authority to administer the Zoning Regulations and was recently upheld by the Board in Order No. 16716A. *See,* Reorganization Plan No. 1, 1982, Subchapter V, Part II (e) and Reorganization Plan No. 1, 1983, Subchapter VI, Part III (B)(1).

Case No. 16716A, *Appeal of Nebraska Avenue Neighborhood Association*, (the *Sunrise* Case), is, in this respect, analogous to the instant situation. In Case No. 16716A, the applicant was constructing a CBRF/community residence facility, not a CBRF/health care facility, but the *Sunrise* facility was determined to be a matter-of-right facility under § 330.5(i). The ZA in that case was presented with the same lack of a specific parking ratio for the matter-of-right facility, and so, looking to the most analogous use, he applied the parking ratio for a rooming and boarding house. The Board upheld the ZA's action, concluding that, "a ruling from the Zoning Administrator was *necessary* because the regulations do not set forth specific parking ... ratios for a community residence facility in the R-5-D zone." (Emphasis added.) *See,* Exhibit No. 76, Attachment E, Order No. 16716A, at 15. Similarly, the regulations do not set forth a parking ratio for a matter-of-right health care facility in an R-5-D zone. Therefore the Board concludes that a parking determination from the ZA was also necessary here.

Although the Board concludes that the ZA had to determine parking for the health care facility, the Board further concludes that he erred in the determination he made. The ZA erred in limiting his parking determination to just residential uses and therefore did not choose the proper most analogous use. Because he chose the incorrect most analogous use, he applied the incorrect parking ratio.

The ZA chose a "rooming or boarding house" as the use most similar to the health care facility for which a parking ratio is set forth in § 2101.1. The parking ratio for a rooming or boarding

house in all zone districts is "1 plus 1 for each 5 rooming units." Thus the ZA concluded that the health care facility required 25 parking spaces. 11 DCMR § 2101.1. The Chief of BLRA's Zoning Review Branch testified that, in making this choice, the BLRA looked only at residential uses because it considered the health care facility a residential use. *See*, November 18, 2003 transcript, at 354-355, lines 6-25 & 1-5. She also testified that BLRA relied on the decision in the *Sunrise* Case, because the choice of rooming or boarding house was upheld there. *See, Id.,* at 318, lines 18-24.

Neither the Chief of the Zoning Review Branch nor counsel for DCRA could point to any authority for the proposition that the ZA was constrained to look only at residential uses. This may have been DCRA's past practice, but the Board is not persuaded that it is a sound one, particularly here, where the health care facility is operated as a commercial enterprise. *Accord.,* 11 DCMR § 801.2.

The fact that a CBRF is listed as a residential use in the parking table set forth in 2101.1 does not necessarily mean that the parking requirement for a health care facility should be compared only to other residential uses. A large health care facility such as this has different parking needs from the average residential use. It must provide parking not only for visitors and possibly residents, but also for a large staff coming and going in shifts, 24 hours a day. It has 117 beds, 29 of which are deemed for "skilled care," the highest level of care under the definition of health care facility at 22 DCMR § 3099.1. On the other hand, a rooming or boarding house provides accommodations and possibly housekeeping services, but it does not provide any specialized supervision, therapeutic services, or medical care. It would likely have no staff other than perhaps a manager and/or a housekeeper/janitor. *See, e.g., Hooker v. Edes Home,* 579 A.2d 608 (D.C. 1990). Its parking needs would therefore be significantly less than the health care facility here.

The ZA's reliance on the *Sunrise* decision (Order No. 16716A) was also misplaced here. The use at issue in *Sunrise* was a community residence facility, not a health care facility. Both the Zoning Regulations and the Department of Health regulations at 22 DCMR § 3099.1 make a clear distinction between the two types of uses. CHG's health care facility provides 24-hour medical care and continuous nursing coverage under the supervision of physicians to residents with physical or mental impairments which substantially limit one or more of their major life activities. By contrast, a community residence facility, such as the one in *Sunrise*, provides a much lower level of care. It provides a safe, hygienic, sheltered living arrangement for residents who "are ambulatory and able to perform the activities of daily living with minimal assistance." 22 DCMR § 3099.1 (definition of community residence facility). During the hearing, DCRA conceded that the facility in S*unrise* does not provide the level of medical care that CHG's health care facility does. *See,* November 18, 2003 transcript, at 341, lines 14-19.

There are significant differences in resident population, level of care provided, and size of staff between a community residence facility and a health care facility. These differences dictate a difference in parking requirements. Therefore, the S*unrise* case is not helpful in determining the use in the Zoning Regulations most analogous to a health care facility in order to determine the correct parking ratio for such a facility.

