## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **CAPITOL HILL GROUP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil No. 07-1936 (RCL)** |
| **v.** | ) | |
| | ) | |
| **PILLSBURY WINTHROP SHAW PITTMAN, LLP,** | ) | |
| **SHAW PITTMAN, LLP,** | ) | |
| **PAUL A. TUMMONDS, JR., AND** | ) | |
| **PATRICK J. POTTER,** | ) | |
| **Defendants.** | ) | |

_____

### DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
### <u>THEIR MOTION FOR SUMMARY JUDGMENT</u>

**August 25, 2008**

**Jack McKay (No. 159335)**
**Pillsbury Winthrop Shaw Pittman LLP**
**2300 N Street, N.W.**
**Washington, D.C. 20037-1128**
**Tel:  202-663-8000**
**Fax:  202-663-8007**
**Email:  jack.mckay@pillsburylaw.com**
**For Defendants**

TABLE OF CONTENTS

I.   INTRODUCTORY STATEMENT ........................................................................... 1

II.  ARGUMENT OMISSION ...................................................................................... 2

    A. Res Judicata .................................................................................................... 2

        1. The Argument Omission And The Chapter 11 Fee Application Arose Out Of The Same Core Nucleus Of Facts And The Argument Omission Should Have Been Raised By CHG By The April 20, 2004 Hearing ........................................................... 2

            a. The Bankruptcy Court Assessed Shaw Pittman's Chapter 11 Fees ......................... 3

            b. Shaw Pittman's Chapter 11 Fees Were Not Resolved By Settlement ..................... 4

        2. CHG's "Performance Driven Fee" Argument Lacks Merit ........................................... 5

        3. CHG Could Have Raised The Argument Omission At The April 20, 2004 Fee Application Hearing ........................................................................................ 5

        4. CHG Was Not Barred, Jurisdictionally Or Procedurally, From Raising The Argument Omission in Connection With The October 21, 2004 or the August 1, 2005 Trials (Unless CHG Was Already Barred By *Res Judicata* As Argued Above) ................10

    B. Statute of Limitations ..................................................................................... 11

        1. CHG's Causal Nexus Arguments Should Be Rejected ................................................ 12

            a. Shaw Pittman Was The Only Possible Responsible Party ..................................... 12

            b. CHG's Possessed Knowledge Of Its Alleged Injury By March 26, 2003 When The Certificates Of Occupancy Were Issues; It Should Have Suspected Shaw Pittman Wrongdoing No Later Than Between January 2004 (When The Engagement Ended) And February 24, 2004 (When The BZA Reversed Itself); And CHG's Knowledge Of Legal Theories Is Irrelevant ............................................................. 12

        2. The "Fraudulent Concealment" Principle Is Inapplicable ........................................... 13

III. DELIVERY OMISSION REPLIES ....................................................................... 14

    A. Res Judicata .................................................................................................. 14

        1. The Delivery Omission And Shaw Pittman's Breach Actions Against CHG Arose From The Same Contract, And Therefore From The Same Core Nucleus Of Facts ............ 14

        2. With Reasonable Diligence CHG Should Have Discovered All Facts Underlying The Delivery Omission By The October 21, 2004 Trial ................................................. 15

    B. Lack of Duty .................................................................................................. 16

1.  CHG's Description Of The Law Is Incorrect And Misleading .................................... 16

2.  CHG's Attorney Affidavits Do Not Create Disputes Of Material Fact And Should Be Disregarded ................................................................................................................ 20

IV. CHG'S RULE 56(f) REQUEST SHOULD BE DENIED ....................................................... 21

V. CONCLUSION ......................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

Brin v. S.E.W. Investors, 902 A.2d 784 (D.C. 2006) ............................................................. 12

\* Brown v. Paulson, 541 F. Supp. 2d 379 (D.D.C. 2008) ........................................................ 6

Burkhart v. WMATA, 112 F.3d 1207 (D.C. Cir. 1997)…………….…..………………….20

Burtoff v. Faris, 935 A.2d 1086 (D.C. 2007)…………………………………………….7

\* Byers v. Burleson, 713 F.2d 856 (D.C. Cir. 1983)…………………………………………6

Capitol Hill Group v. Shaw Pittman LLP, 313 B.R. 344 (D.D.C. 2004) ……………………..1

Christophides v. Porco, 289 F. Supp. 403 (S.D.N.Y. 1968) ................................................... 20

Comer v. Fistere, 103 A.2d 206 (D.C. 1954) ......................................................................... 15

Costa v. Marotta, Gund, Budd & Dzera, LLC, No. 07-1898,
    2008 U.S. App. LEXIS 12742 (1st Cir. June 16, 2008) ...................................................... 4

Crutcher v. Aetna Life Ins. Corp., 746 F.2d 1076 (5th Cir. 1984) ......................................... 15

\* D.A. Elia Constr. Corp. v. Damon & Morey, LLP, No. 07-CV-143A,
    2008 U.S. Dist. LEXIS 25496 (W.D.N.Y. Mar. 31, 2008) ................................................. 4

Dalal v. Goldman Sachs & Co., 541 F. Supp. 2d 72 (D.D.C. 2008) ........................................ 6

Dunning v. Quander, 508 F.3d 8 (D.C. Cir. 2007) ................................................................. 21

E. F. Hutton & Co. v. Brown, 305 F. Supp. 371 (S.D. Tex. 1969) ......................................... 20

Fitzgerald v. Seamans, 384 F. Supp. 688 (D.D.C. 1974), aff'd in part, 553 F.2d 220
    (D.C. Cir. 1977)................................................................................................................ 14

\* Geter v. Horning Bros. Corp., 553 F. Supp. 2d 1 (D.D.C. 2008)............................................. 6

GMAC Mortgage Corp. v. Weisman, 95 Civ. 9869 (JFK), 1997 U.S. Dist. LEXIS 2042
    (S.D.N.Y. Feb. 27, 1997) ................................................................................................. 20

\* Grausz v. Englander, 321 F.3d 467 (4th Cir. 2003) .............................................................. 10

Greenberg v. FDA, 803 F.2d 1213 (D.C. Cir. 1986).............................................................. 21

\*   <u>Hancock v. HomEq Servicing Corp.</u>, 526 F.3d 785 (D.C. Cir. 2008) ............................ 12, 13

\*   <u>Handy v. Shaw, Bransford, Veilleux & Roth</u>, No. 00-2336 (CKK),
    2001 U.S. Dist. LEXIS 25189 (D.D.C. June 5, 2001), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>,
    325 F.3d 346 (D.C. Cir. 2003) .................................................................................. 5, 15

\*   <u>Havens v. Patton Boggs, LLP</u>, No. 05-01454, 2006 U.S. Dist. LEXIS 42910
    (D.D.C. June 26, 2006), <u>aff'd</u>, 235 F. App'x 750 (D.C. Cir. 2007) ........................... 11, 14

    <u>Iacangelo v. Georgetown University</u>, 2008 U.S. Dist LEXIS 46416 (D.D.C. June 17, 2008)..20

\*   <u>Iannochino v. Rodolakis</u>, 242 F.3d 36 (1st Cir. 2001) .................................................. 6, 10, 11

    <u>In re Busy Beaver Bldg. Ctrs., Inc.</u>, 19 F.3d 833 (3d Cir. 1994)................................. 3

    <u>In re Computer Learning Ctrs.</u>, 285 B.R. 191 (Bankr. E.D. Va. 2002) ...................... 3

\*   <u>In re Image Innovations Holdings, Inc.</u>, No. 06-11540, 2008 Bankr. LEXIS 2048
    (Bankr. S.D.N.Y. July 23, 2008) .......................................................................... 4

    <u>Inglett & Co. v. Everglades Fertilizer Co.</u>, 255 F.2d 342 (5th Cir. 1958).............................. 20

    <u>Kronish Lieb Weiner & Hellman v. Fort</u>, 197 F. App'x 261 (4th Cir. 2006) ........................ 5

    <u>Lans v. Gateway 2000, Inc.</u>, 110 F. Supp. 2d 1, <u>aff'd</u>, 202 F. App'x. 463
    (Fed. Cir. 2006) ............................................................................................ 8

\*   <u>Law Offices of Jerris Leonard, P.C. v. Mideast Sys., Ltd.</u>, 111 F.R.D. 359
    (D.D.C. 1986)............................................................................................ 3, 5, 15

    <u>Magee v. Charmoy</u>, No. CV 980167068, 2000 Conn. Super. LEXIS 234
    (Conn. Super. Ct. Feb. 1, 2000) ...................................................................... 5

\*   <u>Messina v. Krakower</u>, 439 F.3d 755 (D.C. Cir. 2006) .......................................... 21

\*   <u>Riehle v. Margolies</u>, 279 U.S. 218 (1929) ....................................................... 4

    <u>Schuldiner v. K Mart Corp.</u>, No. 07-1836, 2008 U.S. App. LEXIS 14238
    (3d Cir. July 7, 2008) .................................................................................. 3

    <u>Shin v. Portals Confederation Corp.</u>, 728 A.2d 615 (D.C. 1999)........................... 11

    <u>Sirmans v. Caldera</u>, 27 F. Supp. 2d 248 (D.D.C. 1998) ...................................... 21

\*   <u>Siwa v. Office of Personnel Mgmt.</u>, 533 F. Supp. 2d 81 (D.D.C. 2008) .................. 6

    <u>Strauss v. Fost</u>, 507 A.2d 1189 (N.J. App. Div. 1986)........................................ 19

\*   <u>Taylor v. Akin, Gump, Strauss, Hauer & Feld</u>, 859 A.2d 142 (D.C. 2004)...................... 18, 19

\* <u>United States v. Bill Harbert Int'l Constr., Inc.</u>, 505 F. Supp. 2d 1 (D.C. 2007) .............8-9, 13

<u>Washington Bancorporation v. Said</u>, 812 F. Supp. 1256 (D.D.C. 1993) ............................... 22

<u>Weisberg v. Williams, Connolly & Califano</u>, 390 A.2d 992 (D.C. 1978) ............................ 14

<u>Yager v. Carey</u>, 910 F. Supp. 704 (D.D.C. 1995), <u>aff'd</u>, Nos. 96-7003, 96-7004,
    1998 U.S. App. LEXIS 1984 (D.C. Cir. Jan. 21, 1998) .................................................... 21


## **Statutes and Rules**

Model Rules of Prof'l Conduct R. 1.16(c) cmt. (2002) ............................................................ 17

Model Rules of Prof'l Conduct R. 1.16(d) cmt. (2002) ......................................................... 18

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | )
| :--- | :--- |
| **CAPITOL HILL GROUP,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | )     **Civil No. 07-1936 (RCL)** |
| **v.** | ) |
| | ) |
| **PILLSBURY WINTHROP SHAW PITTMAN, LLP,** | ) |
| **SHAW PITTMAN, LLP,** | ) |
| **PAUL A. TUMMONDS, JR., AND** | ) |
| **PATRICK J. POTTER,** | ) |
| **Defendants.** | ) |

_____

### DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
### THEIR MOTION FOR SUMMARY JUDGMENT

Defendants respectfully submit this Reply Memorandum in response to CHG's Opposition

to Defendants' Motion for Summary Judgment.[1]

### I.      INTRODUCTORY STATEMENT

CHG does not controvert any facts set forth in Defendants' Statement of Material Facts

[Document No. 5] and, pursuant to L. Civ. R. 56.1, the Court may assume such facts are admitted.

Furthermore, CHG failed to comply with L. Civ. R. 56.1 because it has not identified in its

"Statement of Material Disputed Facts" any fact that it contends is disputed.  CHG only listed a

series of questions, without indicating their factual or legal significance.