BZA APPEAL NO. 17043
PAGE NO. 11

The services provided by the health care facility and the staffing necessary to provide them are most analogous to a hospital. A hospital is a "place where sick or injured persons are given medical or surgical care." *Webster's Third New International Dictionary* (Unabridged), 1986. Analogously, a health care facility is a place where sick or disabled persons are given medical and residential care. A hospital is listed as an "institutional" use in the § 2101.1 parking schedule, but may also be considered a residential use. *See, e.g.,* 11 DCMR §§ 634.3, 636.6, 638.3 and discussion in W*allick v. Board of Zoning Adjustment,* 468 A.2d 1183, 1186 (D.C. 1985). This hybrid nature is similar to the commercial/residential nature of the health care facility. The Board therefore concludes that the ZA should have looked beyond uses categorized as "residential" in § 2101.1 and should have applied the parking ratio for a hospital -- 1 space for each bed. The ZA erred in requiring the health care facility to provide 25 off-street parking spaces. Instead, the health care facility must provide 1 off-street parking space for each bed in the facility.

For the reasons stated above, the Board **denies the appeal in part** with respect to Appellant's claims that the ZA lacked authority to issue Certificates of Occupancy No's. 51289 and 51290 and to determine the parking requirements for the uses in those Certificates of Occupancy. The Board **grants the appeal in part in** concluding that the ZA imposed the incorrect parking requirement on the health care facility use for which Certificate of Occupancy No. 51289 was issued. Therefore, it is hereby **ORDERED** that this appeal be **DENIED IN PART AND GRANTED IN PART.** It is further **ORDERED** that Certificate of Occupancy No. 51289 be reformed to reflect a parking requirement of one off-street parking space for each bed.

VOTE:     5-0-0          (Geoffrey H. Griffis, Ruthanne G. Miller,
                         Curtis L. Etherly, Jr., David A. Zaidain, and
                         Anthony J. Hood, to deny in part and grant
                         in part.)

BY ORDER OF THE D.C. BOARD OF ZONING ADJUSTMENT.

Each concurring member has approved the issuance of this Decision and Order and authorized the undersigned to execute the Decision and Order on his or her behalf.

ATTESTED BY: _____
             JERRILY R. KRESS, FAIA
             Director, Office of Zoning

FINAL DATE OF ORDER: September 9, 2004

PURSUANT TO 11 DCMR § 3125.6, THIS ORDER WILL BECOME FINAL UPON ITS FILING IN THE RECORD AND SERVICE UPON THE PARTIES. UNDER 11 DCMR § 3125.9, THIS ORDER WILL BECOME EFFECTIVE TEN DAYS AFTER IT BECOMES FINAL.LM/rsn

GOVERNMENT OF THE DISTRICT OF COLUMBIA
BOARD OF ZONING ADJUSTMENT



**BZA APPEAL NO. 17043**

As Director of the Office of Zoning, I hereby certify and attest that on
_____ SEP 0 9 2004 _____ a copy of the order entered on that date in this matter was
mailed first class, postage prepaid or delivered via inter-agency mail, to each party
and public agency who appeared and participated in the public hearing concerning
the matter, and who is listed below:

Monte Edwards
Stanton Park Neighborhood Association
330 E Street, N.E.
Washington, D.C. 20002

The Reverend Richard E. Downing, Rector
St. James Episcopal Church
222 8th Street, N.E.
Washington, D.C. 20002

Paul A. Tummonds, Jr., Esq.
for Capitol Hill Healthcare Group
Shaw Pittman
2300 N Street, N.W.
Washington, D.C. 20037

Laura Gisolfi Gilbert, Esq.
Department of Consumer and Regulatory Affairs
941 North Capitol Street, N.E.
Washington, D.C. 20002

Robert Hall, Chairperson
Advisory Neighborhood Commission 6A
815 F Street, N.E.
Washington, D.C. 20002

Cody Rice, Commissioner 6A
Advisory Neighborhood Commission 6A03
815 F Street, N.E.
Washington, D.C. 20002

**BZA APPLICATION NO. 17043**
**PAGE 2**

Sharon Ambrose, City Councilmember
Ward Six
1350 Pennsylvania Avenue, N.W., Suite 102
Washington, D.C. 20004

Denzil Noble, Acting Zoning Administrator
Building and Land Regulation Administration
Department of Consumer and Regulatory Affairs
941 N. Capitol Street, N.E.
Washington, D.C. 20002

Ellen McCarthy, Deputy Director
Office of Planning
801 North Capitol Street, N.E.
4th Floor
Washington, D.C. 20002

Alan Bergstein, Esq.
Office of the Attorney General
441 4th Street, N.W., 6th Floor
Washington, D.C. 20001

rsn

ATTESTED BY:

**JERRILY R. KRESS, FAIA**
**Director, Office of Zoning**