Instead, CHG seeks to avoid summary judgment by refusing to acknowledge that all prior

disputes between Shaw Pittman and CHG arose out of a single contract,[2] falsely asserting that Shaw

---

[1]      Unless otherwise indicated defined terms are as set forth in Defendants' opening Memorandum. "PPAff" and "PTAff" refer to the Affidavits of Patrick Potter [Document Number 7] and Paul Tummonds [Document Number 8], respectively.

[2]      The bankruptcy engagement, pursuant to which Shaw Pittman provided all zoning services, is the only contract implicated in this case.  It was modified to include the "No Objection Term," pursuant to which CHG agreed it would not object to Shaw Pittman's chapter 11 fees.  That modification was addressed extensively by this Court in Capitol Hill Group v. Shaw Pittman LLP, 313 B.R. 344 (D.D.C. 2004).

Pittman and CHG settled their prior fee disputes, and suggesting (based on artificial "units") that the prior Shaw Pittman-CHG litigation was comprised of more than the three trials that actually occurred on April 20, 2004, October 21, 2004 and August 1, 2005.  It also repeatedly misstates the law, for example, by manufacturing of a new *res judicata* element - - i.e., prior judicial analysis of the claim to be barred (as required with collateral estoppel).  CHG also selectively quotes from the directly-applicable provisions of the professional responsibility rules.  For the reasons stated below, the Court should reject these and other similar efforts by CHG and grant the summary judgment motion based on any or all of the grounds of *res judicata*, statute of limitations, and lack of duty.

## II.     ARGUMENT OMISSION

### A.     Res Judicata – Argument Omission

CHG argues that the Argument Omission is not barred by *res judicata* because: (1) the Argument Omission arose out of a different nucleus of facts from the chapter 11 zoning services (Opp. 38); (2) the bankruptcy court's chapter 11 fee award was not "performance driven" (Opp. 42); (3) with reasonable diligence CHG could not have discovered the Argument Omission by the April 20, 2004 hearing on Shaw Pittman's chapter 11 fees (Opp. 27); and (4) it would have been futile to raise the Argument Omission in connection with either the October 21, 2004 or the August 1, 2005 trials (Opp. 33, 35).

#### 1.     The Argument Omission And The Chapter 11 Fee Application Arose Out Of The Same Core Nucleus Of Facts And The Argument Omissions Should Have Been Raised By CHG By The April 20, 2004 Fee Application Hearing

CHG argues that the zoning services giving rise to the Argument Omission "arise from a completely different nucleus of facts" than the very same zoning services described in and covered by Shaw Pittman's chapter 11 fee application.  Opp. 38.  To make its point, CHG argues (a) the bankruptcy court made no assessment of the quality of the work performed by Shaw Pittman (Opp. 38); and (b) Shaw Pittman's fees were resolved pursuant to a settlement with CHG (Opp. 40-42).

### a.    The Bankruptcy Court Assessed Shaw Pittman's Chapter 11 Fees

CHG's contention that the bankruptcy court did not assess the quality of Shaw Pittman's chapter 11 services, including the zoning services, is patently false.  The fees incurred by Shaw Pittman for services rendered during CHG's chapter 11 fees were tried on April 20, 2004.[3]  The bankruptcy court admitted twenty Shaw Pittman exhibits, including all of the invoices covering the zoning services upon which this case is based.  PPAff Ex 18 pp 5-6.  The court accepted Shaw Pittman's 17-page testimony proffer addressing all of CHG's objections.  Id. pp 12, 16-23.  CHG argued at the hearing about Shaw Pittman's fees and services.  Id.  The United States Trustee appeared and commented on the application.  Id. pp 9-10.  Then, Judge Teel stated, in part:

> I've read the proffer presented by the Debtor, Debtor's counsel, and I'm satisfied that the fees in this case were reasonable.  This case presented several hard-fought issues. . . . I'm satisfied that the work was performed in a professional way and that it was for the benefit of the estate. . . . I'm satisfied that the work was necessary and reasonable and ought to be compensated in the circumstances.

Id. pp 23-25.  See also PPAff Ex 17 pp 60-61.[4]

CHG's contention is also legally irrelevant.  Whether two competing claims (in this case Shaw Pittman's claim for fees versus CHG's malpractice claim) arise out of the same core nucleus is based on the facts from which they arise; not whether, and to what extent, one of the claims was previously scrutinized by the court.  This is clearly demonstrated by the fact that *res judicata* applies even to claims adjudicated by default.  See e.g. Law Offices of Jerris Leonard, P.C. v. Mideast Sys., Ltd., 111 F.R.D. 359 (D.D.C. 1986).  See also Schuldiner v. K Mart Corp., No. 07-

---

[3]    This was previously briefed for the Court in CHG I, Case No. 1:04CV00750 & 751 (RCL), Document Number 15, pp 52-55, excerpt attached hereto at **Exhibit A**.

[4]    Bankruptcy courts are charged to independently review and determine the appropriateness of services and fees before approving a fee application.  See e.g., In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833 (3d Cir. 1994).  The U.S. Trustee has a similar duty.  See e.g., In re Computer Learning Ctr., 285 B.R. 191 (Bankr. E.D. Va. 2002).  In this case, Judge Teel acknowledged these independent duties.  PPAff Ex 17 p 59 ("the Bankruptcy Court has an independent duty to scrutinize fee applications, and, in addition, the United States Trustee has an obligation to scrutinize fee applications.").

1836, 2008 U.S. App. LEXIS 14238, *6 (3d Cir. July 7, 2008) ("It has long been determined that a

default judgment is a final judgment with *res judicata* effect. Riehle v. Margolies, 279 U.S. 218,

225, 49 S. Ct. 310, 73 L. Ed. 669 (1929).").

      **b.**      **Shaw Pittman's Chapter 11 Fees Were Not Resolved By Settlement**

Likewise, CHG's assertion that Shaw Pittman's chapter 11 fees were "resolved via a

settlement" (Opp. 40) is patently false. At all times during the fee dispute CHG contested the

existence of the No Objection Term - - i.e., the term in the Shaw Pittman-CHG engagement

prohibiting CHG from challenging Shaw Pittman's fees. See e.g. PPAff Exs 16-17.

Simultaneously, CHG objected to all of Shaw Pittman's chapter 11 fees, including those for zoning

services. PPAff Ex 15; CHG I, 313 B.R. at 348. Losing both disputes, CHG appealed and this

Court affirmed all holdings, including those relating to the existence and enforceability of the No

Objection Term. PPAff Ex 20. Undeterred, CHG challenged the No Objection Term on a tardy

motion for reconsideration before the bankruptcy court. Again CHG lost, again CHG appealed, and

again this Court affirmed. PPAff Ex 25-B. This was not a settlement of Shaw Pittman's chapter 11

fees.

CHG's arguments notwithstanding, the services that allegedly comprise the Argument

Omission and those that underlie the chapter 11 fee application tried on April 20, 2004 are (i)

identical, (ii) based on the same engagement, and (iii) arise from the same nucleus of facts as a

matter of law.[5] CHG's efforts to distinguish the present case based on the false contention that

CHG and Shaw Pittman settled should be rejected.[6]

---

[5]      See cases cited in Shaw Pittman's Summary Judgment Memorandum at 14-15 and its Response to
CHG's Second Supplement [Document Number 30] footnote 8. Also, the following decisions were released
after the Summary Judgment Motion was filed: Costa v. Marotta, Gund, Budd & Dzera, LLC, No. 07-1898,
2008 U.S. App. LEXIS 12742, at *1-2 (1st Cir. June 16, 2008) ("Recognizing this fact, and noting that
disposition of the fee applications would bar a future malpractice action on res judicata grounds . . . ."); D.A.
Elia Constr. Corp. v. Damon & Morey, LLP, 389 B.R. 314, 320 (W.D.N.Y. 2008) ("The present action is
nothing more than an attempt by Elia to relitigate issues that were previously decided against it by the
bankruptcy court, this Court and the Second Circuit."); In re Image Innovations Holdings, Inc., No. 06-

### 2.    CHG's "Performance Driven Fee" Argument Lacks Merit

CHG relies on <u>Magee v. Charmoy</u>, CV 980167068, 2000 Conn. Super. LEXIS 234 (Conn. Super. Ct. Feb. 1, 2000), an unpublished state court decision, to create a new *res judicata* element that it seeks to apply in federal court - - <u>i.e.</u>, that the court in the first action must have engaged in a "performance driven fee" analysis (Opp. 42).  For reasons unclear in the opinion, the <u>Magee</u> court felt it necessary to assess whether the bankruptcy court, in the earlier case, had fulfilled its independent duty to review counsel's fee application, and on the record before it could not make such determination.  However, as indicated above, actual adjudication is not a *res judicata* element, therefore the court should not have even inquired into whether the federal bankruptcy court fulfilled its duties (let alone assume that it did not).  None of the numerous *res judicata* bankruptcy cases relied upon by Shaw Pittman (<u>supra</u> n. 5) engage in the <u>Magee</u> analysis.

### 3.    CHG Could Have Raised The Argument Omission At The April 20, 2004 Fee Application Hearing

CHG recognizes that *res judicata* bars not only claims of which the plaintiff was aware but also those the plaintiff, with reasonable diligence, should have known (Opp. 28).  CHG does not dispute that it was aware that parking restrictions were imposed on it on March 26, 2003 when the Certificates of Occupancy were issued.  However, CHG contends that even with reasonable

---

11540, 2008 Bankr. LEXIS 2048, at *14 (Bankr. S.D.N.Y. July 23, 2008) ("[T]his Court made a finding on quality and value by awarding expenses, and it left open no room for an independent malpractice action. The fee application and malpractice claim are sufficiently similar that it is appropriate to apply *res judicata*.").

[6]      So, too, should CHG's reliance on <u>Kronish Lieb Weiner & Hellman v. Fort</u>, 197 Fed. App'x 261 (4th Cir. 2006) (unpublished), where the facts do not resemble those of this case.  To the extent <u>Kronish</u> stands for the proposition that a claim for fees under an engagement (regardless of whether it is a bankruptcy approved engagement) arises from a different nucleus of facts than a claim for malpractice (under the same engagement), <u>Kronish</u> is directly at odds with the law in this District.  <u>See e.g.</u>, <u>Jerris Leonard</u>, 111 F.R.D. at 361 ("Under this standard, it is hard to imagine a clearer compulsory counterclaim for failure to pay legal fees than a legal malpractice claim stemming from the handling of the litigation for which fees are sought."). <u>See also</u> <u>Handy v. Shaw, Bransford, Veilleux & Roth</u>, Civ. No. 00-2336 (CKK), 2001 U.S. Dist. LEXIS 25189, at *7 (D.D.C. June 5, 2001) ("Indeed, Defendant's evidence of services rendered for which it is owed fees would be the very services that Plaintiff would use as evidence to demonstrate malpractice."), <u>rev'd</u> <u>on other grounds</u> 325 F.3d 346 (D.C. Cir. 2003).

diligence, it could not have learned of the Argument Omission until "Spring of 2006," when it met with Mr. Glasgow who explained the alleged significance of a historic designation argument.  Opp. 29.  Thus, CHG's contention is that it could not have learned of the Argument Omission until it understood its legal theory.

CHG's argument fails as a matter of law because *res judicata* does not require proof that prior to the April 20, 2004 trial, CHG understood the legal theory supported by the facts that were and otherwise should have been known to CHG.  See, e.g., Iannochino v. Rodolakis, 242 F.3d 36, 48-49 (1st Cir. 2001) (expressly rejecting individual debtors' argument that knowledge of the legal theories for malpractice is a *res judicata* prerequisite, even when the debtors were unrepresented at the time of the fee application hearing); see also Geter v. Horning Bros. Corp., 553 F. Supp. 2d 1, 2 (D.D.C. 2008); Siwa v. Office of Personnel Mgmt., 533 F. Supp. 2d 81, 83 (D.D.C. 2008); Brown v. Paulson, 541 F. Supp. 2d 379, 384 (D.D.C. 2008); Dalal v. Goldman Sachs & Co., 541 F. Supp. 2d 72, 76 (D.D.C. 2008); Byers v. Burleson, 713 F.2d 856, 860 (D.C. Cir. 1983).  Instead, *res judicata* focuses solely on the facts that the party knew and should have known with reasonable diligence.

In this case, the pertinent facts are set forth in paragraph 21 of the Complaint, where CHG alleges that if Shaw Pittman had argued the historic designation of CHG's property, then the zoning authorities would have been barred from "imposing *any* parking restrictions whatsoever on the Property due to the historic designation that had been previously placed on one of the Property's buildings by the District of Columbia." (emphasis supplied).  CHG's alleged injury is that it was required to provide *any* parking spaces, and the alleged cause was Shaw Pittman's failure to argue "historic designation," which occurred prior to issuance of the Certificates of Occupancy by the District on March 26, 2003.

However, to avoid summary judgment, CHG changes its story by arguing that its injury was the *increase* in parking-space requirements from 85 to 177.  See Opp. 18.  But, the change from 85 to 177 parking spaces merely represents an *increase* in CHG's alleged injury.  However, this is immaterial (Burtoff v. Faris, 935 A. 2d 1086, 1088 (D.C. 2007)), and CHG knew or should have known all necessary facts prior to the April 20, 2004 fee application hearing.

CHG knew it was subject to parking limitations *before* its bankruptcy.[7]  CHG knew it was subject to parking limitations on March 26, 2003, when the zoning authorities, in response to the litigation commenced by Shaw Pittman in the bankruptcy court against the Zoning Administrator, issued certificates of occupancy requiring a minimum of 85 parking spaces.[8]  And, CHG understood Shaw Pittman had not made arguments that would lead to no parking restrictions whatsoever.  PTAff Exs 3-6.  Based on paragraph 21 of the Complaint, Shaw Pittman's alleged malpractice had already occurred and CHG had been injured on or before March 26, 2003, when the Certificates of Occupancy were issued by the District.

Nevertheless, CHG repeatedly argues that with reasonable diligence, it could not have discovered the facts necessary to bring its Argument Omission claim at the April 20, 2004 hearing. In doing so, CHG ignores its knowledge of the Certificates of Occupancy, the zoning arguments made (and not made) by Shaw Pittman, and the other undisputed facts.  Instead, CHG focuses solely when it actually received the BZA order (March 2005) and met with Mr. Glasgow (Spring 2006).

---

[7]      See, e.g., PTAff ¶39; PTAff Ex 4 p. 7 (pre-bankruptcy, CHG's zoning lawyers, Robins Kaplan, and CHG petitioned the zoning authorities for an order permitting CHG to provide 200 parking spaces to its tenants).  See also Sept. 8, 2000 Amended BZA Order No. 16407, at 2, attached by CHG to its Supplement filed with this Court on February 20, 2008 [Document 22] (stating that in a letter dated April 21, 2000, CHG sought to reduce the number of required parking spaces to 200).

[8]      The Certificates of Occupancy resulted from a settlement of the zoning lawsuit that CHG brought in the bankruptcy case.  CHG refrained from seeking summary judgment (see PTAff Ex 5), and upon receiving the Certificates CHG dismissed its complaint.  See Docket Entry 38 (March 26, 2003), in Adversary Proceeding 03-10003.  See also PPAff Ex 7 p 31.

Courts in this District, however, examine all of the relevant facts that existed prior to the date that a plaintiff asserts actual knowledge of its claim to assess whether, with reasonable diligence, the plaintiff should have earlier ascertained the facts giving rise to the alleged claim.  See United States v. Bill Harbert Int'l Constr. Inc., 505 F. Supp. 2d 1 (D.D.C. 2007); Lans v. Gateway 2000, Inc., 110 F. Supp. 2d 1, 6 (D.D.C. 2000) ("the diligence inquiry looks not to what the litigant actually discovered, but what he or she *could* have discovered"), aff'd 202 F.App'x 463 (Fed. Cir. 2006) (internal citation and quotation marks omitted).  For example in Bill Harbert Int'l the government knew facts in 1995 that certain parties had engaged in a bid-rigging conspiracy. However, the government failed to commence an action against such parties for almost 6 years. Assessing the government's inaction, the Court stated:

> [I]t is clear that an ordinary prudent person presented with the information that the government had in its possession prior to December 28, 1997 regarding defendants Harbert and Anderson **would have investigated the matter further** to ascertain the level of their involvement in the bid-rigging conspiracy.  An ordinary prudent person presented with this type of information **would not have sat on their hands**, as the government did in this case.  Accordingly, the Court finds that no reasonable jury could find that the government did not have inquiry notice of both the injury caused by the alleged conspiracy, and the involvement in the fraud by defendants Harbert and Anderson.

Bill Harbert Int'l, 505 F. Supp. 2d at 11 (emphasis supplied).

In this case, the contemporaneous facts demonstrate that CHG knew all necessary facts underlying the Argument Omission (the existence of parking restrictions and the absence of any argument by Shaw Pittman against any parking restrictions) more than a year before the April 20, 2004 fee application hearing.[9]  And, assuming *arguendo* knowledge of the BZA reversal is necessary for the April 20, 2004 trial to have *res judicata* effect, the undisputed facts demonstrate

---

[9]    Given the number of other lawyers and law firms that have represented CHG related to this zoning matter dating back to 1999 (e.g., (a) Robins Kaplan, (b) Donald R. Hartman, (c) Arnold & Porter and (d) Holland & Knight), it is difficult to imagine how CHG failed to discover the historical designation argument until the Spring of 2006 (as CHG contends), especially if it was acting with reasonable diligence.

that with reasonable diligence, CHG should have known of all facts underlying the Argument

Omission claim and the BZA reversal well in advance of the April 20, 2004 hearing based on the

following undisputed facts:

(1)    in the Fall of 2003, CHG was internally scrutinizing the "practices of Shaw Pittman" (**Exhibit B** attached hereto);

(2)    the bankruptcy court, on January 7, 2004, terminated the retention of Shaw Pittman on all matters, including the zoning matters (PPAff Exs 9-10);

(3)    on January 13, 2004, Mr. Hartman, CHG's lawyer stated that CHG was retaining substitute zoning counsel (PPAff Ex 13);

(4)    on January 15, 2004, Shaw Pittman sent CHG all zoning files (PTAff Ex 10);

(5)    on February 11, 2004, Shaw Pittman advised CHG of the February 24, 2004 *sua sponte* BZA reconsideration hearing (PTAff Ex 12);

(6)    on February 12, 2004 Mr. Shin acknowledged and thanked Shaw Pittman for alerting CHG to the BZA's public meeting on February 24, 2004 (PTAff Ex 13);

(7)    no CHG representative appeared at the February 24, 2004 BZA public hearing where the BZA reversed itself (PTAff Ex 14; Shin & Hartman Affs ¶ 4);

(8)    no CHG representative subsequently contacted the BZA to determine the results of the February 24, 2004 hearing (Shin & Hartman Affs ¶ 4);

(9)    on January 30, 2004, CHG filed its first of several objections to Shaw Pittman's chapter 11 fee application (PPAff Ex 15);

(10)    CHG's objections alleged breaches of fiduciary duty and indiscretions by Shaw Pittman (**Exhibit B** attached hereto);

(11)    CHG's objections included contentions that Shaw Pittman had violated several rules of professional responsibility (**Exhibit C** attached hereto); and

(12)    CHG took extensive document and deposition discovery to establish the alleged indiscretions, breaches and violations, and Shaw Pittman responded by producing two thousand emails and 30 banker's boxes of documents (PPAff Ex 22-A; PPAff ¶ 19).

Bill Harbert Int'l teaches that a prudent person would not have sat on its hands as did CHG,

even ignoring the fee dispute.  CHG's only asset was its real property.  For years CHG had been

engaged with the District over minimum parking requirements.  See e.g., PTAff Ex 15 p 3.

Minimum parking requirements were important to CHG's reorganization efforts.  PPAff Ex 7 pp

28-31.  CHG alleges in the Complaint that parking requirements impact the value of its property.

CHG acted exactly contrary to what would be expected of one acting with reasonable

diligence.  CHG did not advise Shaw Pittman in 2003 of its need or desire that no parking restrictions be imposed.  Likewise, acting with diligence, CHG would have consulted with Robins Kaplan, its long-standing pre-bankruptcy zoning counsel, about obtaining no limits on parking, though there is no evidence that it ever did.  CHG's inaction continued into 2004 when it failed to monitor the February 24, 2004 hearing at the BZA of which Shaw Pittman had advised it, to assess the results of that hearing or to hire new zoning counsel to replace Shaw Pittman.  The BZA hearing was open to the public and occurred literally blocks from CHG's offices.  PTAff Ex 14.  There is no reason why CHG could neither attend the hearing February 24th hearing nor subsequently call the BZA to determine the outcome.

CHG's complete lack of diligence is compounded by its deteriorating relationship with Shaw Pittman in December 2003, the latter's resignation in January 2004,[10] and CHG's litigation, commenced in January 2004, asserting several fiduciary-duty breaches and indiscretions by Shaw Pittman.  Especially under these circumstances, no reasonable jury could find that CHG should not have discovered all facts underlying the Argument Omission prior to April 20, 2004 even if the knowledge of the BZA order was necessary to a finding of *res judicata* of the trial conducted that date.

> **4.    CHG Was Not Barred, Jurisdictionally Or Procedurally, From Raising The Argument Omission in Connection With The October 21, 2004 or the August 1, 2005 Trials (Unless CHG Was Already Barred By *Res Judicata* As Argued Above)**

Apparently believing that it succeeded in establishing that it could not have raised the Argument Omission at the April 20, 2004 trial, CHG then points to the No Objection Term and argues that pressing the Argument Omission, even at the trials conducted on October 21, 2004 and

---

[10]    See e.g., Grausz v. Englander, 321 F.3d 467, 474 (4th Cir. 2003) (deteriorating relationship between debtor and counsel contributed to finding that debtor should have known "there was a real likelihood that he had a malpractice claim against the firm"); Iannochino, 242 F.3d at 49 ("Indeed, the breakdown of the

August 1, 2005, would have been futile.  However, CHG casts its argument in terms that confuse  a so-called "jurisdictional"/"procedural" bar with a substantive defense to its malpractice claim. CHG concedes that it chose to not raise its claim, because it believed (rightly so) that Shaw Pittman would have defended on the basis of the No Objection Term.  However, mere anticipation of a defense does not excuse CHG's failure to timely assert its claim, or justify refusing to apply *res judicata* in this case.  See e.g., Shin v. Portals Confederation Corp., 728 A.2d 615, 619 (D.C. 1999) (even though plaintiff claimed barriers to bringing counterclaims in prior action, he nevertheless could have and should have raised his claims as defenses, as doing so could have rendered the contract void, or at least could have reduced the amount of judgment).

Moreover, CHG's assertion that prosecuting the malpractice action could not have changed the October 21st and August 1st results is incorrect.  If CHG had brought the claim and prevailed, the monetary claims would have been setoff against Shaw Pittman's claims.

### B.    Statute of Limitations

Relying upon the discovery rule, CHG argues that the statute of limitations did not begin to run prior to September 7, 2004 because it neither could have learned the identity of the responsible party nor become suspicious of Shaw Pittman wrongdoing until Spring of 2006.[11]  CHG also implies that the so-called "fraudulent concealment" principle applies.  Opp. 18-19, 32.

---

attorney/client relationship here is further evidence that the Iannochinos should have raised their malpractice claims as objections to the fee award.").

[11]    Under the discovery rule the statute of limitations begins when the plaintiff knows or with the exercise of reasonable diligence should know:  (i) of the injury; (ii) of the injury's cause; and (iii) of some evidence of wrongdoing.  Havens v. Patton Boggs, LLP, No. 05-01454, 2006 U.S. Dist. LEXIS 42910 (D.D.C. June 26, 2006), aff'd 235 F. App'x 750 (D.C. Cir. 2007).

1.  **CHG's Causal Nexus Arguments Should Be Rejected**

a.  **Shaw Pittman Was The Only Possible Responsible Party**

CHG's feigned ignorance as to who was responsible for the alleged injury (Opp. 15) is

frivolous.  So, too, is its reliance on <u>Brin v. S.E.W. Investors</u>, 902 A.2d 784 (D.C. 2006), a case not

involving professional malpractice, where the plaintiff's injuries could have been caused by a

multitude of sources.  Here, Shaw Pittman was the only firm representing CHG in March 2003,

when the District issued the Certificates of Occupancy.

b.  **CHG Possessed Knowledge Of Its Alleged Injury By March 26, 2003 When The Certificates Of Occupancy Were Issued; It Should Have Suspected Shaw Pittman Wrongdoing No Later Than Between January 2004 (When The Engagement Ended) And February 24, 2004 (When The BZA Reversed Itself); And CHG's Knowledge Of Legal Theories Is Irrelevant**

CHG suggests that it should not have known the cause of its alleged injury until it met with

Mr. Glasgow.  Opp. 16 ("CHG *should [not] have been aware of* . . . the Historic Contribution

Exemption at any point prior to their Spring, 2006 meeting with Mr. Glasgow.") (emphasis added).

However, neither meeting with a lawyer nor learning the precise legal theory underlying a

party's claim is an element of the discovery rule.  The recent application of the discovery rule in

<u>Hancock v. HomEq Servicing Corp.</u>, 526 F.3d 785 (D.C. Cir. 2008) is instructive.  There, surviving

children sought to attack loan documents purportedly signed by their deceased mother based on

forgery.  The principal loan documents were obtained by the children in 1999, additional documents

evidencing forgery were obtained in January 2003, and after consulting with counsel, they filed a

lawsuit against the lender in January 2005.  On summary judgment the District Court dismissed,

finding that the statute of limitations began to run in 1999 when the children received the loan

documents, even though they were unaware of the forgery and had not yet consulted with legal

counsel to discuss the legal theory underlying their claim.  Finding that the children "were not

reasonably diligent in investigating and legally challenging the loan" the Court of Appeals affirmed,

reasoning that the children had cause to suspect wrongdoing in 1999 because their mother rarely traveled and the documents were signed outside of the house.  <u>Hancock</u>, 526 F.3d at 787.

In this case, the Certificates of Occupancy were issued on March 26, 2003 and there is no dispute that CHG was aware that they imposed parking restrictions.  If, as CHG asserts in its Complaint, that it needed to be free of parking restrictions in order enhance the vacant/unused portion of its building, it was aware of this "injury" at that time.  However, at no time did CHG ever advise Shaw Pittman of its need or desire to be free from parking limits.

Furthermore, nine months later, in January 30, 2004, CHG was objecting to all of Shaw Pittman's fees (which exceeded $1 million) incurred for all zoning and other services.  PPAff Ex 15.  The only logical way CHG could have avoided paying *any* fees for the zoning services was to establish malpractice.  Indeed, at the same time, CHG was formally accusing Shaw Pittman of malpractice and breaches of fiduciary duties in connection with a variety of other matters.  PPAff Ex 16 pp 5-6; Exhibits D & E attached hereto.  Under these circumstances, CHG had reason to suspect (not to mention motive to assert) that Shaw Pittman did something wrong no later than between January 7, 2004 (upon termination of the engagement) and CHG's learning of the BZA's reversal (which, as explained above, should have occurred on February 24, 2004).  Under both <u>Hancock</u> and <u>Bill Harbert Int'l</u> CHG did not act diligently, and the Court should conclude that CHG knew and otherwise should have known of the facts underlying the Argument Omission well prior to September 7, 2004.

### 2.        The "Fraudulent Concealment" Principle Is Inapplicable

CHG's half-hearted suggestion that Shaw Pittman fraudulently concealed the Argument Omission from CHG (Opp. 18-19, 32) should be rejected.  CHG fails to state with particularity that Shaw Pittman fraudulently concealed anything from CHG.  Besides, fraudulent concealment, if even recognized in D.C., would not toll the statute of limitations beyond the date set by the

discovery rule; which is well in advance of September 7, 2004.  See e.g., Havens v. Patton Boggs, LLP, supra at *14 n.7 (stating that even if fraudulent concealment applies, "once a plaintiff knows, or should know, of the defendant' wrongdoing, the concealment doctrine ceases to be relevant"); Fitzgerald v. Seamans, 384 F. Supp. 688, 693-94 (D.D.C. 1974) ("Where the plaintiff knew, or by the exercise of due diligence could have known, that he may have had a cause of action, the claim that the statute of limitations has been tolled by defendants' fraudulent concealment of the facts must fail.") (internal citation and quotation marks omitted), aff'd in part, 553 F. 2d 220 (D.C. Cir. 1977); Weisberg v. Williams, Connolly & Califano, 390 A.2d 992, 996 (D.C. 1978) (a defense to fraudulent concealment is that plaintiff knew, or through reasonable diligence could have known, that he may have had a cause of action).

### III.    DELIVERY OMISSION

#### A.    Res Judicata

CHG argues that the Delivery Omission is not barred by *res judicata* for four reasons:  (1) the Delivery Omission and Shaw Pittman's breach claims arise from different factual nuclei (Opp. 41-42); (2) the October 21, 2004 and August 1, 2005 trials did not involve "performance driven" fee disputes  (Opp. 42); (3) with reasonable diligence CHG could not have discovered the Delivery Omission until March 2005 (Opp. 28); and (4) it would have been futile to raise the Delivery Omission in connection with either the October 21, 2004 or the August 1, 2005 trials (Opp. 33-37). Arguments 1 and 3 are addressed below, and Shaw Pittman's prior responses to arguments 2 and 4 are incorporated.

#### 1.    The Delivery Omission And Shaw Pittman's Breach Actions Against CHG Arose From The Same Contract, And Therefore From The Same Core Nucleus Of Facts

CHG contends that Shaw Pittman's duty to deliver the BZA order to CHG arises from the Shaw Pittman-CHG engagement (i.e., the Section 327 engagement approved by the bankruptcy

court).  Similarly, Shaw Pittman was enforcing its rights under the same engagement (as modified by the parties) at the October 21, 2004 and August 1, 2005 trials.  CHG had previously breached the terms of the engagement by objecting to Shaw Pittman's fee application.  At the October 21, 2004 and August 1, 2005 trials Shaw Pittman was enforcing its right under the engagement to recover its fees and expenses arising from such breaches.  CHG's claims in this case and Shaw Pittman's breach claims arose from the same contract, i.e., the Shaw Pittman-CHG engagement.  As a matter of law, competing lawsuits (e.g., an attorney's fee claim versus a client's malpractice claim) emerging from the same contractual arrangement arise from the same core nucleus of facts.  See Jerris Leonard, 111 F.R.D. at 361 ("Several courts have held that a tort action stemming out of the same transaction as a breach of contract claim is a compulsory counterclaim to the contract action.") (citing Crutcher v. Aetna Life Ins. Cop., 746 F.2d 1076, 1080 (5th Cir. 1984)).  *Res judicata* applied even in Crutcher where the initial and later lawsuits did not arise from a single contract; Aetna's claim was based on an individual's guaranty of indebtedness, and the individual's claims were based in tort.  Indeed, it does not matter "[t]hat the essential facts are not precisely identical, or that the counterclaim embraces additional allegations."  Handy, 2001 U.S. Dist LEXIS 25189 at *6 (internal citation and brackets omitted).[12]  In this case, because the Delivery Omission and the breach claims previously brought by Shaw Pittman arise from the same contractual arrangement, they arise from the same nucleus of facts.

### 2.    With Reasonable Diligence CHG Should Have Discovered All Facts Underlying The Delivery Omission By The October 21, 2004 Trial

CHG argues that even with reasonable diligence, it could not have learned of the Delivery Omission at any point prior to March 2005.  Opp. 28.  The undisputed facts are to the contrary.  By

---

[12]    The preclusive effect of *res judicata* is even broader than that of Rule 13(a).  See e.g., Comer v. Fistere, 103 A.2d 206, 208 (D.C. 1954) ("Even if it were held that appellant could overcome the procedural hurdle of rule 13(a), she would still be faced with the more formidable barrier of res judicata.").

exercising reasonable diligence CHG should have learned of the BZA Order promptly upon its release on September 9, 2004 (and therefore of the Delivery Omission), in time to bring the matter to the bankruptcy court's attention prior to the October 21, 2004 trial.[13]  As such, with reasonable diligence, CHG should have learned of all facts relating to the Delivery Omission prior to October 21, 2004.  If, however, *res judicata* did not bar the Delivery Omission after the October 21, 2004 trial, it did so after the August 1, 2005 trial because CHG admits learning of the facts underlying the Delivery Omission in March 2005 and could have raised the claim at the August 1, 2005 trial. Opp. 28.  See also PPAff Ex 26.

### B.     Lack of Duty

CHG argues that an attorney is duty bound to forward all material papers to a former client. CHG also argues that material fact disputes exist regarding Shaw Pittman's duties.

### 1.     CHG's Description Of The Law Is Incorrect And Misleading

Despite CHG's statement that "there is a plethora of authorities which hold that an attorney does have a duty to forward time-sensitive court communications to a former client" (Opp. at 20), it does not cite to a single case to this effect.

Instead, CHG relies on Section 33(2)(c) of The Restatement (Third) of the Law Governing Lawyers.  Here, too, CHG did not cite any cases adopting its position or Section 33(2)(c).  And, Shaw Pittman's electronic research did not produce a single decision from any court following Section 33(2)(c).[14]  Significantly, unlike other principles articulated in a restatement, the

---

[13]     Indeed, had CHG (or its counsel) simply acted upon Shaw Pitman's February 11, 2004 letter and attended the February 24, 2004 BZA hearing, it would have been able to avoid the alleged consequences of the Delivery Omission.

[14]     Moreover, despite CHG's representation (Opp. 20, n. 28), Shaw Pittman was unable to locate any decisions from the federal or local courts situated in D.C. stating that the two-volume Restatement (Third) of the Law Governing Lawyers is "highly persuasive authority on the law of malpractice and professional conduct."

Restatement here does not cite to or rely upon any pre-existing decisions imposing the duty set forth in Section 33(2)(c) on an attorney.

CHG did not cite any authority to support its position because, at least in D.C., the duty CHG alleges does not exist. In fact, a review of the applicable law reveals that Shaw Pittman clearly discharged its duties to CHG.

CHG eventually acknowledges that the Rules of Professional Conduct governed Shaw Pittman's duties upon the bankruptcy court's termination of its attorney client relationship on January 7, 2004. Regarding Shaw Pittman's withdrawal duty, Section 1.16(c), though not cited by CHG, states:

> A lawyer must comply with applicable law requiring notice to or permission of a tribunal when terminating a representation. When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.

> Model Rules of Prof'l Conduct R. 1.16(c) cmt (2002)

Shaw Pittman fully complied with this rule. Nothing in Chapter 31 of the District of Columbia Municipal Regulations, which govern practice before the BZA, requires a lawyer to provide notice of withdrawal to the BZA or seek its permission to withdraw. Consequently, Shaw Pittman met is duties to the BZA.

Regarding a lawyer's duties to its client upon terminating the attorney-client relationship, CHG states (Opp. 26):

> "Defendants' legally and factually unsupported contention that they could not have informed the BZA of the cessation of their representation of CHG also flies in the face of the express obligations of D.C. Rule of Professional Conduct 1.16(d), which states that: 'In connection with any termination of representation, a lawyer shall take timely steps to the extent reasonably practicable to protect a client's interests.'" Opp. 26.

However, CHG's quote of Section Rule 1.16(d) nowhere indicates that critical language has been omitted. In fact, Rule 1.16(d) reads in full as follows (emphasis supplied):

"In connection with any termination of representation, a lawyer shall take timely steps to the extent reasonably practicable to protect a client's interests, **such as giving reasonable notice *to the client*, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of fee or expense that has not been earned or incurred**.  The lawyer may retain papers relating to the client to the extent permitted by Rule 1.8(i)."

Model Rules of Prof'l Conduct R. 1.16(d) cmt. (2002).

CHG's omission of the emphasized phrase was neither harmless nor accidental.  The omitted phrase describes precisely the nature of Shaw Pittman's obligations on terminating its representation of CHG.  And, the undisputed facts reveal that Shaw Pittman satisfied every obligation identified in the rule, and more.  Shaw Pittman gave notice to CHG of its withdrawal as CHG's counsel (PTAff Ex 9 p 7), and the bankruptcy court expressly permitted Shaw Pittman to cease providing zoning service to CHG, holding that CHG had adequate time to employ replacement zoning counsel.  PPAff Ex 10 p 10.  Shaw Pittman sent all of the zoning files to CHG on January 15, 2004.  PTAff Exs 9-10.  And, Shaw Pittman sent the February 11, 2004 letter providing CHG ample notice that it was not filing a withdrawal with the BZA.  PTAff Ex 12.  Noticeably absent from Rule 1.16(d) is a requirement that a lawyer, after having fulfilled the specified duties, send documents received nine months later to the former client.

Also meritless are CHG's arguments regarding case law that it twists in order to create a never-ending duty beyond the termination of the attorney-client relationship.  For example, CHG dismisses <u>Taylor v. Akin, Gump, Strauss, Hauer & Feld</u>, 859 A.2d 142 (D.C. 2004) based on the overly-simplistic assertion that Ms. Taylor was never the law firm's client.  A closer reading of the decision reveals its applicability here.  Ms. Taylor alleged that she was a client in connection with a lawsuit brought by Akin on behalf of apartment building tenants; Ms. Taylor being a tenant.  Akin's negligence purportedly arose from its failure to notify Ms. Taylor that the law lawsuit had been dismissed.  <u>Taylor</u>, 859 A.2d at 146.  The court found that between the filing of the complaint and

dismissal, Ms. Taylor was evicted from the building, and as a consequence could not have been a client of Akin at the time the lawsuit was dismissed. As such, Akin had no duty to forward information on the dismissal to Ms. Taylor even if she was a former client. Specifically the court stated:

> even if we assume for the sake of argument that her being a tenant made her a plaintiff of sorts, her status as a plaintiff necessarily ended when she ceased to be a tenant in June 1987. **From that point onward, Akin Gump no longer owed Ms. Taylor any duty with respect to the first lawsuit** (assuming that it had such a duty, which we cannot identify) **because the only source of such a duty – her tenancy – had come to an end**.

Id. at 148 (emphasis supplied). Accordingly, Ms. Taylor's negligence claim, premised specifically on Akin's subsequent failure to provide her with notice of the dismissal, was denied. Taylor is the only decision from D.C. with facts similar to those before the Court, and its analysis leads inescapably to the conclusion that Shaw Pittman discharged its termination duties to CHG.

Strauss v. Fost, 507 A.2d 1189 (N.J. App. Div 1986), cited by CHG, has no bearing on this case. Assuming arguendo that Strauss was properly decided, it is distinguishable on its facts. First, attorney Fost continuously represented client Strauss, before and after the filing and granting of the motion to dismiss the cross-claim (which Fost failed to defend and provide notice of to Strauss). In contrast, there was no attorney-client relationship whatsoever between Shaw Pittman and CHG after January 7, 2004, and therefore none when the BZA reversed itself on February 24, 2004. Indeed, five weeks before the BZA reversal, CHG told Shaw Pittman that it would "retain substitute counsel in these [BZA] pending matters." PPAff Ex 13.

Second, Fost afforded Strauss absolutely no notice or opportunity to respond to the dismissal motion and to avoid default. In contrast, on February 11, 2004, Shaw Pittman provided CHG with written notice and other data regarding the BZA's sua sponte reconsideration hearing. Unlike Strauss, CHG received sufficient advance notice and information to protect its rights by,

19

among other things, attending the February 24, 2004 BZA hearing, contacting the BZA to learn of

the reconsideration results or hiring new zoning counsel.

### 2. CHG's Attorney Affidavits Do Not Create Disputes Of Material Fact And Should Be Disregarded

Apparently CHG attempts to create disputed material facts based upon affidavits of two

lawyers, Messrs. McGovern and Webster, neither of whom has any connection to the events giving

rise to this lawsuit.[15]   However, Mr. McGovern's affidavit does not dispute the position in Shaw

Pittman's February 11, 2004 that there was "no practical way (or reason) for Shaw Pittman to

announce its withdrawal as CHG's counsel."  He only states that he is unaware of anything that

"precludes" filing a withdrawal.  And at best, Mr. Webster's affidavit makes assumptions regarding

the applicable law and then draws conclusions by applying the undisputed facts to those

assumptions of law.  He does not opine as to whether the law imposes a post-termination duty to

forward materials to a prior client.  Applicable law would prohibit his doing so.  See e.g., Burkhart

v. WMATA, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal

expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal

standards."); Iacangelo v. Georgetown University, 2008 U.S. Dist LEXIS 46416 (D.D.C. June 17,

2008) (rejecting testimony of legal experts whose proposed testimony made broad sweeping legal

conclusions).  In fact, he acknowledges this.  Webster Aff ¶4.  In sum, the affidavits of Messrs.

McGovern and Webster do not change the undisputed facts or introduce a factual dispute.  Each

should be disregarded.

---

[15]       To the extent that these or any of CHG affidavits are being used as vehicles for advocacy are improper.  See e.g. E. F. Hutton & Co. v. Brown, 305 F. Supp. 371, 383 (S.D. Tex. 1969); Christophides v. Porco, 289 F. Supp. 403, 406-07 (S.D.N.Y. 1968); GMAC Mortgage Corp. v. Weisman, 95 Civ. 9869 (JFK), 1997 U.S. Dist. LEXIS 2042 at ** 12-13 (S.D.N.Y. Feb. 27, 1997); Inglett & Co. v. Everglades Fertilizer Co., 255 F.2d 342, 348-49 (5th Cir. 1958).

## IV.    CHG'S RULE 56(f) REQUEST SHOULD BE DENIED

CHG has failed to satisfy the Rule 56(f) requirement of advising the court not only *what* discovery is sought but *why* it is necessary.  "A party making a Rule 56(f) request must state[] concretely why additional discovery is needed to oppose a motion for summary judgment." Messina v. Krakower, 439 F.3d 755, 762 (D.C. Cir. 2006) (internal citations and quotation marks omitted). See also Dunning v. Quander, 508 F.3d 8, 10 (D.C. Cir. 2007) (no abuse of discretion in the denial of a Rule 56(f) motion because the plaintiff had failed to provide reasons why discovery was necessary); Greenberg v. FDA, 803 F.2d 1213, 1224 (D.C. Cir. 1986) (irrelevant and speculative relief under Rule 56(f) must be denied.); Yager v. Carey, 910 F. Supp. 704, 731 (D.D.C. 1995) (same), aff'd, Nos. 96-7003, 96-7004, 1998 U.S. App. LEXIS 1984 (D.C. Cir. Jan. 21, 1998).

CHG's argues for Rule 56(f) relief because "the issues in this action, their complexity, and the reality that many of the critical facts are within the possession and control of the Defendants render any summary judgment prior to the taking of depositions improper."  Opp. 44.  However, CHG does not identify a single critical fact that is within Shaw Pittman's control, let alone one that is within Shaw Pittman's *exclusive* control.  Even if CHG had identified a fact within Shaw Pittman's exclusive control, "the mere averment of exclusive knowledge or control of the facts by the moving party is not adequate: the opposing party must show to the best of his ability what facts are within the movant's exclusive knowledge or control. . . . [and] that any of his unanswered discovery requests, if answered, would lead to admissible facts pertinent to a genuine issue." Greenberg, 803 F.2d at 1224 (internal citations and quotation marks omitted).  CHG makes no such showing.

CHG cites Sirmans v. Caldera, 27 F. Supp. 2d 248 (D.D.C. 1998), where this Court granted Rule 56(f) relief to the plaintiff because the defendant's summary judgment motion included documents outside of the prior administrative record and previously unavailable to plaintiff.  Here,

however, Shaw Pittman does not rely upon any document outside of the record in the prior proceedings.  Indeed, CHG has already been afforded, during the fee dispute, unfettered access to both documents (two thousand emails and 30 banker's boxes) and testimony (a full deposition of Patrick Potter).  <u>See</u> <u>e.g.</u>, PPAff ¶ 19 & Ex 22-A.  In any event, CHG's extraordinary access to information when it was previously charging Shaw Pittman with malpractice and fiduciary-duty violations (in connection with the April 20, 2004 hearing) is an additional basis for now denying its Rule 56(f) request.  <u>See</u> <u>e.g.</u>, <u>Washington Bancorporation v. Said</u>, 812 F. Supp. 1256 (D.D.C. 1993).

Further, Mr. Hirsch's affidavit merely provides a "non-exclusive" list of questions.  While he limits the issues for which he purportedly needs such discovery to the *res judicata* and statute of limitations disputes (Hirsch Aff. ¶ 6), thus excluding the duty dispute, he makes no attempt to explain how the *res judicata* or limitations disputes would be affected based on any possible answers.  Indeed, because those legal issues are driven exclusively by facts that were and should have been known by CHG, the questions raised in the affidavit (all aimed at whether, when and how Shaw Pittman knew and/or processed information) are wholly irrelevant.

*[remainder of page is intentionally blank]*

22

## V.     CONCLUSION

For the reasons stated in Defendants' initial Memorandum and for the reasons stated in this reply, Defendants request that the Court grant summary judgment in their favor.


Dated:  August 25, 2008                    Respectfully submitted,

                                           PILLSBURY WINTHROP SHAW PITTMAN, LLP


                                           By:     /s/ Jack McKay_____
                                                   Jack McKay (No. 159335)
                                                   2300 N Street, N.W.
                                                   Washington, D.C. 20037-1128
                                                   (202) 663-8000
                                                   For Defendants

EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In Re: | ) | |
| | ) | |
| CAPITOL HILL GROUP, | ) | Bankruptcy Case No. 02-0359 |
| | ) | Chapter 11 |
| Debtor. | ) | Honorable S. Martin Teel, Jr. |
| | ) | |
| CAPITOL HILL GROUP, | ) | |
| | ) | |
| Appellant, | ) | District Court |
| | ) | Case Nos. 1:04CV00750 & 751 |
| v. | ) | Honorable Royce C. Lamberth |
| | ) | |
| SHAW PITTMAN LLP | ) | |
| | ) | |
| Appellee. | ) | |

## BRIEF OF APPELLEE SHAW PITTMAN LLP

THOMAS J. CATLIOTA
PATRICK J. POTTER
LUIS C. MARINI
Shaw Pittman LLP
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000

i

Court's findings of fact are subject to the clearly erroneous standard.  <u>See</u> also Bankruptcy Rule 8013.

In <u>Johnson v. McDow</u> the Court analyzed what it means to establish clear error with respect to a lower court's finding of fact.  Quoting from the Supreme Court and the U.S. Court of Appeals for the 7th Circuit, this Court said:

> 'A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' <u>United States v. United States Gypsum Co.</u>, 333 U.S. 364, 395 (1948).  'To be clearly erroneous, a decision must . . . strike us as wrong with the force of a five week old, unrefrigerated dead fish.' <u>Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.</u>, 866 F.2d 228, 233 (7th Cir. 1988).  In <u>Anderson v. Bessemer City</u>, the Supreme Court said, 'If the [lower] court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.  Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.' 470 U.S. 564 at 573-574 (1985).

<u>Johnson v. McDow</u>, supra, at 518.

C.    **The Bankruptcy Court Did not Abuse its Discretion when it Fulfilled its Independent Duty to Review Shaw Pittman's Fee Application and its Findings of Fact Were Not Clearly Erroneous.**

1.    The Bankruptcy Court had an independent duty (separate and apart from its obligation to review and rule upon any objections).  <u>See</u> <u>e.g.</u>, <u>In re Busy Beaver Bld. Centers, Inc.</u>, 19 F.3d 833 (3rd Cir. 1994) ("bankruptcy courts have an independent duty to review fee applications even absent objections".  This duty of independent review finds "support in legions of cases decided by bankruptcy and district courts spanning nearly two-thirds of all federal districts as well as in the writings of several renowned commentators.") (multiple citations).  The U.S. Trustee had a similar duty.  <u>See</u> <u>e.g.</u>, <u>In re Computer Learning Ctrs., Inc.</u>, 285 B.R. 191 (Bankr. E.D.Va. 2002) ("In

addition [to the bankruptcy court], the trustee has an independent duty to review fee applications to determine whether they are appropriate."). See also JA 220 (transcript from February 2, 2004 hearing where Bankruptcy Court states, that in agreeing to the No Objection Term "the U.S. Trustee could still come in and object, so Dr. Shin could have protected himself by letting the U.S. Trustee object if Shaw Pittman pulled in bills… that were just unreasonable."); see also JA 1892 (transcript from April 20[th] hearing, where U.S. Trustee states "we had reviewed the fee application … and I've reviewed the objection that was filed by Mr. Hartman"). CHG was fully aware of this. JA 779-80 (CHG's pleading acknowledging, indeed asserting bankruptcy court's independent duty to review fee applications)

In this case, the Bankruptcy Court reviewed all but approximately $63,000 of Shaw Pittman's fees for a first time in December 2003, when it entered its Order on December 16, 2003, finding that "Application is proper and sufficient and that Applicant's [Shaw Pittman's] fees and the costs incurred are reasonable and necessary and were incurred for the benefit of the Debtor [CHG] and its estate." **Addendum Item 1**. CHG (despite, among other things, Mr. Hartman's presence in the courtroom) never raised any objections to this. The Bankruptcy Court reviewed the remaining $63,000 in fees in connection with the April 20, 2004 hearing, ruling and judgment. There is absolutely nothing in the record to suggest that the Bankruptcy Court failed to fulfill its independent duty of review or that it somehow abused its discretion. CHG completely failed to challenge the lower court's exercise of its independent duty to review, and therefore, the lower court's decision should be affirmed. See supra fn. 12.

2.    Separate and apart from the Bankruptcy Court's duty to independently review Shaw Pittman's fee application, the Bankruptcy Court had more than ample evidence before it to reach its rulings on the fee application. See e.g. JA 1907-08. The Bankruptcy Court observed first-hand the disputes that CHG, for two years, called upon Shaw Pittman to prosecute and defend. With respect

53

to all of the disputes, the court saw the pleadings filed by Shaw Pittman for CHG (both affirmative and responsive) and listened to the arguments made by Shaw Pittman in the courtroom (both affirmative and responsive). The Bankruptcy Court also understood that the net effect of CHG's reorganization was to put at least $10 million into the pockets of Peter Shin - - because he was able to get out from underneath an under-market contract to sell CHG's real estate. As such the court, better than anyone, was in a position to make the determinations that it did: that the chapter 11 case was filled with hard fought disputes between CHG and its creditors; that Shaw Pittman did the work for which it billed; and that CHG and its bankruptcy estate, by virtue of (among other things) its successful reorganization, benefited from Shaw Pittman's services. Simply put, CHG can point to nothing in the evidence that will leave this Court with the "definite and firm conviction that a mistake has been committed,"[28] let alone a mistake that would strike this Court "with the force of a five week old, unrefrigerated dead fish."[29]

The objections raised by CHG and stricken by the Bankruptcy Court should not cause the Court to reach a result other than affirmance. First, each of CHG's objections was duly addressed in the April 20, 2004 testimony and evidence (JA 990-1133), and therefore each was considered by the Bankruptcy Court before its ruling. JA 1907 (THE COURT: "I've read the proffer presented by [Shaw Pittman] and I'm satisfied that the fees in this case were reasonable."). Under the clearly erroneous standard, so long as the lower court's ruling is "plausible," then such ruling should not be disturbed on appeal, even if the reviewing court determines (on reviewing the record), that another equally plausible outcome exists.[30]

---

[28]     United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

[29]     Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988), *cited* by this Court in Johnson v. McDow, 236 B.R. 510, 518 (D. D.C. 1999).

[30]     See Anderson v. Bessemer City, 470 U.S. 564 at 573-574 (1985), *cited* by the Court in Johnson v. McDow, 236 B.R. 510, 518 (D. D.C. 1999).

54

Shaw Pittman submits, however, that even a cursory review of CHG's objections reveals that an alternative outcome was not realistic. See JA 990-1006. For example, where CHG objected that certain services rendered by Shaw Pittman were never authorized by Peter Shin, Shaw Pittman produced written instructions from Peter Shin requesting such services. JA 999-1000; JA 1058-1067. For example, where CHG complains about Shaw Pittman drafting but never sending a substantive letter to the Bankruptcy Court on a particular matter, Shaw Pittman cited the court docket (where it had actually been filed), as well as time records reflecting discussions with Peter Shin on the matter. JA 996-97; JA 1038-49. For example, where CHG complains of multiple Shaw Pittman lawyers appearing at hearings without Peter Shin's authority, Shaw Pittman cited to contrary correspondence, the value added by a second colleague, and Peter Shin's attendance at the same hearings (coupled with his failure to ever complain about multiple lawyers, whether it be Shaw Pittman or Dickstein Shaprio (whose fee application Peter Shin never objected to, even though they regularly appeared with multiple lawyers)). JA 997-998. While this Court, under the clearly erroneous standard, need rule out all possible outcomes other than that reached by Judge Teel, Shaw Pittman submits that the objections raised by CHG, addressed by Shaw Pittman and (in effect) ruled upon by the Bankruptcy Court, do not remotely suggest that an alternative outcome would have been the sustaining of any of CHG's objections.[31]

---

[31]    CHG completely fails to argue that the Bankruptcy Court made any clearly erroneous finding of fact, and therefore the lower court's ruling should stand. CHG received bills like clockwork, and could have raised objections on a monthly basis between February 2002 and January 2004. It did not. CHG could have objected to monthly statements filed with the Court. It did not. CHG could have objected to the fee application at or prior to the December 15, 2003 hearing. It did not. CHG could have filed a different objection than it did prior to the January 30, 2003 objection deadline. It did not. To the extent that the deadline was extended for a month, CHG could have filed a different objection prior to the end of February 2003. It did not. CHG could have filed a different objection at any time prior to entry of the April 9th Order. It did not. In fact, CHG could have tried to lodge a protective objection with the Bankruptcy Court prior to April 20, 2004. It did not. Moreover, CHG explained its objections to the U.S. Trustee, and the U.S. Trustee was unwilling to make such objections. Notwithstanding anything it tells this Court, CHG had more than ample opportunity to file timely (or even untimely) objections beyond that which it filed. CHG, not Shaw Pittman, should suffer the consequences of CHG's failure to do so.

**REGARDING ORAL ARGUMENT**

Shaw Pittman continues to submit that this is a frivolous appeal designed to do nothing more than delay payment of legitimate legal bills, never previously objected to by CHG, and subsequently approved by the Bankruptcy Court.  CHG's appellate brief - - which fails to cite the record, makes mostly new arguments on appeal, and fails to contain relevant or persuasive legal authorities - - only supports this contention.  Shaw Pittman does not believe that oral argument is necessary unless it will assist with the prompt disposition of this appeal.

**CONCLUSION**

For all the reasons discussed above, this Court should affirm the Bankruptcy Court in all respects.

Dated:  June 10, 2004                              Respectfully submitted,

                                                  SHAW PITTMAN LLP

                                                  /s/ Patrick Potter
                                                  Thomas J. Catliota
                                                  Patrick J. Potter
                                                  Luis C. Marini
                                                  Shaw Pittman LLP
                                                  2300 N Street, N.W.
                                                  Washington, D.C. 20037-1128
                                                  (202) 663-8000

56

EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - -x
In the Matter of:              :
                               :
CAPITOL HILL GROUP,            :  Case No. 02-00359
                               :
     Debtor                    :
          Chapter 11           :
                               :  Washington, D.C.
- - - - - - - - - - - - - -x      October 21, 2004
```

TRANSCRIPT OF HEARING ON MOTION
FOR ATTORNEY'S FEES AND COSTS
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:              PATRICK J. POTTER, ESQ.
                             THOMAS R. CATLIOTA, ESQ.

For Capitol Hill Group:      DONALD R. HARTMAN, ESQ.

Proceedings recorded by the Court, transcript produced
By Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307,
Washington, D.C. 20005, 202-347-5395, www.pro-typists.com
B8754/bf

1  Donahue fees, which I think are completely irrelevant, but

2  I would like to reserve that until Capitol Hill Group takes

3  its position on that.

4          THE COURT:  Who wants to argue on behalf of

5  Capitol Hill Group?

6          MR. HARTMAN:  Thank you, Your Honor.  Donald

7  Hartman for Capitol Hill Group.

8          I'd like to take a brief moment of the Court's

9  time to present an overview of Capitol Hill's view of this

10  matter.  We basically, Capitol Hill Group throughout this

11  case has been painted by Shaw, Pittman as the devil

12  incarnate.  And I guess that makes me the devil's

13  handmaiden.  Neither of us has escaped attack, continuous,

14  unrelenting, by Shaw, Pittman.  With the sense that

15  everything Capitol Hill Group does has been dilatory, in

16  bad faith.

17          They didn't use the word "lying," but basically

18  that's what they've implied.  That we manufactured facts,

19  we deleted e-mails, any number of scurrilous

20  representations that, to be honest with you, I think I've

21  had about enough of hearing from them, and I think it's

22  time to speak out as to what motivated Capitol Hill Group,

23  where Capitol Hill Group was coming from.

24          My professional experience is I was 12 years, I

25  was general counsel for a major health care entity in this

1   town, so I'm very familiar with bills from outside counsel.

2   Following that, I spent ten years in private practice, most

3   of which was as a partner at two major law firms similar to

4   Shaw, Pittman, so I'm familiar with the other side of the

5   billing issues, as well.

6        I was hired by MedLink Hospital and Nursing

7   Center in October of 2003, to provide health care-related

8   and business-related representation of them as they emerged

9   from bankruptcy.  I was not to have any role in the Shaw,

10  Pittman and Capitol Hill Group situation.

11       In the ensuing two months, first two months of

12  my representation of the hospital and nursing home, several

13  things were brought to my attention regarding Shaw,

14  Pittman's representation of Capitol Hill Group.  Basically,

15  questions were asked of me regarding billing practices and

16  other practices of Shaw, Pittman.

17       MR. CATLIOTA:  Judge, I always am hesitant to

18  interrupt a closing, but I believe Mr. Hartman has spent

19  the last five minutes testifying.

20       THE COURT:  Sustained.  I think you're trying to

21  put into the record facts that are not in evidence.  You'll

22  have to restrict yourself to the record, please.

23       MR. HARTMAN:  Okay.  Well, the record is that

24  Shaw, Pittman has represented to this Court on a number of

25  occasions that Capitol Hill Group took these actions for a

1    number of negative and nefarious reasons. Capitol Hill

2    Group took these actions because of perceived breaches of

3    the fiduciary duty of Shaw, Pittman in its billing and in

4    its representation of Capitol Hill Group. It was solely --

5              MR. CATLIOTA: Is he referring now to the billing

6    practices of Shaw, Pittman during the course of the

7    bankruptcy case? And he's still testifying. He's now

8    saying that -- as I understand what he's saying now, Shaw,

9    Pittman, during the bankruptcy case, he didn't -- he

10   objected to their fees.

11             THE COURT: The objection is sustained.

12             MR. HARTMAN: Your Honor, if I may. The whole

13   business of CHG's objections to the fees and the ensuing

14   contract or acceptance by silence has been the subject of

15   considerable discussion by Shaw, Pittman today, and I don't

16   understand why I can't at least explain to this Court the

17   basis, in a very brief and summary fashion, why the

18   characterizations made of Capitol Hill Group, the

19   representations made of all their aspersions that were

20   cast, and for example they brought up the business about

21   deleting e-mails.

22             THE COURT: You can argue whatever is supported

23   by the record, Mr. Hartman, but you can't start putting

24   into evidence facts that are not in the record.

25             MR. HARTMAN: Well, I think that the record is

1  replete with my discussions of Shaw, Pittman's billing

2  practices back in the past, as to at least in a summary

3  fashion as to why we objected and in fact the objection to

4  their fees is part of the record in this case.  I'm merely

5  trying to summarize -- can I refer back to our objection

6  then?  How about if I get into -- why don't I try that and

7  see if that'll pass Mr. Catliota's test.

8           Capitol Hill Group objected to the fees of Shaw,

9  Pittman because of **perceived indiscretions by Shaw,**

10 **Pittman.  That in fact --**

11          MR. CATLIOTA:  Your Honor, if I may.  I think

12 he's talking about the objection filed on January 30th, to

13 Shaw, Pittman's fees during the bankruptcy case, which has

14 now been totally resolved by not only this Court but Judge

15 Lamberth on appeal, in a decision that hasn't been

16 appealed.  So to the extent he's going to go back and

17 either argue or --

18          THE COURT:  I'll sustain the objection.

19          MR. HARTMAN:  I do not intend to argue that.

20 I do not intend to go back and say that those fees should

21 not have been awarded.

22          THE COURT:  Capitol Hill Group thought it had

23 good grounds to object to the fees if it were allowed to

24 object.  So be it.  What else do you have?

25          MR. HARTMAN:  Okay.  The hearing -- after we

1  replete with my discussions of Shaw, Pittman's billing

2  practices back in the past, as to at least in a summary

3  fashion as to why we objected and in fact the objection to

4  their fees is part of the record in this case.  I'm merely

5  trying to summarize -- can I refer back to our objection

6  then?  How about if I get into -- why don't I try that and

7  see if that'll pass Mr. Catliota's test.

8          Capitol Hill Group objected to the fees of Shaw,

9  Pittman because of perceived indiscretions by Shaw,

10  Pittman.  That in fact --

11          MR. CATLIOTA:  Your Honor, if I may.  I think

12  he's talking about the objection filed on January 30th, to

13  Shaw, Pittman's fees during the bankruptcy case, which has

14  now been totally resolved by not only this Court but Judge

15  Lamberth on appeal, in a decision that hasn't been

16  appealed.  So to the extent he's going to go back and

17  either argue or --

18          THE COURT:  I'll sustain the objection.

19          MR. HARTMAN:  I do not intend to argue that.

20  I do not intend to go back and say that those fees should

21  not have been awarded.

22          THE COURT:  Capitol Hill Group thought it had

23  good grounds to object to the fees if it were allowed to

24  object.  So be it.  What else do you have?

25          MR. HARTMAN:  Okay.  The hearing -- after we

EXHIBIT C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In Re:<br><br>**CAPITOL HILL GROUP,**<br><br>Debtor. | **Bankruptcy Case No. 02-0359**<br>**Chapter 11** |
| **CAPITOL HILL GROUP,**<br><br>Appellant,<br><br>vs.<br><br>**SHAW PITTMAN LLP**<br><br>Appellee. | **Civil Action No. 04-0750**<br>**04-0751**<br><br>**J. Lamberth** |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF APPELLANT CAPITOL HILL GROUP'S OPPOSITION TO MOTION OF SHAW PITTMAN LLP FOR SUMMARY AFFIRMANCE[1]

Donald R. Hartman
Bar No. 0291625
700 Constitution Avenue, N.E.
Washington, D.C. 20002
(202) 546-5700

---

[1] Appellant Capitol Hill Group filed its original Opposition with the Court on May 28, 2004 with leave to file a supplemental memorandum to the Opposition proximate to the time that CHG's appellate brief was due. This Supplemental Memorandum is CHG's appellate brief.

which was to not raise this with the Court and *to not raise this with Fremont and let the closing go forward"* (emphasis added). (See Transcript of February 2, 2004 Hearing, Page 15, lines 10-13). CHG had merely asked Shaw Pittman to prepare an opinion of counsel regarding the Fremont loan. This opinion was to be no different than any other ordinary loan opinion. Essentially, such opinions usually state that all necessary corporate actions/approvals had been obtained in accordance with the corporations bylaws as well as applicable law, that all documents incidental to the loan had been duly executed by CHG and were binding upon CHG, and that counsel is not aware of any actions, suits, investigations, etc., that would affect the validity or enforceability of the loan documents. Mr. Potter did not have the consent of CHG to contact Fremont in any other regard, yet Mr. Potter further stated in open court, that if he had been informed that CHG had not agreed to the Shaw Pittman Counter-Offer, that

> I would have immediately picked up the phone and called Fremont and said, "Okay, I've done all I need to do from the transactional side and, you know, hopefully my obligations in this transaction. I've delivered my legal opinion. I've got the additional time to try to do the closing. But I'm telling you right now that if it matters to you" and I've been told repeatedly by the broker that it does, "that a deal has been struck with me, *you need to know that a deal has not been struck with me* (emphasis added). "

> And I probably would have come back before Your Honor on some sort of expedited basis *to prevent the closing from going forward* (emphasis added) . . . . (See Transcript of February 2, 2004 Hearing, page 17, lines 10-22).

As this Court can see, in the first paragraph, above, Mr. Potter informed the Bankruptcy Court that he would have contacted a third party, Fremont, despite not having and without requesting the consent of his client, CHG, and would have informed Fremont of certain confidential client information to the detriment of CHG. In the very next

—14—

paragraph, it is interesting to note that Mr. Potter does not state that, in addition, he merely would have attempted to inform the Bankruptcy Court that Shaw Pittman's right to be paid in full upon confirmation of CHG's plan had been compromised, but that it was his stated intent to prevent the Fremont closing from occurring.

CHG submits that these examples amply demonstrate behavior that was obviously intended to secure an economic advantage for Shaw Pittman to the detriment of its client, CHG, and cannot possibly yield a reasonable interpretation that these negotiations occurred at arms-length between parties of equal bargaining strength. It is inescapable that Shaw Pittman was solely concerned with enhancing its own economic interests and was completely unconcerned regarding whether such attempts to enhance its self-interests disadvantaged CHG in any manner.

These actions represent obvious breaches of the fiduciary duty that Shaw Pittman owed to its client, CHG. As the courts held in First Am. Corp. v. Al-Nahyan, 17 F. Supp. 2d 10, 27 (D.D.C. 1998) and BCCI Holdings v. Clifford, 964 F. Supp. 468, 491 (D.D.C. 1997), "Like other agents, lawyers owe their clients a duty of loyalty and a duty of care." "Whether an attorney breached his fiduciary duty depends on whether he 'put himself or herself in a position by which he or she cannot give full loyalty to which the client is entitled'." Am. Corp. Id at 17 citing Avianca, Inc. v. Corries, 705 F. Supp. at 460. Mr. Potter put himself in a position whereby the interests of Shaw Pittman were placed ahead of those of his client, CHG. Therefore, by so doing, Mr. Potter breached his fiduciary duty to CHG. "To recover on a claim for breach of fiduciary duty, the plaintiff must prove by a preponderance of evidence that a fiduciary duty existed between the parties, that the defendant violated that fiduciary obligation, and that the

plaintiff suffered damages as a proximate result of the violation. <u>Landise</u>, 725 A. 2d at 450; 3 Fed. Jury Prac. & Instr. Section 123.02 (5th ed.). All of these criteria are readily satisfied in the instant situation. It cannot be disputed that a fiduciary relationship existed between Shaw Pittman and CHG as attorney and client. It also cannot be disputed that Shaw Pittman placed its interests ahead of CHG by demanding a no-contest provision or that Shaw Pittman coerced CHG when it repeatedly threatened to injure CHG by divulging confidential client information to Fremont. These actions violate the fiduciary obligation that Shaw Pittman owed its client, CHG. And, if this Court ultimately agrees with the Bankruptcy Court and finds that CHG agreed to waive its statutory right to object to Shaw Pittman's fees, CHG will have suffered damages as a proximate result of the violation of Shaw Pittman's fiduciary duty to CHG.

It is well-established in the District of Columbia that evidence of a violation of one of the Rules by an attorney is sufficient to support a claim for breach of fiduciary duty. In <u>Avianca</u>, <u>Id</u>, a client sued its attorney for breach of fiduciary duty and sought disgorgement of attorneys' fees previously paid by the client. That Court held,

> The Disciplinary Rules of the American Bar Association's Code of Professional Responsibility, which have been adopted by both the District of Columbia Court of Appeals and the United States District Court for the District of Columbia, D.C.Ct. App. Bar Rules X; U.S. Dist.Ct. D.C.R. 4-3 (IV), while not strictly providing a basis for a civil action, nonetheless may be considered to define the minimum level of professional conduct required of an attorney, such that a violation of one of the DRs is conclusive evidence of a breach of the attorney's common law fiduciary obligations.

On January 1, 1991, The District of Columbia Court of Appeals adopted the Rules of Professional Conduct Applicable to Members of the District of Columbia Bar ("Rule" or "Rules"), which Rules superseded the ABA rules. Nonetheless, the principal enunciated in <u>Avianca</u>, that a breach of the Rules of Professional Responsibility

–16–

constitutes a breach of an attorney's fiduciary obligations, still prevails.  Furthermore, as

the U.S. Court of Appeals for the District of Columbia Circuit held in Hendry v. Pelland,

73 F. 3d 397, 315 U.S.App.D.C. 297 (D.C. 1996):

> As for the first issue, we agree with the Hendrys that their evidence that
> Pelland violated one of the rules of the District of Columbia Code of
> Professional Responsibility was sufficient to support their claim that he
> violated his common law fiduciary duty.  While not holding that the ethical
> rules are co-extensive with an attorney's fiduciary duties, the District of
> Columbia Court of Appeals in Griva v. Davidson, 637 A. 2d 830 (D.C. 1994),
> clearly ruled that "a violation of the Code of Professional Responsibility or
> of the Rules of Professional Conduct can constitute a breach of the attorney's
> common law fiduciary duty to the client." Id. At 846-47.  In particular, and
> significantly for this case, the court treated an alleged violation of Disciplinary
> Rule 5-105 - - prohibiting a lawyer from representing multiple clients "if the
> exercise of his independent professional judgment . . . would be likely to
> involve him in representing differing interests" unless "it is obvious that he
> can adequately represent the interest of each [client] and . . . each consents
> to the representation after full disclosure," D.C. CODE OF PROFESSIONAL
> RESPONSIBLITY DR 5-1-5(B) to (C) - - as equivalent to a breach of the
> attorney's fiduciary duty. . . .  As Pelland recognizes, a basic fiduciary
> obligation of an attorney is the duty of "undivided loyalty," which is
> breached when an attorney represents clients with conflicting interests.

The Rules that are at issue in this matter are Rule 1.3 – "Diligence and Zeal,"

Rule 1.6 – "Confidentiality of Information," and Rule 1.7 – "Conflict of Interest."  CHG

submits that Shaw Pittman's conduct in this matter constitutes a violation of each of these

Rules.

Rule 1.7, "Conflict of Interest," states, in pertinent part:

> (b)  Except as permitted by paragraph (c) below, a lawyer shall not represent a
> client with respect to a matter if:
>         (4) The lawyer's professional judgment on behalf of the client will
> be or reasonably may be adversely affected by the lawyer's responsibilities
> to or interests in a third party or the *lawyer's own financial, business, property
> or personal interests* (emphasis added).
> (c)  A lawyer may represent a client with respect to a matter in the
> circumstances described in paragraph (b) above if each potentially affected
> client provides consent to such representation after full disclosure of the

existence and nature of the possible conflict and the possible adverse consequences of such representation.

It is patently obvious that, once Shaw Pittman and CHG commenced negotiations regarding the amount of attorneys' fees that CHG would pay to Shaw Pittman from the Fremont loan proceeds, that Mr. Potter's loyalty was divided (at best) between Shaw Pittman and his client, CHG, if not downright absent with respect to CHG. Mr. Potter's, and thus Shaw Pittman's, own financial interests became paramount in the negotiations. CHG submits that this scenario presented Mr. Potter with a clear conflict of interest. At this point, the only manner by which Mr. Potter could conceivably continue to represent CHG was if the had, in accordance with Rule 1.7(c) set forth above, made full disclosure of this conflict to CHG, including the possible adverse consequences of such dual representation, and obtained CHG's consent to such representation. Mr. Potter never did any such thing. In Avianca, Id, the court cited Fielding v. Brebbia, 399 F. 2d 1003, 1005 (D.C.Cir. 1968), stating,

> ("Full disclosure" includes a clear explanation of the differing interests involved . . . and the advantage of seeking independent legal advice. I also requires a detailed explanation of the risks and disadvantages to the client . . . including any liabilities that will or may forseeably accrue to him."). Where an attorney takes a position that is actually or potentially adverse to his client, the burden is on the attorney to show that he made a full, affirmative disclosure and acted with the utmost good faith.

The Avianca court went on to say,

> (Because attorney-client relationship provides easy opportunity for attorney to take unfair advantage of client, attorney must prove good faith rather than client proving lack of good faith.), quoting, Goodrum v. Clement, 277 F. 586, 591 (D.C.Cir. 1922).

The Comment to Rule 1.7 (b) provides:

–18–

Paragraphs (b) and (c) are based upon two principles: (1) that a client is entitled to wholehearted and zealous representation of its interests, and (2) that the client as well as the lawyer must have the opportunity to judge and be satisfied that such representation can be provided.

Shaw Pittman cannot, with a straight face, maintain that it provided CHG with wholehearted and zealous representation in this regard, nor can Shaw Pittman maintain that the client, CHG, was afforded the opportunity to judge whether Shaw Pittman could provide such representation in light of all of the factors present at that time. Shaw Pittman's actions do not fall within the exceptions provided regarding full disclosure, thus Shaw Pittman's actions violated Rule 1.7.

Rule 1.3, "Diligence and Zeal," states, in pertinent part:

(a) A lawyer shall represent a client zealously and diligently within the bounds of the law.
(b) A lawyer shall not intentionally:
(1) Fail to seek the lawful objectives of a client through reasonably means permitted by law and the disciplinary rules; or
(2) Prejudice or damage a client during the course of the professional relationship.

The evidence is rife with examples of Shaw Pittman threatening to proactively inform Fremont regarding certain confidential client information in an attempt to coerce CHG into acquiescing to Shaw Pittman's demands regarding payment of its fees. These threats clearly were intended to prejudice or damage CHG during the course of Shaw Pittman's representation of CHG, all to gain an economic advantage for Shaw Pittman. Shaw Pittman might have at least a semblance of a defense against these allegations if Shaw Pittman had been queried by Fremont regarding these matters. But even then, the Rules apparently require Shaw Pittman to seek the consent of CHG before communicating any client information to a third party. But, this is not the case here. Shaw Pittman, on its

own and not in response to Fremont, repeatedly threatened to scuttle the loan negotiations

between CHG and Fremont solely for the pecuniary gain of Shaw Pittman.    Shaw

Pittman's actions violated Rule 1.3.

Rule 1.6, "Confidentiality of Information," states, in pertinent part:

(a) Except when permitted under paragraph (c) or (d), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of the lawyer's client;

(2) Use a confidence or secret of the lawyer's client to the disadvantage of the client;

(3) Use a confidence or secret of the lawyer's client for the advantage of the lawyer or a third person.

(c) A lawyer may reveal client confidences and secrets to the extent reasonably necessary:

(1) To prevent a criminal act that the lawyer reasonably believes is likely to result in death or substantial bodily harm absent disclosure of the client's secrets or confidences by the lawyer; or

(2) To prevent the bribery or intimidation of witnesses, jurors, court officials, or other persons who are involved in proceedings before a tribunal if the lawyer reasonably believes that such acts are likely to result absent disclosure of the client's confidences or secrets by the lawyer.

(d) A lawyer may use or reveal client confidences or secrets:

(1) With the consent of the client affected, but only after full disclosure of the client;

(2) (A) When permitted by these rules or required by law or court order; and

(B) If a government lawyer, when permitted or authorized by law;

(3) To the extent reasonably necessary to establish a defense to a criminal charge, disciplinary charge, or civil claim, formally instituted against the lawyer, based upon conduct in which the client was involved, or to the extent reasonably necessary to respond to specific allegations by the client concerning the lawyer's representation of the client;

(4) When the lawyer has reasonable grounds for believing that a client has impliedly authorized disclosure of a confidence or secret in order to carry out the representation; or

(5) To the minimum extent necessary in an action instituted by the lawyer to establish or collect the lawyer's fees.

It cannot be disputed that Shaw Pittman repeatedly threatened to inform Fremont of

certain confidential client information unless CHG acquiesced to Shaw Pittman's fee

demands.  These actions clearly violate Rules 1.6 (a) (1), (2) and (3).  These actions were

deliberate and knowing, they were intended to disadvantage the client, CHG, and they were intended to provide an advantage to Shaw Pittman. Furthermore, these actions were not permitted exceptions to Rule 1.6 (a) as provided in Rule 1.6 (c) or (d). No criminal act was involved, nor was there a reasonable belief possible that death or substantial bodily harm might result absent disclosure. There were no threats of bribery or intimidation present. Shaw Pittman threatened to divulge confidential client information to Fremont but did not seek, nor did Shaw Pittman receive, CHG's consent to do so. These actions were not permitted by the Rules; there was no court order in effect in this regard. No actions had been commenced against Mr. Potter or Shaw Pittman, nor were the threats in response to an action regarding the collection of Shaw Pittman's fees. Finally, Shaw Pittman had no grounds, reasonable or otherwise, to believe that CHG impliedly authorized the threatened disclosures to Fremont. Shaw Pittman's actions violated Rule 1.6.

CHG submits that there is conclusive evidence that Shaw Pittman's actions violated several Rules and on numerous occasions. Therefore, Shaw Pittman breached its fiduciary duty to CHG. Thus, even if this Court agrees with the Bankruptcy Court, and finds that, after viewing the evidence in the light most favorable to CHG, and drawing all inferences in favor of CHG, there indeed was an acceptance by silence of the Shaw Pittman terms by CHG, this Court should still reverse the Bankruptcy Court by finding that, under equitable principles, Shaw Pittman should not be permitted to reap the fruits of their ill-gained bounty by virtue of their breach of numerous Rules and thus a breach of their fiduciary duty to CHG.

thinking that CHG might ultimately, at some unspecified future time, accept Shaw Pittman's offer(s).

In fact, Mr. Potter testified to that effect at his deposition regarding certain notes he had prepared, stating:

> These were just notes that I jotted down to prompt my discussion with the [Shaw Pittman] management team during the [December 10, 2003] meeting. I assume that they actually know nothing or virtually nothing about the matter other than the firm was owed money, and as you can see from the first point, they might not even know how much, and so I put out point No. 1, "Capitol Hill Group owes the firm approximately 1.2 million dollars." Actually it says, "Owes 1.2 million dollars", it doesn't say Capitol Hill Group. 2. "Wants to pay $500,000", referring to the spread sheet that had been given to me on December 8th at the meeting with Peter Shin. 3. "Has resources to pay more", meaning more than the $500,000. Then I have a "/recognize risk" and I believe what I meant by that was I recognize the risk that if we insist on more we may not get anything paid to us this year if the net result is the debtor is unable to emerge prior to the end of the year. The 4th item is that is says "Leverage highest now", meaning we have a statutory right to be paid in accordance with the bankruptcy code, which means all paid at the conclusion of the case. 5. "Timing – close by 12-15". And under that there is a long line which is, I was thinking to myself, the management team is going to know why I'm here and my bottom line message to the management team is I wanted to reach a consensus with them on negotiations in order to set some base number for discussion, and it says here "Set number high, i.e., 850K and not move off it".

CHG submits that this testimony amply supports a reasonable inference that Shaw Pittman, as early as December 10, 2003, was prepared to accept $850,000 from CHG at confirmation and without any mention whatsoever regarding a no-contest agreement from CHG.


## CONCLUSION

Shaw Pittman breached its fiduciary duty as attorneys to its client, CHG. Shaw Pittman should not be permitted to benefit from such a breach. Viewing the evidence in

the Bankruptcy Case in the light most favorable to CHG and drawing all inferences in

CHG's favor, this Court must conclude that there are material facts in dispute.


**WHEREFORE**, CHG respectfully requests the entry of an order:

a. reversing the Bankruptcy Court's Orders dated March 2, 2004, April 9, 2004,

and April 20, 2004; and

b. granting it such other and further relief to which it is entitled.


Date: June 9, 2004

Respectfully submitted,


/s/
_____

Donald R. Hartman
Bar No. 216925
700 Constitution Avenue, N.E.
Washington, D.C.  20002
(202) 546-5700

Attorney for Capitol Hill Group.